Laura Juran (Cal. Bar No. 199978)
Brian Schmidt (Cal. Bar No. 265937)
California Teachers Association
1705 Murchison Drive
Burlingame, CA 94010
LJuran@cta.org
BSchmidt@cta.org
(650) 697-1400
Attorneys for Plaintiff California Teachers Association

Eric Harrington (Cal. Bar No. 257178)
National Education Association
1201 16th Street NW
Washington, D.C. 20036
eharrington@nea.org
(202) 822-7035
Attorney for Plaintiff National Education Association

Daniel A. Zibel (*pro hac vice forthcoming*)
Martha U. Fulford (*pro hac vice forthcoming*)
National Student Legal Defense Network
1015 15th Street N.W., Suite 600
Washington, D.C. 20005
dan@nsldn.org
martha@nsldn.org
(202) 734-7495
Attorneys for Plaintiffs National Education
Association, California Teachers Association,
Shane Heiman, Kwynn Uyehara, and Stephanie Portilla

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION, | Case No.: _____ |
| CALIFORNIA TEACHERS ASSOCIATION, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| SHANE HEIMAN, | [Administrative Procedure Act Case] |
| KWYNN UYEHARA, and | |
| STEPHANIE PORTILLA, | |
| Plaintiffs, | |

vs.

BETSY DEVOS, *in her official capacity as Secretary of Education*, and

UNITED STATES DEPARTMENT OF EDUCATION,

Defendants.

## **INTRODUCTION**

1.      Plaintiffs National Education Association ("NEA"), California Teachers Association ("CTA"), Shane Heiman, Kwynn Uyehara, and Stephanie Portilla bring this action and assert violations of the Administrative Procedure Act ("APA") and the Higher Education Act of 1965, as amended ("HEA") by defendants Betsy DeVos, Secretary of the United States Department of Education, and the United States Department of Education (collectively "ED" or "Department") for ED's unlawful delay of the effective date of the State Authorization Rule, 81 Fed. Reg. 92,232 (Dec. 19, 2016) ("Final Rule").

2.      The Final Rule established important protections for students enrolled in, or considering enrolling in, online, distance education, and correspondence courses at the postsecondary level.  Those protections include requirements that post-secondary institutions make common sense disclosures to help prospective and enrolled students evaluate both the online program and the institution that offers it, preventing students from wasting time and money on programs that will not help them further their careers.  The Final Rule required institutions of higher education to provide students and prospective students with both public disclosures and individualized disclosures regarding, among other items, whether the program meets state licensure requirements and whether the school was subject to adverse action by the state or accreditor for online programs.  The disclosures would help a student evaluate whether a particular online or distance education program meets or continues to meet her particular needs.

3.      ED published the Final Rule on December 19, 2016 after a multi-year rulemaking process.  At that time, ED highlighted the importance of closing gaps in oversight to ensure

student protections over online and distance education, noting that its Office of the Inspector General and the Government Accountability Office had voiced concerns over fraudulent practices in this arena, and that "multiple" state Attorneys General had "filed lawsuits against online education providers due to misleading business practices."

4.      In light of those concerns and others, ED issued the Final Rule and, consistent with HEA § 482(c)(1), 20 U.S.C. 1089(c)(1) (the "Master Calendar" provision), announced it would take effect on July 1, 2018.

5.      Approximately one month after the Final Rule was published, on January 30, 2017, the Department announced that it "intends to take [action]" regarding the Final Rule.  The Department subsequently established a Regulatory Reform Task Force and conducted an extensive review and analysis of the Department's regulations, including regulations issued under Title IV of the Higher Education Act.  As part of this review and otherwise, the Department was repeatedly made aware of questions by regulated entities regarding the implementation of the Final Rule.

6.      On July 3, 2018, more than 18 months after the Final Rule was published and two days *after* the Final Rule took effect, ED rescinded the Final Rule by publishing a new rule to purportedly "delay" the transpired effective date of the Final Rule for two years, until July 1, 2020.  *See* 83 Fed. Reg. 31,296 (July 3, 2018) (hereinafter the "Delay/Rescission Rule").

7.      In developing and issuing the Delay/Rescission Rule, the Department did not use negotiated rulemaking, opting instead to waive that statutory requirement.  The HEA allows ED to waive negotiated rulemaking only if using it is "impracticable, unnecessary, or contrary to the public interest," within the meaning of the "good cause" exception under the APA.  20 U.S.C. § 1098a; 5 U.S.C. § 553(b)(2)(B).

8.      As alleged below, ED's purported good cause for waiving negotiated rulemaking does not comply with the statutory requirement.  In issuing the Delay/Rescission Rule, ED asserted that "good cause" exists because (1) in February 2018, the Department received two letters raising questions and concerns about the Final Rule and which ED claims are "catalysts" for the Delay/Rescission Rule; and (2) "further consultation in the form of negotiated rulemaking

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          - 3 -

was the appropriate vehicle by which to clarify" the Final Rule, but that "[t]he Department could not have completed the negotiated rulemaking process between February 6, 2018 … and the July 1, 2018 effective date" of the Final Rule.

9.     These justifications are insufficient.  ED's assertion that the February 2018 letters served as a "catalyst" for the Delay/Rescission Rule is inconsistent with its January 2017 statement of intent and its subsequent efforts to review regulations for reform, during which the Department was made aware of the specific concerns expressed in the February 2018 letters months before those letters were sent.  The Department was also aware of the concerns expressed in February 2018 prior to the issuance of the Final Rule.  Had ED wanted to clarify any issues with the Final Rule, it had ample time between January 2017 and July 2018 to do so.

10.     By waiving the statutory negotiated rulemaking requirement without good cause, ED has violated the HEA and has acted in a manner that was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 and 28 U.S.C. § 1331.

12.     Venue is proper in this district because defendants are an officer or employee of the United States acting in her official capacity and an agency of the United States, at least one plaintiff resides in this judicial district, and no real property is involved in this action.  28 U.S.C. § 1391(e).

13.     INTRADISTRICT ASSIGNMENT: Pursuant to Civil Local Rule 3-2(c), this action is properly assigned to either the San Francisco, Oakland, or San Jose Division of this district because: 1) Plaintiff CTA is located in San Mateo County; 2) Plaintiff Kwynn Uyehara resides in Alameda County; and 2) Plaintiff Stephanie Portilla resides in Monterey County.

## PARTIES

14.     NEA is the nation's largest professional employee organization and is committed to advancing the cause of public education.  NEA's three million members work at every level of

education—from pre-school to university graduate programs. NEA has affiliate organizations in every state and in more than 14,000 communities across the United States.

15.    NEA is committed to ensuring a quality education for every student and stands as an organization committed to social justice, willing to speak up to protect the rights of students and taxpayers.  NEA advocates for the highest quality professional development and educational opportunities for all of its members, including those who enroll in online and distance education programs, as well as those who teach such programs.  NEA offers direct help to future and current educators who need student loan assistance.  NEA also advocates on behalf of its members on college affordability, including through its Degrees Not Debt Campaign.

16.    NEA is committed to quality professional development for its members, including by promoting and assisting members with policies surrounding higher education.  NEA has resolved that "[f]ederally financed loan and grant programs should be established to encourage students to become professional educators."  NEA's statements regarding federal financing of loan and grant programs have focused on higher education as a career stepping stone, having resolved that student loan forgiveness programs should be tied to length of professional service. NEA also supports proposals that provide "development and retention, through programs including scholarships and loan forgiveness, of current and future teachers for the pursuit of excellence in our nation's schools and post-secondary institutions."  NEA also supports "establishment and funding of professional development opportunities designed and directed by teachers and education support professionals."  NEA also supports "loan forgiveness for students who become educational employees in public education institutions."  NEA also supports "abolishing all student loan predatory lending practices; terms on federal and private student loans that support the educational and professional goals of lower and middle-class borrowers, while protecting them from predatory lending practices, through strong federal regulation of loan products, fair consumer protections, reasonable terms and interest rates, and accommodating repayment options."

17.    CTA is California's largest professional employee organization, with over 300,000 members.  It is also NEA's largest affiliate.

18.     CTA advocates on behalf of its members for quality educational training and for professional development, including those who enroll in online, distance, and correspondence courses.  CTA assists its members in beginning teacher support programs and teacher credential programs.   CTA advocates on behalf of its members on college affordability, including through its Degrees Not Debt Campaign, together with NEA.

19.     The NEA and CTA bring this suit on behalf of their members.  Members of the NEA and CTA are enrolled in and will enroll shortly in distance or correspondence programs covered by the Final Rule.  NEA and CTA members are injured by the Delay/Rescission Rule because they are actively considering whether to enroll in or continue enrollment in certain programs of higher education that would be required, under the Final Rule, to make certain disclosures.  Because of the Delay/Rescission Rule, NEA and CTA members may not receive disclosures of adverse actions taken against a particular institution or program.  NEA and CTA members may not receive other information about institutions being considered for enrollment, such as information about refund policies or whether a program meets state licensure requirements.  The disclosure of this information, required by the Final Rule, would help the NEA and CTA members identify programs that offer credentials that potential employers recognize and value.  Delaying the requirement to provide these disclosures will require the NEA and CTA members to obtain this information from another source, if available at all, or may lead NEA and CTA members to choose sub-optimal programs for their preferred courses of study. Because of the cost of these programs, and the debt that will be incurred by NEA and CTA members to pay for such programs, NEA and CTA members are harmed by the Delay/Rescission Rule.  NEA and CTA members are also harmed by the Delay/Rescission Rule because the delay of the disclosures related to the complaint resolution process will make it harder for students to access available consumer protections.

20.     Plaintiff Shane Heiman is a second-grade teacher in Lawrence, Kansas.  He is a member of the NEA.  He is currently enrolled in an online master's in science degree as an instructional specialist in elementary STEM (Science, Technology, Engineering, and Math) at Emporia State University ("Emporia").  Mr. Heiman is not currently aware of certain

information that is required to be disclosed under the Final Rule, including whether Emporia has faced adverse actions related to online courses from a state or accrediting agency for engaging in misconduct. If Emporia made the disclosures required by the Final Rule, Mr. Heiman would carefully review such disclosures and, depending on the information provided, the disclosures could affect his decisions whether to continue his degree at Emporia, whether to transfer to a different institution or program, and whether to take out additional loans to finance his education.

21.  Plaintiff Kwynn Uyehara is a fourth-grade teacher in Fremont, California. She is a member of the NEA and CTA. She is planning to apply for a Doctor of Education in Educational Leadership at University of New England and plans to apply by the December 2018 deadline. Ms. Uyehara is not currently aware of certain information that is required to be disclosed under the Final Rule, including whether University of New England has faced adverse actions related to online courses from a state or accrediting agency for engaging in misconduct. If University of New England, either publicly or in an individualized disclosure, disclosed the existence of any adverse actions against it by a state or accrediting agency for engaging in misconduct relating to University of New England online programs, Ms. Uyehara would carefully review such a disclosure. Depending on the information provided, her review of such a disclosure could affect her decision whether to enroll at University of New England, or whether to enroll at a different school instead.

22.  Plaintiff Stephanie Portilla is currently enrolled full-time in an online program at Western Governors University ("WGU") in order to obtain her bachelor's degree in elementary education. She is currently enrolled in her first semester. She is a dues-paying aspiring-educator member of CTA and NEA. When Ms. Portilla first enrolled in the online program, she researched and confirmed through the State of California's teacher certification website whether her program would meet the California state standards for teacher certification. If her program ceased to meet the standards, she is not aware whether WGU would notify her. If WGU did provide her with an individualized disclosure that informed her that it had made a determination that her program no longer meets California's certification requirements, Ms. Portilla would review this disclosure and the information, and, depending on the information, the disclosure

could affect her decision whether to continue her program at WGU, including whether to use her grant funding, whether to stop attending the program, or whether to consider transferring elsewhere.  Ms. Portilla is also not currently aware whether her school has faced adverse actions related to online courses from a state or accrediting agency for engaging in misconduct.  If WGU, either publicly or through an individualized disclosure, disclosed the existence of any adverse actions against it by a state or accrediting agency for engaging in misconduct relating to WGU's online programs, Ms. Portilla would carefully review such a disclosure.  Depending on the information provided, her review of such a disclosure could affect her decision to continue her degree at WGU, including whether to use her grant funding, whether to stop attending the program, or whether to consider transferring elsewhere.

23.     The legal violations alleged in this Complaint have injured and continue to injure Plaintiffs NEA, CTA, and their members, including individual plaintiffs Shane Heiman, Kwynn Uyehara, and Stephanie Portilla, due to the illegal delay of the Final Rule.  Granting the relief requested in this lawsuit would redress these injuries.

24.     Defendant Betsy DeVos is the Secretary of the United States Department of Education and is being sued in her official capacity.  Her official address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.

25.     Defendant United States Department of Education is an executive agency of the United States government and an agency of the United States within the meaning of the APA. The Department's principal address is 400 Maryland Avenue, S.W., Washington, D.C. 20202.

## STATEMENT OF FACTS

### History of State Authorization Requirement

26.     In order to participate in the programs authorized by Title IV of the Higher Education Act (*e.g.*, Pell Grants and federally issued or guaranteed student loans) ("Title IV Programs"), an institution of higher education must be legally authorized by the State in which it operates to provide a program of education beyond secondary education.

27.     State authorization is part of the "program integrity 'triad' under which States, accrediting agencies, and the Department act jointly as gatekeepers for the Federal student aid

programs.  This triad has been in existence since the inception of the HEA; and as an important component of the triad, the HEA requires institutions of higher education to obtain approval from the States in which they provide postsecondary educational programs."  81 Fed. Reg. 48,598 (July 25, 2016).

28.     Section 101(a)(2) of the HEA, 20 U.S.C. § 1001(a)(2) defines the term "institution of higher education" to mean, in part, an educational institution in any State that is legally authorized within the State to provide a program of education beyond secondary education.  Section 102(b) and (c) of the HEA provide, by reference to section 101(a)(2), that a proprietary institution of higher education and a postsecondary vocational institution must be similarly "authorized within a State."  HEA §§ 102(b)(1)(B), 102(c)(1)(B); 20 U.S.C. §§ 1002(b)(1)(B), 1002(c)(1)(B).

29.     In 2010, the Department established regulations to clarify the minimum standards of state authorization that an institution of higher education must demonstrate in order to establish eligibility to participate in the Title IV Programs.  Although the 2010 regulations made clear that all Title IV eligible institutions must have state authorization in the states in which they are physically located, the U.S. Court of Appeals for the District of Columbia set aside the Department's regulations regarding authorization of distance education programs or correspondence courses because the 2010 final rule was not a logical outgrowth of the proposed rule.  *Ass'n of Private Sector Colleges and Universities*, 681 F.3d 427 (D.C. Cir. 2012). The 2010 regulations did not address additional locations or branch campuses located in foreign locations.

### Procedural Requirements for Rules Issued Under Title IV of the HEA

30.     Section 492(a) of the HEA, 20 U.S.C. § 1098a(a), requires the Secretary to "obtain public involvement" in the development of proposed regulations pertaining to Title IV of the HEA. Section 492(b)(2) of the HEA, 20 U.S.C. § 1098a(b)(2), requires that, "[a]ll regulations pertaining to [Title IV] … shall be subject to a negotiated rulemaking (including the selection of the issues to be negotiated), unless the Secretary determines that applying such a requirement

with respect to given regulations is impracticable, unnecessary, or contrary to the public interest (within the meaning of section 553(b)(3)(B) of title 5, U.S. Code)."

31.    Title 5 of the U.S. Code, section 553(b)(3)(b) exempts from the requirement that an agency publish in the Federal Register a "notice of proposed rulemaking" instances in which an agency "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that the notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."

32.    Pursuant to HEA § 492(b)(2), which incorporates § 492(b)(1), "[p]articipants in the negotiations process shall be chosen by the Secretary from individuals nominated by groups [involved in student financial assistance programs, such as students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies]."  Negotiators must have "demonstrated experience or expertise in the relevant subjects under negotiation, reflecting the diversity in the industry, representing both large and small participants, as well as individuals serving local areas and national markets."  20 U.S.C. § 1098a(b)(1)-(2).

<u>The Final Rule</u>

33.    The Final Rule was a product of a multi-year rulemaking that included no fewer than four public hearings, the establishment of a statutorily required negotiated rulemaking committee consisting of seventeen individuals selected by the Department and fifteen alternate members, three pre-scheduled meetings of the negotiated rulemaking committee, one additional session of the negotiated rulemaking committee, the publication of a proposed rule through a Notice of Proposed Rulemaking in the Federal Register, and the receipt and consideration of 139 comments in response to that Notice.

34.    On May 1, 2012, the Department published a notice in the Federal Register of its intent to establish a negotiated rulemaking committee to develop proposed regulations designed to prevent fraud and otherwise ensure proper use of Title IV program funds, especially within the context of technological developments.  77 Fed. Reg. 25,658 (May 1, 2012).

35.     Although the May 2012 Notice did not specifically mention state authorization, on April 16, 2013, the Department published a document in the Federal Register (corrected on April 30, 2013), in which it announced additional topics for consideration by the negotiated rulemaking committee and including the state authorization for programs offered through distance education or correspondence education.  78 Fed. Reg. 22,467 (Apr. 16, 2013).  The April 2013 Notice also announced three public hearings at which interested parties could comment on the topics for consideration by the negotiated rulemaking committee.

36.     On May 13, 2013, the Department published a notice in the Federal Register announcing a fourth public hearing at which interested parties were permitted to comment on the topics suggested by the Department, including state authorization.  78 Fed. Reg. 27,880 (May 13, 2013).

37.     On November 20, 2013, the Department announced its intention to establish a negotiated rulemaking committee to address topics including "[s]tate authorization for programs offered through distance education or correspondence education" and "[s]tate authorization for foreign locations of institutions located in a State."  The Notice identified a series of constituencies which it believed had interests that "are significantly affected by the topics proposed for negotiations."  Those constituencies included students, legal assistance organizations that represent students, consumer advocacy organizations, state higher education executive officers, state attorneys general and other appropriate state officials, business and industry, institutions of higher education, accrediting agencies, financial aid administrators, business officers and bursars and postsecondary institutions, admissions officers at postsecondary institutions, third party servicers who perform functions for postsecondary institutions, state approval agencies, and lenders, community banks, and credit unions.  78 Fed. Reg. 69,612 (Nov. 20, 2013).

38.     The Department established the committee announced in November 2013 and it met to develop proposed regulations on February 19-21, March 26-28, and April 23-25, 2014. During the March 2014 session, the Department proposed adding a negotiated rulemaking session to "give the negotiators more time to consider the issues and reach consensus on

proposed regulatory language."  A fourth session took place on May 19-20, 2014.  The committee did not reach consensus.

39.     On July 25, 2016, the Department published a Notice of Proposed Rulemaking ("NPRM") and afforded the public thirty days (until August 24, 2016) to submit written comments on the proposed state authorization rule.  81 Fed. Reg. 48,598 (July 25, 2018).  The Department received, reviewed, and considered 139 comments in response to the NPRM, including comments on the definition of student residency, the format of disclosures to be made by institutions of higher education, and the process within states for receiving and handling complaints against an institution of higher education.

40.     For example, with respect to the definition of residency, in response to the NPRM, "[m]ultiple commenters asked for clarification on the meaning of 'where a student resides.'"  In response to these comments, the Department stated that, "[t]he student's State of legal residence is the residency or domicile of a student's true, fixed, and permanent home."  81 Fed. Reg. at 92,250.  The Department further provided that a student's residence is "usually where their domicile is located." *Id.* Additionally, the Department stated:

> For the purposes of this rulemaking, a student is considered to reside in a State if the student meets the requirements for residency under that State's law.  In general, when determining the State in which a student resides, an institution may rely on a student's self-determination unless the institution has information that conflicts with that determination.

81 Fed. Reg. at 92,236.

41.     In addition, "[a] few commenters asked that the regulations include compliance for their students from States such as California that reportedly lack oversight for their out-of-State student complaints." 81 Fed. Reg. at 92,238.  Other commenters specifically noted that "the California Bureau for Private Postsecondary Education (CA-BPPE) does not currently require purely online institutions to be authorized and will not accept complaints against non-authorized institutions."  The Department responded to these comments by stating that "if an institution

1    offers postsecondary education or correspondence courses to students residing in a State in

2    which the institution is not physically located, the institution must document that there is a State

3    complaint process in each State in which the institution's enrolled students reside or through a

4    State authorization reciprocity agreement."  The Department further noted that "if a State does

5    not provide a complaint process as described in a State where an institution's enrolled students

6    reside, the institution would not be able to disburse Federal student aid to students in that State."

7    The Department further clarified that "[a] State is not required to have a complaint process,

8    although, it if does not, institutions would not be able to disburse Federal student aid to resident

9    students in that State."  Finally, the Department noted that if it "determines that the complaint

10   process is not compliant with the State authorization regulations, it will notify the institution and

11   subsequently work with the institution to address this issue."

12          42.    The Department also received comments about the form of public disclosures.  In

13   response to these comments, the Department noted that "[a]n institution may combine these

14   disclosures or provide them separately as it sees fit in order to ensure that important information

15   will be presented to students in a clear and concise manner."  81 Fed. Reg. at 92,246.  The

16   Department further provided that it believed that "institutions will make a good faith effort to

17   provide these disclosures to students in a way that will clearly convey the information, so the

18   Department declines to regulate the exact parameters of these disclosures at this time," but noted

19   that "the Secretary may provide additional guidance on this matter in the future."

20          43.    On December 16, 2018, the Department published the Final Rule in the Federal

21   Register.  Consistent with the Master Calendar rule, ED announced an effective date of July 1,

22   2018.  The HEA master calendar rule provides that "any regulatory changes initiated by the

23   Secretary affecting the [Title IV] programs … that have not been published in final form by

24   November 1 prior to the state of the award year shall not become effective until the beginning of

25   the second award year after such November 1 date."  HEA § 482(c)(1), 20 U.S.C. § 1089(c)(1).

26   In practice, this provision means that regulations issued by or on November 1 of a given year

27   shall become effective no sooner than July 1 of the following year, subject to the early

28   implementation provision in HEA § 482(c)(2), 20 U.S.C. § 1089(c)(2).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF            - 13 -

44.     The Final Rule contains requirements on state authorization for distance education or correspondence courses offered to student residing in a state where the institution is not physically located, the definition of a state authorization reciprocity agreement, documentation for state complaint processes, additional locations or branch campuses located in a foreign location, and public and individual disclosures.

45.     *State Authorization Required For Distance and Correspondence Courses.*  The Final Rule requires an institution offering distance education or correspondence courses to students residing in a state where the institution is not physically located to meet that state's requirements for the institution to legally offer postsecondary distance education or correspondence courses.  The Final Rule also provides an alternative, by which an institution that offers distance education or correspondence courses in a state that participates in a "State authorization reciprocity agreement" is considered to meet state requirements for legally offering postsecondary distance education or correspondence courses in the state, "subject to any limitations in that agreement and to any additional requirements of that State."

46.     *State authorization reciprocity agreement.* The Final Rule defines a "State authorization reciprocity agreement" or SARA, as "[a]n agreement between two or more States that authorizes an institution located and legally authorized in a State covered by the agreement to provide postsecondary education through distance education or correspondence courses to students residing in other States covered by the agreement."  The Final Rule further defines a SARA as an agreement that "does not prohibit any State in the agreement from enforcing its own statutes and regulations, whether general or specifically directed at all or a subgroup of educational institutions."

47.     *Complaints.*  The Final Rule also required that "to be considered legally authorized," an institution offering distance education or correspondence courses to students residing in states where the institution is not physically located must document that there is "a process for review and appropriate action on complaints from any of those enrolled students concerning the institution" in the state where the students reside or available through a reciprocity agreement.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF          - 14 -

48.     *Foreign location.*  The Final Rule places certain requirements on institutions that have an additional location or branch campus that is located in a foreign country, including the requirement that they must be authorized by an appropriate government agency of the country where the additional location or branch campus is located, and, if at least 50 percent of an educational program can be completed at the foreign location or branch campus, it must be approved by the institution's accrediting agency and be reported to the state where the institution's main campus is located.

49.     *Disclosures.* The Final Rule includes a requirement that covered distance and correspondence programs make certain public disclosures and make additional disclosures on a "direct[] and individual[ized]" basis.

50.     The required public disclosures include: whether an institution is authorized by each state in which students reside; whether an institution is authorized by a state by virtue of a reciprocity agreement; the consequences, "including ineligibility for title IV, HEA funds" for a student who changes his or her residence to a state where the institution is not authorized; information regarding the process for submitting complaints to state authorities; information about adverse actions against the institution; information about refund policies; and information about whether an institution's programs satisfies educational prerequisites for state licensure or certification.

51.     As part of the required public disclosures, "in the case of a G[ainful] E[mployment] program, as defined under [34 C.FR.] § 668.402," an institution covered by the Final Rule must publicly explain "the consequences, including ineligibility for title IV, HEA funds, for a student who changes his or her State of residence to a state where the institution does not meet licensure or certification requirements in the State."  Thus, the Final Rule is expressly tied to the Department's Gainful Employment regulations.

52.     With respect to the required individual disclosures, an institution that offers distance and correspondence programs covered by the Final Rule must disclose "directly and individually" and "[p]rior to each prospective student's enrollment, any determination by the institution that the program does not meet licensure or certification prerequisites in the State of

the student's residence."  If a prospective student receives such a disclosure and subsequently enrolls in the program, the institution must receive, and must be able to demonstrate that it received, acknowledgement from that student that the student received the disclosure.

53.     Additionally, as part of the required individual disclosures, an institution that offers distance and correspondence programs covered by the Final Rule must disclose adverse actions initiated against the programs and determinations that the program ceases to meet licensure or certification requirements.

54.     When it announced the Final Rule on December 16, 2016, the Department estimated that these disclosures would protect more than 5.5 million students, including nearly three million that attend programs exclusively online.  "Education Department Announces Final Rule on State Authorization of Postsecondary Distance Education, Foreign Locations," Dec. 16, 2016, https://www.ed.gov/news/press-releases/education-department-announces-final-rule-state-authorization-postsecondary-distance-education-foreign-locations.

Post-Publication Guidance to Regulated Entities Regarding the Final Rule

55.     The Department has provided guidance to representatives of regulated entities regarding the Final Rule.

56.     On or about January 10, 2017, the Department received a letter from Marshall Hill (Executive Director, NC-SARA) and Russ Poulin (Director, Policy & Analysis, WCET) seeking clarification regarding the Final Rule.  A true and correct copy of that letter is attached hereto as Exhibit A.  On January 18, 2017, the Department responded by letter, providing clarification regarding certain of the issues raised.  A true and correct copy of that letter is attached hereto as Exhibit B.

The New Administration and the Department's Efforts to Deregulate in 2017 and 2018

57.     Following the election and inauguration of President Trump, and thirty-two days after the Final Rule was published in the Federal Register, the Chief of Staff to the President of the United States issued a memorandum (hereinafter "Regulatory Review Memorandum") that instructed federal agencies, including the Department, to "review[] questions of fact, law, and

policy" with respect to all regulations, including the Final Rule, that had been published in the Federal Register, but which had not yet taken effect.  *See* 82 Fed. Reg. 8,346 (Jan. 24 ,2017).

58.     The Department announced six days later in the Federal Register its intent to take action regarding the Final Rule.  On January 30, 2017, the Department announced in the Federal Register that it was delaying an unrelated rule, issued under the Every Student Succeeds Act ("ESSA").  82 Fed. Reg. 8,669 (Jan 30, 2017).  In that same notice, the Department announced that the delay of the ESSA regulations was the "first of several regulatory actions the Department intends to take regarding regulations that have been published in the Federal Register but had not taken effect as of January 20, 2017, including the Department's regulations for … State Authorization (RIN 1840–AD20) issued under title IV of the Higher Education Act of 1965, as amended."

59.     On February 24, 2017, President Trump issued Executive Order 13,777.  82 Fed. Reg. 12,285 (March 1, 2017) ("Deregulation Order").  The Deregulation Order required the head of each agency to designate a Regulatory Reform Officer to oversee the regulatory reform initiatives.  The Deregulation Order also required each agency to establish a Regulatory Reform Task Force to evaluate existing regulations and "make recommendations to the agency head regarding their repeal, replacement, or modification, consistent with applicable law."  Each Regulatory Reform Task Force was required to produce a report to the agency head within 90 days of the Executive Order and on a schedule the agency head set thereafter, "detailing the agency's progress toward … implementing the regulatory reform initiatives [of the Executive Order]; and … identifying regulations for repeal, replacement, or modification."

60.     On April 25, 2017, the Chief of Staff to Secretary Betsy DeVos appointed Robert S. Eitel as the Department's Regulatory Reform Officer.  On that same date, the Secretary's Chief of Staff established the Department's Regulatory Reform Task Force ("RRTF"), which "meets weekly" and which convened on at least May 4, 2017, May 11, 2017, and May 18, 2017.

61.     On June 22, 2017, the Department published a request for comments entitled "Evaluation of Existing Regulations." 82 Fed. Reg. 28,431 (June 22, 2017) ("June 2017 Solicitation").  In that request, the Department sought "input of regulations that may be

appropriate for repeal, replacement, or modification." The Department sought comment on all of its regulations, codified in subtitles A and B of title 34 of the Code of Federal Regulations, and all of its significant guidance, which include the subtitles in which the Final Rule was to take effect on July 1, 2018.

62.     On August 25, 2017, the Department published a notice of two public hearings to "seek[] public input on Department regulations and guidance specific to postsecondary education programs that may be appropriate for repeal, replacement, or modification." 82 Fed. Reg. 40,518, 40,519. The Department noted that its request for public input included "regulations and guidance for the Federal Student Aid programs authorized under title IV of the Higher Education Act of 1965, as amended, as well as regulations and guidance for the institutional service, international and foreign language education, and student service programs." The public hearings were held on September 26, 2017 in Sandy, Utah, and October 4, 2017 in Washington, D.C.

63.     On October 18, 2017, the RRTF issued its second Status Report to Secretary DeVos. The October 2017 status report states that the "RRTF met during June, July, August, and September," and indicates that the RRTF and each Principal Office within ED were reviewing the comments received by the Department in response to the June 22, 2017 Solicitation.

64.     In addition to the work of the RRTF, on June 16, 2017, the Department published a notice in the Federal Register announcing its intention to establish two negotiated rulemaking committees to prepare proposed regulations for the Title IV Programs. As noticed by the Department, one committee (the "2017-18 Gainful Employment Negotiated Rulemaking Committee") was "to develop proposed regulations to revise the gainful employment regulations published by the Department on October 31, 2014." The second committee (the "2017-18 Borrower Defense Negotiated Rulemaking Committee") was "to develop proposed regulations to revise the regulations on borrower defense to repayment of Federal student loans and other matters, published on November 1, 2016." *See generally* 82 Fed. Reg. 27,640 (June 16, 2017). Both committees were established in the fall of 2017.

65.     More specifically with respect to the negotiated rulemaking committee that was to develop regulations regarding gainful employment, the Department specified that the committee would consider: "[r]evisions to the gainful employment regulations in 34 C.F.R. part 668, subpart Q, including but not limited to … reporting and disclosure of information, as well as related reporting and disclosure regulations in 34 C.F.R. § 668.41."

66.     The 2017-2018 Gainful Employment Negotiated Rulemaking Committee met for a total of thirteen days on December 4-7, 2017, February 5-8, 2018, and March 12-15, 2018.  At each series of sessions, the 2018-18 Gainful Employment Negotiated Rulemaking Committee discussed, among other things, the requirement — as part of the Department's "Gainful Employment" regulations — that certain institutions provide disclosures to students and prospective students.  In Issue Paper #6, released prior to the December 4, 2017 session, the Department asked the 2017-18 Gainful Employment Negotiated Rulemaking Committee to consider questions regarding both the content and method of consumer disclosures, and whether the "Gainful Employment" disclosures should be "limited to GE programs or expanded to all Title IV programs."

<u>Comments on the Final Rule Received in 2017</u>

67.     As part of the RRTF's work, and otherwise, the Department, under Secretary DeVos's leadership, received numerous comments regarding the Final Rule.

68.     In response to the June 2017 Solicitation, on August 1, 2017, Western Interstate Commission for Higher Education Cooperative for Educational Technologies ("WICHE") Cooperative for Educational Technologies and WCET State Authorization Network (SAN) submitted a comment ("WICHE/WCET Comment") that, sought clarification on the term "reside," noting "[t]he use of the term 'reside' conflicts with State requirements for location of activity and adds a level of confusion to the institutions' compliance implementation."  The comment continued that "State regulators would say that they have no jurisdiction over institutions that educate their own residents who receive instruction at institutions located outside their State" and "[t]hose regulators would be unable to oversee such an institution and institutions would have no way to comply with the regulation, as currently written."  The

comment stated that "[t]his is a major flaw in the current language. We would be grateful for guidance." The WICHE/WCET Comment further stated that "[w]e highly recommend that the Department abandon its new definitions of 'reside' and return to the word 'located' that was used in the drafts during the 2014 Negotiated Rulemaking process."

69.     The WICHE/WCET Comment also sought guidance on complaint processes, stating "[p]lease address the ability for an out-of-State public or non-profit institution to be in authorization compliance for activities which it provides in California." The comment provided that California "does not regulate out-of-State public or non-profit institutions serving students within its borders" and noted that "there is no complaint process provided by any agency in California for out-of-State public or non-profit institutions serving students located within their borders." According to the comment, "[a]s the regulation currently reads, those students would not be eligible for title IV aid after July 1, 2018." The comment stated "[w]e doubt that is the Department's intent." The comment then inquired: "Is there a way for the Department to work with California on a compromise, as it did in resolving the issue of having a complaint process for the State authorization regulation for in-state non-profit institutions?" Finally the comment noted that "[t]his same issue may arise with other States, but most of them at least have complaint processes for SARA member institutions. California has not yet joined SARA."

70.     The WICHE/WCET Comment also suggested prompt responses from the Department in preparation for the July 1, 2018 effective date of the Final Rule: "We request that the Department indicate a timeline to expect to receive a response to comments. Please note that compliance requirements for the federal state authorization regulations will require time to implement a process to achieve compliance by July 1, 2018. Your response and direction will be very important. WCET and SAN intend to provide the members of our organizations guidance and support as these regulations are implemented. We would be very pleased to offer further assistance to the Department and to assist with communication to institutions." A true and correct copy of the WICHE/WCET Comment is attached hereto as Exhibit C.

71.     At the October 4, 2017 Public Hearing, Cheryl Dowd, from the WCET State Authorization Network testified. In her testimony, Ms. Dowd suggested that the Department

clarify the use of the term "reside," noting she had a question about "compliance location," and stating that "[w]hen one reads the regulation, it's hard to determine what is the exact requirement by the regulation.  There is language in regard to the use of the word reside."  Ms. Dowd requested that the "basic tenants of the regulations remain" but that the Department provide "guidance … in a timely fashion due to the current effective date of July 1, 2018."  A true and correct copy of excerpts of the transcript of that hearing is attached hereto as Exhibit D.

<u>The Alleged "Catalyst" Letters</u>

72.     On or about February 6, 2018, the Department received a letter from the American Council on Education ("ACE"), a true and correct copy of which is attached hereto as Exhibit E.  The letter stated that institutions had raised concerns with ACE that "the regulations appear to make students who are residents of certain states ineligible for federal financial aid if they are studying online at institutions located outside their states." The ACE letter explained that the concern "is related to the requirement imposed by the state authorization regulations that mandates institutions disclose to students the appropriate state complaint process for their state of residence." The ACE letter further stated that "[a] number of states, including California, do not currently have complaint processes for all out-of-state institutions."  ACE expressed the concern that this would "appear to effectively bar some of their residents from receiving federal financial aid if they choose to study online at institutions located outside their states."  The ACE letter requested that the Department "clarify the Department's position on the eligibility of the students so situated."

73.     The ACE letter did not request that the Department delay the effective date of the Final Rule.

74.     On or about February 7, 2018, the Department received a letter from the WICHE, the National Council for State Authorization Reciprocity ("NC-SARA"), and the Distance Education Accrediting Commission ("DEAC").

75.     The Department did not include a cite to the February 7, 2018 letter in its Notice of Proposed Rulemaking ("Delay Proposal"), 83 Fed. Reg. 24,250 (May 25, 2018), or the Delay/Rescission Rule.  It also did not place the letter in the docket for the rulemaking.

Commenters did not have a full opportunity to comment meaningfully on the letter, which the Department stated was part of the basis for its proposed delay.  On information and belief, a copy of that letter ("WICHE Letter") is attached hereto as Exhibit F.

76.     According to the WICHE Letter, representatives of WICHE, NC-SARA, and DEAC had met with the Acting Assistant Secretary for Postsecondary Education "about critical issues on … distance education," including a "discussion on state authorization."

77.     The WICHE Letter sought "clarification" on ED's "desired format for the disclosures" required by the Final Rule.

78.     The WICHE Letter also raised a "concern" about the definition of "residence" in the Final Rule. No further detail was provided regarding that "concern."

79.     The WICHE Letter suggested the Department had two options; it could "(1) delay the rules and submit the issues to additional negotiated rulemaking or (2) issue clarification via a dear colleague letter on USDE's expectations for compliance."

<u>The Department Proposes to Delay the Final Rule</u>

80.     Despite the January 2017 Regulatory Review Memorandum instructing the Department to "review[] questions of fact, law, and policy" with respect to rules that had not yet taken effect, and the Department's statement in January 2017 that it "intends" to take action regarding the Final Rule, the Department took no action in this regard until May 2018.  On May 25, 2018, the Department published the Delay Proposal in which it proposed a two-year delay, to July 1, 2020, of the effective date of the Final Rule.

81.     In proposing to delay the Final Rule, the Department claimed that the "catalysts for the delay are the February 6 and February 7 [2018] letters."  The Department further stated in the Delay Proposal that it could not address the concerns asserted in the February 2018 letters through guidance because it did "not believe guidance would be sufficient to address the complexities institutions have encountered, even prior to the rule's effective date. Specifically, we believe that we will need significant detail to properly operationalize [the term "residency"] and will need to work with impacted stakeholders to determine how best to address a concern

that is complex and potentially costly to institutions and students." The Department also stated that the WICHE and ACE letters "in particular prompted this proposed delay."

82.     Consistent with its announcement in the Spring 2018 Unified Agenda, the Department also announced in the Delay Proposal its plans to conduct a negotiated rulemaking regarding the state authorization of distance education.  And on July 31, 2018, the Department published in the Federal Register a notice of intent to establish a new negotiated rulemaking committee to consider, among other topics, the requirements related to programs offered through distance education or correspondence courses, including disclosures about such programs to enrolled and prospective students, and other State authorization issues.

83.     The Department provided a 15-day period for the public to comment on the Delay Proposal.  That period included six weekend days and one Federal holiday (Memorial Day, May 28, 2018). To justify the 15-day length of the comment period, the Department stated that "the 2016 rule is scheduled to take effect on July 1, 2018, and a final rule delaying the effective date must be published prior to that date."

84.     In the Delay Proposal, the Department also noted that it planned to conduct negotiated rulemaking to consider possible revisions to the Final Rule, but that it could not complete the negotiated rulemaking process for a rule to go into effect before July 1, 2020 in light of the Master Calendar rule.  The Department stated that "[b]ecause November 1 has already passed, there is no way for the Department to publish a final rule that would be effective by July 1 of this year."  Therefore, the Department claimed that "[i]t would be confusing and counterproductive for the final regulations to go into effect before the conclusion of this reconsideration process."

85.     The Department did not submit the subject of the delay to negotiated rulemaking as required by HEA § 492(b), 20 U.S.C. § 1098a(b) and stated that it "has not had sufficient time to effectuate this delay through negotiated rulemaking."  Although the Department stated that negotiated rulemaking "requires a number of steps" and that such a process "typically takes the Department well over 12 months to complete," the Department provided no citation or evidence that the length of the process was required by law.

86.     The Department stated that it "has good cause to waive the negotiated rulemaking requirement with regard to its proposal to delay the effective date of the final regulations to July 1, 2020, in order to complete a new negotiated rulemaking proceeding to address the concerns identified by some of the regulated parties in the higher education community."  The Department further provided that "it would not be practicable, before the July 1, 2018 effective date specified in the final regulations published December 19, 2016 (81 FR 92232), to engage in negotiated rulemaking and publish a notice of final regulations to delay the effective date."

87.     The Department also stated that it believed that "it will be in the public interest to delay the effective date of these regulations so that these issues can be resolved before the regulations go into effect.  The approach may also benefit from input from States that are in the process of changing requirements for distance education programs."

88.     Despite the unreasonably short comment period, ED received 41 comments on its Delay Proposal, including a comment from plaintiff National Education Association.  A true and correct copy of NEA's comment is incorporated herein and attached hereto as Exhibit G.

<u>The Department Delays/Rescinds the Final Rule</u>

89.     On June 29, 2018, the Department put the Delay/Rescission Rule on public inspection with the Federal Register.

90.     The Federal Register Act requires that the Office of the Federal Register file documents for public inspection at least one business day before publication in the Federal Register.  44 U.S.C. §§ 1503, 1507.

91.     The Freedom of Information Act requires "substantive rules of general applicability" to be published in the Federal Register and provides that "except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."  5 U.S.C. 552(a)(1).

92.     The Delay/Rescission Rule did not publish in the Federal Register until July 3, 2018.  The Department provided that the effective date of the Delay/Rescission Rule was June 29, 2018, four days before the rule was published in the Federal Register.

93.     The Department acknowledged in the preamble to the Delay/Rescission Rule that an "effect" of the delay was to harm students.  For example, the Department noted that: "[a]s a result of the proposed delay, students might not receive disclosures of adverse actions taken against a particular institution or program.  Students also may not receive other information about an institution, such as information about refund policies or whether a program meets certain State licensure requirements.  Increased access to such information could help students identify programs that offer credentials that potential employers recognize and value, so delaying the requirement to provide these disclosures may require students to obtain this information from another source or may lead students to choose sub-optimal programs for their preferred courses of study."

94.     As another example of the "effect" of the Delay, the Department noted that: "the delay of the disclosures related to the complaints resolution process could make it harder for students to access available consumer protections.  Some students may be aware of Federal Student Aid's Ombudsman Group, State Attorneys General offices, or other resources for potential assistance, but the disclosure would help affected students be aware of these options."

95.     The Department reiterated that the letter received from ACE and WICHE in February 2018 were the "catalysts" for the delay, even though it did not dispute that the issues raised in the catalyst letters had been previously made known to the Department.  Nor did the preamble recognize that the Department had indicated in January 2017 that it intended to take action with respect to the Final Rule.  Nor did the preamble recognize the extensive reviews of the Department's regulations that were taking place in 2017, where the issues raised in the "catalysts" were specifically raised.  Nor did the preamble recognize that ED had been engaged in negotiated rulemaking regarding Gainful Employment, which is expressly tied to the Final Rule.  Rather, in the preamble to the Delay/Rescission Rule, the Department stated only that "we only more recently determined that further consultation in the form of negotiated rulemaking was the appropriate vehicle by which to clarify the 2016 final regulations, and it was the cited letters that changed our understanding of the extent of stakeholder concerns."

96.     Although it had proposed to, the Department decided not to delay the requirement of the 2016 Final Rule related to foreign locations of domestic institutions.

97.     ED's publication of the Delay/Rescission Rule marks the consummation of ED's decision-making process and is therefore a final rule and final agency action subject to judicial review.  5 U.S.C. § 704.  The publication of the Delay/Rescission Rule has immediate consequences for Plaintiffs, regulated institutions, enrolled and prospective students, states, and members of the public who would rely on the information that would be disclosed under the Final Rule.

### Count I

### Violation of the APA, Failure to observe procedure required by law

98.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

99.     ED published the Final Rule as authorized by law with an effective date of July 1, 2018.

100.    The Delay/Rescission Rule is a regulation pertaining to Title IV and was subject to the negotiated rulemaking requirements of the HEA.  *See* 20 U.S.C. § 1098a.  ED did not have good cause to dispense with the negotiated rulemaking requirement.  *See id;* 5 U.S.C. § 553(b)(3)(B).

101.    By failing to engage in negotiated rulemaking prior to adopting the Delay/Rescission Rule, ED's publication of the Delay/Rescission Rule was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *see* 5 U.S.C. § 706(2)(A), and was promulgated "without observance of procedure required by law," *id*. § 706(2)(D).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A) Declare that defendants have acted arbitrarily, capriciously, contrary to law, and failed to follow the procedure required by the APA and HEA, by implementing the

Delay/Rescission Rule and failing to conduct a negotiated rulemaking before adopting the

Delay/Rescission Rule;

    (B) Declare unlawful, set aside, and vacate the Delay/Rescission Rule;

    (C) Enjoin defendants from implementing the Delay/Rescission Rule;

    (D) Order the Defendants to implement and give effect to the Final Rule.

    (E) Award plaintiffs their costs and expenses, including reasonable attorney's fees and

expert witness fees; and

    (F) Grant such other relief as this Court deems just and proper.


Date: August 23, 2018                /s/ Brian Schmidt
                                    Brian Schmidt
                                    Staff Attorney
                                    California Teachers Association

Laura Juran (Cal. Bar No. 199978)
Brian Schmidt (Cal. Bar No. 265937)
California Teachers Association
1705 Murchison Drive
Burlingame, CA 94010
LJuran@cta.org
BSchmidt@cta.org
(650) 697-1400

Eric Harrington (Cal. Bar No. 257178)
National Education Association
1201 16th Street NW
Washington, D.C. 20036
eharrington@nea.org
(202) 822-7035

Daniel A. Zibel (*pro hac vice forthcoming*)
Martha U. Fulford (*pro hac vice forthcoming*)
National Student Legal Defense Network
1015 15th Street N.W., Suite 600
Washington, D.C. 20005
dan@nsldn.org
martha@nsldn.org(202) 734-7495