UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION, et al., | Case No. 18-cv-05173-LB |
| Plaintiffs, | |
| v. | **ORDER DENYING DEFENDANTS' MOTION TO DISMISS** |
| BETSY DEVOS, et al., | Re: ECF No. 23 |
| Defendants. | |

## INTRODUCTION

Title IV of the Higher Education Act of 1965, as amended, authorizes the Secretary of Education and the Department of Education (collectively, the "Department") to provide grants and establish financial-assistance programs to help students pay for post-secondary education. Educational institutions must meet certain requirements to participate in these financial-assistance programs.

In December 2016, the Department promulgated regulations adding new requirements for institutions that offer distance-education or correspondence-course programs. *Program Integrity and Improvement*, 81 Fed. Reg. 92,232 (Dec. 19, 2016). Section 668.50 of the regulations (the "Disclosure Rule") required the institutions to issue certain disclosures, both publicly and individually, to their enrolled and prospective students (collectively, the "Disclosures"). Among other things, the Disclosure Rule required the educational institutions to disclose (1) any adverse

actions that a state entity or an accrediting agency might have initiated against them and (2) whether their educational programs that prepare students for jobs in fact satisfy the educational requirements for state licensing or certification for those jobs (e.g., whether a program that prepares students to become teachers satisfies the educational requirements for its students to get teaching certificates). *Id.* at 92,262–63.

The Disclosure Rule was set to go into effect on July 1, 2018. Following a change in presidential administrations, however, the Department issued a new rule in the summer of 2018 (the "Delay Rule"), delaying the effective date of the Disclosure Rule from July 1, 2018 to July 1, 2020 and raising the prospect that it would revise and reconsider the Disclosure Rule entirely. *Program Integrity and Improvement*, 83 Fed. Reg. 31,296, 31,296 (July 3, 2018).

The National Education Association (the "NEA"), the California Teachers Association (the "CTA"), and Shane Heiman, Kwynn Uyehara, and Stephanie Portilla (the "Individual Plaintiffs") — NEA and CTA members who are enrolled or considering enrolling in online-education programs — filed this action against the Department. The plaintiffs allege that the Department failed to comply with certain statutory requirements in promulgating the Delay Rule and that the Delay Rule thus is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act (the "APA").

The Department moves to dismiss the plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(1) on the ground that the plaintiffs do not have Article III standing. The Department argues that the plaintiffs (1) have not suffered an injury in fact (2) that is fairly traceable to the Department (3) that is redressable. The Department argues that the loss of the Disclosures does not constitute an injury in fact caused by the Department. The Department also argues that any purported harm to the plaintiffs is speculative and conjectural. The plaintiffs respond that they are being deprived of information that they would have received in the Disclosures and that they would use that information to make decisions about whether to continue to spend their time and money in continuing in their online-education programs. The plaintiffs

argue that the loss of this information is an injury in fact and that this injury is fairly traceable to the Department's actions in issuing the Delay Rule.

The court denies the Department's motion to dismiss. The plaintiffs have pleaded standing.

## STATEMENT

### 1. The Higher Education Act's "State Authorization" Requirement

Congress enacted the Higher Education Act (the "HEA") "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219, 1219 (1965). Title IV of the HEA "assist[s] in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education" through federal grants and financial-assistance programs. 20 U.S.C. § 1070.

The HEA imposes certain requirements on educational institutions to be eligible for students to pay for their programs with Title IV grants and loans. 20 U.S.C. § 1094(a) ("In order to be an eligible institution for the purposes of any program authorized under this subchapter, an institution must be an institution of higher education or an eligible institution (as that term is defined for the purpose of that program)[.]"). In order for an institution within the United States to be eligible, it must be "an educational institution in any State that . . . is legally authorized within such State to provide a program of education beyond secondary education[.]" 20 U.S.C. § 1001(a)(2); *see* 20 U.S.C. § 1094(i)(4) (citing 20 U.S.C. § 1002(a)(1), (b)(1)(B), (c)(1)(B) (citing 20 U.S.C. § 1001)).

The HEA does not further define what it means for an educational institution to be "legally authorized within such State."

### 2. The 2016 Disclosure Rule

During the last presidential administration, concerns were raised regarding fraud and noncompliance among online and distance-education programs. As the Department reported, "[t]he Office of the Inspector General (OIG), the Government Accountability Office (GAO), and

others have voiced concerns over fraudulent practices, issues of noncompliance with requirements of the title IV programs, and other challenges within the distance education environment." 81 Fed. Reg. at 92,232. "Such practices and challenges include misuse of title IV funds, verification of student identity, and gaps in consumer protections for students." *Id.*

The Department observed that Title IV's state-authorization requirement envisions that "States, accrediting agencies, and the Department act jointly as gatekeepers for the Federal student aid programs[.]" 81 Fed. Reg. at 92,232. The Department noted that "[b]ecause institutions that offer distance education programs usually offer the programs in multiple States, there are unique challenges with respect to oversight of these programs by States and other agencies." *Id.* "Many States and stakeholders have expressed concerns with these unique challenges, especially those related to ensuring adequate consumer protections for students as well as compliance by institutions participating in this sector." *Id.* "For example, some States have expressed concerns over their ability to identify which out of State providers are operating in their States; whether those programs prepare their students for employment, including meeting licensure or certification requirements in those States; the academic quality of programs offered by those providers; as well as the ability to receive, investigate and address student complaints about out-of-State institutions." *Id.*

To address these issues, the Department engaged in a multi-year rulemaking process that cumulated in its promulgating new regulations in December 2016.[1] The regulations required educational institutions offering distance-education or correspondence-course programs to students residing in a state where the institution is not physically located to meet that state's requirements for distance-education or correspondence-course programs (or be covered by a state reciprocity agreement) in order to be "legally authorized within such State."[2] The regulations also included a new Disclosure Rule, which "[r]equire[d] that an institution provide public and

---

[1] Compl. – ECF No. 1 at 10 (¶ 33) (citing 81 Fed. Reg. 92,232); *see also id.* at 10–14 (¶¶ 34–44). Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 14 (¶ 45) (citing 81 Fed. Reg. at 92,262).

individualized disclosures to enrolled and prospective students regarding its programs offered solely through distance education or correspondence courses." *See* 81 Fed. Reg. at 92,233. Among other things, the Disclosure Rule "requir[ed] disclosures that reflect actions taken against a distance education program, how to lodge complaints against a program [students] believe has misled them, and whether the program will lead to certification or licensure[.]" *See id.* at 92,232–33. The Department explained that these requirements "will protect students by providing them with important information that will aid their decisions regarding whether to enroll in distance education programs or correspondence courses as well as improve the efficacy of State-based consumer protections for students." *Id.* at 92,232.

Specifically, the Disclosure Rule imposed the following requirements:

(a) *General.* In addition to the other institutional disclosure requirements established in this and other subparts, an institution described under 34 CFR 600.9(a)(1) or (b) that offers an educational program that is provided, or can be completed solely through distance education or correspondence courses, excluding internships and practicums, must provide the information described in paragraphs (b) and (c) of this section to enrolled and prospective students in that program.

(b) *Public disclosures.* An institution described under 34 CFR 600.9(a)(1) that offers an educational program that is provided, or can be completed solely through distance education or correspondence courses, excluding internships and practicums, must make available the following information to enrolled and prospective students of such program, the form and content of which the Secretary may determine:

(1)(i) Whether the institution is authorized by each State in which enrolled students reside to provide the program;

. . .

(2)(i) If the institution is required to provide a disclosure under paragraph (b)(1)(i) of this section, a description of the process for submitting complaints, including contact information for the receipt of consumer complaints at the appropriate State authorities in the State in which the institution's main campus is located, as required under § 668.43(b);

. . .

(3) A description of the process for submitting consumer complaints in each State in which the program's enrolled students reside, including contact information for receipt of consumer complaints at the appropriate State authorities;

(4) Any adverse actions a State entity has initiated, and the years in which such actions were initiated, related to postsecondary education programs offered solely through distance education or correspondence courses at the institution for the five calendar years prior to the year in which the disclosure is made;

(5) Any adverse actions an accrediting agency has initiated, and the years in which such actions were initiated, related to postsecondary education programs offered solely through distance education or correspondence courses at the institution for the five calendar years prior to the year in which the disclosure is made;

(6) Refund policies with which the institution is required to comply by any State in which enrolled students reside for the return of unearned tuition and fees; and

(7)(i) The applicable educational prerequisites for professional licensure or certification for the occupation for which the program prepares students to enter in —

(A) Each State in which the program's enrolled students reside; and

(B) Any other State for which the institution has made a determination regarding such prerequisites;

(ii) If the institution makes a determination with respect to certification or licensure prerequisites in a State, whether the program does or does not satisfy the applicable educational prerequisites for professional licensure or certification in that State; and

(iii) For any State as to which the institution has not made a determination with respect to the licensure or certification prerequisites, a statement to that effect.

(c) *Individualized disclosures.* (1) An institution described under 34 CFR 600.9(a)(1) or (b) that offers an educational program that is provided, or can be completed solely through distance education or correspondence courses, excluding internships or practicums, must disclose directly and individually —

(i) Prior to each prospective student's enrollment, any determination by the institution that the program does not meet licensure or certification prerequisites in the State of the student's residence; and

(ii) To each enrolled and prospective student —

(A) Any adverse action initiated by a State or an accrediting agency related to postsecondary education programs offered by the institution solely through distance education or correspondence study within 30 days of the institution's becoming aware of such action; or

(B) Any determination by the institution that the program ceases to meet licensure or certification prerequisites of a State within 14 calendar days of that determination.

*Id.* at 92,262–63.

The Department explained its reasons for new disclosure requirements:

> We believe . . . that students would benefit from increased transparency about distance education programs. The disclosures of adverse actions against the programs, refund policies, consequences of moving to a State in which the program does not meet requirements, and the prerequisites for licensure and whether the program meets those prerequisites in States for which the institution has made those determinations will provide valuable information that can help students make more informed decisions about which institution to attend.
>
> Increased access to information could help students identify programs that offer credentials that potential employers recognize and value. Additionally, institutions have to provide an individualized disclosure to enrolled and prospective students of adverse actions against the institution and when programs offered solely through distance education or correspondence courses do not meet licensure or certification prerequisites in the student's State of residence. The disclosure regarding adverse actions will ensure that students have information about potential wrongdoing by institutions. Similarly, disclosures regarding whether a program meets applicable licensure or certification requirements will provide students with valuable information about whether attending the program will allow them to pursue the chosen career upon program completion, helping students make a better choice of program before they incur significant loan debt or use up their Pell Grant and subsidized loan eligibility.

*Id.* at 92,254–55.

The Disclosure Rule was set to go into effect on July 1, 2018. *Id.* at 92,232. (Under the statutory "master calendar" rule in the HEA, the Department could not set an effective date for the Disclosure Rule before then.[3])

### 3. The 2018 Delay Rule

In the summer 2018, the Department issued the Delay Rule to delay the effective date of certain portions of the 2016 regulations, including the Disclosure Rule, from July 1, 2018, to July 1, 2020. 83 Fed. Reg. 31,296. (The Delay Rule is dated June 28, 2018, *id.* at 31,303, but was not published in the Federal Register until July 3, 2018, *id.* at 31,296.) The Department stated that it was delaying the effective date "based on concerns recently raised by regulated parties and to

---

[3] Compl. – ECF No. 1 at 13 (¶ 43) (citing 20 U.S.C. § 1089(c)(1)).

ensure that there is adequate time to conduct negotiated rulemaking to reconsider selected provisions of 2016 final regulations and, as necessary, develop revised regulations." *Id.* at 31,296.

The Department explained that the Delay Rule was prompted by two letters the Department received from organizations that represent regulated educational institutions. *Id.* The Department expressed a view that delaying the effective date of the 2016 regulations would benefit students too. *Id.* at 31,297. The Department stated that if the 2016 regulations were to go into effect, educational institutions might decide that the cost of obtaining state authorization and determining licensure requirements from each state where its students reside were too great and might choose to not offer their programs to students from certain states (in particular, states where only a small number of students enroll) or refuse enrollment or Title IV financial aid for distance education generally as a "safeguard against unintentional noncompliance" — thereby causing students to lose the opportunity to use Title IV financial aid to participate in those programs. *Id.* at 31,297, 31,301.

The Department acknowledged that delaying the effective date of the 2016 regulations and the Disclosure Rule might negatively impact students:

> *Comment:* Commenters stated that delaying the effective date of the 2016 final regulations would negatively impact students because the consumer protections and disclosures that would have been available to students under the 2016 final regulations will not be available to students. A few commenters expressed concern that students' ability to file complaints against institutions would be impeded by delaying the effective date of the provisions in the 2016 final regulations related to the State complaint process.

> *Discussion:* While we do not have specific data with regard to how many schools and States have come into compliance with the 2016 final regulations, based on the information we do have, we expect that many students will still receive disclosures regarding distance education programs during the period of the delay due to steps institutions have already taken. . . .

> [W]e acknowledged in the [notice of proposed rulemaking] that, as a result of the proposed delay, it is possible that students might not receive disclosures of adverse actions taken against a particular institution or program. Students also may not receive other information about an institution, such as information about refund policies or whether a program meets certain State licensure requirements. This information could help students identify programs that offer credentials that potential employers recognize and value; delaying the requirement to provide these

disclosures may require students that desire this information to obtain it from another source or may lead students to choose sub-optimal programs for their preferred courses of study. We note, however, that the Department has never required ground-based campuses to provide this information to students, including campuses that enroll large numbers of students from other States. Thus, for students who attend on-ground campuses, the program they completed may meet licensure requirements in the State in which the campus is located but not licensure requirements in other States.

. . . .

We recognize that the burden of the delay does fall on students and believe that the description of the effects of the delay reflects this. However, as noted in the Analysis of Comments section in this preamble, many students will still receive sufficient disclosures regarding distance education programs during the period of the delay due to steps institutions have already taken to comply with the 2016 final regulations. . . . The Department maintains its position that, in allowing reconsideration of the 2016 final regulations to provide institutions greater clarity on key issues, the benefits of the delay of the selected provisions are greater than the potential costs to students of the delayed disclosures and complaint processes that could already be accessible from other sources.

*Id.* at 31,298, 31,301.

### 4. The Plaintiffs

The National Education Association is the largest professional-employee organization in the country and is committed to advancing the cause of public education.[4] The NEA has over three million members, who work at every level of education from preschool to university graduate programs.[5] The NEA has affiliates in every state and in more than 14,000 communities across the United States.[6] The California Teachers Association is the NEA's largest affiliate and is California's largest professional-employee organization, with over 300,000 members.[7]

---

[4] Compl. – ECF No. 1 at 4 (¶ 14).

[5] *Id.* at 4–5 (¶ 14).

[6] *Id.* at 5 (¶ 14).

[7] *Id.* (¶ 17).

The NEA and the CTA bring this action on behalf of their members.[8] NEA and CTA members are enrolled in and will enroll shortly in distance-education or correspondence-course programs covered by the Disclosure Rule.[9] The NEA and the CTA allege that because of the Delay Rule, their members may not receive Disclosures of adverse actions taken against a particular institution or educational program, refund policies, or whether a program meets state-licensing and certification requirements.[10] As a result, the Delay Rule forces NEA and CTA members to try to obtain from other sources the information that they would otherwise receive pursuant to the Disclosure Rule — assuming this information is otherwise available at all.[11] This lack of information may also lead NEA and CTA members to choose "suboptimal programs" for their preferred courses of study and incur debt by taking out loans to pay for programs that are suboptimal.[12]

Individual plaintiffs Shane Heiman, Kwynn Uyehara, and Stephanie Portilla are NEA members, and Ms. Uyehara and Ms. Portilla are CTA members.[13] Mr. Heiman is a second-grade teacher and is currently enrolled in an online program at Emporia State University for a master's degree in science as an instructional specialist in elementary STEM (science, technology, engineering, and math).[14] Ms. Uyehara is a fourth-grade teacher and plans to apply by December 2018 to the University of New England's Doctor of Education program in educational leadership.[15] Ms. Portilla is an aspiring educator and is currently enrolled in an online program at Western Governors University for a bachelor's degree in elementary education.[16] Mr. Heiman,

---

[8] *Id.* at 6 (¶ 19).

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.* at 6–7 (¶¶ 20–22).

[14] *Id.* at 6 (¶ 20).

[15] *Id.* at 7 (¶ 21).

[16] *Id.* (¶ 22).

Ms. Uyehara, and Ms. Portilla state that they are not aware of information that the Disclosure Rule requires their respective schools to disclose, including whether their schools have faced adverse actions from states or accrediting agencies for engaging in misconduct.[17] Ms. Portilla also states that she researched and confirmed when she began her program that it met the California state standards for teacher certification but does not know that her school would tell her in the event that it ever determined that her program ceased to meet the state standards.[18] Mr. Heiman, Ms. Uyehara, and Ms. Portilla state that if they received these Disclosures, they would carefully review them, and that the information in the Disclosures could affect their decisions whether to apply for or continue in their programs, whether to use additional grant funding or take out additional loans for their programs, or whether to enroll at or transfer to other schools instead.[19]

## STANDARD OF REVIEW

A complaint must contain a short and plain statement of the ground for the court's jurisdiction. Fed. R. Civ. P. 8(a)(1). The plaintiff has the burden of establishing jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Farmers Ins. Exch. v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911, 912 (9th Cir. 1990).

The Department moves to dismiss the plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. A defendant's Rule 12(b)(1) jurisdictional attack can be either facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). "A 'facial' attack asserts that a complaint's allegations are themselves insufficient to invoke jurisdiction, while a 'factual' attack asserts that the complaint's allegations, though adequate on their face to invoke jurisdiction, are untrue." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 n.3 (9th Cir. 2014). This is a facial attack. The court thus "accept[s] all allegations

---

[17] *Id.* at 6–8 (¶¶ 20–22).

[18] *Id.* at 7 (¶ 22).

[19] *Id.* at 6–8 (¶¶ 20–22).

of fact in the complaint as true and construe[s] them in the light most favorable to the plaintiff[].”

*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).[20]

The Department argues that the plaintiffs lack standing. Standing pertains to the court's subject-matter jurisdiction and thus is properly raised in a Rule 12(b)(1) motion to dismiss. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121–22 (9th Cir. 2010) (citing *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)).

“‘As a general rule, in an injunctive case [a] court need not address standing of each plaintiff if it concludes that one plaintiff has standing.’” *Atay v. County of Maui*, 842 F.3d 688, 696 (9th Cir. 2016) (quoting *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009)).

## ANALYSIS

The Department argues that the court need not reach the merits of the plaintiffs' APA challenge because the plaintiffs lack standing to assert it. The Department argues that the plaintiffs have not satisfied the elements of Article III standing: (1) an injury in fact (2) fairly traceable to the Department (3) that is redressable. The court disagrees. As discussed below, the plaintiffs have satisfied all three elements of Article III standing. The plaintiffs have also satisfied the separate "zone of interests" test, formerly referred to at times as "prudential standing."[21]

---

[20] The Department characterizes its motion as a factual attack, Defs. Mot. to Dismiss – ECF No. 23 at 19, but it does not argue that any of the allegations in the plaintiffs' complaint are untrue. It appears that the Department characterizes its attack as a factual attack in order to ask the court to take notice of certain matters of public record. *Id.* The court can take notice of matters of public record in any event. Fed. R. Evid. 201; *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). The allegations within the four corners of the complaint are not contradicted by any outside documents the Department cites, and thus the court accepts the allegations as true and construes them in the light most favorable to the plaintiffs.

[21] The "zone of interests" test was, until recently, also referred to as "prudential standing." *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 n.5 (9th Cir. 2018). More recently, "the Supreme Court called that description 'misleading,' and 'in some tension with the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging,'" *Id.* (internal ellipsis omitted) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–26 (2014)).

### 1. Zone of Interests

While the parties do not expressly raise the zone-of-interests test, the court addresses it briefly here, to assess whether the case is justiciable and to avoid confusion between the application of this test and the application of the separate test for Article III standing. *Cf. Federal Election Commission v. Akins*, 524 U.S. 11, 19–20 (1998) (addressing the zone-of-interests test before addressing Article III standing).

"The 'zone-of-interests' test . . . is a judge-made 'prudential standing requirement,' independent of the three immutable constitutional standing requirements of Article III." *Bonnichsen v. United States*, 367 F.3d 864, 873 (9th Cir. 2004) (citing *Bennett v. Spear*, 520 U.S. 154, 163 (1997)). In the context of a claim brought under the APA, "the relevant zone of interests is not that of the APA itself, but rather 'the zone of interests to be protected or regulated by the statute that the plaintiff says was violated.'" *East Bay Sanctuary Covenant v. Trump*, __ F.3d __, No. 18-17274, 2018 WL 6428204, at *13 (9th Cir. Dec. 7, 2018) (internal brackets and some internal quotation marks omitted) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)).

"The Supreme Court has emphasized that the zone of interests test, under the APA's 'generous review provisions,' 'is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.'" *Id.* (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 & n.17 (1987)). "Even in cases 'where the plaintiff is not itself the subject of the contested regulatory action,' the zone of interests test 'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue.'" *Id.* (quoting *Clarke*, 479 U.S. at 399; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014)). "Thus, it is sufficient that the [plaintiffs]' asserted interests are consistent with and more than marginally related to the purposes of the [statute]" or "are, at the least, '*arguably* within the zone of interests' protected by the [statute]." *Id.* (emphasis in original, some internal quotation marks omitted) (quoting *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017)).

Unlike the constitutional requirements of Article III standing, "Congress can modify or abrogate the zone of interests test" and allow any person to file a claim under a federal statute, subject to the limits of Article III standing. *Bonnichsen*, 367 F.3d at 873–74 (citing *Bennett*, 520 U.S. at 163).

One of the central purposes of the Higher Education Act was "to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. at 1219; *accord* 20 U.S.C. § 1070 ("It is the purpose of this part, to assist in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education[.]"). The plaintiffs bring their APA challenge in connection with Disclosures about distance-education and correspondence-course programs that they allege will "help prospective and enrolled students evaluate both the online program and the institution that offers it, preventing students from wasting time and money on programs that will not help them further their careers."[22] This falls squarely within the zone of interests protected by the HEA.

## 2. Article III standing

"The 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.* (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly allege facts demonstrating' each element." *Id.* (internal ellipsis omitted) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

---

[22] Compl. – ECF No. 1 at 2 (¶ 2).

## 2.1 Injury in Fact

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). For an injury to be concrete, it "must be 'de facto'; that is, it must actually exist. . . . 'real,' and not 'abstract.'" *Id.* (citing dictionaries). "'Concrete' is not . . . necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize, . . . intangible injuries can nevertheless be concrete." *Id.* at 1549 (citing cases).

### 2.1.1 Informational injury

The plaintiffs here have pleaded a concrete and particularized injury in fact: the loss of the Disclosures they had a right to receive under the Disclosure Rule. The Disclosures the plaintiffs would have received would have included information about whether their schools were ever subject to an adverse action by a state or accrediting agency and whether their educational programs meet state licensing and certification requirements. The plaintiffs plead that if they received those Disclosures, they would carefully review them and be better able to determine if the educational programs they are enrolled in or applying to are suitable versus "suboptimal" and make more informed decisions about whether or not to continue with their programs and applications. The Delay Rule prevented the Disclosure Rule, and the requirement that educational institutions provide the plaintiffs with these Disclosures, from going into effect. The loss of these Disclosures and information thus inflicts an injury in fact on the plaintiffs.

"The notion of an informational injury serving as an injury-in-fact sufficient for standing can be traced to *Federal Election Commission v. Akins*, 524 U.S. 11 (1998)." *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1258 (9th Cir. 2010). *Akins* was a case brought by voters challenging a decision by the Federal Election Commission ("FEC") not to designate the American Israel Public Affairs Committee ("AIPAC") as a "political committee" subject to various disclosure rules under the Federal Election Campaign Act ("FECA"). *Akins*, 524 U.S. at 13, 15–16. The FEC argued that

the plaintiff voters lacked standing, arguing that (among other things) the plaintiffs had not sustained an injury in fact. *Id.* at 19. The Supreme Court disagreed:

> The "injury in fact" that respondents have suffered consists of their inability to obtain information — lists of AIPAC donors (who are, according to AIPAC, its members), and campaign-related contributions and expenditures — that, on respondents' view of the law, the statute requires that AIPAC make public. There is no reason to doubt their claim that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in a specific election. Respondents' injury consequently seems concrete and particular. Indeed, this Court has previously held that a plaintiff suffers an "injury in fact" when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute.

*Id.* at 21 (citing *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982)); *accord Spokeo*, 136 S. Ct. at 1549–50 (reaffirming that "a group of voters' 'inability to obtain information' that Congress had decided to make public . . . [and] advocacy organizations' failure to obtain information subject to disclosure under the Federal Advisory Committee Act constitute[] sufficiently distinct injury to provide standing to sue") (citing *Akins*, 524 U.S. at 20–25 (1998); *Pub. Citizen*, 491 U.S. at 449).[23]

The Supreme Court did not require that the voters in *Akin* show that they would necessarily make a bad decision due to the deprivation of information, or that they would suffer some other concrete or particularized harm as a consequence of making an uninformed decision. Instead, the Court held that the loss of the information to make a more informed decision itself constituted a concrete and particular injury in fact. *Akins*, 524 U.S. at 21.

### 2.1.2 The Department's arguments

The Department raises three arguments as to why the loss of the Disclosures that students would have received under the Disclosure Rule is not an injury in fact and cannot provide a basis for standing:

---

[23] The Department agrees that "courts have recognized an Article III injury where a plaintiff has been deprived of information to which they have a statutory right." Defs. Mot. to Dismiss – ECF No. 23 at 15–16 (citing *Wilderness Soc'y*, 622 F.3d at 1258).

1.  unlike a statute, a mere regulation like the Disclosure Rule cannot establish a right to information whose loss can provide a basis for standing,[24]

2.  the Disclosure Rule never went into effect and thus never established a right to information, and thus there is no loss of information that provides a basis for standing,[25] and

3.  the plaintiffs' injuries are speculative, conjectural, or "self-inflicted."[26]

None of these arguments is persuasive.

### 2.1.2.1    Whether a regulatory right to information can give rise to standing

The D.C. Circuit has recognized that the deprivation of information to which plaintiffs have a regulatory right (as opposed to a statutory right) can constitute an injury in fact for the purposes of standing.

This issue arose in *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986). That case involved a challenge to the Department of Health and Human Services ("HHS")'s implementation of the Age Discrimination Act ("ADA"). *Id.* at 934. The ADA's purpose was "to prohibit discrimination on the basis of age in programs or activities receiving Federal financial assistance." *Id.* (citing 42 U.S.C. § 6101). The ADA required HHS to issue a set of model government-wide regulations to carry out that purpose, after which each federal agency that administered any program of financial assistance — including HHS itself — was required to draft its own agency-specific regulations. *Id.* at 935 (citing 42 U.S.C. § 6103(a)).

HHS issued government-wide regulations that (1) required programs that receive federal financial assistance to provide HHS with a self-evaluation listing all age distinctions they used and the justification for each and (2) directed agencies to require the recipient programs to provide the agencies with information about their compliance. *Id.* Three years later, HHS promulgated agency-specific regulations for itself. *Id.* Unlike its government-wide regulations, HHS's agency-

---

[24] Defs. Mot. to Dismiss – ECF No. 23 at 15–16; Defs. Mot. to Dismiss Reply – ECF No. 28 at 6–8.

[25] Defs. Mot. to Dismiss – ECF No. 23 at 16; Defs. Mot. to Dismiss Reply – ECF No. 28 at 8.

[26] Defs. Mot. to Dismiss – ECF No. 23 at 16–19; Defs. Mot. to Dismiss Reply – ECF No. 28 at 10–12.

specific regulations (1) did not require programs to provide a self-evaluation and (2) required programs to provide compliance information only upon request by HHS (without specifying when, if ever, HHS would make such a request). *Id.*

Four senior-citizen-welfare organizations sued to challenge the HHS-specific regulations. *Id.* The organizations wanted the information that the general regulations required to be disclosed to use in counseling their members about unlawful age discrimination and referring them to appropriate services. *Id.* at 937–38. The organizations argued that the loss of this information caused them injury. *Id.* HHS moved to dismiss, arguing that (among other things) the organizations lacked standing because they had not suffered any injury in fact. *Id.* at 936–37.

Writing for the D.C. Circuit, then-Judge Ruth Bader Ginsburg rejected HHS's lack-of-standing arguments:

> The government-wide regulations HHS published afford interested individuals and organizations a generous flow of information regarding services available to the elderly. [The plaintiffs] assert[] that two of the challenged dispositions in the HHS-specific regulations — the elimination of the self-evaluation requirement and the reduction of compliance reports — significantly restrict that flow. The information secured by the general regulations, but cut short by the HHS-specific regulations, would enhance the capacity of [the plaintiffs] to refer members to appropriate services and to counsel members when unlawful age discrimination may have figured in a benefit denial. . . . As in the case of other organizations whose standing this court has upheld, [the plaintiffs] thus ha[ve] adequately alleged a direct, adverse impact on [their] activities by reason of the agency decisions reflected in the HHS-specific regulations. *See, e.g.*, *Scientists' Institute for Public Information, Inc. v. AEC*, 481 F.2d 1079, 1087 n.29 (D.C. Cir. 1973) (holding that plaintiff organization had standing to challenge AEC decision not to issue an environmental impact statement because the agency action limited the plaintiff's ability to carry out one of its major activities: informing the public).

*Id.* at 937.

Notably, there was no requirement in the underlying Act for recipient programs to provide self-evaluations or compliance information. *See* Age Discrimination Act of 1975, Pub. L. No. 94-135, tit. III, 89 Stat. 713, 728–32 (1975). The information-disclosure requirements at issue arose only from regulation, not from statute. *See Action All.*, 789 F.2d at 935. The D.C. Circuit nonetheless held that the loss of "[t]he information secured by the general regulations, but cut

short by the HHS-specific regulations," could provide the basis for an injury in fact and Article III standing. *Id.* at 937.

The D.C. Circuit reaffirmed *Action Alliance* in *PETA v. U.S. Department of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015). That case involved a challenge to the Department of Agriculture ("USDA")'s implementation of the Animal Welfare Act ("AWA"). *Id.* at 1089. The AWA's purpose was to "insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment" and "to assure the humane treatment of animals during transportation in commerce." *See id.* at 1089–90 (citing 7 U.S.C. § 2131(1)–(2)). The AWA required the USDA to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." *See id.* at 1090 (citing 7 U.S.C. § 2143(a)(1)). The AWA required the USDA to issue general animal-welfare regulations. *Id.* (citing 7 U.S.C. § 2143(a)(2)(A)). The AWA also required the USDA to issue species-specific regulations for dogs and primates and gave the USDA discretion to issue species-specific regulations for other covered animals. *Id.* (citing 7 U.S.C. §§ 2143(a)(2)(B), 2151).

The USDA interpreted the AWA's definition of "animal" to exclude birds until 2002, when Congress amended the definition to explicitly exclude "birds . . . bred for use in research." *Id.* (citing 7 U.S.C. § 2132(g)). The USDA interpreted this amendment to mean that the AWA's definition of "animal" included birds not bred for research. *Id.* at 1090 (citing *Animal Welfare; Definition of Animal*, 69 Fed. Reg. 31,513, 31,513 (June 4, 2004); 9 C.F.R. § 1.1). On the same day that it announced that the AWA applied to birds not bred for research, however, the USDA also announced that it "d[id] not believe that the general standards" under the AWA, which had been promulgated for mammalian care, were appropriate for birds. *Id.* (citing *Animal Welfare; Regulations and Standards for Birds, Rats, and Mice*, 69 Fed. Reg. 31,537, 31,539 (June 4, 2004)).

The USDA had a practice of inspecting complaints of mammalian mistreatment and making its inspection reports publicly available in an online database. *Id.* at 1095. It refused to do so for complaints of bird mistreatment, even after the AWA's amendment. *Id.* The animal-welfare

organization PETA sued under the APA. *Id.* at 1089, 1091. The USDA moved to dismiss, arguing that (among other things) that PETA lacked standing. *Id.* at 1091.

The D.C. Circuit rejected the USDA's lack-of-standing arguments. It reaffirmed its holding in *Action Alliance* that when "government-wide regulations . . . afforded interested individuals and organizations a generous flow of information" but "specific regulations significantly restricted that flow," plaintiffs that relied on that information to conduct their routine activities might be able to plead an injury and Article III standing. *Id.* at 1094 (internal quotation marks and ellipsis omitted) (quoting *Action All.*, 789 F.2d at 935–37). It then held that "[b]ecause PETA's alleged injuries — denial of access to bird-related AWA information including, in particular, investigatory information, and a means by which to seek redress for bird abuse — are 'concrete and specific to the work in which they are engaged,' we find that PETA has alleged a cognizable injury sufficient to support standing." *Id.* at 1095 (citing *Action All.*, 789 F.2d at 938).

There was no requirement in the underlying Act that required the USDA to provide bird-abuse inspection reports in an online database. The D.C. Circuit nonetheless held that the USDA's practice of making available inspection reports about animal-abuse allegations, and PETA's interest in those reports in connection with bird-abuse allegations, could provide a basis for standing. *Id.*[27]

Citing the D.C. Circuit, the Seventh Circuit has suggested, albeit in dicta, that regulations and agency policies, in addition to statutes, may give rise to a right to information that can form the basis for an injury in fact and Article III standing. "It need not be fatal to the plaintiffs' claim . . . that an explicit right to information is not within the [statutory] text or history. Although an act of Congress would seem to be necessary to establish a right to information sufficient to confer

---

[27] Judge Millett filed a dubitante opinion taking issue with the majority's holding that PETA had standing because not only was there no statutory right to the reports PETA sought, there was no regulatory right either. *PETA*, 797 F.3d at 1103 (Millett, J., dubitante) ("Even as alleged by PETA, there is no suggestion that anything in the Animal Welfare Act or any regulation gives PETA any legal *right* to such information or reports.") (emphasis in original). Judge Millett contrasted *PETA* from *Action Alliance* by observing that, in *Action Alliance*, "the information sought was arguably required to be disclosed at least by regulation, and was being put to a specific use by the plaintiffs seeking to protect the legal rights of the elderly they served," whereas in *PETA*, there was no requirement even in regulation to provide the information that PETA sought. *Id.* at 1104.

informational standing, we have noted authority in other courts indicating that regulations or agency policies may be sufficient to create a right to information." *Bensman v. U.S. Forest Serv.*, 408 F.3d 945, 958–59 (7th Cir. 2005) (citing D.C. Circuit cases).

The Department cites no cases that hold that a right to information secured by regulation, as opposed to statute, cannot provide a basis for an injury in fact or standing. The Department intimates that the Ninth Circuit held in *Wilderness Society*, 622 F.3d 1251, that only a statutory right to information can give rise to standing. Not so. The Ninth Circuit observed that deprivation of a statutory right to information can provide a basis for standing. *Id.* at 1258. It did not hold that deprivation of a regulatory right to information cannot. *See id.*[28] The Department's reliance on *Cary v. Hall*, No. C 05-4363 VRW, 2006 WL 6198320 (N.D. Cal. Sept. 30, 2006), fails for the same reason. *Cary* held that "informational injury is implicated when plaintiffs are effectively denied information to which they would otherwise be entitled by statute." *Id.* at *9 (citing cases). It did not hold that informational injury is not implicated when plaintiffs are effectively denied information to which they would be otherwise entitled by regulation. *See id.*

The Department also cites *Friends of Animals v. Jewell*, 115 F. Supp. 3d 107 (D.D.C. 2015) (*Friends of Animals I*), *aff'd*, 828 F.3d 989 (D.C. Cir. 2016) (*Friends of Animals II*), for the proposition that "[i]nformational standing arises 'only in very special statutory contexts,' where a statutory provision 'explicitly create[s] a right to information.'"[29] Notwithstanding the context that a D.C. district court cannot countermand the D.C. Circuit's opinion in *Action Alliance*, the Department's argument confuses Article III standing with the zone-of-interests test (i.e., prudential standing).[30]

---

[28] The Department argues that "[t]his murmuring in other Circuits" about regulatory informational rights "is simply insufficient to overcome the Ninth Circuit's unequivocal statement that 'courts have recognized an Article III injury where a plaintiff has been deprived of information to which it has a *statutory* right.'" Defs. Mot. to Dismiss Reply – ECF No. 28 at 8 (emphasis added by the Department) (purportedly quoting *Wilderness Soc'y*, 622 F.3d at 1258). Not only was the emphasis in the quote added by the Department, not the Ninth Circuit, the quoted language does not actually appear in *Wilderness Society* or in any other federal case.

[29] Defs. Mot. to Dismiss – ECF No. 23 at 16.

[30] The *Friends of Animals* decision did not turn on either the question of statutory rights to information versus regulatory rights or the zone-of-interests test, but instead on the fact that the plaintiff did not

The language the Department quotes from *Friends of Animals I* was in turn quoted from the D.C. Circuit's opinion in *Animal Legal Defense Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C. Cir. 1994). That case, and that quote, did not address injury in fact or Article III standing. To the contrary, the D.C. Circuit reaffirmed that "informational injury satisfies the minimum requirements of Article III standing." *Animal Legal*, 23 F.3d at 501 (citing *Action All.*, 789 F.2d at 936–39). Instead, what the case, and the quote, addressed was the separate zone-of-interests test.

The plaintiffs in *Animal Legal* were animal-welfare advocates that wanted the USDA to expand animal-welfare rules under the Animal Welfare Act. *Id.* at 498. The D.C. Circuit held that their generalized interest in promoting animal welfare was not within the "zone of interests" protected by the AWA. *Id.* at 503–04 ("It is simply not enough that the organizations exist to promote interests congruent with the humanitarian purposes of the statute, broadly conceived. . . . The organizations have not asserted any claim within the zone of interests protected by the Act, and their suit may not be heard."). "[O]nly in very special statutory contexts," where "Congress, . . . by specific enactments, override[s] the zone of interest test and related prudential standing purposes," can a plaintiff bring an APA challenge with claims that do not fall within the zone of interests protected by the underlying statute. *Id.* at 502 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)).[31] The D.C. Circuit held that Congress did not override the zone-of-interests test in the AWA. *Id.* ("The Animal Welfare Act has no such provision.").

This "very special statutory contexts" requirement is not necessary where a plaintiff's claim falls within the zone of interests protected by the underlying statute. The *Animal Legal* plaintiffs' interest in promoting animal welfare as a general matter — an interest that did not directly affect the *Animal League* plaintiffs any more than any other member of the public writ large — did not fall within the zone of interests protected by the AWA. As a result, the plaintiffs needed "very

---

have a right to the information at issue at all. *Friends of Animals II*, 828 F.3d at 992 ("Here, [plaintiff]'s contention that it has standing fails at the first part of the inquiry, the sine qua non of informational injury: It is seeking to enforce a statutory deadline provision that by its terms does not require the public disclosure of information.").

[31] This is the language the Department quotes in its filings. Defs. Mot. to Dismiss Reply – ECF No. 28 at 7.

special statutory contexts" to be able to bring a claim from outside the zone of interests. The D.C. Circuit contrasted this to the senior-citizen-welfare organizations in *Action Alliance*, who sought information about compliance with the Age Discrimination Act "to advise their members of *the members' own rights* under the statute, rather than simply to educate all those who desire to promote the statute's substantive purposes." *Animal League*, 23 F.3d at 503 (emphasis in original) (citing *Action All.*, 789 F.2d at 939). Unlike the *Animal Legal* plaintiffs, the *Action Alliance* plaintiffs fell within the zone of interests of their statute. *Id.* ("'[S]uch interests as promotion of the knowledge, enjoyment, and protection of the rights created by a statute are securely within the zone of interests protected by that statute.'") (some internal quotation marks omitted) (quoting *Action All.*, 789 F.2d at 939). Consequently, the *Action Alliance* plaintiffs did not need to point to any "very special statutory contexts" that gave them a right to the disclosures they sought — the fact that regulations gave them a right to the disclosures was sufficient. *See Action All.*, 789 F.2d at 937.

The court finds the D.C. Circuit's reasoning in *Action Alliance* persuasive and adopts it here. The plaintiffs here, like the plaintiffs there, are within the zone of interests of their underlying statute. The Disclosure Rule here, like the government-wide regulations there, "afford[ed] individuals and organizations a generous flow of information." *Cf. Action All.*, 789 F.2d at 937. The Delay Rule here, like the HHS-specific regulations there, "significantly restrict[s] that flow." *Cf. id.* As the D.C. Circuit's decision in *Action Alliance* confirms, the fact that the right to information stems from a regulation, as opposed to a statute, does not mean that it cannot form the basis for an injury in fact and Article III standing. *Cf. id.*

### 2.1.2.2 Whether a regulation that has not yet gone into effect can establish a right to information that can give rise to standing

The Department next argues that the Disclosure Rule never went into effect, so the plaintiffs never had an effective right to any Disclosures. According to the Department, the loss of information — when there never was a right to that information — inflicts no injury and thus does not provide a basis for standing.

1    This argument fails. Courts recognize that where a regulation has not gone into effect but

2    would, when effective, provide plaintiffs with concrete benefits, a delay of that regulation and the

3    commensurate delay or deprivation of those benefits can constitute an injury in fact and provide a

4    basis for standing. *Bauer v. DeVos*, 325 F. Supp. 3d 74, 89–90 (D.D.C. 2018) (where the

5    Department of Education delayed a rule had not yet gone into effect but that would have, when

6    effective, provided students with new protections, the delay inflicted an injury in fact); *accord,*

7    *e.g.*, *Pineros y Campesinos Unidos del Noroeste v. Pruitt*, 293 F. Supp. 3d 1062, 1064 (N.D. Cal.

8    2018) (same re EPA's delay of pesticide rule that had not yet gone into effect but that would have,

9    when effective, protected agricultural workers from dangers of exposure to pesticides). By

10    contrast, the Department cites no cases in support of its argument that a right to information under

11    a regulation that has not yet gone into effect cannot provide a basis for standing.[32]

12    ### 2.1.2.3    Whether the plaintiffs' injuries are speculative, conjectural, or "self-inflicted"

13

14    The Department advances a number of arguments about why the plaintiffs' injuries are too

15    speculative, conjectural, or "self-inflicted" to constitute injury in fact for purposes of Article III

16    standing. None prevails.

17    ### 2.1.2.3.1    The plaintiffs' plans to enroll in educational programs

18    The Department first argues that the NEA and CTA do not have standing because "Plaintiffs

19    allege that 'NEA and CTA members are injured by the Delay Rule because they are actively

20    considering whether to enroll in or continue enrollment in certain programs of higher education

21    that would be required, under the [Disclosure] Rule, to make certain disclosures.' But such 'some

22    day' intentions — without any description of concrete plans, or indeed even any specification of

23    when the some day will be — do not support a finding of the 'actual or imminent' injury that

24    courts require."[33]

25

26    ---

[32] Defs. Mot. to Dismiss – ECF No. 23 at 16 (citing no cases on this issue); Defs. Mot. to Dismiss
27    Reply – ECF No. 28 at 8 (same).

28    [33] Defs. Mot. to Dismiss – ECF No. 23 at 16 (some internal quotation marks and internal brackets
omitted) (quoting *Lujan*, 504 U.S. at 564) (other citations omitted).

The three Individual Plaintiffs in this action have concrete plans. Mr. Heiman and Ms. Portilla are currently enrolled in online courses, and Ms. Uyehara plans to apply by December 2018. The Individual Plaintiffs allege that they would review the Disclosures they would have received in deciding whether to apply or continue in their courses. Their plans are sufficiently concrete to provide a basis for standing.[34]

The Department cites *Townley v. Miller*, 722 F.3d 1128 (9th Cir. 2013), to support its argument that the plaintiffs' plans are too speculative to give rise to standing, but that case undermines its argument. It involved a challenge to a Nevada election law that mandated the inclusion of an option to vote for "none of these candidates" in statewide and presidential elections. *Id.* at 1130–31. Eleven plaintiffs brought suit to challenge how Nevada counted the votes. *Id.* at 1132. Seven were voters who intended to vote generally but who had not expressed an intent to cast a vote for the "none of these candidates" option in any election. *Id.* Two were voters who expressed an intent to cast a "none of these candidates" ballot. *Id.* (The final two were Republican designees for presidential electors, who claimed that the inclusion of a "none of these candidates" option hurt their election chances. *Id.* at 1132, 1135.) The Ninth Circuit held that the first seven voters had suffered only a speculative injury and therefore did not have standing. *Id.* at 1133. But the Ninth Circuit held that the next two voters — who had expressed an intent to vote for "none of these candidates" — had suffered an injury in fact. *Id.* at 1134 ("We agree with plaintiffs that the first two standing requirements [injury in fact and causation] are met. In light of their stated intent to cast ballots for NOTC, the injury [these plaintiffs] assert — the harm caused by the Secretary refusing to give legal effect to their ballots — is sufficiently concrete and imminent, not conjectural or hypothetical.").[35] The Individual Plaintiffs' intent here is at least as

---

[34] Only one plaintiff needs to have standing for this case to proceed. *Atay*, 842 F.3d at 696. The court thus does not need to address whether the NEA or the CTA independently have standing based on their members' plans to enroll in distance-education or correspondence-course programs.

[35] The Ninth Circuit ultimately held that those plaintiffs lacked standing because they failed to establish the third element of standing, redressability. *Townley*, 722 F.3d at 1134–35 ("[These plaintiffs] fall short, however, in establishing that the relief they seek would *redress* the injury they argue is caused by § 293.269(2). Plaintiffs say they are harmed because the ballots cast for NOTC are not given legal effect, yet they do not actually ask that, as the remedy for this injury, the Secretary of

1 concrete as the two "none of these candidates" voters' that the *Townley* court held was sufficient

2 to provide a basis for standing.

3           **2.1.2.3.2      The impact of Disclosures on the plaintiffs' decisions**

4       The Department next argues that the plaintiffs' injuries are speculative because it is

5 speculative whether the Disclosures would affect their enrollment decisions or help them identify

6 more optimal or less optimal educational programs. The Department argues that the plaintiffs

7 merely allege that if they received Disclosures, they "would carefully review such disclosures and,

8 *depending on the information provided*, the disclosures *could* affect [their] decisions," including

9 whether to enroll or continue in educational programs, whether to stop attending the programs, or

10 whether to transfer to different schools.[36] This, the Department argues, "stacks speculation upon

11 hypothetical upon speculation, which does not establish an 'actual or imminent' injury."[37]

12       How the Disclosures would affect the plaintiffs' decisions about whether to enroll or continue

13 in their educational programs depends on what the Disclosures say. Disclosures that say, for

14 example, that the plaintiffs' educational programs meet all state licensing and certification

15 requirements, or that their schools have never been subject to adverse action by a state or

16 accrediting agency, would engender a different reaction from Disclosures that the programs do not

17 meet state requirements and that their schools are under investigation by a dozen state attorneys

18 general for fraud. The plaintiffs' inability to say at this juncture what the Disclosures would say,

19 and thus to say how they would react, does not render their injury hypothetical or speculative.

20

---

21 State be ordered to give legal effect to such ballots. Rather, they demand that the option of casting a
ballot for NOTC be entirely removed from the Nevada election system. As a result, if plaintiffs were to

22 prevail in this lawsuit, voters' opposition to named candidates would not be given legal effect, but
instead voters would no longer have the opportunity to affirmatively express their opposition at the

23 ballot box at all. The relief plaintiffs seek will therefore *decrease* their (and other voters') expression
of political speech rather than increase it, worsening plaintiffs' injury rather than redressing it. . . .

24 Because the relief plaintiffs seek would worsen the position of voters who intend to cast ballots for
NOTC, rather than redress the injury they assert, this category of plaintiffs lacks standing.") (emphasis

25 in original). The plaintiffs' complaint here does not suffer from the same defect.

26 [36] Defs. Mot. to Dismiss – ECF No. 23 at 18 (emphasis added by the Department) (quoting Compl. –
ECF No. 1 at 6–8 (¶¶ 20–22)).

27 [37] *Id.* (quoting *N.Y. Reg'l Interconnect, Inc. v. Fed. Energy Regulatory Comm'n*, 634 F.3d 581, 587
(D.C. Cir. 2011)).

28

Their loss of the Disclosures and the opportunity to use them to make a more informed decision is itself a concrete injury. *Cf. Akins*, 524 U.S. at 21. And the plaintiffs allege that if they received the Disclosures, they "would" (not "could") carefully review them. The injury they suffer from being deprived of Disclosures that they would carefully review is concrete, not hypothetical or speculative. *Cf. Townley*, 722 F.3d at 1134.[38]

### 2.1.2.3.3 The availability of information from other sources

Finally, the Department argues that "[e]qually speculative are Plaintiffs' allegations that they will not receive the subject disclosures. They fail to allege, for example, that such information is

---

[38] The Department's reliance on *New York Regional Interconnect, Inc. v. Federal Energy Regulatory Commission*, 634 F.3d 581 (D.C. Cir. 2011), is misplaced. That case involved a challenge to various agency orders regarding electrical-power transmission by a plaintiff that did not participate in the power-generation or transmission market and had no active proposals to do so. *Id.* at 586–87. That is a far cry from the plaintiffs here, who are currently enrolled or planning to apply to educational institutions from which they seek Disclosures.

The Department's other cases are similarly inapposite. *Association of American Physicians and Surgeons, Inc. v. Brown*, No. 2:16-cv-02441-MCE-EFB, 2018 WL 1535531 (E.D. Cal. Mar. 29, 2018), involved a doctors' association challenging a law that allowed doctors to individually contract their billing rates with health-insurance plans, required the establishment of a dispute-resolution procedure if a plan and an out-of-network doctor had a dispute, and finally provided for a methodology for calculating rates if the doctor and the plan could not agree. *Id.* at *2. Because the doctors' association did not plead that they were unable to reach agreements with health-insurance plans or pursue the dispute-resolution process, the court held that the doctors' claims that they were injured by the rate-calculation methodology in the law were speculative because they might never reach that stage. *Id.* at *5. Here, by contrast, the plaintiffs would have been entitled to Disclosures under the Disclosure Rule now, without any additional speculative steps. *Fletcher v. California Correctional Health Care Services*, No. 16-cv-04187-YGR(PR), 2016 WL 5394125 (N.D. Cal. Sept. 27, 2016), and *Lovell v. P.F. Chang's China Bistro, Inc.*, No. C14-1152RSL, 2015 WL 4940371 (W.D. Wash. Mar. 27, 2015), are data-breach cases where the courts held that the plaintiffs' allegations that they would suffer any harm was speculative. *Fletcher*, 2016 WL 5394125, at *2; *Lovell*, 2015 WL 4940371, at *2. Here, the plaintiffs are suffering a concrete harm: being deprived of the Disclosures. *National Alliance for the Mentally Ill, St. Johns Inc. v. Board of County Commissioners*, 376 F.3d 1292 (11th Cir. 2004), involved a challenge to a board decision not to fund a mental-health group home — brought by plaintiffs who did not claim that they wanted to live in a group home. *Id.* at 1293–95. Here, the plaintiffs plead that they would carefully review the Disclosures they seek. *Perry v. Columbia Recovery Group, LLC*, No. C16-0191JLR, 2016 WL 6094821 (W.D. Wash. Oct. 19, 2016), involved a challenge to a debt collector's technical violations of the disclosures it was required to make under the Fair Debt Collection Practices Act — brought by a plaintiff who did not allege that he intended to dispute his debt or that would have taken any action had he received proper disclosures. *Id.* at *1–2. Here, the plaintiffs plead that they would carefully review the Disclosures and may take action (e.g., withdrawing from their courses) if the Disclosures reveal negative information about their schools. *Cf. id.* at *6 ("Certainly, if a consumer contends that alleged debt is incorrect, or merely wishes to verify the debt, then a deficient disclosure of [his] FDCPA rights could create a risk of real harm because a consumer could inadvertently forfeit their right to validate the debt.") (citations and internal quotation marks and brackets omitted).

not publicly available (e.g., on an institution's website) or that they have attempted to obtain such information by contacting the institution directly but have been rebuffed. . . . [T]he Court should reject Plaintiffs' theory of standing because, to the extent Plaintiffs have suffered any harm, it is self-inflicted. Plaintiffs themselves acknowledge that they may be able to obtain the requested information even absent the 2016 Rule. Yet they apparently have undertaken no effort whatsoever to determine whether such information is in fact available elsewhere. . . . Accordingly, insofar as Plaintiffs have been unwilling to even attempt to obtain the purportedly sought-after information, they have failed to demonstrate an Article III injury."[39]

The Department's argument that the plaintiffs have not suffered an injury relies on the conceit that there is no difference between providing students individualized Disclosures (as educational institutions were required to do under the Disclosure Rule) and telling students to fend for themselves and scour the public record looking for equivalent information (where it might or might not be available). The court is not persuaded. When it issued the Disclosure Rule, the Department estimated that it would take an educational institution an average of 100 hours per program to research and disclose the job licensing and certification requirements called for by the Disclosure Rule, plus 15 hours to research and disclose the other required information (adverse actions by state or accrediting agencies, refund policies, etc.) — time the Department valued at $3,655.00 for the program-specific disclosures and $548.25 for the other disclosures. 81 Fed. Reg. at 92,259–60 (monetizing the cost of educational institutions' time at $36.55 an hour). Even assuming that all of the information that students would have received under the Disclosure Rule is publicly available elsewhere (a questionable proposition), the Delay Rule's depriving students of individualized Disclosures of this information — which would require students to spend what the Department estimates is over 100 hours of research to place themselves in the same position that they would have been but for the Delay Rule[40] — inflicts a real injury. *See generally Airline*

---

[39] Defs. Mot. to Dismiss – ECF No. 23 at 17, 18–19 (citations omitted).

[40] It would likely take students more time and effort to research information than the educational institutions, as the institutions would have access to information that the students lack. For example, an educational institution would have direct knowledge if a state or accrediting agency took adverse action against it, whereas students would not have the same direct knowledge.

*Serv. Providers v. L.A. World Airports*, 873 F.3d 1074, 1078 (9th Cir. 2017) (holding that plaintiffs had standing to challenge a regulation that required them to participate in negotiations, because "[t]he time spent in those negotiations is itself a concrete injury"). It is worth noting that one of the reasons the Department offered in support of its decision to issue the Delay Rule was that it might be too burdensome for educational institutions to assess state-licensing requirements in order to disclose them to students.[41] It takes chutzpah for the Department to delay the Disclosure Rule and claim that it would be too hard for educational institutions to research and disclose the required information, on the one hand, while arguing that students lack standing to challenge the Department's delay because they should be able to hunt down this undisclosed information on their own, on the other.[42]

*     *     *

The court holds that the plaintiffs have pleaded a concrete injury in fact and have satisfied the first element of standing.

### 2.2   Causation

The plaintiffs have pleaded that their injury is fairly traceable to the Department's actions and thus have pleaded causation for the purposes of Article III standing. Under the Disclosure Rule, educational institutions that offered distance-education or correspondence-course programs were required to provide Disclosures to students and the public. Because the Department issued the Delay Rule, the Disclosure Rule and these requirements never went into effect. The loss of these mandatory Disclosures is directly traceable to the Department's conduct in issuing the Delay Rule.

---

[41] 83 Fed. Reg. at 31,297 ("If [the Disclosure Rule] were to go into effect on July 1, 2018, some institutions, especially those with limited resources, could determine that the costs of obtaining State authorization, ensuring the relevant States have complaint procedures, and assessing licensure requirements, are not worth the benefit of eligibility for title IV aid if only a small number of students enroll online from a particular State, and therefore may not obtain State authorization for all applicable States.").

[42] The Department's claim that the plaintiffs' injuries are "self-inflicted" is unsupported. The "self-inflicted injury" doctrine provides that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fear of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). The Department points to nothing in the complaint or elsewhere that suggests that the plaintiffs have inflicted harm or costs on themselves.

The Department argues that educational institutions might disclose some information voluntarily or some of the information that would be subject to disclosure under the Disclosure Rule might be publicly available even without the Disclosure Rule. Assuming this were true, this does not mean that the Department has not caused injury by relieving those educational institutions of their mandatory obligations to make Disclosures. *Cf. Akins*, 524 U.S. at 25 (informational-injury plaintiffs pleaded causation where the FEC failed to designate AIPAC a "political committee" subject to disclosure requirements, even if the FEC had the authority to exercise discretion to not require AIPAC to produce information).

The court holds that the plaintiffs have pleaded that their injury is fairly traceable to the Department's actions and have satisfied the second element of standing.

### 2.3 Redressability

If the plaintiffs prevail, the court can set aside the Delay Rule. *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018). The Disclosure Rule will go into effect, and the plaintiffs' educational institutions will be required by law to provide Disclosures. That would redress the plaintiffs' injuries.

The Department's reliance on *Levine v. Vilsack*, 587 F.3d 986 (9th Cir. 2009), and *Salmon Spawning and Recovery Alliance v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008), is misplaced. In both cases, even if the plaintiffs had prevailed on their challenges, the agencies remained free in their discretion to regulate — or to choose not to regulate — the complained-of conduct (animal-slaughter methods and salmon overfishing, respectively). *Levine*, 587 F.3d at 995; *Salmon Spawning*, 545 F.3d at 1229. Winning their lawsuits would not necessarily have redressed those plaintiffs' injuries. By contrast, if the plaintiffs here prevail and the court vacates and sets aside the Delay Rule, the Disclosure Rule will go into effect — without being contingent on any additional discretionary decisions by the Department — and will require the plaintiffs' educational institutions to make the Disclosures the plaintiffs seek. The plaintiffs' injuries thus are redressable here.

The court holds that the plaintiffs have pleaded that their injury is redressable and have satisfied the third element of standing.

## CONCLUSION

The plaintiffs have pleaded standing to pursue this case. The court denies the Department's motion to dismiss.

**IT IS SO ORDERED.**

Dated: December 17, 2018

LAUREL BEELER
United States Magistrate Judge