1   JOSEPH H. HUNT
    Assistant Attorney General
2   ALEX G. TSE
    United States Attorney
3   MARCIA BERMAN
    Assistant Branch Director
4   KAREN S. BLOOM
    Senior Counsel
5   STUART J. ROBINSON, CA Bar No. 267183
    R. CHARLIE MERRITT
6   Trial Attorneys
    U.S. Department of Justice, Civil Division
7   450 Golden Gate Ave.
    San Francisco, CA 94102
8   Phone: (415) 436-6635; Fax: (415) 436-6632
    Email: stuart.j.robinson@usdoj.gov
9   *Counsel for Defendants*

10

11                  **IN THE UNITED STATES DISTRICT COURT**

12              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13

14   NATIONAL EDUCATION ASSOCIATION,      )
     et al.,                              )
15                                        )
              Plaintiffs,                 )        Case No. 3:18-cv-05173-LB
16                                        )
                  v.                      )        **ADMINISTRATIVE RECORD**
17                                        )
     BETSY DEVOS, in her official capacity as )
18   Secretary of Education, et al.,      )
                                          )
19            Defendants.                 )
20                                        )

21

22

23

24

25

26

27

28

ADMINISTRATIVE RECORD
Case No. 3:18-cv-05173-LB

1   JOSEPH H. HUNT
    Assistant Attorney General
2   ALEX G. TSE
    United States Attorney
3   MARCIA BERMAN
    Assistant Branch Director
4   KAREN S. BLOOM
    Senior Counsel
5   STUART J. ROBINSON, CA Bar No. 267183
    R. CHARLIE MERRITT
6   Trial Attorneys
    U.S. Department of Justice, Civil Division
7   450 Golden Gate Ave.
    San Francisco, CA 94102
8   Phone: (415) 436-6635; Fax: (415) 436-6632
    Email: stuart.j.robinson@usdoj.gov
9   *Counsel for Defendants*

10

11                    **IN THE UNITED STATES DISTRICT COURT**

12              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13   _____     )

14   NATIONAL EDUCATION ASSOCIATION,        )    Case No. 3:18-cv-05173-LB
     et al.,                                )
15                                          )    **DESIGNATION AND**
            Plaintiffs,                     )    **CERTIFICATION OF**
16                                          )    **ADMINISTRATIVE**
                                            )    **RECORD**
17              v.                          )
                                            )
18   BETSY DEVOS, in her official capacity as )
     Secretary of Education, et al.,        )
19                                          )
                                            )
20          Defendants.                     )
     _____     )

21

22                              **CERTIFICATION**
                        **OF ADMINISTRATIVE RECORD**

23

24          I, Brian P. Siegel, Acting Assistant General Counsel, do hereby certify that, to the best of

25   my knowledge, the pages identified in the accompanying Administrative Record Index constitute

26   a true and complete copy of the agency record underlying the Department of Education's

27   decision to waive negotiated rulemaking at issue in the above-referenced litigation.  I have

28

Certification of Administrative Record
Case No. 3:18-cv-05173-LB

personal knowledge of the actions and activities carried out by the various employees who were assigned to review and compile the documents contained in the Administrative Record.

The agency excluded from the administrative any and all privileged materials.

In accordance with 28 U.S.C. § 1746, I hereby certify and declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed January 3, 2019

*/s/Brian P. Siegel*
Brian P. Siegel

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTESTATION**

I, Stuart J. Robinson, am the ECF user whose user ID and password authorized the filing of this document.  Under Civil L.R. 5-1(i)(3), I attest that Brian P. Siegel has concurred in this filing.


Dated: January 3, 2019                    _/s/Stuart J. Robinson_
                                          Stuart J. Robinson

Certification of Administrative Record
Case No. 3:18-cv-05173-LB

1  JOSEPH H. HUNT
   Assistant Attorney General
2  ALEX G. TSE
   United States Attorney
3  MARCIA BERMAN
   Assistant Branch Director
4  KAREN S. BLOOM
   Senior Counsel
5  STUART J. ROBINSON, CA Bar No. 267183
   R. CHARLIE MERRITT
6  Trial Attorneys
   U.S. Department of Justice, Civil Division
7  450 Golden Gate Ave.
   San Francisco, CA 94102
8  Phone: (415) 436-6635; Fax: (415) 436-6632
   Email: stuart.j.robinson@usdoj.gov
9  *Counsel for Defendants*

10

11                 **IN THE UNITED STATES DISTRICT COURT**

12            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13  

14  NATIONAL EDUCATION ASSOCIATION,       )   Case No. 3:18-cv-05173-LB
    et al.,                               )
15                                        )
         Plaintiffs,                      )   **ADMINISTRATIVE**
16                 v.                      )   **RECORD INDEX**
                                          )
17  BETSY DEVOS, in her official capacity as )
    Secretary of Education, et al.,       )
18                                        )
                                          )
19       Defendants.                      )
                                          )
20  

21

22

23

24

25

26

27

28

Administrative Record Index
Case No. 3:18-cv-05173-LB

| Document No. | Title | Bates No. |
|---|---|---|
| 1 | Federal Register Notice of Proposed Rule, 83 Fed. Reg. 24250, May 25, 2018 | 0001 |
| 2 | Comments received in response to Proposed Rule | 0007 |
| 3 | Federal Register Final Rule, 83 Fed. Reg. 31296 (July 3, 2018) | 0138 |
| 4 | ACE letter, February 6, 2018 | 0146 |
| 5 | WICHE letter,  February 7, 2018 | 0147 |
| 6 | Dear Colleague Letter/Q&A mentioned in the Final Rule, July 27, 2012 | 0148 |

(CMR) Task 276000–110 of Q400 Dash 8 (Bombardier) Temporary Revision ALI–0173, dated March 14, 2017, to Section 1–27, Certification Maintenance Requirements of the Maintenance Requirements Manual (MRM) Part 2, of Product Support Manual (PSM) 1–84–7.

**(h) Initial Compliance Time**

The initial compliance time for doing the CMR Task 276000–110 specified in paragraph (g) of this AD is within 8,000 flight hours after the effective date of this AD.

**(i) No Alternative Actions or Intervals**

After the maintenance or inspection program has been revised as required by paragraph (g) of this AD, no alternative actions (e.g., inspections) or intervals may be used unless the actions or intervals are approved as an alternative method of compliance (AMOC) in accordance with the procedures specified in paragraph (j)(1) of this AD.

**(j) Other FAA AD Provisions**

The following provisions also apply to this AD:

(1) *Alternative Methods of Compliance (AMOCs):* The Manager, New York ACO Branch, FAA, has the authority to approve AMOCs for this AD, if requested using the procedures found in 14 CFR 39.19. In accordance with 14 CFR 39.19, send your request to your principal inspector or local Flight Standards District Office, as appropriate. If sending information directly to the manager of the certification office, send it to ATTN: Program Manager, Continuing Operational Safety, FAA, New York ACO Branch, 1600 Stewart Avenue, Suite 410, Westbury, NY 11590; telephone 516–228–7300; fax 516–794–5531. Before using any approved AMOC, notify your appropriate principal inspector, or lacking a principal inspector, the manager of the local flight standards district office/certificate holding district office.

(2) *Contacting the Manufacturer:* For any requirement in this AD to obtain corrective actions from a manufacturer, the action must be accomplished using a method approved by the Manager, New York ACO Branch, FAA; or Transport Canada Civil Aviation (TCCA); or Bombardier, Inc.'s TCCA Design Approval Organization (DAO). If approved by the DAO, the approval must include the DAO-authorized signature.

**(k) Related Information**

(1) Refer to Mandatory Continuing Airworthiness Information (MCAI) Canadian Airworthiness Directive CF–2017–35, dated November 29, 2017, for related information. This MCAI may be found in the AD docket on the internet at *http://www.regulations.gov* by searching for and locating Docket No. FAA–2018–0449.

(2) For more information about this AD, contact John P. DeLuca, Aerospace Engineer, Avionics and Administrative Services Section, FAA, New York ACO Branch, 1600 Stewart Avenue, Suite 410, Westbury, NY 11590; telephone 516–228–7369; fax 516–794–5531; email *9-avs-nyaco-cos@faa.gov.*

(3) For service information identified in this AD, contact Bombardier, Inc., Q-Series

Technical Help Desk, 123 Garratt Boulevard, Toronto, Ontario M3K 1Y5, Canada; telephone 416–375–4000; fax 416–375–4539; email *thd.qseries@aero.bombardier.com;* internet *http://www.bombardier.com.* You may view this service information at the FAA, Transport Standards Branch, 2200 South 216th St, Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195.

Issued in Des Moines, Washington, on May 15, 2018.

**Dionne Palermo,**

*Acting Director, System Oversight Division, Aircraft Certification Service.*

[FR Doc. 2018–11141 Filed 5–24–18; 8:45 am]

**BILLING CODE 4910–13–P**

─────────────

**DEPARTMENT OF EDUCATION**

**34 CFR Parts 600 and 668**

**[Docket ID ED–2018–OPE–0041]**

**RIN 1840–AD39**

**Program Integrity and Improvement**

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Secretary proposes to delay, until July 1, 2020, the effective date of the final regulations entitled Program Integrity and Improvement published in the **Federal Register** on December 19, 2016 (the final regulations). The current effective date of the final regulations is July 1, 2018. The Secretary proposes the delay based on concerns recently raised by regulated parties and to ensure that there is adequate time to conduct negotiated rulemaking to reconsider the final regulations, and as necessary, develop revised regulations. The provisions for which the effective date is being delayed are listed in the **SUPPLEMENTARY INFORMATION** section of this document.

**DATES:** We must receive your comments on or before June 11, 2018. As previously indicated, we are establishing a 15-day public comment period for the proposed delay in effective date. We are doing so because the 2016 rule is scheduled to take effect on July 1, 2018, and a final rule delaying the effective date must be published prior to that date. A longer comment period would not allow sufficient time for the Department to review and respond to comments, and publish a final rule.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments submitted by fax or by email

or those submitted after the comment period. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* to submit your comments electronically. Information on using *Regulations.gov,* including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under "Help."

• *Postal Mail, Commercial Delivery, or Hand Delivery:* The Department strongly encourages commenters to submit their comments electronically. However, if you mail or deliver your comments about the notice of proposed rulemaking, address them to Jean-Didier Gaina, U.S. Department of Education, 400 Maryland Ave. SW, Mail Stop 294–20, Washington, DC 20202.

*Privacy Note:* The Department's policy is to make all comments received from members of the public available for public viewing on the Federal eRulemaking Portal at *www.regulations.gov.* Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** Sophia McArdle, Ph.D., U.S. Department of Education, 400 Maryland Ave. SW, Mail Stop 290–44, Washington, DC 20202. Telephone: (202) 453–6318. Email: *sophia.mcardle@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

*Invitation to Comment:* We invite you to submit comments regarding this notice of proposed rulemaking. See **ADDRESSES** for instructions on how to submit comments.

During and after the comment period, you may inspect all public comments about this notice of proposed rulemaking by accessing *Regulations.gov.* You may also inspect the comments in person at 400 Maryland Avenue SW, Washington, DC, between 8:30 a.m. and 4:00 p.m. Washington, DC time, Monday through Friday of each week, except Federal holidays. If you want to schedule time to inspect comments, please contact the person listed under **FOR FURTHER INFORMATION CONTACT.**

*Assistance to Individuals with Disabilities in Reviewing the*

*Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public-rulemaking record for this notice of proposed rulemaking. If you want to schedule an appointment for this type of accommodation or auxiliary aid, please contact the person listed under **FOR FURTHER INFORMATION CONTACT.**

Based on additional concerns recently raised by regulated parties related to implementation of the final regulations, the Secretary proposes to delay, until July 1, 2020, the effective date of the final regulations. The Department proposes this delay to hear from the regulated community and students about these concerns and to consider, through negotiated rulemaking, possible revisions to the final regulations.

Two letters in particular prompted this proposed delay. The Department received a letter dated February 6, 2018 (February 6 letter), from the American Council on Education (*http://www.acenet.edu/news-room/Documents/ACE-Letter-on-State-Authorization-Concern.pdf*), which represents nearly 1,800 college university presidents from all types of U.S. accredited, degree-granting institutions and the executives at related associations. That letter expressed concerns that, "students who are residents of certain states may be ineligible for federal financial aid if they are studying online at institutions located outside their states. This is related to the requirement imposed by the state authorization regulations that mandates institutions disclose to students the appropriate state complaint process for their state of residence. A number of states, including California, do not currently have complaint processes for all out-of-state institutions." On February 7, 2018, the Department also received a letter from the Western Interstate Commission for Higher Education (WICHE) Cooperative for Educational Technologies, the National Council for State Authorization Reciprocity, and the Distance Education Accrediting Commission, all of which represent regulated parties (February 7 letter). In the letter, these entities stated that there is widespread concern and confusion in the higher education community regarding the implementation of the final regulations, particularly with respect to State authorization of distance education and related disclosures. The authors of the February 7 letter argued that the new regulations will be costly and burdensome for most colleges and universities that offer distance education and that some States have not implemented the necessary policies and procedures to conform to the student complaint procedures required by the regulations. The authors also expressed that institutions need additional information from the Department to better understand how to comply with the new regulations. They stated, for instance, that the way the term "residence" is described in the preamble of the 2016 rule may conflict with State laws and common practice among students for establishing residency. These issues are more complex than we understood when we considered them in 2016. Therefore, we believe that a more precise definition of "residence"—which can be defined by States in different ways for different purposes—should be established through rulemaking to ensure institutions have the clarity needed to determine a student's residence (81 FR 92236). The Department does not believe guidance would be sufficient to address the complexities institutions have encountered, even prior to the rule's effective date. Specifically, we believe that we will need significant detail to properly operationalize this term and will need to work with impacted stakeholders to determine how best to address a concern that is complex and potentially costly to institutions and students.

The authors of the two letters also asked the Department to clarify the format in which they should make public and individualized disclosures of the State authorization status for every State, the complaint resolution processes for every State, and details on State licensure eligibility for every discipline that requires a license to enter a profession. The authors suggested that the Department should delay the rules and submit the issues to additional negotiated rulemaking or, alternatively, clarify the final regulations through guidance. We believe that these disclosure issues, particularly those regarding individualized student disclosures, also require further review and the consideration of whether more detailed requirements are necessary for proper implementation. For instance, what disclosures would need to be made to a student when the student changes his or her residence? How would an institution know that a student has changed his or her residence so that individualized disclosures could be made? For how long must a student reside at the new address to be considered a resident of that State for the purposes of State authorization disclosures (and how will this answer vary State by State and be further complicated by the fact that each State's definition may have been originally developed for a variety of purposes)? What if a student enrolls in a program that meets the licensure requirements of the State in which the student was living at the time, but then the student relocates to a new State where the program does not fulfill the requirements for licensure? What is the obligation of the university if the program no longer meets the licensure requirements, due to a student's move, not a change in the program?

Finally, to add further complexity, students may not always notify their institution if they change addresses, or if they relocate temporarily to another State. While the preamble of the 2016 regulation did state that institutions may rely on the student's self-determination of residency unless it has information to the contrary, there may need to be additional clarification or safeguards for institutions in the event that a student does not notify the institution of a change in residency.

For both of the residency and disclosure issues, guidance is not the appropriate vehicle to provide the clarifications needed. Guidance is inherently non-binding and, therefore, could not be used to establish any new requirements. More importantly, due to the complexity of these issues, we are not confident that we could develop a workable solution through guidance and without the input of negotiators who have been engaged in meeting these requirements. Additionally, the necessary changes may impose a greater burden on some regulated parties, or could significantly minimize burden to institutions, which would require an updated estimate of regulatory impact. In sum, the Department believes that the clarifications requested are so substantive that they would require further rulemaking including negotiated rulemaking under the Higher Education Act of 1965, as amended (HEA).

We believe that delaying the final regulations would benefit students and that many students will still receive sufficient disclosures regarding distance education programs during the period of the delay due to steps institutions have already taken in this area.

Since the final regulations are currently scheduled to go into effect in July, we believe the delay will benefit those students who are planning to take coursework via online programs during the summer months, or who may be making plans to do internships in other States. Many institutions and students

ordinarily not heavily engaged in distance education do provide and take online courses in the summer. If the final regulations were to go into effect on July 1, 2018, an institution may be hesitant to offer these courses outside the State in which the institution is located, because the uncertainty of how to determine students' residency, and the associated requirements, may make a State unwilling to pursue State authorization in all of the possible locations its students may reside during the summer. Students will also depend on their institution taking the necessary and involved steps to come into compliance in each State. Some institutions, especially those with limited resources, could simply determine that the cost of obtaining State authorization, of ensuring the relevant states have complaint procedures, and assessing licensure requirements, is simply not worth the benefit of eligibility for title IV aid if only a small number of students enroll online from a particular State, which would mean that some students could not continue their education during the summer if during those months they return to their parents' home to save money or because dormitory facilities on campus are closed. Thus, students would lose the opportunity to use title IV aid for these courses. By contrast, institutions that routinely provide distance education to large numbers of students from all 50 States may have already taken the initiative to obtain State authorization and assess the complaint systems and licensure requirements since the cost-benefit ratio favors such an action. As a result, the delay will not adversely affect students attending those institutions.

In addition, DCL GEN–12–13 provides guidance regarding student complaints and student consumer disclosures as related to distance education, ensuring that during the delay institutions will be aware of their existing obligations and that students will receive these protections. Under 34 CFR 668.43(b), an institution is required to provide to students its State approval or licensing and the contact information for filing complaints. DCL GEN–12–13 clarifies this requirement with respect to distance education.

The negotiated rulemaking process could not be completed with final regulations that would go into effect before July 1, 2020. To comply with section 482 of the HEA (20 U.S.C. 1089), also known as the "master calendar requirement," a regulatory change that has been published in final form on or before November 1 prior to the start of an award year—which begins on July 1

of any given year—may take effect only at the beginning of the next award year, or in other words, on July 1 of the next year. Because November 1 has already passed, there is no way for the Department to publish a final rule that would be effective by July 1 of this year. Moreover, for the reasons explained below, any negotiated rulemaking process would not be finished until sometime in 2019, so regulations resulting from that process could not be effective before July 1, 2020 at the earliest. It would be confusing and counterproductive for the final regulations to go into effect before the conclusion of this reconsideration process. We thus propose delaying the current effective date—July 1, 2018— until July 1, 2020.

The Department has not had sufficient time to effectuate this delay through negotiated rulemaking. Negotiated rulemaking requires a number of steps that typically takes the Department well over 12 months to complete. The HEA requires the Department to hold public hearings before commencing any negotiations. Based upon the feedback the Department receives during the hearings, the Department then identifies those issues on which it will conduct negotiated rulemaking, announces those, and solicits nominations for non-Federal negotiators. Negotiations themselves are typically held over a 3-month period. Following the negotiations, the Department prepares a notice of proposed rulemaking and submits the proposed rule to the Office of Management and Budget (OMB) for review. The proposed rules are then open for public comment for 30–60 days. Following the receipt of public comments, the Department considers those comments and prepares a final regulation that is reviewed by OMB before publication.

In this instance, the catalysts for the delay are the February 6 and February 7 letters. The Department could not have completed the well-over 12-month negotiated rulemaking process, described in the previous paragraph, between February 6, 2018, and the July 1, 2018, effective date. Thus, the Department has good cause to waive the negotiated rulemaking requirement with regard to its proposal to delay the effective date of the final regulations to July 1, 2020, in order to complete a new negotiated rulemaking proceeding to address the concerns identified by some of the regulated parties in the higher education community.

Based on the above considerations, the Department is proposing to delay until July 1, 2020, the effective date of the following provisions of the final

regulations in title 34 of the Code of Federal Regulations (CFR):
- § 600.2 Definitions (definition of State authorization reciprocity agreement).
- § 600.9(c) (State authorization distance education regulations).
- § 600.9(d) (State authorization of foreign locations of domestic institution regulations).
- § 668.2 (addition of "Distance education" to the list of definitions).
- § 668.50 (institutional disclosures for distance or correspondence programs regulations).

*Waiver of Negotiated Rulemaking:* Under section 492 of the HEA (20 U.S.C. 1098a), all regulations proposed by the Department for programs authorized under title IV of the HEA are subject to negotiated rulemaking requirements. However, section 492(b)(2) of the HEA provides that negotiated rulemaking may be waived for good cause when doing so would be "impracticable, unnecessary, or contrary to the public interest." Section 492(b)(2) of the HEA requires the Secretary to publish the basis for waiving negotiations in the **Federal Register** at the same time as the proposed regulations in question are first published.

For the reasons stated above, it would not be practicable, before the July 1, 2018 effective date specified in the final regulations published December 19, 2016 (81 FR 92232), to engage in negotiated rulemaking and publish a notice of final regulations to delay the effective date. The Department also believes it will be in the public interest to delay the effective date of these regulations so that these issues can be resolved before the regulations go into effect. The approach may also benefit from input from States that are in the process of changing requirements for distance education programs. There is, therefore, good cause to waive negotiated rulemaking pertaining to this delay. Note, we are only waiving negotiated rulemaking and are providing this notice and opportunity to comment on the proposed delay.

**Executive Orders 12866, 13563, and 13771**

**Regulatory Impact Analysis**

Under Executive Order 12866, it must be determined whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive Order and subject to review by OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—
(1) Have an annual effect on the economy of $100 million or more, or

adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

This proposed regulatory action is a significant regulatory action subject to review by OMB under section 3(f) of Executive Order 12866. The quantified economic effects and net budget impact associated with the delayed effective date are not expected to be economically significant. Institutions will be relieved of an expected Paperwork Reduction Act burden of approximately $364,801 in annualized cost savings or $5.2 million in present value terms for the delay period, though it is possible some States have already incurred these costs preparing for the current effective date. The Department is interested in comments on whether costs have already been expended in this area and estimates of costs still needed to be incurred.

We have also reviewed this proposed delay under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency:

(1) Propose or adopt regulations only upon a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing this proposed delay only on a reasoned determination that its benefits would justify its costs. In choosing among alternative regulatory approaches, we selected the approach that would maximize net benefits. In particular, the Department believes avoiding the compliance costs for institutions and the potential unintended harm to students if institutions decide not to offer distance education courses to students who switch locations for a semester or do not allow students to receive title IV aid for such courses because the definition of residency needs additional clarification outweighs any negative effect of the delayed disclosures. Based on the analysis that follows, the Department believes that this proposed delay of the final regulations is consistent with the principles in Executive Order 13563.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have estimated that this proposed rule has a potential upper bound effect of estimated annualized cost savings of $705,737, or $10,081,963 in present value terms, using a 7 percent discount rate over a perpetual time horizon, in administrative and information disclosure costs. This is an upper bound estimate of these cost savings, since some institutions may have begun development of disclosures to meet the proposed regulatory requirements. As a central estimate, the Department estimates institutions will be relieved of an expected Paperwork Reduction Act burden of approximately $364,801 in annualized cost savings or $5.2 million in present value terms for the delay period; though it is possible some States have already incurred these costs preparing for the current effective date.

Because of these savings, this proposed rule, if finalized, would be considered an Executive Order 13771 deregulatory action. The Department explicitly requests comments on

whether these administrative cost savings and foregone benefits calculations and discussions are accurate and fully capture the impacts of this rule delay.

**Effects of Delay**

The Regulatory Impact Analysis of the final regulations stated that the regulations would have the following primary benefits: (1) Updated and clarified requirements for State authorization of distance education and foreign additional locations, (2) a process for students to access complaint resolution in either the State in which the institution is authorized or the State in which they reside, and (3) increased transparency and access to institutional and program information.

As a result of the proposed delay, students might not receive disclosures of adverse actions taken against a particular institution or program. Students also may not receive other information about an institution, such as information about refund policies or whether a program meets certain State licensure requirements. Increased access to such information could help students identify programs that offer credentials that potential employers recognize and value, so delaying the requirement to provide these disclosures may require students to obtain this information from another source or may lead students to choose sub-optimal programs for their preferred courses of study. On the other hand, students who attend on-ground campuses may find that, while the program they completed meets licensure requirements in that State, it does not meet licensure requirements in other States. The Department has never required ground-based campuses to provide this information to students, including campuses that enroll large numbers of students from other States.

Additionally, the delay of the disclosures related to the complaints resolution process could make it harder for students to access available consumer protections. Some students may be aware of Federal Student Aid's Ombudsman Group, State Attorneys General offices, or other resources for potential assistance, but the disclosure would help affected students be aware of these options.

The Department also recognizes a potential unintended effect of the final regulation on students from institutions reacting to uncertainty in the definition of residency and other aspects of the 2016 final regulation by refusing enrollment or title IV aid to distance education students as a safeguard against unintentional non-compliance. A variety of other possible scenarios

described herein, resulting from confusion about the rule or an institution's inability or unwillingness to comply, could also result in loss of title IV aid to students. For example, if a student pursues a summer internship and relocates to another State for the summer semester, institutions may choose not to allow them to take courses online because their residency is unclear. The Department believes the possibility of this outcome and the disruption it could have to students' education plans counts in favor of delaying the rule to prevent institutions from taking such actions while negotiated rulemaking clears up lingering and widespread uncertainty. A student who is unable to take classes during the summer months may be unable to complete his or her program on time, especially if the student is working or raising children and cannot manage a 15 credit course load during the regular academic terms.

Delay may, however, better allow institutions to address the costs of complying with the final regulations. In promulgating those regulations, the Department recognized that institutions could face compliance costs associated with obtaining State authorization for distance education programs or operating foreign locations. But the Department did not ascribe specific costs to the State authorization regulations and associated definitions because it presumed that institutions were already complying with applicable State authorization requirements and because nothing in the final regulations requires institutions to have distance education programs.

Although the Department did not ascribe specific costs to this aspect of the regulation, it provided examples of costs ranging from $5,000 to $16,000 depending on institution size, for a total estimated annual cost for all institutions of $19.3 million. Several commenters stated that the Department underestimated the costs of compliance with the regulations, noting that extensive research may be required for each program in each State. One institution reported that it costs $23,520 to obtain authorization for a program with an internship in all 50 States and $3,650 to obtain authorization for a new 100 percent online program in all 50 States. To renew the authorization for its existing programs, this institution estimated a cost of $75,000 annually including fees, costs for surety bonds, and accounting services, and noted these costs have been increasing in recent years. The Department believes this institution's estimate is credible; however, we request comment on

whether this example provides a typical or accurate level of expected compliance costs across a representative population, and the extent to which institutions have already incurred these costs. In practice, actual costs to institutions vary based on a number of factors including an institution's size, the extent to which an institution provides distance education, and whether it participates in a State authorization reciprocity agreement or chooses to obtain authorization in specific States.

Delay may also allow institutions to postpone incurring costs associated with the disclosure requirements. As indicated in the *Paperwork Reduction Act of 1995* section of the final regulations, those costs were estimated to be 152,565 hours and $5,576,251 annually.

*Net Budget Impact:* As noted in the final regulations, in the absence of evidence that the regulations would significantly change the size and nature of the student loan borrower population, the Department estimated no significant net budget impact from these regulations. While the updated requirements for State authorization and the option to use State authorization reciprocity agreements may expand the availability of distance education, student loan volume will not necessarily expand greatly. Additional distance education could provide convenient options for students to pursue their educations and loan funding may shift from physical to online campuses. Distance education has expanded significantly already and the final regulations are only one factor in institutions' plans within this field. The distribution of title IV, HEA program funding could continue to evolve, but the overall volume is also driven by demographic and economic conditions that are not affected by these regulations and State authorization requirements were not expected to change loan volumes in a way that would result in a significant net budget impact. Likewise, the availability of options to study abroad at foreign locations of domestic institutions offers students flexibility and potentially rewarding experiences, but was not expected to significantly change the amount or type of loans students use to finance their education. Therefore, the Department did not estimate that the foreign location requirements in 34 CFR 600.9(d) would have a significant budget impact on title IV, HEA programs. As the final regulations were not expected to have a significant budget impact, delaying them to allow for reconsideration and renegotiation of

the final rule is not expected to have a significant budget impact. This analysis is limited to the effect of delaying the effective date of the final regulations to July 1, 2020, and does not account for any potential future substantive changes in the final regulations.

**Regulatory Flexibility Analysis**

The final regulations would affect institutions that participate in the title IV, HEA programs, many of which are considered small entities. The U.S. Small Business Administration (SBA) Size Standards define "for-profit institutions" as "small businesses" if they are independently owned and operated and not dominant in their field of operation with total annual revenue below $7 million. The SBA Size Standards define "not-for-profit institutions" as "small organizations" if they are independently owned and operated and not dominant in their field of operation, or as "small entities" if they are institutions controlled by governmental entities with populations below 50,000. Under these definitions, approximately 4,267 of the IHEs that would be subject to the paperwork compliance provisions of the final regulations are small entities. Accordingly, we have reviewed the estimates from the 2016 final rule and prepared this regulatory flexibility analysis to present an estimate of the effect on small entities of the delay in the final regulations.

In the Regulatory Flexibility Analysis for the final regulations, the Department estimated that 4,267 of the 6,890 IHEs participating in the title IV, HEA programs were considered small entities— 1,878 are not-for-profit institutions, 2,099 are for-profit institutions with programs of two years or less, and 290 are for-profit institutions with four-year programs. Using the definition described above, approximately 60 percent of IHEs qualify as small entities, even if the range of revenues at the not-for-profit institutions varies greatly. Many small institutions may focus on local provision of specific programs and would not be significantly affected by the delay in the 2016 regulations because they do not offer distance education. As described in the analysis of the 2016 final rule, distance education is a growing area with potentially significant effects on the postsecondary education market and the small entities that participated in it, including an opportunity to expand and serve more students than their physical locations can accommodate but also increased competitive pressure from online options. Overall, as of Fall 2016,

Federal Register / Vol. 83, No. 102 / Friday, May 25, 2018 / Proposed Rules

**24255**

approximately 15 percent of students receive their education exclusively through distance education while 68.3 percent took no distance education courses. However, at proprietary institutions almost 59.2 percent of students were exclusively distance education students and 30.4 percent had not enrolled in any distance education courses.[1] The delay in a clear State authorization rule for distance education may slow the reshuffling of the postsecondary education market or the increased participation of small entities in distance education, but that is not necessarily the case. Distance education has expanded over recent years even in the absence of a clear State authorization regime.

In the analysis of the 2016 final rule, we noted that the Department estimated total State Authorization Reciprocity Agreement (SARA) fees and additional State fees of approximately $7 million annually for small entities, but acknowledged that costs could vary significantly by type of institution and institutions' resources and that these considerations may influence the extent to which small entities operate distance education programs. Small entities that do participate in the distance education sector may benefit from avoiding these fees during the delay period. If 50 percent of small entities offer distance education, the average annual cost savings per small entity during the delay would be approximately $3,280, but that would increase to $6,560 if distance education was only offered by 25 percent of small entities. This estimate assumes small entities have not already taken steps to comply with the State authorization requirements in the 2016 final rule. The Department welcomes comments on the distribution of small entities offering distance education, the estimated costs to obtain State authorization for their programs, and the extent to which small entities have already incurred costs to comply with the 2016 final rule.

The Department also estimated that small entities would incur 13,981 hours of burden in connection with information collection requirements with an estimated cost of $510,991 annually. Small entities may be able to avoid some of the anticipated burden during the delay. To the extent small entities would need to spend funds to comply with State authorization requirements for distance education, the proposed delay would allow them to postpone incurring those costs. And although institutions may have incurred some of the $510,991 annual costs to prepare for the information collection requirements, it is possible that institutions could avoid up to that amount during the period of the delay.

**Paperwork Reduction Act of 1995**

As indicated in the Paperwork Reduction Act section published in the 2016 final regulations, the assessed estimated burden was 152,565 hours affecting institutions with an estimated cost of $5,576,251.

The table below identifies the regulatory sections, OMB Control Numbers, estimated burden hours, and estimated costs of those final regulations.

| Regulatory section | OMB control No. | Burden hours | Estimated cost $36.55/hour institution |
|---|---|---|---|
| 600.9 .................................................................................................. | 1845–0144 | 160 | 5,848 |
| 668.50(b) ............................................................................................ | 1845–0145 | 151,715 | 5,545183 |
| 668.50(c) ............................................................................................ | 1845–0145 | 690 | 25,220 |
| Total .......................................................................................... | .................... | 152,565 | 5,576,251 |
| Cost savings due to delayed effective date ..................................... | .................... | 152,565 | 5,576,251 |

This notice proposes to delay the effective date of the all of the cited regulations.

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* Braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register.** Free internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects**

*34 CFR Part 600*

Colleges and universities, Foreign relations, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

*34 CFR Part 668*

Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs—education, Loan programs—education, Reporting and recordkeeping

requirements, Selective Service System, Student aid, Vocational education.

Dated: May 22, 2018.

**Betsy DeVos,**
*Secretary of Education.*
[FR Doc. 2018–11262 Filed 5–24–18; 8:45 am]
**BILLING CODE 4000–01–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 30**

**[EPA–HQ–OA–2018–0259; FRL–9978–31–ORD]**

**RIN 2080–AA14**

**Strengthening Transparency in Regulatory Science; Extension of Comment Period and Notice of Public Hearing**

**AGENCY:** Environmental Protection Agency (EPA).

[1] 2017 Digest of Education Statistics Table 311.15: Number and percentage of students enrolled in degree-granting postsecondary institutions, by distance education participation, location of student, level of enrollment, and control and level of institution: Fall 2015 and fall 2016. Available at *https://nces.ed.gov/programs/digest/d17/tables/dt17_311.15.asp?current=yes.*

# Congress of the United States
## Washington, DC 20510

June 11, 2018

The Honorable Betsy DeVos
Secretary of Education
U.S. Department of Education
400 Maryland Ave., SW
Washington, D.C. 20202

Re: Notice of proposed rulemaking; Docket ED-2018-OPE-0041-0001

Dear Secretary DeVos:

We write in response to the Notice of Proposed Rulemaking (NPRM) indicating the Department of Education's (Department's) intent to delay implementation of the final Program Integrity and Improvement regulations by two years.  Specifically, we oppose the proposed delay of these regulations, which govern how distance education is authorized in states and the authorization needed for American schools with branch campuses in other countries, and we urge the Department to permit this rule to take effect on July 1, 2018, as originally planned.

Delaying these regulations will impede the ability of not only states to protect their residents, but also students to access key consumer protections and disclosures.  The proposed delay also improperly bypasses negotiated rulemaking as required by the Higher Education Act (HEA),[1] without satisfying criteria for an exemption from such rulemaking as articulated by the Administrative Procedures Act (APA).[2]

State authorization is one of the longest standing eligibility requirements for institutions of higher education seeking to receive federal financial aid.  Originally included in the National Defense Education Act of 1958 and preserved in the HEA of 1965, the state's role has been explicitly stated in law for 60 years.  States provide critical oversight and play a vital consumer protection role as part of the program integrity triad, along with the federal government and accrediting agencies.  However, it has not always been clear to colleges and universities operating distance education programs in multiple states how they should meet state authorizing requirements.

The state authorization of distance education rule, found in the Program Integrity and Improvement regulations, clarified that institutions offering such programs must be authorized in any state that requires them to do so, regardless of whether the college is physically headquartered in that state.  Fundamentally, the rule is about respecting states' authority to protect their own residents and regulate online programs operating within their borders if they choose to do so. Delaying the rule threatens to weaken the program integrity triad by undermining the role of states in their oversight of higher education.

---

[1] 20 USC 1098a(b)(2)
[2] 553(b)(3)(B) of title 5, United States Code

0007

The Program Integrity and Improvement regulations prescribe key consumer protection disclosures to warn students about any adverse actions taken against institutions and programs and whether the program meets state licensure requirements. Additionally, the rule requires student disclosures to include information related to refund policies and how to seek assistance with complaints, including the contact information for appropriate state authorities, such as the attorneys general offices.

Brazenly, in the NPRM, the Department acknowledges negative consequences the proposed delay will have on students by stating: "Access to such information could help students identify programs that offer credentials that potential employers recognize and value, so delaying…may lead students to choose suboptimal programs."[3] The Department goes on to assert that the proposed delay will primarily benefit for-profit colleges, noting that 70 percent of students at proprietary institutions had enrolled in some or exclusively distance education courses, as compared to just 32 percent of students overall.[4]

Additionally, the regulations stipulate state and federal oversight of American institutions receiving federal financial aid but operating in foreign locations, thereby ensuring core protections for students enrolled in campuses abroad. The Department offers no rationale for delaying this component of the rule, which is troubling, particularly as we are unaware of any concerns raised by stakeholders. The Department instead delays the foreign locations component without consideration for the importance of ensuring that a clear process is in place for basic authorization of institutions at which students study abroad and for which they can still receive taxpayer-funded federal financial aid.

To ensure compliant and responsive rulemaking and robust stakeholder participation, the Department under the Obama Administration held four sessions of negotiated rulemaking[5] and provided stakeholders an additional opportunity to submit comments for 30 days after no consensus was reached by the negotiators.[6] The Department carefully considered 139 comments over a four-and-a-half-month period, which included consultation with the Department of Defense, before publishing the final rule in December 2016.

In contrast to the deliberative process of the previous Administration, the Department is providing the general public no more than 15 days to comment on the proposed delay. This abrupt proposal comes just one month before the rule's effective date and would impose a two-year delay without negotiated rulemaking.

Through the HEA, Congress requires the Department to use negotiated rulemaking to promulgate rules for programs authorized by Title IV of the Act unless the Department determines that negotiated rulemaking is "impracticable, unnecessary, or contrary to the public

---

[3] Docket ID ED-2018-OPE-0041
[4] Docket ID ED-2018-OPE-0041
[5] U.S. Department of Education. Negotiated Rulemaking 2013-2014 Program Integrity and Improvement. https://www2.ed.gov/policy/highered/reg/hearulemaking/2012/programintegrity.html
[6] Office of the Federal Register, dated July 25, 2016. Vol. 81, No. 142, page 48598. https://www.gpo.gov/fdsys/pkg/FR-2016-07-25/pdf/2016-17068.pdf

0008

interest" as defined in the APA.[7]  Such an exception is often called a "good cause" waiver.  The Department acknowledges that it must go through a negotiated rulemaking process, but states that additional time is needed in order to fully execute this process before the effective date of July 1, 2018.  The Department uses this reason as proof of having "good cause" to forego negotiated rulemaking. The notice of proposed rulemaking states:[8]

> *"The Department has not had sufficient time to effectuate this delay through negotiated rulemaking. Negotiated rulemaking requires a number of steps that typically takes the Department well over 12 months to complete. [...] The Department could not have completed the well-over 12-month negotiated rulemaking process, described in the previous paragraph, between February 6, 2018, and the July 1, 2018, effective date. Thus, the Department has good cause to waive the negotiated rulemaking requirement with regard to its proposal to delay the effective date of the final regulations to July 1, 2020, in order to complete a new negotiated rulemaking proceeding to address the concerns identified by some of the regulated parties in the higher education community."*

However, the courts have held repeatedly that "good cause" is narrowly tailored.  In Natural Resources Defense Council (NRDC) v. Abraham, the U.S. Court of Appeals for the Second Circuit held that an impending effective date of a rule does not satisfy "good cause" and that there must be a threat of "real harm" to the public to justify any action without satisfying the appropriate process under the APA.  Just a few months ago, in March of 2018, Pineros y Campesinos Unidos del Noroeste, et al. v. E. Scott Pruitt, et al., the U.S. District Court for the Northern District of California further solidified the limited use of "good cause" by ruling that the Environmental Protection Agency (EPA) illegally delayed implementation of key pesticide safety rules.  The EPA stated that it did not provide the proper process under the APA because more time was needed, but the court held that lack of sufficient time was not a valid justification. The court stated:

> *"EPA justified this failure by relying on the "good cause" exception to the notice and comment requirements. See, e.g., California v. Health & Human Servs., 281 F. Supp. 3d 806, 824-25 (N.D. Cal. 2017) (discussing the good cause exception). EPA argued that "good cause" existed because more time was needed for "further review and consideration of new regulations" and confusion could result if the rule went into effect but was "subsequently substantially revised or repealed." (See AR 101, 103, 112.) The good cause, exception, however, is extraordinarily narrow and is reserved for situations where delay would do real harm. See, e.g., United States v. Valverde, 628 F.3d 1159, 1164-65 (9th Cir. 2010). A new administration's simple desire to have time to review, and possibly revise or repeal, its predecessor's regulations falls short of this exacting standard. Cf. Clean Air Council, 862 F.3d at 9 ("Agencies obviously have broad discretion to reconsider a regulation at any time. To do so, however, they must comply with the [APA], including its requirements for notice and comment.").*

---

[7] 20 USC 1098a(b)(2)

[8] Federal Register. Program Integrity and Improvement. https://www.federalregister.gov/documents/2018/05/25/2018-11262/program-integrity-and-improvement

0009

It is clear courts have found that a lack of time fails to satisfy the "good cause" standard Congress requires of the Department to waive negotiated rulemaking under the HEA.

The Department states delaying the effective date of the regulations is necessary due to questions recently raised by certain regulated entities, such as requests to clarify how colleges should determine the state of student residency, the coverage of out-of-state institutions under student complaint systems, and the Department's preferred format for required disclosures.[9]  Institutions have worked over the past 18 months to implement this rule, and their investments should not be wasted now by an unnecessary delay of these consumer protections and disclosures.  We encourage the Department to respond to stakeholder requests for clarity and direction through additional sub-regulatory guidance.  This can and should be done without delaying the rule's July 1 effective date and violating federal law.

In sum, the Department's proposed delay will have significant, negative implications for students, who will lack effective consumer protections and information.  The proposed delay will also have significant, negative implications for state actors, who would again be limited in their ability to enforce their own laws that oversee distance education programs operating within their borders. And, it will have significant, negative implications for taxpayers, who will have less transparency and less rigorous oversight of potentially predatory colleges and universities seeking to evade states' consumer protections.

Contrary to the Department's claims, maintaining the effective date of the rule is practicable, necessary, and in the public interest.  We therefore reiterate our position that the Department should allow the rule to take effect and work with institutions and states to resolve any lingering administrative concerns that may exist.

Sincerely,

PATTY MURRAY
Ranking Member
U.S. Senate
Committee on Health, Education, Labor,
and Pensions

ROBERT C. "BOBBY" SCOTT
Ranking Member
U.S. House of Representatives
Committee on Education and the
Workforce

---

[9] American Council on Education. Letter to Secretary DeVos, dated February 6, 2018. http://www.acenet.edu/news-room/Documents/ACE-Letter-on-State-Authorization-Concern.pdf
Western Interstate Commission for Higher Education (WICHE) Cooperate for Educational Technologies, the National Council for State Authorization Reciprocity, and the Distance Education Accrediting Commission, Letter to Acting Asst. Secretary Frank Brogan, dated February 7, 2018. https://wcet.wiche.edu/sites/default/files/WCET-SARA-DEAC-Letter-2-7-18_0.pdf

0010



June 11, 2018

Jean-Didier Gaina
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Avenue, SW
Mail Stop 294-20
Washington, DC 20202

*Via electronic submission at regulations.gov*

Re:     Comments on NPRM, Program Integrity and Improvement (State Authorization), Docket ID
        ED–2018–OPE–0041

Dear Mr. Gaina:

On behalf of the American Association of Colleges of Osteopathic Medicine (AACOM), thank you for the opportunity to provide comments on the U.S. Department of Education's notice of proposed rulemaking (NPRM), and we support the Department's decision to delay state authorization of postsecondary distance education to allow time for negotiated rulemaking. AACOM represents the 34 accredited colleges of osteopathic medicine (COMs) in the United States. These colleges are accredited to deliver instruction at 51 teaching locations in 32 states. In the current academic year, these colleges are educating nearly 29,000 future physicians—more than 20 percent of all U.S. medical students.

AACOM strongly supports the Department's willingness to receive public comment and conduct negotiated rulemaking to reconsider state authorization of distance education and the unintended consequences of the increased administrative and financial burdens that interfere with the educational missions of postsecondary institutions who train the nation's future physician workforce. ***While we understand the importance of accountability and appropriate oversight of regulations affecting postsecondary institutions and Title IV programs, we have continued to strongly urge the Department to reject a one-size-fits-all approach and consider factors unique to medical education and the training of future physicians as it evaluates existing regulations and devises new regulatory policy.***

AACOM has previously expressed its serious concerns regarding the adverse effects that implementation of state authorization provisions 34 C.F.R. 600.9(a) and (b) have already had on medical education. COMs, many of which are located in rural areas, often lack in-state training opportunities, and send their students out-of-state to complete their core clinical rotations during years three and four. This instruction is a mandatory component of the student's curriculum and of the educational pathway to becoming a licensed physician. Specifically, the new fees and onerous administrative mandates charged by states have had a particularly negative impact on AACOM member institutions as they work to offer robust learning experiences for medical students during core clinical rotations and produce physicians capable of practicing in a variety of clinical settings.

7700 Old Georgetown Road
Suite 250
Bethesda, MD 20814
P 401.968.4100
www.aacom.org

500 New Jersey Avenue, NW
Suite 380
Washington, DC 20001-2005
P 202.844.4217
www.aacom.org

Consequently, AACOM reinstates its previous position and maintains serious concerns that the distance education regulation, as finalized in 2016, does not provide the necessary clarification regarding how the Department will treat core clinical rotations under the regulation.  Students who are sent out-of-state to complete their core clinical rotations regularly receive remote instruction from their medical school in their home state.  However, the regulation does not prohibit states from imposing additional fees or further complicating administrative requirements with respect to distance education.  As a result, our member institutions could again face an extremely heavy lift and unnecessary administrative and financial burdens.

Furthermore, as noted, both in comments previously submitted by AACOM and in the NPRM, regulatory policy surrounding this multifaceted issue should be mindful of the process, time, and resources required for states, institutions, and other entities to comply.  If the Department continues to link Title IV institutional eligibility decisions to provisions as outlined in our comments, it could severely jeopardize or penalize medical students who rely on various federal financial aid assistance programs to help fund their education as they become licensed physicians, thereby further exacerbating the nation's physician workforce shortage.

***Therefore, as the Department moves forward through the regulatory process, we strongly urge the Department to thoroughly evaluate the unintended consequences of these policies on medical education and revise state authorization provisions 34 C.F.R. 600.9(a), (b), and (c), to explicitly exempt U.S. medical schools and clinical rotations as a condition of Title IV eligibility.***

Thank you for providing the opportunity to share our views.  As the nation faces a physician workforce shortage, it is critical to educate and sustain a future health care workforce to meet the nation's health care needs.

AACOM looks forward to working closely with the Department to ensure that medical schools and students are well served by Title IV federal financial aid programs.  If you have any questions or require further information, please contact Pamela Murphy, Senior Vice President of Government Relations, at (202) 844-4217 or pmurphy@aacom.org, or Julie Crockett, Federal Regulatory Affairs Manager, at (202) 844-4231 or jcrockett@aacom.org.

Respectfully,

Stephen C. Shannon, DO, MPH
President and CEO

2



**ED-2018-OPE-0041**
**Program Integrity and Improvement**
**Comments of the Association of American Publishers**

June 11, 2018

Ms. Sophia McArdle
U.S. Department of Education
400 Maryland Avenue, SW
Mail Stop 290-44
Washington, D.C.  20202

Dear Ms. McArdle:

On behalf of the Association of American Publishers, I am providing comments on the Department of Education's proposal to delay, until July 1, 2020, the effective date of the final regulation entitled Program Integrity and Improvement published in the Federal Register on December 19, 2016 and to engage in negotiated rulemaking to reconsider the final regulations, and, as necessary, develop revised regulations.

The Association of American Publishers (AAP) consists of more than 400 member organizations.  Our members include the nation's foremost digital learning companies and publishers, both large and small, of college textbooks, scholarly, literary, cultural, scientific and technological works, and university presses.  The wide range of materials produced by these publishers is frequently and routinely adopted as course materials in four- and two-year institutions of higher learning throughout the country.

On August 24, 2016, AAP in coordination with the Software & Information Industry Association (SIIA) submitted comments on the Proposed Regulations on State Authorization and Disclosure Requirements (ED-2016-OPE-0050).[1]  We urged that as the Department moved to protect students, families and taxpayers, that it do so in a manner that does not deter technological innovations associated with online courses and digital learning materials. In our comments, we also urged the Department to revise its regulation to address three key issues:

---

[1] Those comments can be found at https://www.regulations.gov/document?D=ED-2016-OPE-0050-0064 and https://www.regulations.gov/document?D=ED-2016-OPE-0050-0070 .

1. Allow for students residing in states without student complaint processes that do not participate in a reciprocity agreement to maintain access to Title IV funds for institutions in states with a complaint process.
2. Provide guidance for states on key terminology used in the regulation to ensure consistent meaning and implementation across states, institutions, and accrediting agencies.
3. Do not create unreasonable additional burdens for distance and correspondence course programs.

We renew our call for the Department to address these issues.  We support the Department's proposal to delay the effective date and engage in negotiated rulemaking.  We would ask that these issues be included in your future rulemaking.

Sincerely,

David E. Anderson
Senior Director, Education Policy and Innovation



June 11, 2018


Honorable Betsy DeVos
Secretary of Education
U.S. Department of Education
400 Maryland Ave., SW
Washington, DC 20202

Re: Docket ID ED-2018-OPE-0041

Dear Secretary DeVos:

On behalf of the approximately 450 higher education institutions represented by the Career Education Colleges and Universities, I write to support the U.S. Department of Education's ("Department") proposed delay, from July 1, 2018 to July 1, 2020, of the final regulations published in the Federal Register December 19, 2016 ("final regulations"). The solicitation for written comments regarding the proposed rule delay was published in the Federal Register May 25, 2018.

As described in the preamble to the final regulations, the 2016 rule was intended to end uncertainty with respect to State authorization and close gaps in State oversight to ensure students, families, and taxpayers are adequately protected.[1] However, the Department concedes it missed the mark and instead promulgated a burdensome, costly, and confusing rule – provisions of which have been publically criticized by several respected members of the higher education community.[2]

We applaud this Administration's efforts in recognizing the complexities of the State authorization concept and respecting that affected stakeholders are better poised to revise *or eliminate* the rule through new negotiated rulemaking.[3]

We stand ready to assist in determining how best to ensure adequate consumer protections while also balancing the needs for access, affordability, and imposing a lesser burden on students, institutions, and States.

Sincerely,

Steve Gunderson
President & CEO

---

[1] *See* 81 FR 92232-92232.
[2] *See* 83 FR 24250-24251.
[3] Since 2010, robust consumer protection requirements aimed at out-of-State institutions that enroll students who reside in a different State have been implemented or enhanced by most States. Therefore, the Department should consider whether any Federal rulemaking beyond full elimination of the final regulations is appropriate or duplicative as a result of the intended purpose already being achieved by another part of the triad.

June 11, 2018

*Electronically filed via regulations.gov*

The Honorable Betsy DeVos
Secretary of Education
Lyndon Baines Johnson Department of Education Building
400 Maryland Avenue SW
Washington, DC 20202

Re:   Notice of Proposed Rulemaking, 83 Fed. Reg. 24,250 (May 25, 2018)
      Docket ID ED-2018-OPE-0041-0001

Dear Secretary DeVos,

The Center for Responsible Lending (CRL)[1] files this comment in response to the U.S. Department of Education's notice of proposed rulemaking that would delay and re-open final regulations on the distance education provision of the Higher Education Act (HEA). CRL urges the Department to implement the properly proposed and finalized regulations of 2016 and to address any lingering concerns about implementation through the issuance of guidance. The Department's previously conducted negotiated rulemaking on this topic as well as its subsequent notice and comment period provided sufficient opportunity for all interested parties to submit comments and perspectives. Moreover, the Department duly addressed all comments through its process as reflected in its final regulations. Efforts to delay and modify these regulations will only result in more confusion for students, institutions, existing reciprocity compacts, and states and create more opportunities for institutional abuse that wastes taxpayer money and ensures that poor programs will continue to thrive as the Department carries out an unnecessary and duplicative process.

Further, the decision to delay these important regulations only a month before the date of implementation is extremely troublesome. All entities have had almost 18 months to prepare for compliance and should therefore be ready to proceed with minimal impediments. This latest action in the Department's series of regulatory rollbacks serves only to further erode consumer protections that benefit students, institutions and taxpayers while preventing states from enforcing their own laws and protecting their own citizens. In fact, the Department has provided no justification for this action save a limited record of letters from institutional organizations that requested guidance only, not a delay and new process. CRL encourages the Department to abandon its latest attempt at de-regulation and take steps to actually further its mission of serving students and ensuring access to high quality education.

---

[1] The Center for Responsible Lending is a non-profit, non-partisan research and policy organization dedicated to protecting homeownership and family wealth by working to eliminate abusive financial practices, including student loan debt incurred as a result of fraudulent representations by higher learning institutions. CRL's views on student lending are informed by its affiliation with Self-Help, one of the nation's largest nonprofit community development financial institutions. Self-Help has provided $6 billion in financing to 70,000 homebuyers, small businesses and nonprofits and serves more than 80,000 mostly low-income families through 30 retail credit union branches in North Carolina, California, and Chicago.

## I.    Background

Program integrity in our higher education system relies on the "triad," consisting of oversight by the federal government, state governments and accrediting agencies. Each component of the triad plays an essential part in ensuring that students have access to high quality higher education opportunities and that institutions operate with accountability. This dynamic has been tested over the past few decades as we have seen the rise of the for-profit college sector coupled with widespread programmatic abuses, particularly within this rapidly growing sector. Further, as the digital revolution continued, online and distance education have also increased simultaneously and as a direct feature of many of these for-profit programs. Today, millions of students attend school online. The 2016 distance education regulations attempted to rectify the gap created by inconsistent state authority and regulation of online providers where students and taxpayers found themselves inadequately protected should an issue arise with on-line coursework or programs. The need for regulation was clear and simple: there is no reason why online education should be exempted from full oversight under the triad, especially when millions of American students and borrowers attend school online and billions of dollars in federal funds flow through these programs.

In 2014, more than 2,300 institutions offered over 23,000 distance-education programs. As of Fall 2015, more than 4.9 million undergraduate students—one in four—participated in distance education, including 2.1 million students (12 percent) who were enrolled exclusively online. Of those 2.1 million entirely-online students, 1.3 million were enrolled at institutions located within their states, and 767,000 were enrolled in online institutions located across state lines. Recent data from the National Council on State Authorization Reciprocity Agreements (SARA) also gives us some insight into the scope of online enrollment in the United States: 1495 institutions are SARA members, serving 1,166,560 students. Of this count, only 200,171 students fall outside the SARA guidelines and 966,389 fall within them.

These numbers indicate that any delay in implementation of these rules will have a far-reaching effect on our higher education system. Further, the extent of distance education participation coupled with the fact that the majority of these programs are for-profit lends even more urgency to the need for swift, un-delayed implementation of the final rules.

## II.    For-profit colleges, the sector most known for waste, fraud and abuse, make up a disproportionate share of the SARA market.

In fall 2016, entirely-online students made up 52 percent of the student body at private for-profit colleges, more than three times that of students at private nonprofit colleges (15 percent) and more than five times that of public institutions (10 percent). As seen in the table below, the for-profit schools (shown in orange) ranked in the Top 12 for distance enrollment accounted for about 40% of all distance education students in 2016. All of these schools, which collectively enroll 18% of SARA students, have also been the focus of consumer complaints at the federal or state level.

**Table: Top 12 Schools for Distance Enrollment[2]**

| | Number of Students Taking at Least One Class Online, 2016 |
|---|---|
| University of Phoenix-Arizona | 129,332 |
| Western Governors University | 84,289 |
| Grand Canyon University | 68,542 |
| Liberty University | 67,766 |
| Southern New Hampshire University | 63,973 |
| Walden University | 52,565 |
| University of Maryland-University College | 50,932 |
| American Public University System | 48,623 |
| Excelsior College | 41,658 |
| Ashford University | 41,343 |
| Capella University | 37,569 |
| Kaplan University | 37,431 |

State oversight is always crucial, but even more so when known bad actors are attempting to operate outside of oversight. For the past several years, CRL has conducted research on college affordability and the higher education landscape with a particular focus on North Carolina and Florida. While the issue of unscrupulous institutions affects all students whose detrimental reliance on information presented by these schools prompts them to take out student loans, we note that these problems are particularly severe for students at for-profit colleges.

In CRL's research on North Carolina student outcomes, we found that low-income students (as measured by the number of Pell Grantees) make up a far larger percentage of students at for-profit schools than their public and private school counter parts, as do African-American students.[3] Additionally, these for-profit, post-secondary institutions are more expensive than other schools and borrowers are less likely to be able to repay their loans when they leave. Unfortunately, this means that an inordinate number of low-income students and students of color are left with large loans that they cannot repay. By contrast, borrowers who attend public and private colleges have a smaller debt load and can afford to repay their loans when they leave school.[4] In addition to taking out loans that they cannot afford to repay, students of color at for-profit universities often borrow without ever receiving a degree. In a 2014 national research paper on student outcomes at for-profit institutions, CRL found that African Americans and Latinos attending for-profit colleges are far less likely to graduate than their peers at other schools. Nearly eighty percent of African-American and two-thirds of Latino students do

---

[2] Source: https://www.insidehighered.com/digital-learning/article/2018/01/05/new-us-data-show-continued-growth-college-students-studying
[3] Whitney Barkley & Robin Howarth, *NC Student Loan Calculus: What North Carolina Can Do to Ensure All of Its Students Receive an Affordable, Quality College Education* (Center for Responsible Lending, 2016).
[4] *Id.*

not complete for-profit programs.[5] These outcomes cannot be attributed to the demographics of these students. Historically black colleges and universities (HBCUs) also have large low-income and student of color populations, but lower financial costs and significantly better outcomes.[6] The implications of this research are widely applicable. In 2012, over 1.5 million borrowers originated federal and private student loans at for-profit institutions.[7] Our most recent research included extensive qualitative analysis using focus groups of for-profit students in Florida, many of them online students.  Due to these staggering numbers, we urge the Department to focus on the disparate student outcomes at for-profit schools and consider how predatory schools acutely affect students of color by ensuring that these institutions are effectively regulated. The 2016 distance education rules are just one method of ensuring accountability.

### III.    States must be able to determine who operates in their borders.

State authorization is an essential part of the educational triad, no less important than accreditation or federal authorization. The triad is a three-legged stool. The absence of any one leg undermines the entire structure.

In many ways, state authorization is the most vital piece of the triad – if it is properly executed. States are in the best position to truly oversee a program or institution. Their proximity to the physical location of the school, in the case of hybrid programs, allows effective state agencies to conduct site visits, investigate complaints, and address deficiencies in a timely manner. States are often the first line of defense for borrowers attending failing programs or institutions, whether the investigation is done by their authorization board or the Office of the Attorney General.

Many states have high standards for consumer protection, as well as other laws of general applicability aimed at protecting their residents. These states should have the authority to oversee and enforce their laws against any institution operating in their state, including an institution of higher education.

Further, the lack of an explicit requirement for state authorization may be interpreted as a requirement for states to accept all institutions operating in their state, even if that state's licensing scheme would not have allowed a particular school or sector to operate there. States that are concerned about specific institutions should not be forced to allow them to enroll students without state approval or rigorous oversight.

---

[5] Peter Smith & Leslie Parrish, *Do Student of Color Profit from For-Profit Colleges? Poor Outcomes & High Debt Hamper Attendees' Futures* (Center for Responsible Lending, 2014).

[6] Whitney Barkley & Robin Howarth, *NC Student Loan Calculus: What North Carolina Can Do to Ensure All of Its Students Receive an Affordable, Quality College Education* (Center for Responsible Lending, 2016).

[7] Analysis of data from the office of Federal Student Aid (https://studentaid.ed.gov/sa/about/data-center/student/portfolio) compared with borrower statistics from the U.S. Senate Committee on Health, Education, Labor, and Pension, 112th US Cong., *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*, (2012) (http://www.help.senate.gov/imo/media/for_profit_report/Contents.pdf).

For example, the University of Phoenix is a participant in the SARA compact through its home state of Arizona. Despite investigations by state attorneys general,[8] the Securities and Exchange Commission,[9] and the Federal Trade Commission,[10] as well as negative actions by the Department of Defense,[11] the institution is still approved to enroll distance education students in any SARA member state – even if that state has documented abuses by the institution.

State approval boards and regulatory schemes are not identical from state to state. States should be encouraged to regulate above that floor and, more importantly, should be able to reject institutions that do not meet their higher standards. Instead of accepting all institutions, states should be able to approve only one institutional sector for distance education – or withdraw approval, on a case-by-case basis, for schools they believe will not provide quality services to students in their state. The Department of Education should be committed to permitting states to have the final say regarding which institutions or institution types are enrolling their students.

IV.    **Conclusion**

The 2016 regulations on distance education are a critical component of program integrity and accountability for the current digital era. The regulations carefully balance the needs and interests of students, institutions, and states in this constantly changing arena. While we recognize that there is often room for improvement, the proper method for doing so in this case is to issue guidance not delay implementation. We urge the Department to rely on the extensive rulemaking record already in its possession and its authority as a federal regulator and protector of the taxpayer investment to move forward with these rules as originally planned. The Department should clarify, not dismantle, these regulations.

We thank you for the opportunity to provide our comments.

Sincerely,

Center for Responsible Lending

---

[8] Apollo Educ. Group, Inc., Report (Form 8-K), at 2 (Aug. 7, 2015).
[9] Apollo Educ. Group, Inc., Report (Form 8-K), at 2 (Apr. 19, 2012).
[10] Apollo Educ. Group, Inc., Report (Form 8-K), at 2 (July 29, 2015).
[11] Apollo Educ. Group, Inc., Report (Form 8-K), at 2 (Oct. 7, 2015).



**Comments submitted by
The National Consumer Law Center
to the U.S. Department of Education**

**Re: Proposed Delay of Program Integrity and
Improvement, State Authorization of Distance
Education Regulations (83 Fed. Reg. 24,250)**



**Docket: ED-2018-OPE-0041**

**June 11, 2018**

The National Consumer Law Center (NCLC) submits these comments on behalf of its low-income clients regarding the Department of Education's proposed two-year delay of the state authorization of distance education regulations.[1]  We urge the Department not to delay, but to move forward with prompt implementation of the state authorization of distance education regulations finalized in 2016.[2]

NCLC is a nonprofit organization specializing in consumer issues on behalf of low-income people.  NCLC has nationally recognized expertise in student loan law and publishes a widely-used treatise, *Student Loan Law* (5th ed. 2015), *updated at* www.nclc.org/library.  NCLC's Student Loan Borrower Assistance Project provides information about student borrowers' rights and seeks to increase public understanding of student lending issues and to identify policy solutions to promote access to education and lessen student debt burdens.[3]  It also provides direct representation to low-income student loan borrowers, many of whom are struggling with unaffordable federal student loan debt after enrolling in career education programs that failed to provide valuable training, credentials or opportunities.  NCLC's Student Loan Borrower Assistance Project consults with civil legal services organizations across the country that represent borrowers in their local communities.

**Importance of the Rule to Low-Income Students**

The 2016 State Authorization of Distance Education Rule ("the 2016 Rule" or "the Rule") is of significant importance to our low-income clients and to low-income consumers served by legal services providers across the country.  In addition to being of limited economic means, our clients are often the first in their families to purse higher education.  They include people of color, immigrants, non-native English speakers, single mothers and veterans.  They are too often targeted by unscrupulous and predatory out-of-state schools that encourage individuals to take out federal student loans to enroll in distance education programs without regard to

---

[1] Proposed Delay of Program Integrity and Improvement Regulations, 83 Fed. Reg. 24,250 (May 25, 2018).
[2] Program Integrity and Improvement, 81 Fed. Reg. 92,232 (Dec. 19, 2016).
[3] The Project's website includes more information; *see* www.studentloanborrowerassistance.org.

0021

whether the programs are worthwhile investments or will qualify students for licensure in their states.

These students are among the "5.5 million distance education students at degree-granting institutions" that the 2016 Rule was designed to protect.[4]  The 2016 Rule was created to close a loophole that left online students attending schools without an in-state physical location unprotected by the federal and state higher education supervisory plan.  As the Department explained when it announced the rules:

> State authorization is a longstanding requirement in the Higher Education Act that requires institutions to be authorized in the state in which they are located as a condition for eligibility to receive Title IV Federal student aid.  While all higher education institutions must have state authorization in the states in which they are physically located, there are no federal regulations for distance education providers in states where the institutions are not located.[5]

The 2016 Rule corrects that oversight and restores important state protections to online students.   Under the Rule, the Department requires all providers of distance education that wish to participate in the Title IV program to obtain state authorization in each state where they enroll students and where the state requires authorization to operate.  This ensures that states have the opportunity to conduct a review of out-of-state education providers just as they do for in-state providers.  It also prevents the federal government from working at cross-purposes with states, by funding entities to offer services in states where they are not authorized to operate.

Additionally, the Rule strengthens consumer protections for students in two key ways.  First, the Rule requires schools to disclose basic but critical information about the quality and value of their programs.  Specifically, the Rule requires schools to disclose information about adverse actions taken by state agencies and accreditors and to disclose where career programs do not meet programmatic accreditation requirements necessary for the student to attain a professional license in her home state.  This latter requirement was designed to address the devastating problem of students wasting their time and money to attend job-specific programs, such as nursing or teaching, without realizing or being told that the programs will not actually qualify them for licensure in that occupation in their state.  These disclosures will not resolve the problems of predatory enrollment, but are basic, common sense steps toward reducing the risk of students unwittingly enrolling in predatory or worthless programs.

---

[4] Press Release, Education Department:  Education Department Announces Final Rule on State Authorization of Postsecondary Distance Education, Foreign Locations (Dec. 16, 2016), *available at* https://www.ed.gov/news/press-releases/education-department-announces-final-rule-state-authorization-postsecondary-distance-education-foreign-locations.
[5] *Id.*

0022

Second, the Rule defines and sets parameters around use of state authorization agreements, which nearly all states now use as part of their framework for overseeing distance education.  Importantly, the Rule requires these agreements to be consistent with enforcement of state consumer protection laws for them to provide valid state authorization for the purposes of Title IV eligibility.  The Rule clarifies that states must be able to enforce their own consumer protection laws, including those designed to protect against abuses in the higher education industry, under state authorization agreements.  This addresses a critical consumer protection deficiency in current state authorization practices identified by NCLC in a 2015 report.[6]

**There is No Time to Delay in Protecting Online Students**

There is no time to delay in closing this loophole: distance education is the fastest growing segment of higher education,[7]  and more students are obtaining their education online every year.  These students deserve the same legal protections as students attending traditional brick-and-mortar schools in the same state, and have already waited far too long.

Additionally, as detailed in an NCLC report, a majority of the largest online education schools are owned and operated by the same for-profit companies that have been the subject of multiple law enforcement investigations and actions.[8]  Bringing online schools into the Title IV framework and subjecting them to state oversight now is critical to deterring and preventing abusive conduct that wastes students' and taxpayers' dollars.

In announcing the proposed delay, the Department said delay was needed "based on concerns recently raised by regulated parties" and to consider possible revisions to the rules through a new rulemaking.  But the requests for clarification raised by industry were on issues long known to the Department and to participants in the rulemaking process, and can and should be addressed through guidance without any need to delay protections for students or pursue further rulemaking.  Indeed, NCLC and other advocates for students have specifically urged the Department to move forward with implementing the rules and cited information from the preamble of the 2016 rule to describe how ED can easily clarify the scope of the rules.[9]

---

[6] National Consumer Law Center, Wake-Up Call to State Governments: Protect Online Education Students from For-Profit School Fraud (Dec. 2015), *available at* http://www.nclc.org/images/pdf/pr-reports/brief-ensure-ed-integrity-2015.pdf.
[7] Office of the Inspector General, Dep't of Educ., "Title IV of the Higher Education Act Programs: Additional Safeguards are Needed to Help Mitigate the Risks That are Unique to the Distance Education Environment," ED-OIG/A07L0001 at 4, 6 (Feb. 2014).
[8] National Consumer Law Center, Wake-Up Call to State Governments: Protect Online Education Students from For-Profit School Fraud (Dec. 2015), *available at* http://www.nclc.org/images/pdf/pr-reports/brief-ensure-ed-integrity-2015.pdf.
[9] Letter to Sec. DeVos Requesting Guidance and Implementation of State Authorization of Distance Education Rule (March 26, 2018), *available at* https://na-production.s3.amazonaws.com/documents/03262018_State_Authorization_Letter_Final.pdf.

0023

Announcing plans to delay the rule barely a month before its implementation and almost a year-and-a-half after it was first published is not only unnecessary, but also unfair to institutions, to states, and most importantly, to students.  If the 2016 Rule is delayed, online students will be left out of the federal and state regulatory framework and thus exposed to continued abuses for another two years.  Additionally, the lateness of the notice is unfair to the student borrowers who were the intended beneficiaries of the Rule.  The late notice necessitated an unusually short period for the public to provide comments (15 days inclusive of only 10 business days).  While industry lobbyists may be able to respond to notices during such a brief window, most busy students and borrowers cannot, and we fear their voices will be left out of the process.

**Conclusion**

The 2016 state authorization rules can and should be implemented as scheduled this summer as an important step toward protecting online students.

Thank you for considering these comments.  Please feel free to contact Abby Shafroth at ashafroth@nclc.org or 617-542-8010 with any questions or to discuss.

4

# ConsumersUnion®

## THE ADVOCACY DIVISION OF CONSUMER REPORTS

June 11, 2018

Betsy DeVos, Secretary
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

**RE: Program Integrity and Improvement [Docket ID: ED-2018-OPE-0041; RIN: 1840-AD39]**

Dear Secretary DeVos:

Consumers Union, the advocacy division of Consumer Reports,[1] appreciates the opportunity to comment in response to the Department's proposal to delay implementation of the state authorization rule for postsecondary distance education programs.

We strongly support the 2016 rule, and urge the Department to move forward with implementation.  It adds clarity to the regulatory framework applicable to distance education providers, in recognition of the changing landscape for postsecondary education that increasingly involves distance education providers marketing their programs to students in multiple states.  The 2016 rule includes these important provisions:

- It requires all providers of distance education to obtain state authorization in each state where they intend to enroll students, to ensure states conduct an active review of out-of-state education providers.
- It defines permissible uses of reciprocity agreements, and provides that a student's home state has final authority to resolve complaints and enforce its own consumer protection laws even where reciprocity agreements are present.
- It also provides important notice requirements, to ensure that students do not unwittingly enroll in career programs that do not meet the programmatic accreditation requirements necessary for the student to obtain a professional license in her home state, or which are subject to ongoing investigations that may portend trouble at the institution.

---

[1] Consumers Union is the advocacy division of Consumer Reports, an expert, independent, non-profit organization whose mission is to work for a fair, just, and safe marketplace for all consumers and to empower consumers to protect themselves. Consumers Union works for pro-consumer policies in the areas of financial services, as well as telecommunications, health care, food and product safety, energy, telecommunications, privacy and data security, and competition and consumer choice, among other issues, in Washington, DC, in the states, and in the marketplace. Consumer Reports is the world's largest independent product-testing organization, using its dozens of labs, auto test center, and survey research department to rate thousands of products and services annually. Founded in 1936, Consumer Reports has over 7 million subscribers to its magazine, website, and other publications.

Our organization served on the 2014 Program Integrity and Improvement Committee, representing the interests of consumer advocacy organization.  Negotiators engaged in robust stakeholder discussions over four sessions in developing this rule.  The resulting 2016 final rule reflects that substantial stakeholder input.  There is simply no rationale to abruptly delay the rule for another two years, allowing confusion and uncertainty to impact states, distance education providers, and – most importantly – students.

General comments

With more than 2.8 million post-secondary education students enrolled in online-only programs,[2] the Department must take seriously the issue of quality in online education programs with greater urgency than ever before.  As the Department acknowledged in its notice of proposed rulemaking, there has been significant growth in the number of students enrolling in out-of-state online programs, a majority of whom enroll in proprietary schools' online programs.[3]

Despite this trend, online-only education remains largely unregulated.[4] Unfortunately, increasing complaints about fraud at some institutions indicate that the need for clear state oversight standards is overwhelming.  Online programs offered by for-profit schools are too often purveyors of fraud and debt rather than knowledge and skills. For example, in 2014, Ashford and its parent company Bridgepoint Education, Inc. paid $7.25 million to Iowa for misleading online recruiting practices, including deceiving prospective students by leading them to believe that online education degrees would allow them to become classroom teachers.[5]   Last year, the California Attorney General also sued Ashford and Bridgepoint for widespread deception in its recruitment practices, as well as aggressive debt collection.[6]

However, Ashford continues to have an active distance education business.[7] Ashford is not alone in doing active business despite being under investigation.  For example, the University of Phoenix,[8] Kaplan[9] and Ashworth[10] have also been the focus of complaints by state and federal agencies for their ongoing distance education programs.

---

[2] I. ELAINE ALLEN ET AL., ONLINE REPORT CARD: TRACKING ONLINE EDUCATION IN THE UNITED STATES 4 (2016), *available at* http://onlinelearningsurvey.com/reports/onlinereportcard.pdf.

[3] Program Integrity and Improvement; Proposed Rule, 81 Fed. Reg. 48598, 48607 (proposed July 25, 2016).

[4] ROBYN SMITH, NAT'L CONSUMER LAW CTR., ENSURING EDUCATIONAL INTEGRITY: 10 STEPS TO IMPROVE STATE OVERSIGHT OF FOR-PROFIT SCHOOLS 18 (2014), *available at* http://www.nclc.org/images/pdf/pr-reports/for-profit-report.pdf.

[5] Press Release, Iowa Dep't of Justice, Office of the Attorney General, Ashford University and Parent Company Bridgepoint Education Agree to $7.25 Million Payment Major Changes after Miller Alleges Consumer Fraud (May 16, 2014), https://www.iowaattorneygeneral.gov/newsroom/ashford-university-and-parent-company-bridgepoint-education-agree-to-7-25-million-payment-and-majo/.

[6] Press Release, Calif. Dep't of Justice, Attorney General Xavier Becerra Sues For-Profit Ashford University for Defrauding and Deceiving Students (Nov. 29, 2017), https://oag.ca.gov/news/press-releases/attorney-general-xavier-becerra-sues-profit-ashford-university-defrauding-and.

[7] Press Release, Bridgepoint Educ., Bridgepoint Education Reports Second Quarter 2016 Results (Aug. 2, 2016), http://www.prnewswire.com/news-releases/bridgepoint-education-reports-second-quarter-2016-results-300307777.html.

[8] Apollo Education Group, Inc., Current Report (Form 8-K), at 2 (Aug. 7, 2015).

[9] Press Release, North Carolina Dep't of Justice, Office of Attorney General, Unlicensed Medical Institute Shut Down for Offering Faulty Classes (Oct. 9, 2015http://www.ncdoj.gov/News-and-Alerts/News-Releases-and-Advisories/Press-Releases/Unlicensed-medical-institute-shut-down-for-offerin.aspx.

For these reasons, it is crucial that states conduct an active review of schools seeking authorization to operate under their jurisdiction, to prevent schools with poor track records from putting students into debt for questionable programs. Without proper oversight of these schools, the Department, states, students and taxpayers will continue to bear the cost.

To address these problems, the 2016 rule clarified that distance education providers must obtain authorization in every state where it seeks to operate, and set forth crucial new standards in two specific areas: (1) state authorization reciprocity agreements; and (2) disclosures to students about authorization, accreditation, and other important information measures of school quality.

State authorization reciprocity agreements

The 2016 rule's provisions regarding interstate reciprocity agreements are critical to resolve longstanding confusion as to which standards and processes apply to distance education programs authorized through such agreements, and to ensure that states can still enforce their own consumer protection laws when their residents are harmed by out-of-state actors. Absent clear and final authority for a student's home state to enforce its applicable laws, such agreements, if they seek to preempt laws in a student's home state, could result in a two-tiered oversight system that encourages schools to engage in "forum shopping," seeking to headquarter in a state with more lax consumer protection laws.  This in turns results in weaker protections for students taking distance education courses with out-of-state providers.

The 2016 rule clarifies that a state can enforce its own laws, including consumer protection laws of general applicability as well as those specific to higher education, in order to protect students.  This is a crucial change that must be implemented without delay, to improve distance education standards preserve states' rights to protect their residents.

Accreditation and Disclosures

The 2016 rule also provides important disclosures to students enrolled in programs that are meant to lead to obtaining a professional license, the requirements of which can vary substantially from one state to another – unbeknownst to the student.  Without adequate information regarding a distance education program's current accreditation status, students seeking to become teachers, nurses, and other professionals can find themselves in debt for a program that does not qualify them to sit for the exams they need to pass in order to embark on their intended careers.

To address this issue, the 2016 rule requires schools to inform prospective students if the program does not meet licensure or certification requirements in the state where the student resides.  It also requires distant education providers to promptly notify all prospective and enrolled students when there are any adverse actions being taken by a

---

[10] Press Release, Fed. Trade Comm'n, Ashworth College Settles FTC Charges it Misled Students About Career Training, Credit Transfers (May 26, 2015), http://www.ncdoj.gov/News-and-Alerts/News-Releases-and-Advisories/Press-Releases/Unlicensed-medical-institute-shut-down-for-offerin.aspx.

0027

state agency or an accreditor, as well as any determination that the program fails to meet licensure or certification prerequisites.

<u>Conclusion</u>

Students enrolled at distance education programs need fair treatment from their schools, and proper oversight from state and federal government, in order to realize the opportunities they seek through postsecondary education.  It is crucial that the Department set ground rules to promote the best interests of students, not simply to ease friction in the authorization process for schools.  We strongly urge the Department to implement the 2016 rule, to provide clarity to schools and protect our nation's students.


Sincerely,


Suzanne Martindale
Senior Attorney



**www.consumer-action.org**

| | | |
|---|---|---|
| PO Box 70037 | 1170 Market St., Suite 500 | 11901 Santa Monica Blvd., PMB 563 |
| Washington, DC 20024 | San Francisco, CA 94102 | Los Angeles, CA 90025 |
| 202-544-3088 | 415-777-9648 | 213-624-4631 |

June 11, 2018

Sophia McArdle, Ph.D
Department of Education
400 Maryland Avenue SW, 6W256
Washington, DC 20202

**Re: Program Integrity and Improvement (State Authorization)**
**Docket no. ED-2018-OPE-0041**

Dear Dr. McArdle,

Consumer Action writes to you on behalf of low- and moderate-income, limited-English-speaking, and other underrepresented consumers nationwide. We are writing in response to Federal Register notice ED-2018-OPE-0041, which seeks to delay implementation of the 2016 state authorization regulations. We would like to convey our strong opposition to delaying the 2016 state authorization regulations, a rule that was finalized after nearly two years of negotiations, public scrutiny and review. Delaying the rule is unfair to institutions, to states, to taxpayers, and most importantly, to students. Instead, we urge you to implement the authorization rule as it stands. The Department's intent to establish a new (and, in our view, unnecessary) rulemaking process later this year is no basis for the Department to refuse to implement and enforce the existing, finalized state authorization regulations in the interim.

Online education is a booming industry, especially for for-profit institutions, where entirely-online students make up nearly 50 percent of the student body. According to the Integrated Postsecondary Education Data System, nearly 4.9 million undergraduate students, or one in four, participated in distance education as of 2015, including 2.1 million students who were enrolled exclusively online. Nearly one in five veterans was enrolled in an exclusively-online program in 2015. Given these significant figures, we worry about the impact that delaying the authorization rule would have on current and future students and student loan borrowers, many of which are veterans, servicemembers, single parents, and the first in their family to attend college.

The average student enrolled in an online-only for-profit program owes more in federal student loans than in any other education sector ($31,298.60 compared with $28,482.20 on average across all education sectors); and that debt is higher than those not enrolled in entirely-online programs ($21,525.60, on average).[1] The students that are more likely to enroll in online education programs are disproportionately older, poorer, and more likely to be an

---

[1] U.S. Department of Education, National Center for Education Statistics, Integrated Postsecondary Education Data System (IPEDS), Spring 2016 and Spring 2017, Fall Enrollment component. (This table was prepared January 2018.)

underrepresented minority than those who enroll in non-online programs, including brick-and-mortar schools.[2]

The state authorization regulation requires schools that provide online education to disclose critical information that students need to make informed decisions about their education and finances, including whether the program they're considering satisfies certain licensure/certification prerequisites and whether the programs meets licensure/certification requirements in the state where the student resides—basically protecting students from paying thousands of dollars for worthless degrees that do not adequately prepare them for their intended profession.

The state auhtorization regulation also provides vital, yet basic, protections to consumers by requiring that students have a way to file complaints and that states/institutions have a way of addressing them. This complaint system functions as an essential early warning system of potential waste, fraud, and abuse of students and federal financial aid. Delaying the implementation of this rule would mean students and borrowers are left unprotected and without the assurance of high-quality program standards.

The 2016 state authorization rule provides core protections to consumers and reserves states' rights to enforce their own laws—essential elements of protecting the higher education system that should not be ignored while the Department pursues a new regulation. States and educational institutions have had nearly 18 months to comply with this rule and have invested valuable resources in doing so. The Department's decision to publish this notice of delay in late May, just weeks before the July 1 implementation deadline, and with minimal time for a period of public comment, is cause for concern.

If the Trump Administration is serious about protecting students from predatory practices, the Department of Education must implement the state authorization regulations without delay. Each of these accountability measures is essential to protect students and taxpayers from misconduct by unscrupulous education programs, and to maintain the integrity of our federal financial aid program.

Thank you for the opportunity to comment.


Regards,

Alegra Howard
National Priorities Associate
Consumer Action
Alegra.howard@consumer-action.org
(408) 460-6797

---

[2] U.S. Department of Education, National Center for Education Statistics, 2015-16 National Postsecondary Student Aid Study (NPSAS:16).

June 11, 2018


Sophia McArdle
Department of Education
400 Maryland Avenue SW., Room 6W256
Washington, DC 20202

RE:  Public Comment on Docket No. ED-2018-OPE-0041

Dear Ms. McArdle:

On behalf of the thousands of service members, veterans, and their family members and
survivors we represent, we ask that you *not postpone* the date of the implementation of
regulations relating to the State authorization of distance education providers and
correspondence education.

Due to service abroad, family and work obligations, service related disabilities, and other
extenuating circumstance, approximately one in five military-connected students take distance
education and correspondence courses. In order to ensure a strong return on investment for the
student's and taxpayers' dollars it is imperative that proper measures are maintained to guarantee
education offered online is high quality.

The quality metrics for Title IV programs rely heavily on the triad of federal, state, and
accreditors oversight. While oversight by the federal government over Title IV programs is
necessary, so is the oversight by states and accreditors, to ensure the triad works as intended.
Keeping states from protecting their residents by enforcing postsecondary-specific consumer
protections goes contrary to the very nature of state authorization. Given their more localized
jurisdiction, states have the capacity to better monitor and follow training programs. They are
also aware of what other institutions are offering in their jurisdictions, and therefore can provide
better safety measures to ensure students are getting access to the same quality of education at
any school they attend within their state.

Additionally, this regulation provides essential protections to consumers. Under the regulation
the Department seeks to delay, states are required to ensure students have a way of filing
complaints – which is essential as an early warning system of potential waste, fraud, and abuse –
and schools are required to make certain information available to students, such as whether or
not the program the student is pursuing will lead to licensure in their field of study for that state.
A research report by Veterans Education Success found that 20% of more than 300 degrees in
fields that require a license left the graduates literally ineligible to even sit for a licensing exam;
their degrees left them unable to work in the field of study.[1]   Therefore, such disclosures are

---

[1] Veterans Education Success, "The GI Bill Pays for Degrees That Do Not Lead to a Job" (2015)
available at
https://static1.squarespace.com/static/556718b2e4b02e470eb1b186/t/57eeaa61197aea4f38f19f02
/1475258978479/GI+Bill+Pays+for+Degrees+That+Do+Not+Lead+to+a+Job+%283%29.pdf

0031

important. Making this information readily available allows students to make better informed decisions related to their pursuit of higher education, thereby helping to cut down on waste of money for both the student and the tax payer.

Military-connected student have access to a significant amount of military education benefits and deserve to know their hard-earned benefits will be used towards high quality education leading to career advancement both during their military service and in their transition into the civilian workforce. That is why we ask the Department to please move forward with timely implementation of this regulation.

Sincerely,


Jared Lyon                                    Deirdre Parke Holleman, Esq.
President & CEO                               Washington Executive Director
Student Veterans of America                  The Retired Enlisted Association


Bonnie Carroll                               Carrie Wofford
Present & Founder                            President
Tragedy assistance Program for Survivors     Veterans Education Success



**NATIONAL
EDUCATION
ASSOCIATION**
nea.org
*Great Public Schools
for Every Student*

1201 16th St., N.W.  |  Washington, DC 20036  |  Phone: (202) 833-4000

*Lily Eskelsen García
President*

*Rebecca S. Pringle
Vice President*

*Princess R. Moss
Secretary-Treasurer*

*John C. Stocks
Executive Director*

June 11, 2018

Jean-Didier Gaina
U.S. Department of Education
Office of Postsecondary Education
400 Maryland Avenue, SW
Washington, DC
20202-6110

Re: Request for comments on proposed delay of the 2016 Program Integrity and Improvement –
State Authorization Rule

Docket ID ED–2018–OPE–0041

Dear Jean-Didier Gaina,

We write on behalf of our members in response to the proposed delay[1] of the 2016 Program
Integrity and Improvement—State Authorization Rule (hereinafter "State Authorization Rule" or
"Rule").[2] The National Education Association (NEA), the nation's largest professional employee
organization, is committed to advancing the cause of public education.  NEA's three million
members work at every level of education—from preschool to university graduate programs.
NEA has affiliate organizations in every state and in more than 14,000 communities across the
United States.

NEA is fundamentally committed to both a quality education for every student and stands as an
organization committed to social justice, willing to speak up to protect the rights of students and
taxpayers. We advocate for the highest quality professional development and educational
opportunities for all of our members, including those who enroll in online and distance education
programs, as well as those who teach such programs. We appreciate the opportunity to comment
and strongly oppose the delay of the State Authorization Rule.

We believe the State Authorization Rule provides important protections for Title IV student loan
borrowers and grant recipients for the following reasons:

- **The Rule requires important consumer disclosures.** The Rule requires institutions
  operating online programs to provide important disclosures to the public, as well as to
  enrolled and prospective students. For example, the Rule requires institutions to disclose
  the program's authorization status, either directly by the state where enrolled students

---

[1]      83 Fed. Reg. 24,250 (May 25, 2018).
[2]      81 Fed. Reg. 92,232 (Dec. 19, 2016).

reside or through a state authorization reciprocity agreement; the possible consequences of losing federal financial aid if a student moves to a state where the program is not authorized; the process for submitting complaints; information about adverse actions against the school; state refund policies where enrolled students reside; and the educational prerequisites for professional licensure or certification in the states where enrolled students reside, including notifications when the institution determines its program does not meet the licensure or certification requirements. These disclosures are important to our members, who otherwise could waste valuable time and money on programs that do not meet state licensure or certification requirements or on programs that have faced state legal adverse actions.

- **The Rule defines a "state authorization reciprocity agreement" to allow states to enforce their higher education consumer protection laws against institutions offering online education programs.** Prior to the publication of the Rule in December 2016, NC-SARA (the non-government-affiliated organization that manages the state authorization reciprocity agreement that forty-eight states and one U.S. territory have joined) established as part of its agreement that participating states could only enforce consumer protection laws of general applicability, a provision that continues in effect today. This provision has prevented states from enforcing consumer protection laws narrowly tailored to the higher education sector, such as refund requirements, cancellation requirements, mandated disclosures, prohibited practices, student protection funds or bonds to reimburse students for economic losses caused by school closures, private rights of action, requirements regarding the content of key documents such as enrollment agreements and course catalogs, and student complaint procedures. If the Rule is implemented, NC-SARA should change its requirements to permit state Attorneys General to enforce their higher education consumer protection laws against online education programs that engage in predatory practices.

- **The Rule protects students by requiring a complaint system in the state where the student resides or through reciprocity agreements.** The Rule requires that an institution that enrolls students in distance education courses outside of the state where the institution is physically located must document the complaint process for a state to review and act upon complaints from its students. Such a requirement would help guide students towards the appropriate state agencies if they run into problems while enrolled in an online education program.

NEA's faculty and staff members strongly support this rule that allows states to effectively oversee the quality of the education offered to their students, as well as the other program integrity rules implemented by the Department over the last several years.

In addition to the important protections provided by the Rule, the Department's reasons for delaying the Rule are insufficient. The Department relies on two letters, received in February 2018, as the basis for the proposed delay. The Department, however, previously grappled with those same issues when it finalized Rule in 2016. Moreover, the issues addressed in those letters could easily have been resolved through subregulatory guidance.

Finally, the Department must submit any delay in the effective date of the Rule to a negotiated rulemaking process.[3] Congress has provided that the Department may only bypass negotiated rulemaking where that process would be "impracticable, unnecessary, or contrary to the public interest" within the meaning of the "good cause" exception to notice and comment rulemaking.[4] The Department's own delays during the seventeen months since publishing the Rule in December 2016 do not constitute a valid basis for waiving the Department's negotiated rulemaking statutory obligation. Nor does the receipt of the February 2018 letters cited in the Notice of Proposed Rulemaking constitute a valid basis for waiving negotiated rulemaking.

We strongly urge the Department not to finalize the delay and instead to permit the Rule to go into effect on July 1, 2018. Thank you in advance for your attention to these important issues facing student loan borrowers, as well as institutions of higher education and their faculty and staff.

Sincerely,

Donna M. Harris-Aikens
Director, Education Policy and Practice

---

[3]        20 U.S.C. § 1098a.
[4]        5 U.S.C. § 553(b)(3)(B).



1015 15th St. NW, Suite 600
Washington, DC 20005
www.nsldn.org

Jean-Didier Gaina
U.S. Department of Education
400 Maryland Avenue S.W.
Mail Stop 294-20
Washington, D.C. 20202-6110

June 11, 2018

Re: Request for comments on proposed delay of the 2016 Program Integrity and Improvement –
State Authorization Rule

Docket ID ED–2018–OPE–0041

Dear Jean-Didier Gaina,

We write on behalf of the National Student Legal Defense Network ("NSLDN") in response to the
proposed delay[1] of the 2016 Program Integrity and Improvement – State Authorization Rule
(hereinafter "Rule").[2]  NSLDN is a non-partisan, non-profit organization that works, through
litigation and advocacy, to advance students' rights to educational opportunity and to ensure that
higher education provides a launching point for economic mobility.  NSLDN appreciates the
opportunity to comment on this proposed delay.

Because the Rule includes several important provisions to strengthen state oversight of distance
education programs as well as provide students with access to critical information as they consider
enrolling, it is necessary to protect the growing number of student loan borrowers who enroll in out-
of-state online programs, especially at for-profit institutions.  For that reason, NSLDN strongly
opposes the Department's proposal to delay the effectiveness of the Rule.

1. **The 2016 State Authorization Rule Strengthens State Oversight of Distance
   Education Programs**

The Rule requires that an institution offering distance education obtain authorization from each
state in which the institution enrolls a student who receives federal student aid, if such authorization
is required by that state.  Alternatively, the Rule allows an institution to enter into a state
authorization reciprocity agreement in order to offer distance education programs in states in which
an institution does not maintain a physical location.  Finally, the Rule requires any institution that
offers distance education programs to document the state process for resolving student complaints
in every state in which an enrolled student resides.  Because the Rule creates a system for enhanced

---

[1]     83 Fed. Reg. 24,250 (May 25, 2018).  This Rule creates new requirements for online and distance education
programs, adding to the regulatory scheme already in place for brick-and-mortar schools.  *See* Program Integrity Issues,
75 Fed. Reg. 66,832 (Oct. 29, 2010).
[2]     81 Fed. Reg. 92,232 (Dec. 19, 2016).

United States Department of Education
Jean-Didier Gaina
June 11, 2018
Page 2 of 10

oversight of distance education and online programs, NSLDN opposes delaying these important provisions.

Of particular importance here, the Rule resolves a major issue with state reciprocity agreements. At the time the 2016 regulations were finalized, as well as today, the only state authorization reciprocity agreement to exist—known nationally as NC-SARA—exempted online colleges from state higher education consumer protection laws that apply to schools with a physical presence. This exemption has led to a two-tiered oversight system where students who enroll in distance education programs receive less state protection from predatory practices than their peers who attend brick-and-mortar schools. For example, students who choose to attend online programs authorized through NC-SARA can no longer benefit from the protection of state laws and regulations such as refund requirements, cancellation requirements, mandated disclosures, prohibited practices, student protection funds or bonds to reimburse students for economic losses caused by school closures, private rights of action, requirements regarding the content of key documents such as enrollment agreements and course catalogs, and student complaint procedures. In practice, this means that a student who lives in Delaware and enrolls in an online program offered by an institution physically located in Colorado cannot seek recourse against the institution using Delaware's higher education consumer protection laws. Similarly, the state of Delaware cannot enforce its own higher education consumer protection laws against that Colorado-based institution, ceding their enforcement authority to Colorado or, if Colorado fails to take action, to NC-SARA.

The 2016 definition of a "state authorization reciprocity agreement," however, altered NC-SARA's prior emphasis on deregulation in the online education field. The Rule defines a "state authorization reciprocity agreement" as one between two or more states "that authorizes an institution located and legally authorized in a [s]tate covered by the agreement to provide . . . distance education . . . to students residing in other [s]tates covered by the agreement."[3] More importantly, the definition clarifies that a state authorization reciprocity agreement cannot "prohibit any [s]tate . . . from enforcing its own statutes and regulations, whether general or specifically directed at all or a subgroup of educational institutions."[4] In other words, online programs offered through NC-SARA would no longer be exempt from state higher education consumer protection laws under the Rule. Likewise, states would no longer be prohibited from enforcing their own laws, allowing the student who lives in Delaware to seek help and assistance from her home state. These changes are crucial for protecting online students from abusive practices in the forty-eight states and one U.S. territory that currently participate in NC-SARA.[5]

In addition, the Rule requires institutions that offer online programs to document the complaint process in each state where an enrolled student resides. Making sure that students know where to turn for help is vital, given the number of abuses that have occurred in this sector. In fact, there is no question that robust complaint processes can provide vital information to state law enforcement. For example, following an investigation into complaints filed by online students, the California Attorney General initiated a lawsuit against Ashford University in 2017 alleging that the school

---

[3]     81 Fed. Reg. at 92,233.
[4]     *Id.*
[5]     "SARA States and Institutions," NC-SARA, http://nc-sara.org/sara-states-institutions.

United States Department of Education
Jean-Didier Gaina
June 11, 2018
Page 3 of 10

"illegally misled students about their educational prospects and unfairly saddled them with debt."[6] By that time, Ashford had built an online empire, at one point enrolling over 80,000 students nationwide.[7]  The California Attorney General accused Ashford of making a wide variety of false and misleading statements to convince prospective students to enroll, misleading investors and the public in its filing with the Securities and Exchange Commission, and engaging in aggressive and illegal tactics to collect unpaid student debts.[8]  The lawsuit seeks restitution for California's students, as well as civil penalties and a permanent injunction prohibiting Ashford from engaging in similar misconduct in the future.[9]  Had Ashford University's online students who resided in California not known about their ability to complain about the school's conduct, or not known which state entity to send their complaints, it would have been much more difficult for California to investigate and pursue justice on behalf of its students.

Given the more balanced "state authorization reciprocity agreement" definition that increases states' ability to protect their students as well as the increase in accountability for online programs through the state complaint processes, NSLDN recommends that the Department of Education implement the important state authorization rule as planned on July 1, 2018.

## 2.  The State Authorization Rule Provides Students with Access to Critical Information to Inform their Enrollment Decisions

In addition to increasing state oversight of distance education programs, the Rule ensures that students make informed enrollment decisions.  The Rule requires institutions that offer distance education programs to provide both public and individualized disclosures to students.

First, the Rule requires online programs to disclose publicly: (1) whether the institution is authorized to provide the distance education program by the state where the enrolled student resides—or, alternatively, whether the institution's program is authorized through a state authorization reciprocity agreement—and an explanation of the consequences, including the possibility of losing eligibility for federal student aid, if a student moves to a new state where the distance education program is not authorized, or in the case of a Gainful Employment program, where the program does not meet licensure or certification requirements of the state; (2) a description of the state complaint process or the process for submitting complaints established by SARA, including contact information for appropriate state agencies where the student resides and where the institution's main campus is located; (3) a list of any adverse actions that a state or accrediting agency has initiated against the distance education program or the institution as a whole in the last five years; (4) an explanation of the refund policies of the state where the enrolled student resides; and (5) the educational prerequisites for professional licensure or certification for the occupation which the

---

[6]         Press Release, State of California Dep't of Justice Office of the Attorney General,
Attorney General Xavier Becerra Sues For-Profit Ashford University for Defrauding and Deceiving Students
 (Nov. 29, 2017), https://oag.ca.gov/news/press-releases/attorney-general-xavier-becerra-sues-profit-ashford-university-defrauding-and.
[7]         *Id.*
[8]         *Id.*
[9]         Ashley A. Smith, "Calif. Attorney General Sues For-Profit Ashford," *Inside Higher Ed* (Nov. 30, 2017), https://www.insidehighered.com/quicktakes/2017/11/30/calif-attorney-general-sues-profit-ashford.

United States Department of Education
Jean-Didier Gaina
June 11, 2018
Page 4 of 10

program prepares students to enter in the state where, *inter alia*, the enrolled student resides, and, if the institution makes a determination with respect to certification or licensure prerequisites, whether the program does or does not satisfy the applicable requirement or, if the institution has not made a determination for any state, a statement to that effect.  These disclosures would help prospective and enrolled students evaluate the legitimacy of both the online program and the institution that offers it, preventing students from wasting time and money on programs that will not help them further their careers.

Second, the Rule requires distance education programs to make the following individualized disclosures to students: (1) prior to enrollment, any determination by the institution that the program does not meet licensure or certification requirements in the state where the student resides; (2) to all prospective and enrolled students, any adverse action by a state or accrediting agency related to the online program within thirty days of the institution learning about that action; and (3) also to all prospective and enrolled students, any determination that the program ceases to meet licensure or certification requirements of a state within fourteen days of that determination.  This information would ultimately help students to assess the value of any potential degree by clarifying whether they will be able to find a job in their chosen field where they currently live.

Disclosures have limitations, of course, but their fundamental purpose is to increase information and, therefore, the quality of student enrollment decisions.  Despite proposing to delay the effectiveness of the Rule, the Department agrees with this sentiment, conceding that "*the delay of the disclosures related to the complaints resolution process could make it harder for students to access available consumer protections.  Some students may be aware of Federal Student Aid's Ombudsman Group, State Attorneys General offices, or other resources for potential assistance, but the disclosure would help affected students be aware of these options.*"[10]  Because, as the Department acknowledges, delaying the effectiveness of the disclosure requirement will "make it harder for students to access available consumer protections,"[11] NSLDN strenuously opposes delaying the effective date of this Rule.[12]

3. **The Department has not Provided Adequate Justification for Delaying the 2016 State Authorization Rule**

   a. *The comment period for the proposed delay is too short and does not permit a meaningful opportunity to comment*

---

[10]     83 Fed. Reg. at 24,253 (emphasis added).

[11]     *Id.*

[12]     Disclosure requirements also aid regulators and civil law enforcement agencies.  Numerous consumer protection government enforcement actions have been based on substantial misrepresentations made by institutions in required disclosures.  Indeed, public disclosure may have other benefits.  For example, as one commentator noted, "[c]onsider the detailed prospectuses that come from stocks and mutual funds.  Very few individual investors read them, but they and other filings required by the Securities and Exchange Commission have resulted in a relatively clean system for the sale of company stock to the public.  Investment scams are rare because company information is secured by the media, by institutional investors and their analysis, and by watch-dog groups, essentially serving as monitors on behalf of all potential investors."  Robert Shireman, "Perils in the Provisions of Trust Goods: Consumer Protection and the Public Interest in Higher Education, " *Center for American Progress*, 2 (May 2014), *available at* https://cdn.americanprogress.org/wp-content/uploads/2014/05/ConsumerProtection.pdf.

United States Department of Education
Jean-Didier Gaina
June 11, 2018
Page 5 of 10

The Department's proposal states that the reason for the short comment period is that the Rule is scheduled to take effect on July 1, 2018 and "a longer comment period would not allow sufficient time for the Department to review and respond to comments, and publish a final rule."[13]  The Department's purported basis for this delay includes "concerns recently raised by regulated parties."[14]  However, the "recently raised" concerns arose from letters dated February 6 and 7, 2018.[15]  Even if the letters were a proper "catalyst" for delay, the Department has provided no explanation for why it waited more than three months after receiving these letters before publishing its notice of proposed rulemaking.

Moreover, the extremely short 15-day comment period—which included a federal holiday (Memorial Day, May 28, 2018) and six weekend days—does not permit us to meaningfully comment on this delay.  The Department seems to acknowledge this fact itself, noting that proposed rules are typically open for comment for thirty to sixty days.[16]  Fifteen days is simply not enough time to prepare meaningful comments.  The Department should permit the Rule to go into effect.

  b.  *The Department has prejudged the outcome of this rulemaking*

The comment period closes on June 11, 2018, which leaves only nineteen days for the Department to review comments and write a final rule.  This timeframe is too short to meaningfully take into account comments that run contrary to the Department's conclusions.  The Department further assumes that it will implement the rule as proposed, stating "a final rule delaying the effective date must be published prior to [July 1, 2018].  A longer comment period would not allow sufficient time for the Department to review and respond to comments, and publish a final rule."[17]

  c.  *The Department provided an incomplete record*

The Department relied on two letters as its basis for delaying the Rule.  It provided a citation to the letter from the American Council on Education ("ACE").  But it also relied on a letter from Western Interstate Commission for Higher Education ("WICHE") Cooperative for Educational Technologies, the National Council for State Authorization Reciprocity, and the Distance Education Accrediting Commission dated February 7, 2018.  The Department did not provide a link to this second letter, nor was it included in the rulemaking docket on regulations.gov.  Because the Department has not put out for comment the second letter it relied upon, the Department has made it difficult for commenters to meaningfully comment, as they do not understand the full basis for the Department's reasoning.

  d.  *The Department has not provided a sufficient basis for delay*

---

[13]     83 Fed. Reg. 24,250.
[14]     *Id.*
[15]     As discussed below, these issues were previously raised both in the 2016 rulemaking and to the Department in August and October 2017.
[16]     83 Fed. Reg. at 24,252.
[17]     83 Fed. Reg. at 24,250.

United States Department of Education
Jean-Didier Gaina
June 11, 2018
Page 6 of 10

As a sole substantive basis for the delay, the Department has cited fears of "widespread concern and confusion" that it believes exist "in the higher education community." The source of this statement appears to be the two letters, referenced above, rather than concerns raised directly by any regulated entity. Nor has the Department referenced receipt of any concerns from students—a constituency that the Department notes is likely to suffer from the delay. The Department's substantive basis for the delay is simply insufficient.

As noted above, the Department relied on the ACE and WICHE letters as its basis for delaying the Rule. These letters do not provide a sufficient basis for delay, however. The ACE letter focuses not on the definition of "residency," but on the separate issue of whether certain states have complaint processes for out-of-state institutions, which entities are required to disclose under the Rule. This issue could easily be clarified with sub-regulatory guidance. In particular, ACE, individual institutions, or the Department could reach out to California with respect to its complaint system. Moreover, ACE sought only clarification, but not delay, of the Rule.

What we believe to be the WICHE letter (which, as noted above, was not put out for public comment) in no way necessitates delay of the Rule. It further raises the issue of determining a student's "residency," noting only that "[a]nother area of concern is that issue [sic] is that the regulation defines 'residence' in a way that conflicts with state laws and common practice."[18] The letter's authors appear to misunderstand the Rule, which, as noted above, provides that "a student is considered to reside in a State if the student meets the requirements for residency under that State's law."[19] The Rule further provides that "[i]n general, when determining the State in which a student resides, an institution may rely on a student's self-determination unless the institution has information that conflicts with that determination."[20] To the extent that further clarification is needed, the Department could provide guidance in the form of a Dear Colleague Letter.

Finally, the Department has inconsistently described the effect that this delay will have on students. Although the Department states that "[w]e believe that delaying the final regulations would benefit students,"[21] the Department has also boldly conceded that:

1. "As a result of the proposed delay, students might not receive disclosures of adverse actions taken against a particular institution or program."[22]

2. "Students also may not receive other information about an institution, such as information about refund policies or whether a program meets certain State licensure requirements. Increased access to such information could help students identify programs that offer credentials that potential employers recognize and value, so delaying the requirement to provide these disclosures require students to obtain this information

---

[18]    Letter from WICHE Cooperative for Educ. Tech., Distance Educ. Accrediting Comm'n, & Nat'l Council for State Authorization Reciprocity Agreements, to Frank Brogan, Acting Asst. Sec'y of Postsecondary Educ., U.S. Dep't of Educ. (Feb. 7, 2018), *available at* https://wcet.wiche.edu/sites/default/files/WCET-SARA-DEAC-Letter-2-7-18_0.pdf.
[19]    81 Fed. Reg. at 92,236.
[20]    *Id.*
[21]    83 Fed. Reg. 24,250-51.
[22]    *Id.* at 24,252.

United States Department of Education
Jean-Didier Gaina
June 11, 2018
Page 7 of 10

> from another source or may lead students to choose sub-optimal programs for their preferred courses of study."[23]

3.  As noted above, "the delay of the disclosures related to the complaints resolution process could make it harder for students to access available consumer protections. Some students may be aware of Federal Student Aid's Ombudsman Group, State Attorneys General offices, or other resources for potential assistance, but the disclosure would help affected students be aware of these options."[24]

The Department's discussion also ignores its cost-benefit analysis from the Rule.  In 2016, the Department noted that students would benefit from the Rule as the result of increased transparency, the ability to identify programs that "offer credentials that potential employers recognize and value," the ability to make "better choice of program" because of the disclosures on licensure and certification in their state, the ability to know how to submit complaints and access available consumer protections, and the ability to understand the consequences of relocation.[25]  The Department also previously stated that institutions would benefit from increased clarity "concerning the requirements and process for State authorization of distance education."[26]

> *e.   The Department has not established "good cause" to waive negotiated rulemaking*

As the Department acknowledges, all of the rules it promulgates must first go through the negotiated rulemaking process,[27] which can take over twelve months to complete, with negotiations being held over a three-month period.[28]  The statute provides only a very narrow exception to this requirement, which is known as the "good cause" standard under the Administrative Procedure Act ("APA").  The Department now invokes this exception, claiming that the "catalysts" for the delay were the February 6 and 7, 2018 letters, combined with an inability to engage in negotiated rulemaking prior to the July 1, 2018 implementation deadline.  These justifications are wholly inadequate.  The final Rule was published on December 19, 2016, giving the Department seventeen months to perform its statutory obligation for negotiated rulemaking.  As discussed below, the Department grappled with the issues raised in the letters during the 2016 rulemaking.  The Department also heard about those very same issues in both August and October 2017.[29]  Thus, the

---

23    *Id.* at 24,253.
24    *Id.*
25    81 Fed. Reg. at 92,232, 92,255.
26    *Id.*
27    20 U.S.C. § 1098a.
28    The Negotiated Rulemaking Act requires 30 days' notice for the submission of comments and applications for membership on the negotiated rulemaking panel. 5 U.S.C. § 564(c). The Department typically holds between three and four negotiation sessions. However, where the only topic would have been delay, the Department could have held only one negotiation session, allowing the Department to proceed on an abbreviated timeline, while still fulfilling their obligations under the APA.
29    Transcript of Public Hearing, Comment by Cheryl Dowd, WCET State Authorization Network, Regulatory Reform—Post Secondary Education, to U.S. Dep't of Educ. (Oct. 4, 2017), *available at* https://www2.ed.gov/policy/highered/reg/reform/2017/washingtondchearingtranscript.pdf ("Second question is about compliance location.  When one reads the regulation, it's hard to determine what is the exact requirement by the regulation.  There is language in regard to the use of the word reside."); Comment by WCET and SAN (Aug. 1, 2017) to Dep't of Educ. in response to Evaluation of Existing Regulations, 82 Fed. Reg. 28,431 (June 22, 2017), *available at*

United States Department of Education
Jean-Didier Gaina
June 11, 2018
Page 8 of 10

Department had already been put on notice about any possible confusion.  To the extent that the Department had concerns about certain aspects of the rule, the Department could have initiated a negotiated rulemaking on the delay much earlier.  Having created the appearance of a need for speed through its own actions, the Department cannot now claim that it would not be "practicable" to comply with its statutory obligations.  Its dilatory actions are insufficient for invoking the "good cause" standard under the APA.

The Department has also announced that it is reconsidering the 2016 rule more broadly.  The Department states that it would be "confusing and counterproductive" for the 2016 rule to go into effect while it reconsiders the rule.  However, it is, in fact, more "confusing and counterproductive" to delay the rule at the eleventh hour, failing to follow the statutorily-required procedures, after schools and borrowers have been preparing for the rule's implementation.  (In fact, only one of the so-called "catalyst" letters even requested a delay; the other sought additional implementation guidance only.)  In addition, the Department claims it has "good cause" to waive negotiated rulemaking on the delay because it will complete a new negotiated rulemaking on the substance of the rule in time for a July 1, 2020 effective date.  This conflates the Department's obligations.  It *must* do negotiated rulemaking on the delay but *must also* engage in negotiated rulemaking on any future changes to the substance of the rule.  One is not a substitute for the other.  More importantly, the Department's desire to make substantive changes does not relieve the Department of its obligations on the delay under the APA.

### 4. If the Department Believes the Rule Needs Clarity, the Department Could Issue Appropriate Guidance, Rather Than Delaying the Rule

To the extent that the Department believes that additional clarity is needed, it could provide such clarity through guidance.  No delay is needed.

   *a.  To the extent the Department believes additional guidance is needed, it could provide guidance resolving any perceived uncertainty regarding a student's "residency"*

During the negotiated rulemaking process for the Rule, a few commenters expressed concern over how to define a student's "residency" for the purpose of complying.[30]  The Department responded to these concerns by clarifying that "[t]he student's State of legal residence is the residency or domicile of a student's true, fixed, and permanent home."[31]  The Department further provided that a student's residence is "usually where their domicile is located."[32]  Additionally, the Department stated:

---

https://www.regulations.gov/document?D=ED-2017-OS-0074-0073 (requesting clarification on term "reside" and complaint processes, particularly the eligibility of California students).  We note that the Department spent significant time during 2017 on regulatory review and deregulatory reform.  The Department could have analyzed these issues in August or October 2017 when they were raised and had sufficient time to comply with its statutory obligations if it truly believed delay was necessary.

[30]      The Department extensively addressed comments on what would happen if a student relocated, 81 Fed. Reg. at 92,236, and provided clarification on the phrase "where a student resides," *id.* at 92,249-50.

[31]      81 Fed. Reg. at 92,250.

[32]      *Id.*

United States Department of Education
Jean-Didier Gaina
June 11, 2018
Page 9 of 10

> For the purposes of this rulemaking, a student is considered to reside in a State if the student meets the requirements for residency under that State's law. In general, when determining the State in which a student resides, an institution may rely on a student's self-determination unless the institution has information that conflicts with that determination.[33]

Yet, the Department now states, without explanation or support, that residency "issues are more complex than we understood when we considered them in 2016."[34] That is simply not the case. Even if it were true, it would still be improper for the Department to base any delay on concerns it already considered as part of the negotiated rulemaking process.

In addition, the Department unjustifiably claims that the proposed delay will benefit students because it will potentially increase the number of online courses offered by institutions this summer. The Department asserts that many students who choose to take online classes during the summer change their residency by moving back to their parents' homes. Given the alleged uncertainty around determining a student's "residency," the Department's argument goes, institutions "may be hesitant" to offer online classes, forcing some students to forgo additional credits paid for via federal student aid. Interestingly, the Department provides no data to back up this claim. Neither of the letters cited by the Department suggest institutions are "hesitating" due to regulatory uncertainty. The Department's concern is therefore speculative and hypothetical, which cannot form the basis for reasoned decision-making.

>    b.   *To the extent the Department believes additional guidance is needed, it could provide guidance on the format for disclosures*

The WICHE letter requests clarification on the required format of the Rule's disclosures. The Department typically provides guidance regarding the format for disclosures through its IFAP website. It could do so for the disclosures required in this Rule too.

>    c.   *To the extent the Department believes additional clarity is needed, it could provide guidance on the complaint system*

The ACE letter sought guidance on the eligibility of students to enroll in online programs in states that do not have a complaint process for out-of-state institutions, such as California. The Department could provide guidance on the Rule's requirement that a state have a process in place to "review and [take] appropriate action on complaints."[35] The Department could also conduct outreach with states that appear not to have complaint processes in place to confirm whether or not that is actually the case, resolving any uncertainty about California.

*      *      *

For all of the reasons stated above, NSLDN strongly opposes delaying the 2016 Rule. Thank you in advance for your attention to these important issues facing student loan borrowers.

---

[33]   81 Fed. Reg. at 92,236.
[34]   83 Fed. Reg. at 24,251.
[35]   34 C.F.R. § 600.9(c)(2).

United States Department of Education
Jean-Didier Gaina
June 11, 2018
Page 10 of 10

Sincerely,

Robyn K. Bitner, Counsel
Martha U. Fulford, Senior Counsel

June 11, 2018

Sophia McArdle
Department of Education
400 Maryland Avenue SW., Room 6W256
Washington, DC 20202

RE: Public Comment on Docket no. ED-2018-OPE-0041

Dear Ms. McArdle:

Higher Ed, Not Debt is a multi-year multi-organization campaign of student, faculty, labor, and consumer groups dedicated to tackling the student debt crisis. We are writing in response to Federal Register notice ED-2018-OPE-0041, which seeks to delay implementation of the 2016 state authorization regulations. We are writing to strongly urge the Department to reconsider the delay and proceed in implementing the 2016 state authorization rule as written, a regulation that is the result of two prior negotiated rulemakings.

Our concern about this delay has to do with the impact such a delay would have on current and future student loan borrowers. Data show that that:

1. Borrowers in distance-education-only, for-profit programs have debt loads higher than the average for students in programs not entirely online, including brick and mortar programs, in each income quartile.[1]
2. Borrowers enrolled in distance-education-only programs carry higher loan debt on average at for-profits in  the 2015-2016 academic year compared with their counterparts at brick-and-mortar for-profit programs ($8,213.50 and $7,553.90 respectively).
3. The cumulative average federal student loan debt for graduating borrowers enrolled in distance-education-only programs is higher at for-profit institutions than in any other sector ($31,298.60 compared with $28,482.20 on average across all sectors); and is higher than those not enrolled in entirely-online programs ($21,525.60, on average).

Students that opt to enroll in distance education programs are disproportionately older, poorer, and more likely to be an underrepresented minority than those who enroll in non-distance-education-programs, including brick-and-mortar.[2] Instead of making access and quality a priority for those who need it the most, the current financialization and lack of regulations on distance education makes obtaining an online degree more expensive and, if this rule is rolled back, of less quality than the degrees our more affluent students receive.

For the nearly one in three students[3] that participate in distance education programs delays in the rules meant to protect these student consumers could mean the difference between a lifetime of unmanageable debt or financial stability. Students pursuing non-traditional educational pathways deserve every bit of oversight and

---

[1] U.S. Department of Education, National Center for Education Statistics, 2015-16 National Postsecondary Student Aid Study (NPSAS:16).
[2] U.S. Department of Education, National Center for Education Statistics, 2015-16 National Postsecondary Student Aid Study (NPSAS:16).
[3]  U.S. Department of Education, National Center for Education Statistics, Integrated Postsecondary Education Data System (IPEDS), Spring 2016 and Spring 2017, Fall Enrollment component. (This table was prepared January 2018.)

accountability that traditional students receive as a result of strict adherence to the program integrity accountability triad made up of the Department of Education, accreditors, *and* states.

The government must preserve their investment in the federal student loan program and in aid to distance education providers. Students investing their time and money into these programs, at the very least, deserve the guarantee that their credentials will have value in their state's job market and professional industry standards. Additionally, this regulation provides vital yet basic protections to consumers by requiring that students have a way to file complaints and that states/institutions have a way of addressing them. This complaints system functions as an essential early warning system of potential waste, fraud, and abuse of students and federal financial aid.

Finally, it would be negligent of the Department to deny students the disclosures and information they are entitled to to make informed decisions about their schooling and finances. To re-regulate this issue for a third time would mean many more cohorts of students and borrowers are left unprotected and without the assurance of high-quality program standards.

We, once again, urge the Department to quickly proceed in implementing the 2016 state authorization regulations.

Sincerely,

Senya Merchant
Program Manager
Higher Ed, Not Debt

0047



**IOWA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL**



June 11, 2018

The Honorable Betsy DeVos
U. S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

Dr. Sophia McArdle
U.S. Department of Education
Transmitted via electronic posting to www.regulations.gov

**RE: Docket ID ED-2018-OPE-0041**

Dear Secretary DeVos and Dr. McArdle:

The Iowa Attorney General and the Iowa College Student Aid Commission (Iowa College Aid) respectfully submit these joint comments on the Notice of Proposed Rulemaking (NPRM) published in the *Federal Register* by the U.S. Department of Education (the Department) on May 25, 2018. In this NPRM, the Department proposes delaying until July 1, 2020, the effective date of the final regulations published on December 19, 2016 (Final Regulations) concerning state authorization and required disclosures for Title IV participating schools that offer distance education and correspondence courses.

Iowa College Aid is Iowa's postsecondary registration agency, providing regulation and oversight of postsecondary institutions doing business in the State. In addition to registration, Iowa College Aid administers a complaint handling process for Iowans attending in-state and out-of-state institutions, as well as non-residents attending Iowa institutions. Iowa College Aid also partners with the Iowa Attorney General to administer certain provisions of the Iowa Consumer Fraud Act that provide consumer protections for Iowa postsecondary students. Lastly, Iowa College Aid is the state agency authorized to enter into or recognize agreements that create interstate reciprocity in the regulation of postsecondary distance education.

The Iowa Attorney General is the primary enforcer of Iowa's consumer protection laws. Our office has always made protecting consumers one of our highest priorities, and while we address a wide variety of

consumer issues, the actions of several postsecondary education providers have brought distance education issues to the forefront of our concerns. Our office has conducted a number of Iowa-only investigations and legal actions against Iowa and out-of-state institutions. Additionally, we have participated in and led several multi-state actions against distance education providers operating nationwide.

These comments reflect our agencies' shared interest in protecting Iowans who seek to purchase educational services from institutions of higher education operating within Iowa, as well as those beyond our borders.

In the NPRM, the Department explains that the reason for the proposed delay is the concerns raised by regulated parties in two letters, received by the Department on February 6 and February 7, 2018. The Department also notes in the NPRM that questions remain about how exactly individualized disclosures should be made in a variety of factual situations that complicate the issue of residence, and concludes that these issues are so complex that they can only be addressed through a delay and a further round of negotiated rulemaking.

The February 6 letter comes from the American Council on Education (A.C.E.), and warns that the Final Regulations "appear to make students who are residents of certain states ineligible for federal financial aid if they are studying online at institutions located outside their states," when those states do not have the complaint processes required by section 600.9(c)(2). The letter asks the Department to "clarify" its position on the federal student aid eligibility of such students. In fact, the Department thoroughly and carefully explained its position on this exact issue in the Preamble to the Final Regulations published in 2016 (Preamble), where it wrote that: "we agree with commenters that, if a State does not provide a complaint process as described in a State where an institution's enrolled students reside, the institution would not be able to disburse Federal student aid to students in that State." FR 92238. Rather than an "additional concern," as the NPRM calls it, the February 6 letter advances a concern that was raised and addressed during the prior round of negotiated rulemaking.

The February 7 letter comes from the Western Interstate Commission for Higher Education Cooperative for Educational Technologies (WCET), the Distance Education Accrediting Commission, and the National Council for State Authorization Reciprocity Agreements. In it, these entities write that the Final Regulations will be costly and burdensome for colleges and universities that offer distance education to comply with, and take issue with the definition of "residence" given by the Final Regulations.

The Department carefully considered the regulatory burdens that the Final Regulations would impose on colleges and universities before promulgating them, and made suggestions for minimizing these burdens in the Preamble—writing at one point that "[t]he administrators of a State authorization reciprocity agreement could provide [information about state-based complaint processes] to its members as a potential service, which could reduce the burden on individual institutions while still providing necessary information for the protection of students." FR 92247. There is nothing new in the February 7 letter, and nothing that justifies the renegotiation and dilution of the Final Regulations. The issues surrounding individualized disclosures and residence are also not new. In fact, the Department specified in the Preamble that it expected individualized disclosures to have been given "by the time the student enrolls." FR 92250.

Furthermore, institutions have had ample time to prepare to meet the new regulatory requirements over the course of the approximately 18 months since the Final Regulations were promulgated in December 2016. The Regulations are not overwhelmingly burdensome; in fact, some of the disclosures they require, e.g., State-based student complaint contact information and state authorization disclosures, are already in place now at institutions that offer distance education programs. Iowa College Aid sees these disclosures

routinely on the websites of Iowa institutions and out-of-state institutions that offer distance education programs.

The Department wisely chose to base its decision to delay implementation "only on a reasoned determination that its benefits would justify its costs." Our offices, based on our extensive hands-on experience with student-consumers in the status quo, respectfully disagree with the Department's determination. We firmly believe that students in Iowa and nationwide would be best served by the prompt implementation and enforcement of the Final Regulations, and that the acknowledged benefits to students (several of which are correctly identified in the NPRM) far outweigh the impact of compliance costs on institutions offering distance education.

We believe that prompt implementation is particularly imperative as it relates to distance education programs that prepare students for State-licensed employment. Currently, institutions often place all the responsibility for determining whether an institution's distance education program meets the educational requirements for professional licensure in a given State on the students. The NPRM correctly acknowledges that this system "may lead students to choose sub-optimal programs"; in fact, it *does* and *will* lead to sub-optimal choices, and in this context a "sub-optimal" choice may mean spending years and thousands of dollars on a literally useless degree. Because of the severity of this harm, institutions must be held accountable for the fundamental in-state validity of fully distance education programs marketed to students who wish to pursue careers that require a professional license. One of the most passionate arguments in favor of such regulations comes from one of the co-authors of the February 7 letter. Please see the WCET blog posting at https://wcetfrontiers.org/2018/02/07/professional-licensure-notifications-disclosures/. This posting characterizes professional licensure program disclosures as the "[i]nstitution's moral obligation for the student," and it reads in part:

> "If a student is choosing the institution to prepare them to pursue a particular professional field, the institution must accept the moral obligation to provide the necessary information regarding the prerequisites to pursue that professional field.
>
> Consider the inexperienced student vs. the academic department offering the program. Who do you think has better access to understand how to research and determine the prerequisites in another state? We have often heard that it should be the student's responsibility to determine licensure applicability. But how is a student who has not taken the first course in their chosen profession supposed to know how a curriculum (which they did not design nor do they understand) matches their state's academic requirements."

WCET's assertion could not be more on target. The Iowa Attorney General's Office and Iowa College Aid have fielded complaints from a large number of consumers in recent years who have experienced significant disappointment and financial hardship after finding out that the distance education programs they completed did not qualify them for licensure. Iowa College Aid maintains regulations that prohibit a registered institution from offering a professional licensure preparation program via distance education that does not meet Iowa's professional licensure requirements to Iowa residents. However, under the terms of Iowa College Aid's agreement to participate in SARA, Iowa College Aid is prohibited from enforcing Iowa-based consumer protections against the vast majority of such institutions. The prompt implementation of the Department's rules is necessary to ensure that institutions across the country who market professional licensure programs via distance education across state lines fulfill their moral obligation to provide timely, meaningful disclosures to students about the licensure outcomes of their programs.

The Iowa Attorney General and Iowa College Aid applaud the Department for establishing these impactful Final Regulations.  We urge the Department to stand firm in implementing the rules as scheduled on July 1, 2018.  Thank you for considering our comments.

Respectfully submitted,

Thomas J. Miller
Attorney General of Iowa

Karen Misjak
Executive Director, Iowa College Aid

4

  

U. S. Department of Education

34 CFR Parts 600 and 668

Docket ID ED-2018-OPE-0041

RIN 1840-AD39

Program Integrity and Improvement

Comments on Notice of Proposed Rulemaking

Submitted via regulations.gov


June 1, 2018

Dear Education Department Colleagues:

We were pleased to see the U.S. Department of Education's (ED) recent notice of proposed rulemaking for 34 CFR Parts 600 and 668 (Docket ID ED-2018-OPE-0041) rules affecting state authorization of distance education and related matters. Thank you for responding to our concerns. As we stated in our joint letter of February 7, 2018, there is widespread confusion in the higher education community about several aspects of the December 2016 regulations set to go into effect July 1, 2018 but which you now propose to delay. We agree that non-regulatory guidance from ED is unlikely to address the current gap between institutional understanding of those rules and the Department's expectations for compliance. We therefore believe the Department's plan to refer these rules to the review and consideration afforded by the negotiated rulemaking process is a wise one.

As the NPRM document acknowledges, these issues are indeed complex. Dealing with the complications of determining student location, and providing appropriate notifications regarding programs intended to prepare students for professional licensure, are real challenges faced by institutions that offer distance education programs. We agree that additional consideration of rules relating to those topics is warranted, as is consideration of a more straightforward definition of a state authorization reciprocity agreement.

We have two comments in response to requests set forth in the NPRM. First, institutions can more directly provide estimates of their costs to comply with state authorization of distance education rules, but we believe ED substantially underestimated those costs in developing the December 2016 rules. Since ensuring compliance is an expensive activity, institutional personnel need to have a good understanding of federal compliance requirements to avoid unnecessary expenses. Nevertheless, we believe that cost of compliance should not be used as the sole reason to remove a requirement necessary to support program quality and consumer protection. We point out that institutions must comply with relevant state laws, and incur attendant compliance costs, whether or not ED has its own rules in place.

Comments on Notice of Proposed Rulemaking
June 1, 2018
Page 2 of 2

Second, with regard to your request for comments on "the distribution of small entities offering distance education," as of April 2018, 45 percent (810) of the 1,800 institutions that participate in the SARA initiative are institutions that enroll less than 2,500 FTE students. Presumably, the overwhelming majority of these institutions participate in SARA because they carry out distance education.

We look forward to working with ED throughout the forthcoming negotiated rulemaking process to develop rules that support distance education as an important way for students to increase their educational attainment, while ensuring high quality and effective consumer protection.

Sincerely,

Russell Poulin
Director, Policy & Analysis
The WICHE Cooperative for
Educational Technologies

Marshall Hill
Executive Director
National Council for State Authorization
Reciprocity Agreements

Leah Matthews
Executive Director
Distance Education Accrediting
Commission



Maryland Consumer Rights Coalition

June 11, 2018

Sophia McArdle
Department of Education
400 Maryland Avenue SW., Room 6W256
Washington, DC 20202

RE: Public Comment on Docket no. ED-2018-OPE-0041

Dear Ms. McArdle:

MCRC is a statewide coalition of individuals and organizations that advances financial justice and economic inclusion for Maryland consumers through research, education, direct service, and advocacy. We work in partnership with our 8,500 supporters across the state to promote inclusive, equitable economic policies and programs. On behalf of consumers in Maryland, I appreciate the opportunity to provide comments in response to Federal Register notice ED-2018-OPE-0041, which seeks to delay implementation of the 2016 state authorization regulations.

We are writing to strongly urge the Department to not delay the implementation and instead proceed with the 2016 state authorization rule as written. Any postponement leaves more cohorts of vulnerable students susceptible to predatory for-profit colleges and private career schools that have shown time and again to target low-income students, students of colors, and veterans for high cost schools that lead to massive debt burdens and poor gainful employment outcomes.

Furthermore, delaying the rule would undermine the role of states in overseeing these distance-education-only programs. As a state-based nonprofit organization, MCRC is well aware of the importance of state authorization as a part of the educational "triad." States often have a better understanding of a particular institution's behaviors than the more distant federal government. Site visits, investigations, and student accessibility are all more likely to occur at the state-level than at the federal-level due to physical proximity. States have the opportunity to act as a first line of defense for students, and it would be negligent to lessen these consumer protections by delaying the 2016 rule.

The current state authorization rule is the result of two prior negotiated rulemaking processes, which looked at data, consulted experts, and came at the end of many, many hours of thoughtful consideration by the Department. To delay such a carefully crafted rule is not just counterproductive, but is frankly irresponsible. Furthermore, efforts to delay and/or modify the



Maryland Consumer Rights Coalition

rule will lead to confusion for students, schools, and states. Students and taxpayers cannot risk opening the door any wider for programs with a track record of poor student outcomes, waste, fraud, and abuse while the Department wastes time duplicating a rulemaking process.

In 2016, MCRC released our report "*Making the Grade: An Analysis of For-Profit and Career Schools in Maryland*" which found that 66% of students at for-profit schools take out student loans for programs that cost two to five times more than their public school counterparts. For-profit schools recruit low-income students and those from communities of color. Our report found that of African-American students enrolled in postsecondary institutions, 62% were enrolled at for-profit and private career schools.[1]

Students in distance-education-only, for-profit programs have been shown to take on more debt than those at brick-and-mortar for-profit institutions. These borrowers tend to be older, lower-income, and more likely to be a member of a historically oppressed minority group than their counterparts at in-person for-profit institutions.[2] These sorts of statistics demonstrate why strong guardrails must be put in place to protect students at for-profit schools – especially distance-education-only institutions.

Finally, we want to express our discomfort with the fact that the Department decided to announce the decision to delay this rule just a month before the date of implementation. There has been plenty of time – 18 months to be exact – for institutions to prepare for the rule and create new compliance procedures. The Department's announcement was not accompanied by a clear explanation for why it is necessary to go back on years of hard work to craft a rule that adequately protects students and taxpayers from predatory institutions.

For these reasons, we urge the Department to move forward with the 2016 regulations and, in doing so, stand up for students and taxpayers over for-profit institutions that have a history riddled with extremely damaging and fraudulent behavior.

We appreciate the opportunity to comment on Federal Register notice ED-2018-OPE-0041.

Sincerely,
Maryland Consumer Rights Coalition

---

[1] http://marylandconsumers.org/penn_station/folders/about/test_2/For-Profit_School_Report_-_for_website.pdf
[2] U.S. Department of Education, National Center for Education Statistics, 2015-16 National Postsecondary Student Aid Study (NPSAS:16).



June 11, 2018

Sophia McArdle, Ph.D.
U.S. Department of Education
400 Maryland Ave., SW
Mail Stop 290-44
Washington, D.C. 20202

**RE: Notice of Proposed Rulemaking on ED-2018-OPE-0041-0001**

Dear Dr. McArdle:

Thank you for the opportunity to comment on the Department's recent notice proposing to delay final regulations related to the state authorization of distance education institutions and foreign locations for two years.

After careful review of the Department's notice, as published in the Federal Register on May 25, 2018, we do not believe that this delay will be in the best interests of taxpayers or students, nor do we find a sufficient evidentiary basis for making this delay. The comment included with this letter corroborates these findings and concludes that guidance is still sufficient to address any outstanding concerns from the distance education community. As such, we urge the Department to implement the state authorization of distance education and foreign locations rule as currently scheduled to take effect on July 1, 2018.

Please do not hesitate to contact us if you wish to discuss these comments further, at laitinen@newamerica.org, bass@newamerica.org, and/or mccann@newamerica.org.

Sincerely,

Amy Laitinen
Director, Higher Education

Jared Bass
Senior Counsel for Education and Strategy

Clare McCann
Deputy Director for Federal Policy

# Table of Contents

**Table of Contents**                                                                 **2**

**Background**                                                                        **3**

**Substantive Concerns with the Delay of the Rule**                                   **3**

    There is Insufficient Evidence of a Problem                     3

        Complaint Process Requirement Can Still Be Fulfilled    3

        Residency Determinations Can be Based on Students' Self-Reporting    4

        Format of Disclosures Can be Left to Institutions    4

    Guidance Is Sufficient to Resolve the Department's Concerns      5

**Procedural Concerns with the Delay of the Rule**                                    **5**

    The Department Has Been Irresponsible in its Management of the Rule    5

    The Department Offered Insufficient Time for Comment              6

    The Delay Is Overly Broad                                         7

**Negative Consequences of the Delay**                                                **7**

**Our Previous Correspondence to the Department**                                     **8**

## Background

State authorization is a statutory requirement built into the very definition of an institution of higher education. It is used to determine which institutions may participate in the federal financial aid programs. As such, state authorization is an integral part of the program integrity triad, a federal arrangement in which states, accreditors, and the Department of Education serve as guardians to taxpayer dollars.

In federal law, state authorization takes three forms: authorization of physical locations (known as "brick-and-mortar" authorization); distance education; and foreign locations. Each of these areas reflects the nature of our higher education system—that where innovations in the delivery and scope of higher education occur, our laws must be updated to ensure that accountability, consumer protection, and stewardship of taxpayer dollars, follow. Moreover, the inclusion of all three of these areas in the state authorization space acknowledges the perpetual sovereignty of states in new areas of higher education and reflects the deep and historic partnership between states and the federal government in consumer protection. These three areas are outlined in two federal rules. Each rule clarifies the minimum requirements in each area, and reaffirms that federal-state partnership.

## Substantive Concerns with the Delay of the Rule

### There is Insufficient Evidence of a Problem

As the basis for this delay, the Department points to two letters: one from a consortium of higher education organizations dated February 6, 2018, and the other dated February 7, 2018 from three organizations with ties to distance education providers. While the Department points to these two letters, it points to no concrete evidence of a problem nor evidence for a delay. Basing the delay on these secondhand accounts is irresponsible and tantamount to governing by hearsay. Moreover, the Department's basis for this delay is incomplete, as the notice does not point to any direct concerns from states or students in implementing the rule—only institutional membership organizations.

### Complaint Process Requirement Can Still Be Fulfilled

In the February 6 letter, the author writes that some students may not be eligible for student aid as their state may not have a system on which to act on consumer complaints associated with out-of-state institutions. As of the writing of this public comment, 48 states already participate in the State Authorization Reciprocity Agreement (SARA), which means that institutions in those states can come into compliance with the rule, as a designated complaint process under a reciprocity agreement will suffice.

That just leaves two states for consideration. To our knowledge, there is no evidence that Massachusetts' complaint system would not address complaints about out-of-state institutions. According to a state authorization survey conducted by the State Higher

Education Executive Officers (SHEEO), Massachusetts will have regulations in place to join SARA by Fall 2018; until then, the commonwealth does not require purely online programs headquartered in other states to obtain authorization. Moreover, in the interim, Massachusetts does accept complaints about institutions of higher education not located within the state but that enroll Massachusetts denizens through the Public Charities Division of its Attorney General office.[1]

While it is possible that California has not yet expanded its consumer complaint system, we are not aware of efforts by the Education Department to clarify with or provide technical assistance to the state to evaluate whether it could be compliant with this issue by the upcoming deadline for implementation. The ill-informed concerns of the first letter could have been addressed through a single phone call, rather than the delay of an entire rule.

The second letter, dated February 7, raised two administrative issues for clarification: how to determine the residency of students for purposes of the rule and the appropriate format for consumer disclosures. We address each of these issues below.

## Residency Determinations Can be Based on Students' Self-Reporting

The February 7 letter noted that "the regulation defines 'residence' in a way that conflicts with state laws and common practice." The Department relied on this letter to suggest that "[t]hese issues are more complex than we understood when we considered them in 2016."

The fact is, they're not. Residency is a matter of state law, and as the 2016 rule intended to respect state law, accepting a students' own self-reported state of residence is appropriate. A letter from New America and other representatives of the higher education community to the Department—to date, unanswered and unacknowledged, but included as part of this comment—clarified, based on a reading of the regulation's preamble, that an institution can simply rely on the student's assessment of their residency in meeting the requirements of the rule.[2] It is surprising that this Administration seeks to instead impede the sovereignty of states by potentially proposing a new definition of residency that may conflict with state law moving forward.

## Format of Disclosures Can be Left to Institutions

The other administrative issue raised by the February 7 letter was the appropriate format for disclosures. The 2016 regulation reserved the ability of the Secretary to decide the format at a later date, but never specified that there was a required format. Put simply,

---

[1] "SHEEO State Authorization Surveys: Massachusetts Department of Higher Education." State Higher Education Executive Officers Association. http://sheeo.org/sheeo_surveys/user/11.

[2] "State Authorization." Correspondence to Secretary Betsy DeVos. Letter from Amy Laitinen, New America; Yan Cao, The Century Foundation; National Consumer Law Center; and Service Employees International Union. 26 March 2018.
https://na-production.s3.amazonaws.com/documents/03262018_State_Authorization_Letter_Final.pdf.

there is no required format for the disclosures. An institution can use whatever format they would like for the public disclosures, unless and until the Department dictates otherwise. In fact, those disclosures could be satisfied through a general website posting. Similarly, there is no required format for individualized disclosures in the 2016 rule. An email would suffice.

### Guidance Is Sufficient to Resolve the Department's Concerns

Based on the information above, the Department should not proceed with the proposed delay of this rule. To address any outstanding confusion, unsubstantiated as it may be, the Department could simply provide guidance on the state authorization of distance education and foreign locations rule. If timing is a major concern, the Department can simply let the rule take effect on July 1, 2018 and then issue guidance thereafter. Moreover, the Administration should stop misrepresenting requests for more information as pleas for a delay; and it should take responsibility for the faithful implementation of the Higher Education Act's requirement that institutions are authorized in order to remain eligible for federal financial aid. To do otherwise is disingenuous, unsupportable, and a dereliction of the duty the Department has to protect students and taxpayers.

## Procedural Concerns with the Delay of the Rule

### The Department Has Been Irresponsible in its Management of the Rule

As you may know, the state authorization of distance education and foreign locations final rule is the product of two negotiated rulemakings, several comment periods, all dating back to 2010. The final rule was published in the Federal Register on December 19, 2016, and is set to take effect on July 1, 2018. As such, the rule built in more than a year of time for the Department, institutions, and others to prepare for and responsibly implement the rule. Some institutions, such as Michigan State University, have already conducted state-by-state assessments to assess where their programs are authorized, the licensure requirements in those states, and to prepare additional notification requirements. If the Department elects to delay the rule now for two years, all but ensuring it will never take effect, it has wasted the valuable time and resources of institutions that have spent nearly 18 months preparing for its effective date.

While the Department points to two February 2018 letters seeking clarification, various organizations from the distance education community and the higher education community more broadly sought clarification on aspects of the rule from the Department for more than a year. In fact, an author of one of the letters, recently attested to this.[3] As mentioned earlier, our organization, along with other advocates, also sent a letter to the Department in

---

[3]  Poulin, Russell and Cheryl Dowd. "State Authorization Federal Regulation (Almost) Delayed...What's Next?" WCET Frontiers. 29 May 2018.
https://wcetfrontiers.org/2018/05/29/state-authorization-federal-regulation-almost-delayed-whats-next/.

March seeking guidance and clarification. Given that the Department had sufficient notice, time to review the rule, and the ability to take any necessary actions well before now, we find the delay of this rule to be irresponsible and a problem of the Department's own design.

## The Department Offered Insufficient Time for Comment

As previously stated, the Department had sufficient notice and time with which to act on the issues which serve as the basis of this delay. The Department published this notice before a holiday weekend (Memorial Day) and only provided a fifteen-day comment period. Such a short comment period is insufficient to address all of the problems we see inherent in the notice.

The public should not be shortchanged in its ability to comment because the Department procrastinated in bringing an unnecessary delay. Nor should the public be negatively impacted because a longer comment period may require the Department to work a little harder to review public comments prior to July 1, 2018. As stated previously, this situation is of the Department's own design and choosing, and the public should not suffer because of that. In addition, we note the logical inconsistency in the Department's arguing that it needs to delay the rule to obtain input from the higher education community on the administrative issues in the notice—while limiting the community's opportunity to provide input on whether a delay is even necessary to just fifteen days.

Had the Department provided more time to the public to comment, we believe there are a number of additional analyses and comments that might have been possible and useful to the Department in proceeding with the scheduled implementation of the 2016 final rule. For instance, more time might have allowed:

- More state authorizers and state attorneys general to review the delay and weigh in on how it will affect students in their states;
- Stakeholders to assess the consumer complaint systems across all states to describe whether and how they meet the stated requirements of the rule;
- Members of the public to develop and make recommendations about the appropriate format, method of delivery, and content of the required disclosures under the rule, including developing a recommended template and common language for those disclosures;
- Stakeholders to evaluate the enrollment of online students in out-of-state programs;
- Stakeholders to study  reports by organizations like the Institute for Justice on licensure requirements by occupation and state, in an effort to explain the implications of a delay for those students;
- Stakeholders to evaluate the frequency of occurrence of adverse actions by states and/or accrediting agencies to understand the potential implications of disclosing—or more importantly, *not* disclosing—those actions to students;

- Stakeholders to provide a comparative analysis of the residency requirements in each state;
- Institutions to describe the costs of compliance already sunk in preparing for the rule, to inform the Regulatory Impact Analysis of this notice and to note the harm done by delaying the rule only after those costs have been spent; and
- Students to describe past experiences with institutions that did not provide them with the kind of information this rule requires to be disclosed, to explain to the Department that future cohorts of students cannot wait to receive that information.

### The Delay Is Overly Broad

The delay of this rule is unsubstantiated and unnecessary. The Department could offer interim solutions to the three potential challenges identified in the cited letters by communicating with the states in which it believes the implementation of this problem will be a factor, and providing them with technical assistance. We are not aware of any effort by the Department to do so.

But even if the Department does proceed with a delay, the delay as currently constructed is overly broad and unwarranted. As the delay only deals with three issues (discussed above), the Department should only have proposed to delay those three parts of the rule. Moreover, as the Department has not made a case for any problems with the implementation of the foreign locations aspect of the rule, that portion of the rule should still take effect on July 1, 2018.

## Negative Consequences of the Delay

The Department's notice also acknowledges the negative consequences of delaying the disclosure of key items to students of distance-education institutions. The delay of these disclosures will have some of the most severe and immediate consequences for students. Under the distance education state authorization rule, institutions must disclose to their students when adverse actions have been taken against the program; any applicable refund policies required under state law; and whether the program meets licensure requirements where the students reside. With nearly 1.2 million students enrolled in distance-education programs out-of-state, the Department's delay is a clear indication that it is putting the needs of institutions, and the powerful lobbyists that represent them, ahead of those of students.

The Iowa Attorney General settled a lawsuit in 2015 with an institution that offered an online teacher preparation program that students believed would lead to their being certified as a public school teacher. According to the Attorney General's office, graduation from that program is not sufficient to obtain initial teacher licensure in any state, in large part because its programs do not offer student teaching experience.[5] Such circumstances are devastating for students, expensive for taxpayers, and have negative implications for the labor market; unlicensed workers earn 28 percent less, on average, than licensed

workers, and more than one in four American workers across 1,100 occupations require a license to do their jobs. These statistics may sound familiar, given that representatives of a for-profit institution and a community college jointly submitted a proposal—popular among other negotiators—to close these loopholes during the gainful employment negotiations held earlier this year.[4] Their proposal is addressed in part by the state authorization rule set to take effect in only a few weeks, so it is difficult to imagine why the Department believes that portion of the rule should not take effect as planned.

Finally, the Department suggests that the largest institutions, providing instruction to students from across the country, have likely already met the requirements of the rule; so those institutions' students will benefit from the rule even when it is not in effect. However, meeting the authorization requirements of the states does not, itself, solve the problem. Without this rule, institutions—big or small, and especially the most unscrupulous—are not going to voluntarily disclose information to students that might inform or change their enrollment decisions. Institutions of all sizes are unlikely to obtain authorization that falls outside of existing reciprocity agreements unless they are required to do so by states or the federal government. And reciprocity agreements like NC-SARA are unlikely to resolve critical discrepancies with the December 2016 rule—like clarifying that reciprocity agreements may not prohibit the enforcement of applicable state consumer protection laws —without a federal requirement to do so, harming students and creating legal and regulatory uncertainty that costs institutions and states alike.

The Trump Administration seems to have made a habit of overstepping the boundaries of the federal role to prevent states from exerting their own sovereign authority. This rule requires that institutions and reciprocity agreements respect the laws and regulations of states; and its delay reopens the notions that institutions do not, in fact, need to comply with states' responsibilities.

## Our Previous Correspondence to the Department

Given that we submitted a letter to the Department earlier this year regarding the implementation of state authorization requirements for distance education programs and neither received a response nor saw it referred to in this notice for delay, we are reattaching that letter in full here as a part of our comment.

---

[4] Metune, Laura. Memorandum to Gainful Employment Negotiated Rulemaking Committee. "Issue 8—Certification." California Community Colleges Chancellor's Office. 30 January 2018. https://www2.ed.gov/policy/highered/reg/hearulemaking/2017/gememoissue8metune.pdf.

March 26, 2018

The Honorable Betsy DeVos
Secretary
U.S. Department of Education
400 Maryland Ave, SW
Washington, D.C. 20202

Dear Secretary DeVos:

We respectfully ask that you issue guidance clarifying aspects of the 2016 State Authorization of Distance Education and Foreign Locations final rule, namely to address the preferred format for consumer disclosures and residency determinations. These were the same issues identified by three representatives of the distance education community (WCET, NC-SARA, and DEAC) in a letter to the Acting Assistant Secretary of Postsecondary Education, Frank Brogan, earlier this month.

As you know, state authorization is a vital part of the program integrity triad. At its heart, the state authorization requirement recognizes and respects the sovereignty of States. It builds on the foundations of our democratic structure in ensuring a partnership between States and the Federal Government in the oversight of higher education.

The United States Department of Education strengthened this partnership through its state authorization regulations. Essentially, these regulations stated that the Department of Education would not provide taxpayer funding to an institution of higher education that was not approved by a State and ensured that a State would have a way to act on the complaints of its denizens. Given the expanding role of technology in higher education, the Department further clarified the state authorization requirements for institutions seeking to offer programs through distance education. That regulation simply said that an institution offering programs through distance education would only have to obtain state authorization where any State required it. The Department also provided for reciprocity agreements, in which nearly all States participate, and required institutions to provide basic information to States, students, and their families in certain situations.

The final rule was published in the Federal Register nearly fifteen months ago. For more than a year, the distance education community has spent valuable time and resources preparing for compliance with this important rule. Awards have even been given to model programs and institutions.[1] With less than five months until the rule takes effect on July 1, 2018, the Department should do all it can to ensure that those efforts were not in vain, that State sovereignty and students still matter. Departmental guidance clarifying the agency's expectations for institutions on small areas of confusion identified in the letter will help accomplish that goal.

As noted above, the letter to Acting Assistant Secretary Brogan only sought clarification on two administrative issues, which should in no way impede the implementation of this rule. For instance, concerning the residency issue, the Preamble to the final rule states that "an institution may rely on a student's self- determination of the State in which he or she resides unless the institution has information to the contrary." The Department can use this and other language to provide further guidance to institutions seeking to comply with the rule. Additionally, concerning consumer disclosures, the Department should provide guidance to the community that the disclosures should, at a minimum, be prominently posted on program websites in a manner that ensures visibility to both enrolled students and potential students. This guidance will provide flexibility for the community as it presents vital information to students. On the subject of providing such information to students, one of the authors of the recent letter to the Department has stated that it is "the right thing to do."[2] We agree.

Departmental guidance will pave the way for successful implementation of this rule and send a clear message that the Department will not stand in the way of States, nor will it impede efforts to bolster and strengthen consumer protections for students. It is the right thing to do.

Sincerely,

Amy Laitinen
Director, Higher Education Initiative, New America

Yan Cao
Fellow, The Century Foundation

National Consumer Law Center (on behalf of its low-income clients)

Service Employees International Union (SEIU)

CC: Mr. Frank Brogan
     Mr. James Manning

---

[1] https://wcet.wiche.edu/SANsational%202017
[2] https://wcetfrontiers.org/2017/12/04/house-hea/



### *State of New Jersey*

**PHILIP D. MURPHY**
*Governor*

**SHEILA Y. OLIVER**
*Lt. Governor*

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
PO Box 080
TRENTON, NJ 08625-0080

**GURBIR S. GREWAL**
*Attorney General*

June 11, 2018

The Honorable Betsy DeVos
Secretary
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

Re:     Proposed Delay of Program Integrity and Improvement Rules
        [Docket ID ED-2018-OPE-0041] / [RIN 1840-AD39]

Dear Secretary DeVos:

On behalf of the State of New Jersey, we write to oppose the U.S. Department of Education's last-minute proposal to delay the effective date of the Program Integrity and Improvement rules finalized in 2016. *See Program Integrity and Improvement*, 83 Fed. Reg. 24,250 (May 25, 2018); *Program Integrity and Improvement*, 81 Fed. Reg. 92,232 (Dec. 19, 2016).

The Program Integrity and Improvement rules were adopted to protect the steadily increasing number of students who pursue higher education through online and distance learning programs. As you must know, your Department identified the need for additional rules for the distance learning market after the Department's own Inspector General and others raised concerns about gaps in consumer protections for students, fraudulent practices by some educational institutions, and noncompliance with federal requirements by institutions receiving federal funds. *See* 81 Fed. Reg. at 92,232. The 2016 rules address these issues while respecting the role that state oversight can play in protecting students and taxpayers.

Even as it proposes to postpone the effectiveness of the 2016 rules, the Department of Education candidly acknowledges that its proposal may harm students. According to the Department, "the delay of the disclosures related to the complaints resolution process could make it harder for students to access available consumer protections," and the delay of the rules' disclosure requirements "may lead students to choose sub-optimal programs for their preferred courses of study." 83 Fed. Reg. at 24,253.

Students deserve better than the Department's rushed effort to deny them the benefits of the 2016 rules. These rules were years in the making and reflect stakeholder input from negotiated rulemaking sessions and in response to a notice of proposed rulemaking. Your Department has had nearly two years to prepare for the rules to take effect as scheduled. No good cause exists for delaying the 2016 rules, let alone delaying them on the eve of their scheduled effective date without observing the procedures required by law.



HUGHES JUSTICE COMPLEX TELEPHONE: (609) 292 4925 • FAX: (609) 292 3508
New Jersey Is An Equal Opportunity Employer • Printed on Recycled Paper and Recyclable

0066

First, the Department cannot justify the proposed delay by referring to the February 2018 letter that it received from the American Council on Education, which expresses concern about the impact of one provision of the 2016 rules on students resident in certain States (namely, California) who are studying online at institutions located elsewhere. Notwithstanding the Department's attempt to cast this issue as one that came to the Department's attention only recently, this issue was in fact raised and addressed by the Department in the rulemaking that produced the 2016 rules. *See* 81 Fed. Reg. at 92,238. An issue that was addressed by the Department in 2016 cannot provide grounds for the proposed delay of the 2016 rules. Nor can an issue relating only to one provision of the 2016 rules justify delaying the entire suite of 2016 reforms.

Second, the Department's stated interest in considering more precise rules does not constitute good cause to delay the effective date of the 2016 rules, particularly without observing statutorily required procedures. *See, e.g., Pineros y Campesinos Unidos del Noroeste v. Pruitt*, 293 F. Supp. 3d 1062, 1066-67 (N.D. Cal. 2018); *National Venture Capital Association v. Duke*, 291 F. Supp. 3d 5, 15-20 (D.D.C. 2017). Clarification of the existing rules, if warranted, can be accomplished through guidance—a point made in the very same letter that the Department cites as a catalyst for its proposed delay of the 2016 rules. In suggesting otherwise, the Department relies on an artificially narrow characterization of the role of guidance in facilitating regulatory compliance and on the mistaken view that stakeholders would not be able to provide input if the agency clarifies its regulatory standards through guidance instead of negotiated rulemaking.

The Department should allow the Program Integrity and Improvement rules to take effect on July 1, 2018, as all stakeholders have anticipated since 2016. Thank you for your consideration of our views.

Sincerely,

Gurbir S. Grewal
Attorney General

Zakiya Smith Ellis, Ed.D.
Secretary of Higher Education

Sophia McArdle, Ph.D
U.S. Department of Education
400 Maryland Ave., SW
Mail Stop 290-44
Washington, D.C. 20202

May 30, 2018
Docket ID: ED-2018-OPE-0041

Dear Ms. McArdle,

Please accept the following comments in response to the Department's May 25, 2018 request for comment on a proposed delay of the Program Integrity and Improvement Regulations to allow time for clarification through negotiated rulemaking. I am submitting these comments in the context of my experience managing state authorization at a large public institution, and not on behalf of the institution.

I support the Department's proposed delay and clarification of the regulations. I recognize the importance of sharing online program information with students, including information related to authorization, licensure, and student complaint processes. Out-of-state online students face unique challenges, and transparency regarding authorization and licensure eligibility is essential in protecting those students as consumers.

Specifically, I support the Department's intent to clarify the:

- meaning of the term "residence"
- format required for student disclosures
- process to address student complaints in states lacking an adequate complaint process

Clarifying these items will greatly assist institutions in developing compliance strategies that meet the Department's expectations. Researching requirements for each licensure program in all 50 states as well as other required disclosure information requires significant university resources and is difficult to complete without further clarification on these topics.

Thank you for the opportunity to submit comments in support of the proposed delay of the Program Integrity and Improvement Regulations.

Sincerely,

Lisa Siefker
State Authorization Program Manager
The Ohio State University

0068



15442 Ventura Blvd. Suite 201  Los Angeles, CA 91403  |  cody@studentdebtcrisis.org

DATE:          06/11/2018

TO:          Sophia McArdle
             The Department of Education
             400 Maryland Ave. SW
             Washington, DC 20202

RE: Public Comment on Docket no. ED-2018-OPE-0041

Dear Ms. McArdle:

Student Debt Crisis is writing to you in response to Federal Register notice ED-2018-OPE-0041. The Department's proposal would delay the 2016 rule regarding state authorization of distance education programs. We urge the Department to reconsider the delay and modification of these rules as it has created confusion for students, institutions, and states. The regulation was developed during two prior negotiated rulemaking sessions and has received proper review and scrutiny. We encourage the Department to immediately implement the 2016 rule.

**Delaying regulations would have a major impact on current and future student loan borrowers:**

- Students leave distance-education-only, for-profit education programs with significantly higher student debt loads than the average for students in programs not entirely online.
- Borrowers enrolled in distance-education-only programs carry higher loan debt on average at for-profits than their counterparts at brick-and-mortar for-profit programs.
- The average cumulative federal student loan debt for graduating borrowers at distance-education-only programs is highest at for-profit institutions; and is higher than those not enrolled in entirely-online programs.

Students enrolled in distance education programs are older, poorer, and more likely to be an underrepresented minority than those enroll in non-distance-education-programs. These students are more likely to be exposed to fraud and abuse by low-quality, costly education programs. Further, nearly 1 in 5 veterans are enrolled at riskier online-only, for-profit schools.

Delaying the 2016 rule removes consumer protections that are vital for vulnerable students to make informed financial and education decisions. The state authorization rule is essential to ensuring program quality and integrity for consumers. Additionally, the regulation provides additional protections that include a way to file consumer complaints and creating a way for states and institutions to address them.

For nearly a third of students enrolled in distance education programs, delaying rules that protect students could mean life-long student loan debt. Students should be offered the piece of mind that their education program will actually provide credentials that meet industry standards and are valuable to the current job market.

Finally, the Department has an obligation to provide students with disclosures and information that help people make informed decisions about their education financing. Reviewing regulatory rules for the third time is an unnecessary delay that puts many students and borrowers at risk of falling victim to expensive, low-quality education programs.

Again, we urge the Department to immediately implement the 2016 state authorization regulations.

Student Debt Crisis is a nationwide advocacy group with over 1,000,000 supporters calling for fundamental reforms to student loan policies.

Sincerely,

Cody Hounanian
Program Director
Student Debt Crisis



15442 Ventura Blvd. Suite 201  Los Angeles, CA 91403   |   cody@studentdebtcrisis.org

DATE:          06/11/2018

TO:             Sophia McArdle
                 The Department of Education
                 400 Maryland Ave. SW
                 Washington, DC 20202

RE: Public Comment on Docket no. ED-2018-OPE-0041

Dear Ms. McArdle:

Student Debt Crisis is writing to you in response to Federal Register notice ED-2018-OPE-0041. The Department's proposal would delay the 2016 rule regarding state authorization of distance education programs. We urge the Department to reconsider the delay and modification of these rules as it has created confusion for students, institutions, and states. The regulation was developed during two prior negotiated rulemaking sessions and has received proper review and scrutiny. We encourage the Department to immediately implement the 2016 rule.

**Delaying regulations would have a major impact on current and future student loan borrowers:**

- Students leave distance-education-only, for-profit education programs with significantly higher student debt loads than the average for students in programs not entirely online.
- Borrowers enrolled in distance-education-only programs carry higher loan debt on average at for-profits than their counterparts at brick-and-mortar for-profit programs.
- The average cumulative federal student loan debt for graduating borrowers at distance-education-only programs is highest at for-profit institutions; and is higher than those not enrolled in entirely-online programs.

Students enrolled in distance education programs are older, poorer, and more likely to be an underrepresented minority than those enroll in non-distance-education-programs. These students are more likely to be exposed to fraud and abuse by low-quality, costly education programs. Further, nearly 1 in 5 veterans are enrolled at riskier online-only, for-profit schools.

Delaying the 2016 rule removes consumer protections that are vital for vulnerable students to make informed financial and education decisions. The state authorization rule is essential to ensuring program quality and integrity for consumers. Additionally, the regulation provides additional protections that include a way to file consumer complaints and creating a way for states and institutions to address them.

For nearly a third of students enrolled in distance education programs, delaying rules that protect students could mean life-long student loan debt. Students should be offered the piece of mind that their education program will actually provide credentials that meet industry standards and are valuable to the current job market.

Finally, the Department has an obligation to provide students with disclosures and information that help people make informed decisions about their education financing. Reviewing regulatory rules for the third time is an unnecessary delay that puts many students and borrowers at risk of falling victim to expensive, low-quality education programs.

Again, we urge the Department to immediately implement the 2016 state authorization regulations.

Student Debt Crisis is a nationwide advocacy group with over 1,000,000 supporters calling for fundamental reforms to student loan policies.

Sincerely,

Natalia Abrams
Executive Director
Student Debt Crisis



**SIIA** Accelerating Innovation in
Technology, Data & Media

202.289.7442   **1090 Vermont Ave NW Sixth Floor**
www.siia.net     **Washington DC 20005-4905**

6/11/2018

Sophia McArdle, Ph.D.
US Department of Education
400 Maryland Avenue SW
Mail Stop 290-44
Washington, DC 20202

**RE: ED-2018-OPE-0041; Program Integrity and Improvement**

On behalf of the Software & Information Industry Association (SIIA), I write to comment on the
notice of proposed rulemaking, ED-2018-OPE-0041, regarding the delay of the regulations
entitled Program Integrity and Improvement until July 1, 2020.

SIIA supports the Department of Education's proposal to delay the regulations and the original
intent of the regulations to ensure that institutions offering distance education and
correspondence course programs to students provide adequate protections and transparency
to all students. We support activities to ensure students across the country continue to have
access to high-quality programs.

As background, SIIA is the principal trade association for the software and digital content
industry. SIIA members include 200+ of the nation's leading publishers and innovative
developers of digital products and services for K-20 education, including digital instructional
materials, education software and applications, online educational programs, professional
development and related technologies and services for use in education. Our members also
depend on the nation's schools to provide a skilled, high-tech workforce with both academic
proficiency in the core subject areas and 21st century skills.

SIIA, in coordination with the Association of American Publishers, submitted comments on
these regulations on August 24, 2016 encouraging the Department to maintain access to Title
IV funds for students participating in distance learning outside of their state of residency. This
issue was expounded upon by the American Council on Education in their February 6, 2018
letter to the Department. SIIA supports the statements made in that letter.

Thank you for your attention to these thoughts and concerns. SIIA and our member companies
look forward to further working with the U.S. Department of Education and institutions of
higher education to improve the quality and availability of distance learning programs. Please
don't hesitate to contact me or Sara Kloek, SIIA's director of education policy, at
skloek@siia.net or (202) 789-4448 with any further questions or requests for further
information.

Sincerely,

Mark MacCarthy
Senior Vice President, Public Policy
Software & Information Industry Association



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

BARBARA D. UNDERWOOD
ATTORNEY GENERAL

DIVISION OF ECONOMIC JUSTICE
CONSUMER FRAUDS & PROTECTION BUREAU

June 11, 2018

The Honorable Elisabeth DeVos
Secretary
United States Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

**Re: Docket ID ED-2018-OPE-0041**

Dear Secretary DeVos:

We, the undersigned Attorneys General of New York, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, North Carolina, Oregon, Rhode Island, Virginia, and Washington write to oppose the U.S. Department of Education's ("Department") proposed rulemaking to delay and replace the final Program Integrity and Improvement Rule (the "Program Integrity Rule" or the "Rule"). The Rule would bolster states' ability to protect students enrolled in online programs in our states by requiring schools that offer online programs in multiple states to obtain authorization to operate in each state where such programs are offered, to the extent that such authorization is required under state law. The Rule would also increase the transparency and accountability of such distance education programs by requiring schools to provide crucial disclosures to prospective and enrolled students. Delay of the Rule will significantly harm students by depriving them of the critical consumer protections provided by the Rule. In addition, the Department's decision to replace the Rule opens the door to a process that could lead to adoption of a much weaker rule. This would be a serious disservice to students. Moreover, the Department has failed to establish that delay and replacement of the Rule is warranted.

The number of students enrolled in distance education has increased every year for the last fourteen years.[1] In 2016, over 3 million students were enrolled in exclusively distance education programs.[2] More than 40% of students enrolled in distance education courses are studying at out-of-state institutions.[3] While distance education provides many benefits to

---

[1] *See* Julie E. Seaman et al., *Grade Increase: Tracking Distance Education in the United States*, ONLINE LEARNING SURVEY 3, http://onlinelearningsurvey.com/reports/gradeincrease.pdf.
[2] *See id.*
[3] *See Pearson's Distance Education Enrollment Report 2017*,
https://www.onlinelearningsurvey.com/reports/digtiallearningcompassenrollment2017info.pdf

students, it can also carry risks for students and challenges for regulators.  In many states, students enrolled in distance education programs offered by out-of-state schools are ineligible for state-level consumer protections, such as state tuition-reimbursement funds and state disclosure and refund requirements.  State regulators face challenges in identifying which out-of-state schools are offering distance education programs to students in their state and in obtaining sufficient information to evaluate the quality of such programs and to determine whether schools offering the programs are complying with applicable law.

State oversight is especially important for one sector of the distance education industry -- for-profit schools.  At for-profit schools, the majority of students are enrolled in at least some distance education courses.[4]  Investigations and enforcement actions by state attorneys general against for-profit schools have revealed widespread misconduct by for-profit schools, including schools that provide distance education in multiple states.[5]  This misconduct has included misrepresenting graduates' employment and salary outcomes; misrepresenting accreditation status; offering predatory student loans; and misrepresenting that programs qualify graduates to earn professional licensure in the state where the program is offered.  The long list of state attorney general enforcement actions against for-profit schools demonstrates that state oversight is critical to ensure that students are protected from harm.  In addition, the Department's continuing efforts to dismantle existing consumer protections for students, such as the Department's actions to delay and replace the Gainful Employment Rule and the Borrower Defense Rule, have left students more vulnerable to schools' misconduct and have made state oversight of distance education even more important.

### A.  Delay of the Rule Will Significantly Harm Students

The Program Integrity Rule was finalized after a robust and thorough negotiated rulemaking.  Numerous stakeholders, including state attorneys general, participated in this rulemaking process.  The Rule, which was slated to go into effect on July 1, 2018, would bolster state-level oversight of distance education by requiring schools that offer distance education programs in multiple states to obtain authorization to operate in each state where such programs are offered, to the extent that authorization is required under state law.  Pursuant to the Rule, a distance education program offered in a state where the school has not met state requirements would not be eligible for Title IV financial aid for students enrolled in that state.  The provision would strengthen states' oversight capacity by ensuring that states that sought to regulate distance education would be able to identify and regulate schools offering distance education in their state.  Delaying the Rule will permit schools to use federal funds for programs that operate outside of the oversight of state regulators.

The Program Integrity Rule would also bolster state oversight and strengthen protections for students by spurring critical changes to state authorization reciprocity agreements.  The

---

[4] *See id.*

[5] These include actions against: American Career Institute; Ashford University/Bridgepoint Education, Inc.; Corinthian Colleges, Inc.; Career Education Corporation; Education Management Corporation; Daymar College; DeVry University; ITT Tech; American National University of Kentucky; and Westwood Colleges, among others.

0076

Program Integrity Rule would permit schools offering distance education in states where the school is not physically located to obtain state authorization in those states through membership in a state authorization reciprocity agreement. However, the Rule was purposefully crafted to permit schools to obtain authorization through such an agreement only where the agreement permits member states to enforce both general consumer protection and education-specific state laws against out-of-state schools. The current, national state authorization reciprocity agreement, "SARA", does not permit states to enforce education-specific state laws against out-of-state SARA member schools.[6] Accordingly, the Rule would require SARA to revise applicable policies to permit states to enforce education-specific state laws against out-of-state member schools. This would ensure that distance education students have the same access to information about programs and to refunds and other state-level protections as students enrolled at traditional brick-and-mortar schools. This would also expand states' ability to bring enforcement actions against predatory for-profit schools offering online programs in their states and would increase states' ability to adopt state laws that protect their consumers.

The Program Integrity Rule would provide many additional benefits to students that should not be delayed. It would require schools that offer distance education programs in multiple states to provide crucial disclosures to prospective students, including a disclosure alerting students if a school determines that a particular program does not satisfy state requirements for obtaining professional licensure in the students' state. The Rule would require schools to disclose information on how to submit a consumer complaint to appropriate state authorities in each state in which the program's students reside. The Rule would also require schools to disclose adverse actions by state entities or accrediting agencies related to the distance education programs. The Rule would also require schools offering distance education to disclose any applicable state refund policies for the return of unearned tuition and fees. The delay of the Rule will deprive prospective students of critical information that would help them choose appropriate programs and exercise their rights under state laws.

## B. The Department has Failed to Establish that Delay and Replacement of the Rule is Warranted

The Department has failed to establish that delay and replacement of the Rule is warranted. In the May 25, 2018 Notice of Proposed Rulemaking, the Department states that the last-minute proposal to delay and replace the Rule was prompted by the Department's receipt of two letters from groups representing regulated parties in February 2018. While we disagree with the letter-writers' claims that the Rule requires additional clarification, we also note that the limited concerns raised by regulated parties that are described in the Department's May 25, 2018 Notice of Proposed Rulemaking would be adequately addressed through the issuance of explanatory guidance, rather than wholesale delay and replacement of the Rule. Moreover,

---

[6] Note that Massachusetts is joining SARA with a special state-specific arrangement that will permit Massachusetts to enforce certain state regulations governing for-profit schools with respect to out-of-state SARA member schools. *See Memorandum of Understanding Between the Office of the Attorney General and the Department of Higher Education*, MASS 2 (2017), http://www.mass.edu/bhe/lib/documents/AAC/AAC18-10b_Attachment%20B%20AGO%20DHE%20MOU.pdf.

although the Rule was published in December 2016, the Department waited until May 25, 2018, just five weeks before the Rule was to go into effect, to announce a proposed delay and replacement of the Rule, providing only fifteen days for comments. The fifteen-day comment period fails to provide interested parties with adequate time to address the proposed delay and replacement.

In the Notice of Proposed Rulemaking, the Department cites a letter from the American Council on Education that expressed concern that as a result of the Rule's requirements, students who are residents of certain states that do not currently have complaint processes in place for all out-of-state schools, including California, may be ineligible for federal financial aid to attend online programs offered by out-of-state schools.

The Department cites this concern as a justification for its decision to delay and replace the Rule. However, this concern does not warrant such an overly broad response. First, this issue was explicitly raised, considered, and responded to by the Department in the notice and comment process for the Rule. The Department notes in the preamble to the Rule that "a few commenters asked that the regulation include compliance for their students from States such as California that reportedly lack oversight for their out-of-State student complaints," and that "[s]ome commenters recommended allowing institutions to use their home State's complaint processes for students in States lacking adequate complaint procedures." [7] The Department responded to these comments in the preamble, reaffirming that under the Department's final Rule, "if a State does not provide a complaint process as described in a State where an institution's enrolled students reside, the institution would not be able to disburse Federal student aid to students in that State."[8] Since the issue was raised, considered, and responded to during the notice and comment rulemaking proceeding issuance of the Rule, the Department cannot rely on regulated parties' citation of this issue in their February 2018 letters as a "new" issue that would require a last-minute delay of the Rule, or that would require a second negotiated rulemaking to address. Second, even if this concern had been raised for the first time in February 2018, it does not justify the delay and replacement of the entire Rule. Rather, this concern could be addressed through delay and replacement of the specific provision that requires schools to disclose a state's complaint process, rather than the entire Rule.

The Department's May 25 Notice of Proposed Rulemaking also cites a second letter received by the Department from groups representing regulated parties as grounds for the Department's proposal to delay and replace the Rule. The second letter expressed that schools need additional information from the Department to better understand how to comply with the Rule.[9] While we do not believe that the Rule requires additional clarification, any request for additional information could be satisfied through issuance of guidance, rather than wholesale delay and replacement of the Rule.

---

[7] 81 Fed. Reg. 92232, 92238 (Dec. 19, 2016) (codified at 34 C.F.R. pts. 600 & 668).

[8] *Id.*

[9] *See* Letter from Russell Poulin et al., to Frank Brogan, Acting Assistant Secretary of Postsecondary Education, U.S. Dep't. of Educ. (Feb. 7 2018), https://wcet.wiche.edu/sites/default/files/WCET-SARA-DEAC-Letter-2-7-18_0.pdf.

The second letter also expressed concern that the way the term "resident" is described in the preamble of the Rule may "conflict with State laws and common practice among students for establishing residency." To the contrary, the definition does not conflict with state law, but rather, is grounded in state law definitions of residency. Indeed, the preamble of the Rule states that: "[f]or purposes of this rulemaking, a student is considered to reside in a State *if the student meets the requirements for residency under that State's laws*."[10]

The May 25 Notice of Proposed Rulemaking asserts that issuance of guidance would be insufficient because the Department now believes that there is a need for a more precise definition of residence in the Rule because states may define residency in different ways for different purposes. This issue was not raised by any of the regulated parties in their letters to the Department, and the Department does not indicate why it waited until immediately before the Rule was to go into effect before raising this concern as the basis for a last-minute delay and replacement of the Rule. Furthermore, the Department has cited no new facts or changed circumstances that justify its deviation from its previous position. Moreover, the Department could adequately address this concern through guidance explaining how schools should handle questions that might arise in connection with state law definitions of residency.

The Department also attempts to justify its proposal to delay and replace the Rule by noting that the letter-writers requested clarification of the format for the Rule's required disclosures. The Department's decision to delay and replace the disclosure requirements is not a rational or proportional response to a request for more information about the format of the disclosures. To the extent that any additional clarification about disclosure formatting is necessary, the Department could provide such clarification by issuing guidance.

In sum, nothing in the Department's proposal justifies either delaying implementation of the Rule or opening the door to a full-blown reconsideration of the protections that have already been thoroughly vetted. For all of the reasons discussed herein, we call on the Department to reconsider its decision to delay and replace these crucial protections for students.

Sincerely,

Barbara D. Underwood
New York Attorney General

George Jepsen
Connecticut Attorney General

---

[10] 81 Fed. Reg. 92232, 92236 (Dec. 19, 2016) (emphasis added).

0079

Matthew P. Denn
Delaware Attorney General

Karl A. Racine
District of Columbia Attorney General

Russel Suzuki
Hawaii Attorney General

Stephen H. Levins
Executive Director, Hawaii Office of
Consumer Protection

Lisa Madigan
Illinois Attorney General

Thomas J. Miller
Iowa Attorney General

Janet T. Mills
Maine Attorney General

Brian E. Frosh
Maryland Attorney General

Maura Healey
Massachusetts Attorney General

Lori Swanson
Minnesota Attorney General

Joshua H. Stein
North Carolina Attorney General

Ellen F. Rosenbaum
Oregon Attorney General

0080

Peter F. Kilmartin
Rhode Island Attorney General

Mark R. Herring
Virginia Attorney General

Bob Ferguson
Washington State Attorney General

June 11, 2018

Sophia McArdle
U.S. Department of Education, Office of Postsecondary Education
400 Maryland Avenue SW., Room 6W256
Washington, DC 20202
202-453-6914

Re: Comment on Program Integrity and Improvement (State Authorization), ED-2018-OPE-0041

Dear Ms. McArdle:

The Department's proposal to delay the 2016 rule on program integrity and state authorization of distance education programs not only leaves students more susceptible to investing their time and money into low-quality institutions, but also undermines states' abilities to ensure and enforce postsecondary quality standards.

Furthermore, an extensive delay is a disproportionate response to the requests for clarification, which are the stated bases for this proposed action. The two letters referenced by the Department as justification for this delay—submitted by the American Council on Education (ACE), and by a group including the National Council for State Authorization Reciprocity Agreements (NC-SARA), WICHE Cooperative for Educational Technologies (WCET), and Distance Education Accrediting Commission (DEAC)—requested clarification and guidance. A delay further disregards the resources invested by states and institutions in preparation for implementing the 2016 rule. Rather, the two letters referenced in the Department's notice and another letter received from New America, The Century Foundation, National Consumer Law Center, and the SEIU suggest that guidance, not additional delay, would be the most appropriate and efficient response.

**Consumer Protections are Needed for Growing Body of Students Pursuing Distance Education**

With a large and growing student population utilizing distance education, the Department's delay of the 2016 rule removes the consumer protections necessary for enrolled and prospective students to make informed decisions. As of 2015, nearly 2.1 million undergraduate students pursued an education entirely online, and over 770,000 of those students were enrolled in a program not located in their state of residence.[1] The disclosures required by those rules would have aided students in investing their time and money in quality distance education programs, rather than in programs that offer credentials not valued by potential employers. Many of these disclosures reflect information that is of critical importance to students and that responsible institutions already track, such as:

[1] U.S. Department of Education, National Center for Education Statistics, Integrated Postsecondary Education Data System (IPEDS), Spring 2014 and Spring 2015, Fall Enrollment component (prepared Dec. 2015), available at https://nces.ed.gov/programs/digest/d15/tables/dt15_311.15.asp?current=yes.

- **Authorization Status.** For students, information about whether an institution is operating without proper authorization from a state or through an interstate reciprocity arrangement would be highly relevant to a student's decision to enroll in a program. Furthermore, law-abiding institutions providing distance education already know whether and how they are authorized to operate in a given state. Disclosure of this information as required under the 2016 rule is relevant to students, and adds little to no additional burden to provide as institutions are already familiar with their authorization status.

- **Adverse Actions**. The existence of substantive, adverse actions taken against a program, especially involving a state or accreditors, would be relevant information for any enrolled or prospective student. Institutions already receive notification from states, accrediting bodies, and other law enforcement entities when actions are formally taken against them. Notifying students of such action could easily occur through established channels of communication, and at little to no additional cost for institutions. Absent such disclosures, current and prospective students are at a severe and unfair informational disadvantage.

- **Prerequisites for Professional Licensure.** Satisfying the licensure and certification requirements (or preferences) for a given profession can be critical to finding employment in some fields of study. Whether or not enrolling in a particular distance education program will provide students with necessary credentials to enter the workforce is an important fact that current and prospective students should be aware of. Institutions that are dedicated to preparing students for gainful employment may already capture this information in order to comply with the 2016 Gainful Employment regulations,[2] laws forbidding the false certification of loan for students with certain disqualifying statuses,[3] and/or state laws requiring certain vocational degree programs to prepare students for licensure in relevant occupations.[4] The same requirement should be applied to distance education programs.

Neither letter referenced by the Department indicates any reason why these disclosures must be delayed or why guidance from the Department would not be sufficient. Absent the disclosures required through the state authorization rule, students are more likely to fall prey to low-quality programs, which fail to satisfy basic educational prerequisites for professional licensure and employment in their fields of study.

**Federal Rule Clarifies States' Roles in Ensuring Consumer Protection**

State authorization exists as a necessary quality assurance for consumers. Without a federal baseline, interstate reciprocity systems such as NC-SARA can introduce uncertainty regarding

---

[2] The 2016 Gainful Employment rule "revised §668.412(a)(14) to require that an institution indicate whether the GE program meets the licensure and certification requirements of each State."
[3] See 34 C.F.R. § 685.215(a)(1)(iii).
[4] See, *e.g.*, Maryland Commercial Law 13-320.

both consumer protections and complaint mechanisms for students enrolling in distance education. The 2016 rule clarified that state consumer protection law would continue to operate as a check on predatory, deceptive, and otherwise unlawful practice by providers of distance education. The clarifying function of the federal baseline proved to be so integral that in Massachusetts, a Special Commission recommended that the Commonwealth of Massachusetts should join SARA if and only if

> the federal regulation requires interstate reciprocity agreements (for the purposes of federal law) to permit states to enforce their consumer protection statutes and regulations, both general and specific, such that SARA will need to amend its policies and permit enforcement of the Massachusetts regulations on for-profit schools.[5]

Massachusetts' Board of Higher Education also stated that the Commonwealth only began "exploring the process of joining SARA" in earnest after the publication of the final 2016 rule, which "provided that interstate reciprocity agreements cannot prohibit a state from enforcing its statutes and regulations, including those specific to all or a subset of educational institutions."[6] This delay will reintroduce confusion regarding important student protections.

The Department should not delay the state authorization of distance education programs rule. Delaying the rule needlessly weakens disclosures and protections for students who pursue distance education. That is why we ask the Department to please move forward with timely implementation of the final 2016 regulation.

Respectfully submitted,

Kelia Washington, Summer Scholar
The Century Foundation

Yan Cao, Fellow
The Century Foundation

---

[5] Special Commission on Interstate Reciprocity Agreements, Report to the General Court (Oct. 31, 2016), available at www.mass.gov/files/documents/2016/12/tb/special-commission-interstate-reciprocity-agreements.pdf.
[6] Massachusetts Board of Higher Education, "Request for Committee and Board Action: Board of Higher Education Authorization for Massachusetts to Enter into the State Authorization Reciprocity Agreement (SARA) and Delegation of Authority to Commissioner (Oct. 24-31, 2017), available at https://www.mass.edu/bhe/lib/documents/AAC/AAC18-10_AAC%2018-08%20SARA.pdf.

June 11, 2018

Sophia McArdle
Department of Education
400 Maryland Avenue SW., Room 6W256
Washington, DC 20202

RE: Public Comment on Docket no. ED-2018-OPE-0041

Dear Ms. McArdle:

Student Action is a national organization representing thousands of undergraduate college students in over nine states. Our work focuses on ensuring that higher education is affordable and accessible for all students, especially those coming from disadvantaged backgrounds. We are writing in response to Federal Register notice ED-2018-OPE-0041, which seeks to delay implementation of the 2016 state authorization regulations. We are writing to strongly urge the Department to reconsider the delay and proceed in implementing the 2016 state authorization rule as written, a regulation that is the result of two prior negotiated rulemakings.

Our concern about this delay has to do with the impact such a delay would have on current and future student loan borrowers. Data show that that:

1. Borrowers in distance-education-only, for-profit programs have debt loads higher than the average for students in programs not entirely online, including brick and mortar programs, in each income quartile.[1]
2. Borrowers enrolled in distance-education-only programs carry higher loan debt on average at for-profits in the 2015-2016 academic year compared with their counterparts at brick-and-mortar for-profit programs ($8,213.50 and $7,553.90 respectively).
3. The cumulative average federal student loan debt for graduating borrowers enrolled in distance-education-only programs is higher at for-profit institutions than in any other sector ($31,298.60 compared with $28,482.20 on average across all sectors); and is higher than those not enrolled in entirely-online programs ($21,525.60, on average).

Students that opt to enroll in distance education programs are disproportionately older, poorer, and more likely to be an underrepresented minority than those who enroll in non-distance-education-programs, including brick-and-mortar.[2] Instead of making access and quality a priority for those who need it the most, the current financialization and lack of regulations on distance education makes obtaining an online degree more expensive and, if this rule is rolled back, of less quality than the degrees our more affluent students receive.

For the nearly one in three students[3] that participate in distance education programs delays in the rules meant to protect these student consumers could mean the difference between a lifetime of unmanageable debt or financial stability. Students pursuing non-traditional educational pathways deserve every bit of oversight and

---

[1] U.S. Department of Education, National Center for Education Statistics, 2015-16 National Postsecondary Student Aid Study (NPSAS:16).
[2] U.S. Department of Education, National Center for Education Statistics, 2015-16 National Postsecondary Student Aid Study (NPSAS:16).
[3] U.S. Department of Education, National Center for Education Statistics, Integrated Postsecondary Education Data System (IPEDS), Spring 2016 and Spring 2017, Fall Enrollment component. (This table was prepared January 2018.)

accountability that traditional students receive as a result of strict adherence to the program integrity accountability triad made up of the Department of Education, accreditors, *and* states.

The government must preserve their investment in the federal student loan program and in aid to distance education providers. Students investing their time and money into these programs, at the very least, deserve the guarantee that their credentials will have value in their state's job market and professional industry standards. Additionally, this regulation provides vital yet basic protections to consumers by requiring that students have a way to file complaints and that states/institutions have a way of addressing them. This complaints system functions as an essential early warning system of potential waste, fraud, and abuse of students and federal financial aid.

Finally, it would be negligent of the Department to deny students the disclosures and information they are entitled to to make informed decisions about their schooling and finances. To re-regulate this issue for a third time would mean many more cohorts of students and borrowers are left unprotected and without the assurance of high-quality program standards.

We, once again, urge the Department to quickly proceed in implementing the 2016 state authorization regulations.

Sincerely,

Aija Nemer-Aanerud
Director, Student Action

the institute for
college
access&success

June 11, 2018

Sophia McArdle, Ph.D.
U.S. Department of Education
400 Maryland Ave., SW
Mail Stop 290-44
Washington, D.C. 20202

RE: Notice of Proposed Rulemaking on ED-2018-OPE-0041-0001

Dear Dr. McArdle:

Thank you for the opportunity to comment on the U.S. Department of Education's proposed two-year delay of final regulations related to the state authorization of distance education institutions and foreign locations. An independent, nonprofit organization, the Institute for College Access & Success (TICAS) works to make higher education more available and affordable for people of all backgrounds, with an emphasis on low-income, underrepresented students.

States have long had important responsibilities in protecting students from low-quality and abusive colleges. The distance education regulation the Department seeks to delay includes important protections that enable states to fulfill those roles. It protects states' ability to enforce their laws, ensures students are able to file complaints against their schools when need be, and requires schools to make certain information available to students, such as whether or not the program the student is pursuing will lead to licensure in their field of study for that state. The Department's two-year delay is unnecessary and puts students at risk.

As the basis for delaying the rule, the Department cites two letters: The first from the American Council on Education dated February 6, 2018, and the other dated February 7, 2018 from three organizations that oversee distance education providers – the National Council for State Authorization Reciprocity Agreements, the Western Interstate Commission for Higher Education, and the Distance Education Accrediting Commission.

The February 6 letter posits that some students may not be eligible for student aid as their state may not have a system in place to act on consumer complaints associated with out-of-state institutions, and specifically cites California as a state lacking a complaint handling process. The February 7 letter raised two administrative issues for clarification: How to determine the residency of students for purposes of the rule, and the appropriate format for consumer disclosures.

**The delay of the entire rule is unnecessary to address any of these concerns.**

Any confusion regarding residency and disclosure formatting are capable of being resolved through guidance, rather than delaying and redrafting the rule. As currently drafted, the state authorization and distance education rules allow an institution to simply rely on the student's assessment of their residency

in meeting the requirements of the rule.[1] The concern over disclosures is even weaker. There is no required format for the disclosures required by the rule. Institutions can use whatever format they would like for the public disclosures, unless otherwise directed by the Department. These are misunderstandings about the rule, not flaws in it. Therefore, to address any outstanding confusion on these issues, the Department could simply provide guidance without any delay of the implementation.

If concerns about California's complaint handling procedures remain that cannot be addressed by technical assistance and guidance, despite having had nearly 18 months to work with the state to implement the rule, the Department should proceed with a narrower delay affecting only students living in California and attending online programs at out-of-state institutions. Notably, the Department does not describe any effort it has made to gather information since the rule was finalized 18 months ago, or to clarify California's complaint processes. California should not be used as justification to delay the rule for the over 1 million students enrolled in out-of-state distance education programs.

The Department first began to consider state authorization with a public hearing on June 16, 2009. The most recent regulation was finalized on December 16, 2016, more than 18 months ago. The two letters were received more than four months ago. After these ample opportunities to fully consider all aspects of this issue, further delay is unnecessary and harmful to students.

We urge the Department to immediately provide the guidance and technical assistance necessary to address these concerns, and to protect students by allowing the rule to go into effect as scheduled on July 1, 2018. If you have questions about our comments, please contact me at aperry@ticas.org.

Sincerely,

Angela Perry

---

[1] "State Authorization." Correspondence to Secretary Betsy DeVos. Letter from Amy Laitinen, New America; Yan Cao, The Century Foundation; National Consumer Law Center; and Service Employees International Union. 26 March 2018. https://na-production.s3.amazonaws.com/documents/03262018_State_Authorization_Letter_Final.pdf.



**Bryant & Stratton College**

FOR EVERY & IN LIFE

June 11, 2018

Sophia McArdle, Ph.D.
U.S. Department of Education
400 Maryland Avenue, SW
Mail Stop 290-44
Washington, D.C.  20202

> Re:    Public Comment – Notice of Proposed Rulemaking
>         34 CFR Parts 600 and 668
>         Docket ID. ED-2018-OPE-0041
>         Submitted via: www.regulations.gov.

Dear Dr. McArdle:

Please accept this correspondence as public comment in response to the Notice of Proposed Rulemaking pertaining to 34 CFR Parts 600 and 668 issued by Secretary DeVos on May 22, 2018.  Bryant & Stratton College ("BSC") is a private, for-profit college with nineteen campuses located in New York, Ohio, Virginia, Wisconsin, and an Online Education division with students in most states.  BSC has been an institutional member of NC-SARA for the past two years and has kept a watchful eye on the proposed distance education regulations.

We have had the opportunity to review Secretary DeVos' recent notice proposing a delay in the effective date of the Program Integrity and Improvement regulations published on December 19, 2016, along with a number of letters submitted by our colleagues and peers in support thereof.  After working to prepare BSC to implement operations in order to ensure compliance with these regulations, we are in agreement with the various points summarized by Secretary DeVos on May 22.  We agree that the proposed delay to the effective date of the regulations will allow the Department of Education to ensure that those areas of the regulations in question will be adequately addressed so the road to compliance for all post-secondary institutions will be clear.  Accordingly, BSC respectfully submits that the effective date of the Program Integrity and Improvement regulations be delayed as proposed.

Regards,

Francis J. Felser, C.P.A., B.S., M.B.A, D.M.
President & Chief Executive Officer



# BOISE STATE UNIVERSITY
## DIVISION OF EXTENDED STUDIES

June 7, 2018

Sophia McArdle
U.S. Department of Education
400 Maryland Avenue SW/Room 6W256
Washington, DC 20202

Re:   *Program Integrity and Improvement; Proposed Delay*
      *Docket ID ED-2018-OPE-0041/RIN 1840-AD39*

Dear Ms. McArdle:

Boise State University (www.boisestate.edu) is a public, metropolitan doctoral research university of distinction providing leadership in academics, research, and civic engagement.  We are Idaho's largest university and serve more than 22,000 students.  Accredited by the Northwest Commission on Colleges and Universities since 1941, we currently offer 11 doctoral degrees, 68 master's degrees, 24 graduate certificates, 90 undergraduate degrees, 4 associate degrees, and 37 undergraduate certificates.

## Distance Education Activities
Outside of Idaho, Boise State University operates solely as an online/distance provider of postsecondary education.  Distance Education offerings include 39 academic degrees and certificates and 535 unique academic courses delivered via web-based course management systems.  Over 40 percent of all students take at least one course online and each semester research almost 3,000 students attend exclusively online.
In an effort to more efficiently and cost-effectively comply with state authorization laws nationwide, Boise State University was among the first 25 institutions in the nation to join the voluntary State Authorization Reciprocity Agreement (SARA).

## Support Proposed Delay; Vital Clarifications and Amendments Necessary
We support the proposed two-year delay and believe additional discussion during negotiated rulemaking will produce more informed, realistic, and effective regulations.  We thank the Department for listening to key stakeholders and acknowledging the complexity of state authorization, the mobility of today's students, and the maturity of distance education delivery.

Respectfully Submitted,

Mark Wheeler
Dean, Division of Extended Studies

220 E. Parkcenter Blvd.  Boise, Idaho 83706
Phone (208) 426-1709   Fax (208) 426-3467   extendedstudies.boisestate.edu

0090



**Office of the President**

1700 Van Hise Hall
1220 Linden Drive
Madison, Wisconsin 53706-1559
(608) 262-2321 Phone
(608) 262-3985 Fax

e-mail:  rcross@uwsa.edu
website: www.wisconsin.edu/

June 7, 2018

U.S. Department of Education
34 CFR Parts 600 and 668
**Docket ID ED-2018-OPE-0041**
RIN 1840-AD39
Program Integrity and Improvement
Comments on Notice of Proposed Rulemaking
Submitted via regulations.gov

Dear Education Department Colleague:

I am writing on behalf of the University of Wisconsin (UW) System.  The UW System is made up of two doctoral universities (UW-Madison and UW-Milwaukee), 11 comprehensive four-year universities, 13 two-year campuses, and statewide UW-Extension.  The UW System serves approximately 170,000 students each year with about 39,000 faculty and staff.

The following comments are in response to the May 25 Notice in the Federal Register indicating that the U.S. Department of Education plans to delay implementation of the final state authorization regulations until July 1, 2020.

Wisconsin is one of eleven states participating in the Midwestern State Authorization Reciprocity Agreement (M-SARA). Similar agreements exist for the four regional higher education compacts to create an inter-regional agreement overseen by the National Council for State Authorization Reciprocity Agreements. This includes about 1,750 institutions from the current 48 SARA member states (plus the District of Columbia and the Virgin Islands). This nationwide framework ensures interstate reciprocity and simplifies the state authorization process for interstate offerings of postsecondary distance education courses and programs.

SARA was created for the specific purpose of streamlining the regulatory process while maintaining compliance with reasonable and consistent standards relating to financial scores, consumer protections and disclosure requirements. Institutions of higher education, including the UW System, are particularly concerned about additional federal regulation in this area – especially regulation that is not thoroughly vetted by stakeholders – which may diminish the

Universities: Madison, Milwaukee, Eau Claire, Green Bay, La Crosse, Oshkosh, Parkside, Platteville, River Falls, Stevens Point, Stout, Superior, Whitewater. Colleges: Baraboo/Sauk County, Barron County, Fond du Lac, Fox Valley, Manitowoc, Marathon County, Marinette, Marshfield/Wood County, Richland, Rock County, Sheboygan, Washington County, Waukesha. Extension: Statewide.

0091

benefits of SARA and create additional regulatory burdens on institutions that SARA was designed to streamline.

The UW System supports delaying the final regulations. Thank you for your consideration of these comments.

Sincerely,

Ray Cross
University of Wisconsin System

June 7, 2018


Ms. Jean-Didier Gaina
Office of Postsecondary Education
U.S. Department of Education
400 Maryland Ave.
S.W Mail Stop 294-20
Washington, D.C. 20202

Agency Docket ID: ED-2018-OPE-0041

### Program Integrity and Improvement: State Authorization

In December 2016, the U.S. Department of Education (ED) released final rules regarding the Federal oversight on state authorization of online education. The decision to delay the implementation until July 1, 2020, announced in May 2018, is met with gratitude and anticipation of ultimate changes to the current rules in hopes that any updated language will provide better clarity amongst institutions on key definitions of the rule, as well as reduce unnecessary and duplicative ED oversight on the state authorization process.

The rules published in December 2016 provide little clarity on key definitions, such as "residence". ED has provided minimal guidance or clarity to multiple unclear or ill-defined definitions which leaves institutions with a heavy burden to comply with an unclear and obtuse rule.

As a member of the State Authorization Reciprocity Agreement (SARA), Liberty University has repeatedly voiced concerns regarding the verbiage change of an "acceptable" reciprocity agreement. The current definition, although not ED's intention according to a later clarification, is interpreted to adversely affect SARA. Based on the current language, any reciprocity agreement "does not prohibit a participating State from enforcing its own consumer protection laws" (Section 600.2). This specific section complicates reciprocity agreements because it specifically allows agreeing States to impose additional, separate State based regulations. During the delay, ED should clarify its definition of an acceptable reciprocity agreement or completely revoke its prior rules that provide an unnecessary regulatory burden on State based agreements.

Liberty acknowledges the importance and necessity of helpful and effective consumer information and protections. Every institution of higher education should provide all students with accurate information concerning their degree programs and paths to licensure. Currently, institutions that desire to conduct business in their state must comply with each states regulations and obtain any necessary authorizations. Institutions who have already made efforts to comply with State regulations through reciprocity agreements should not have additional unnecessary, duplicative, and burdensome regulations added from ED.


Finally, the recommendation to remove federal oversight of the entire state authorization process is shared by many institutions and organizations as this would reduce additional administrative burden and promotes the availability of affordable and accessible higher education because the additional cost to comply with duplicative regulations drives up the administrative cost to provide education to students. The delay in implementation allows for a complete review and overhaul of the final rulings, leaving this authority to the States.

**Main Points:**

1. The delay in implementation of these rules will save institutions valuable resources, both monetarily as well as physical resources, that would have been tied up ensuring the many facets of the final rules were implemented: enhanced disclosure statements that currently are lacking clarity in current rule, adherence to new rules on the vague definition of "residence" from federal rule in comparison to that on the state level. These cost savings can be passed on to students instead of monetary resources being tied up in hiring additional staff or redirecting current staff tasks. Students will not be buried in additional consumer information that is unclear and creates another hurdle. In addition, students will no longer need to take action on various aspects of the consumer disclosures that were cumbersome.

2. The proposal for a two-year delay of regulations governing state oversight of online college programs is one that is needed in order for ED to provide clarity on several key components and definition of the finalized rules published in December 2016.

3. A delay in implementation would allow Liberty University, as well as over 1,200 other institutions encompassing 48 states, who are part of SARA, to not have to seek clarity from individual States and agencies as to the legitimacy of SARA being recognized as an acceptable means to comply with federal definition of an acceptable reciprocity agreement as outlined by the December 2016 rules. This blurs the authoritative line of State oversight versus that of Federal definitions on what constitutes an acceptable state reciprocity agreement.

4. The delay will allow for a complete reevaluation of the need for federal oversight of the state authorization process with respect to current State effectiveness as well as costs to institutions.

**LAUREATE**
EDUCATION INC®

Comments of Laureate Education, Inc., with its U.S. Institutions in Response to
the U.S. Department of Education's Notice of Proposed Rulemaking to Delay
until July 1, 2020, its Regulations on Program Integrity and Improvement –
State Authorization on Distance Education - ED-2018-OPE-0041

Attn:
Sophia McArdle, Ph.D.
U.S. Department of Education
400 Maryland Ave. SW
Mail Stop 290-44
Washington, DC 20202

Jean-Didier Gaina
U.S. Department of Education
400 Maryland Ave. SW
Mail Stop 294-20
Washington, DC 20202

June 11, 2018

Laureate Education, Inc., and its U.S. institutions (hereinafter referred to as "Laureate")
appreciate the opportunity to respond to the U.S. Department of Education's (the Department)
request for comments in its recent Notice of Proposed Rulemaking (NPRM) regarding its
proposal to delay the effective date of the final regulations pertaining to state authorization.
83 Fed. Reg. 24250, May 25, 2018. Laureate also appreciates the Department's efforts to review
its regulations to ensure efficiency and clarity. However, this is one regulation that we believe
the Department should continue to implement.

As Laureate has indicated in previously filed comments and recently during a 12866 meeting
with the Office of Management and Budget (OMB), the issues of state authorization and
transparency to students regarding institutional and programmatic licensure approvals are ones
on which Laureate and its institutions have spent significant time and effort. The issue of
compliance in this area is and will always be complex and, perhaps, imperfect. As long as there
is no effort to play a game of "gotcha" where it is clear that an institution attempted best
efforts to comply, the presence of complexity and imperfection do not serve as justifications for
delay of these long-sought regulations, and we continue to believe that the current regulations
should become effective on July 1, 2018.

We also believe these regulations are necessary and timely in order to provide clarity around
the regulatory triad created by the Higher Education Act (HEA) and in order to ensure an
equitable minimum level of consistent compliance and understanding by any and all institutions

1

offering distance education and by states that regulate them.[1] After all, distance education is no longer a new modality, and while some of these regulations may seem burdensome, institutions should have already operationalized best effort processes to be state-authorized and to provide disclosures to students regarding complaints and licensure, especially since these regulations have been pending for quite some time.

The Department seems to indicate in its recent NPRM that the best approach to improve these regulations is through a new negotiated rulemaking in order to "receive input of negotiators who have been engaged in meeting these requirements." While Laureate supports a new negotiated rulemaking in this and other distance education-related areas to further improve the regulatory framework for Title IV purposes, we are concerned with the continued regulatory whiplash institutions face and with the possibility of two more years without specific federal regulation pertaining to distance education, the triad, and state regulation. In addition, the Department's apparent reliance on negotiated rulemaking implies that negotiators might reach consensus, but as we know from experience, consensus is an extremely high bar to reach. The Department already has a substantial rulemaking record with input from all interested parties on which it could rely to clarify provisions in the short term, while considering longer-term improvements.

Instead of delaying the regulations for yet another two years, we believe that many of the regulatory confusions can be clarified, at least temporarily, through dear colleague letters and FAQ.[2]

The three primary questions and concerns highlighted by the Department (and in the letters referenced) relate to:

- The use of "residing in" when referencing both state authorization and complaint requirements;
- The issue of compliance where a state has no complaint process; and
- The burdens/questions associated with professional licensure notifications and acknowledgements.

Some potential solutions for guidance can even be found in the Department's existing records. See attached Comments of Walden University, August 24, 2016.

First, while Laureate, like other previous commenters, is concerned by the term "residing in," the Department could indicate in guidance that the term means whatever states indicate is

---

[1] As Walden additionally outlined in its prior 2016 comments (attached), these regulations represent a good first step by the Department to demonstrate its authority regarding the triad. From these baseline regulations, we would support additional efforts in a new regulation to clarify state authorization and reciprocity criteria, and to ensure due process at the state level for Title IV eligibility purposes.

[2] We would note that the American Council on Education letter that the Department references in its NPRM does not seek a delay, but rather clarification; the Department seems to indicate that may also be WICHE/NC-SARA/DEAC's intent as well.

0096

required for the purposes of authorization. Regarding the question of complaint processes where states may not have such requirements, the Department clearly has the authority to indicate that institutions may simply indicate that no such process exists at this time. It is noteworthy that for all institutions (not just distance education programs), a complaint process requirement already exists under federal regulation at 34 CFR 668.43(b), so whatever constitutes compliance with that section should apply in 600.9 and 668.50.

Regarding licensure, Walden's prior comments express the urgency and interest in all institutions using their best efforts to notify students of their licensure eligibility in the state where they reside. Again, this is a very complex area and the process will be imperfect, but the Department has the authority to apply and implement these regulations while considering institutions' best efforts to do as much as possible to inform students. It is a bit remarkable that institutions would enroll students without at least some knowledge of the licensure requirements in each state for each profession. The Department's NPRM asks how an institution would handle a student's mobility from one state to another. The existing regulations already resolve this issue. It is clear that the disclosures (both the broad ones and individualized) occur with *the time of enrollment* in mind. In sum, the prospective student is informed of issues associated with licensure before (s)he begins. The Department's concern of possible changes in state residence is a legitimate one, but (a) the broader disclosure requirements should provide all students a place to review the state-by-state information if they decide to move and (b) institutions should voluntarily be reminding all students throughout their enrollment that it is the student's responsibility to determine his or her individual eligibility for licensure and providing them the contact information of the relevant state licensure boards. While this is a good area for improvement in a new rulemaking, it is not a reason to delay the current regulations.

Finally, to the extent that the Department feels that it doesn't have the ability to clarify provisions using sub-regulatory guidance, it does have the authority to consider how it enforces specific provisions of the regulations pending the necessary improvements it would seek in a new rulemaking.[3]

In conclusion, Laureate appreciates the Department's request for comments prior to implementing a delay and hopes the Department will proceed with the regulation's implementation.

---

[3] One example here is that the current regulations indicate that institutions should disclose any adverse action a state or accreditor has *initiated* regarding an institution or program relating to distance education (34 CFR 668.50(b)(4) and (5)). The term 'adverse action' isn't defined (and states and accreditors each have different definitions). In addition, initiation of an action shouldn't be considered relevant to the students and the public until it becomes final with findings; therefore, the timing of this disclosure seems premature. If the Department so chooses, it could (a) delay this provision or (b) take into account these factors for implementation/enforcement purposes until its new rulemaking corrects these issues.

0097

# WALDEN UNIVERSITY

**VIA EMAIL**

Sophia McArdle
U.S. Department of Education
400 Maryland Ave. SW
Room 6W256
Washington, DC 20202

Scott Filter
U.S. Department of Education
400 Maryland Ave. SW
Room 6W253
Washington, DC 20202

August 24, 2016

Attn: Sophia McArdle and Scott Filter

     Re:    (ED-2016-OPE-0050) Comments of Walden University to the U.S. Department of Education on Its Notice of Proposed Rulemaking to Amend Its Regulations on Program Integrity and Improvement – State Authorization

Dear Ms. McArdle and Mr. Filter:

     Walden University ("Walden") respectfully submits these comments in response to the U.S. Department of Education's (the "Department") Notice of Proposed Rulemaking ("NPRM") relating to its program integrity and improvement regulations on state authorization (Docket ID ED-2016-OPE-0050), published on July 25, 2016 at 81 Fed. Reg. 48598 et seq.

     For more than 45 years, Walden University has helped working professionals achieve their academic goals by educating them at a distance. The flexibility we provide our students allows them to study as they continue to make an impact in their professions and in the communities where they reside. Today, more than 50,000 students from all 50 states and many countries outside the U.S. are pursuing their doctoral, master's, or bachelor's degrees online at Walden. Walden educates primarily at the graduate level, with approximately 85% of its students enrolled at the master's and doctoral levels. Our areas of study include: health sciences, counseling, human services, management, psychology, education, public health, nursing, public administration, and information technology. Based in Minneapolis, Minnesota, Walden University is accredited by the Higher Learning Commission ("HLC"), as well as by several specialized and professional accrediting agencies.

     As a very early adopter of distance education and as a participant in the Department's Distance Education Demonstration Program, Walden has watched and participated in the process to expand the higher education triad regulatory structure to online institutions and programs. The issues presented when regulating distance education institutions and programs are most complex

at the state level. Walden is proud that it has long maintained the appropriate state approvals in the many states where it is required to do so. In the last year, Walden also became an early approved participant in the State Authorization Reciprocity Agreement (SARA) and learned that there are significant advantages, but also some disadvantages regarding this new regulatory approach. In addition to its experience with institution-level authorization, offering a variety of programs that lead to professional licensure has provided Walden many years of experience in helping our students to understand the complexities of achieving licensure once they graduate. Disclosure and transparency with students are key components to serving students well in distance education, as they are in any educational environment. With its significant first-hand expertise and understanding of the importance of compliance and disclosure in these areas, Walden is pleased to be able to provide comments and recommendations to the Department's most recent proposed regulations pertaining to the Higher Education Act's state authorization provisions application to distance education.

State Authorization - § 600.9

Walden appreciates the steps the Department has taken to improve its state authorization language pertaining to distance education since its earlier proposals. Generally, these proposed regulations strike the appropriate balance to ensure that institutions offering distance education are appropriately authorized in the states where they operate, while also respecting a state's authority to determine whether an institution's level of operation warrants explicit authorization.

Walden understands the important purpose of the Department's proposal for institutions to document the complaint processes in the states where students reside, but respectfully recommends tying this requirement to its already existing disclosure provisions regarding complaints, which is applicable to all institutions. Specifically, §668.43(b) already requires institutions to disclose information to prospective and current students "with contact information for filing complaints with its accreditor and with its state approval or licensing entity and any other relevant State official or agency that would appropriately handle a student's complaint." It seems that a new provision in §600.9(c) could simply reference §668.43(b) and clarify that the existing disclosure requirement applies more broadly regarding institutions offering distance education.[1]

In addition to this recommendation, Walden seeks clarification on the breadth of the Department's intentions regarding documentation and disclosure. First, it appears that §600.9(c)(2) would require institutions to document that a complaint process exists in every state in which the institution has students residing, regardless of whether authorization is required.

---

[1] We similarly suggest the Department consider linking its proposed disclosure requirements in §668.50 regarding adverse actions to the existing regulations that require *all* institutions have information on such actions available to students. As indicated more fully below, it seems unjustified for the Department to only require disclosure of adverse actions of programs offered solely through distance education.

However, it is more consistent with the rest of the proposed regulation, and the aforementioned existing regulation, to require institutions to document the processes in the states where the institution is authorized. Second, there are disparities among states regarding complaint processes. Some states have many avenues by which a student can file state complaints, while others' complaint systems remain lacking. Given the complexities and inconsistencies in these processes between the 50 states, it would be a significant burden for institutions to continually ensure the accuracy of this information. Walden therefore recommends that each state authorizing body be required to provide any such information regarding complaints to the institutions it approves and the institution would then be required to document the information provided. This step would reduce institutional burdens and ensure accuracy for the students.

Walden will comment more specifically below on the issues pertaining to reciprocity, but provides one recommendation here regarding the relationship between §§ 600.9(c)(1)(i) and (ii). Specifically, Walden recommends the Department clarify that any institution offering distance education has the option to decide whether it chooses to be authorized individually in each state required or whether it participates in a reciprocity agreement between states. As outlined further in the next section, Walden has learned that while there could be significant benefits to participating in a reciprocity agreement, an institution may instead maintain or seek individual state authorizations. Walden therefore recommends that the regulation clearly state the option, perhaps by adding "or" between sections (i) and (ii) of §600.9(c)(1).

Definition of State Authorization Reciprocity Agreement - §600.2

Walden has long supported the concept of reciprocity to minimize the complexities and to create efficiencies in state regulation of institutions offering distance education programs. Walden expressed this support in the Department's initial state authorization rulemaking in 2010. See Comments of Walden University, August 2, 2010. It is essential that the burdens of regulation among 50 states not impede the continued innovation of these important program offerings.

Walden, therefore, generally supports the Department's recognition of reciprocity as an option for authorization of distance education in this proposed rulemaking. However, while committed to the concept of reciprocity, Walden believes it is essential that the Department's regulations ensure the strength of the regulatory triad and also same level of protections for students and institutions as provided by individual state authorization. Based on Walden's own experiences in the last 15 months with National Council for State Authorization Reciprocity Agreements (NC-SARA), Walden makes two recommendations for the Department's consideration.

First, any reciprocity agreement that sets criteria for how the states' portal agents approve institutions should not rely solely on criteria or findings utilized at the federal level. Rather, state reciprocity agreements should establish that each participating state will undertake its own

review of an institution in its state. For example, NC-SARA's existing financial responsibility standards require its participating states to rely solely on the financial composite score established by the Department.[2] Such a reliance on federal regulation weakens the strength of the triad and puts in place a complex metric for an unintended purpose. At the federal level, the Department has chosen to calculate many for-profit institutions' composite scores at the parent level while disregarding the financial condition of the parent's institutions. Looking solely at the parent level financials is not a good federal policy, but it is even worse policy at the state level and could put student-consumers at undo risk. Using Walden's parent entity, Laureate Education, Inc. by example, its U.S. institutions are located in different states under different portal agents and each institution should have its own individual composite score, which the portal agent should review. It simply does not make sense for a portal agent in a reciprocity agreement to apply the federal government's Laureate-level composite across each of the institutions when determining authorization. While in Walden's case, the institution's score is a perfect 3.0, with the parent below a passing score, it is highly likely that there could be many other situations where the parent score passes, but institutions located in several states could having failing scores. In short, relying only on a parent score may very well mask the financial condition or behavior of the institution itself and states—whether through reciprocity or not—should have the authority and discretion to review an institution's own financial condition during the authorization process. For these reasons, Walden recommends that when permitting the use of reciprocity agreements, the Department ensure such agreements require states to review the condition of the institution itself located in their state when making authorization decisions.

Walden's second recommendation relates to the need to ensure that institutions and their students are protected under a reciprocity agreement in the same manner as they would be if authorized by individual states. Just as the Department proposes provisions to require access to clear student complaint processes and consumer protection laws under a reciprocity framework, the Department should require that all reciprocity agreements establish clear due processes by which state portal agents under a reciprocity agreement grant, deny, or remove an institution from its approval or by which an institution may voluntarily withdraw from such approval.

As stated previously, Walden continues to support the general framework of reciprocity and believes it can be an important, effective, and efficient form of regulation of institutions offering distance education. However, the agreement prepared by NC-SARA, the nation's largest reciprocity agreement with 40 states now included, lacks the necessary details and criteria and structure needed to afford institutions and students due process throughout their participation. Walden learned this through its own recent experience when NC-SARA's agreement provided no guidance to the portal agent or the regional compact regarding notice, a hearing, and an

---

[2] While relying on the Department's financial composite score calculation, NC-SARA's standards fail to adopt the rest of the Department's financial responsibility standards, which provides opportunities for institutions to post letters of credit to be considered financially responsible.

appeals process. The SARA regulators were forced to make these processes up mid-stream, with some elements changing throughout. The concern regarding the lack of process is not so much about protecting the institution as it is about protecting enrolled students from any unnecessary sudden change in an institution's status, without appropriate notice and opportunity to be heard. Walden therefore strongly urges the Department to include in its definition in §600.2 a requirement that all reciprocity agreements must include standard due process requirements, similar to those provided in proceedings by state agencies, the Department, and by accrediting agencies.

<u>Institutional Disclosure Requirements for Programs Offered Solely Through Distance Education or Correspondence - §668.50</u>

Walden generally understands and supports the basis for the additional disclosure requirements the Department proposes, but raises a few concerns and suggestions. First, the Department may need to further define "adverse action" or ensure some form of consistency to ensure that students and the public fully understand the meaning of such action taken. Second, as indicated in the first footnote, we are concerned with the application of some of these disclosure requirements to institutions offering programs provided solely by distance education, rather than to all institutions and the programs they offer. If the Department intends to implement disclosure requirements pertaining to adverse actions by states and accrediting agencies, why not have them apply more broadly? Even within the distance education realm, the Department has not explained why programs offered solely by distance education are subject to these disclosures when hybrid programs are not.

This latter point is particularly important as it relates to the Department's proposed disclosure requirements pertaining to state professional licensure and certification prerequisites. Walden fully supports the Department's interest in implementing these provisions. As the Department knows, Walden has a long-established policy and practice of disclosing information regarding licensure requirements to our prospective and current students in the many states in which they are enrolled. As a predominantly graduate degree level institution, Walden offers many licensure level programs and does so to students in all 50 states. We understand our obligation to appropriately inform our students of the complexities relating to licensure and as the Department proposes to mandate; for years we have voluntarily required prospective students to attest that they understand if our program does not meet their state's licensure prerequisites.

Our primary comment to these proposed regulations is that they should apply to all institutions offering licensure programs, regardless of whether offered on-ground, through a hybrid program, or solely at a distance. Our second comment is that, with regard to the disclosure of each states educational prerequisites, we recommend §668.50(b)(7)(i) be clarified to allow institutions to directly cite/link to the websites of the relevant state professional licensure boards for information, which are the most current and authoritative sources for such

information. Licensure boards are continually updating their requirements and standards and these citations or links will allow institutions to provide students with continually current information.

Conclusion

As always, Walden appreciates the opportunity to provide comments. We hope the Department finds the concerns and recommendations raised to be constructive and helpful.

Respectfully submitted,

Jonathan A. Kaplan
President

1k2-93ni-lmbf
I support the delay. Unclear portions of the regulations must be resolved before institutions can move forward.

---

1k2-93nw-kn0w
Joanna Miller
Dear Dept of Education. I would like to add my support for delaying the implementation for two years.
This is my position and not the official position of my district, which may also agree.
Thank you.
Joanna Miller

---

1k2-93n9-18ud
It's heartening to see evidence that you consider comments when making decisions. From my perspective as a former student of public education, the one change that could make the biggest impact would be replacing that simp Betsy DeVos with someone competent.

Thank you for your kind consideration.

---

1k2-93hp-2ca1
Suzan Harkness
I would like to suggest that the federal government continue to delay action on "State Authorization" regulation and to further study the issue and its impact. The 50 United States, districts and territories should have the ability to continue education oversight within their borders and to utilize reciprocity agreements to protect learners. A federal solution is unnecessary at the present time.

---

1k2-93j7-ciot
Sharyl Thompson
This is written to express my full support for delaying the implementation of the Program Integrity and Improvement regulations. As a professional who has worked in the details and nuances of state authorization for 17 years, the regulations as currently published have created additional confusion for students, institutions, accreditors, and states. Another negotiated rule-making process, if it includes individuals who have a clear understanding how state authorization and professional licensure works across state lines, could result in common-sense, reasonable, and manageable regulations. I appreciate and support the Department's concern for consumer protection of students, but for the regulations to be useful and successful, more work needs to be done.

1k2-93o0-c19y
Lynn Rose
Hi,

I work at a community college and I feel that additional time is necessary before regulatory action is implemented,
so that institutions may have time resolve some unclear compliance expectations for approval in some states.

Thank you.

---

1k2-93f0-qe6t
Jim Mello
The delay is prudent given the potential impact on institutions, learners, and process.

---

1k2-93f2-9hq0
John Thomas Dolan
I would like to see the federal government implement limited "State Authorization" regulation based on the following essential elements:

1. States (including commonwealths, districts, and territories) shall be required to regulate higher education activities conducted within respective borders.
2. Higher education activities conducted within a states border may be regulated through reciprocity.

The rationale for this straight-forward and limited regulation is to leave responsibility with the states (not federal), and to require states to pay attention to and have a process to regulate higher education activities within respective borders (because some states, such as California, do not have adequate oversight of higher education activities conducted by out-of-state non-profit and public institutions.) And, the first statement is necessary to allow such regulation to occur through reciprocity as in the second statement.

---

1k2-93i5-k1ro
Hello,

Please delay the enforcement of the Federal Regulations until July 1, 2020.

The delay will make it possible to resolve confusion (for students, institutions, states, and accreditors) in the current regulations.
There are some parts of the regulations that are very onerous and expensive for institutions to implement. A delay would give institutions more time to plan and budget for the changes.

A delay and subsequent negotiated rule making provides the U.S. DOE the opportunity to bring to the table individuals who have actually done the work of state authorization and have a thorough understanding of it, and doesnt just simply represent a certain sector, type of institution, or non-related entity.

The regulations do need to be clarified and written in a way that is consistent with current state authorization regulations. A delay provides the opportunity to make needed changes.



**Council for Education**

**Council for Education**
4625 West Nevo Drive Suite 2 & 3
Las Vegas, Nevada 89103
v. 800-307-1076 x 1| f. 877-459-7907
e. director@CforED.com
w. https://CforED.com

June 11, 2018

Secretary Betsy DeVos
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

## RE: PUBLIC COMMENTS IN OPPOSITION TO THE DELAY OF PROGRAM INTEGRITY AND IMPROVEMENT, A PROPOSED RULE BY THE U.S. EDUCATION DEPARTMENT (83 FR 24250)

Dear Secretary, DeVos:

The Council for Education ("CED"), a Nevada Non-Profit Organization that represents members of a class of student loan borrowers, hereby submits these public comments in opposition to the U.S. Secretary of Education's proposal to delay, by two years, the effective date of the final regulations entitled Program Integrity and Improvement published in the Federal Register on December 19, 2016 (the final regulations).

The final rules would establish requirements for institutional eligibility in order to participate in Title IV, HEA programs which are financial aid programs that include the Federal Pell Grant program, the Federal Supplemental Educational Opportunity Grant, the Federal Work-Study program, the Teacher Education Assistance for College and Higher Education (TEACH) Grant program, the Federal Family Educational Loan Program, and the William D. Ford Direct Loan program. The new regulations would clarify the State authorization requirements that an institution must comply with to be eligible to participate in HEA Title IV programs. CED opposes the delay which will cause harm to Nevada students, taxpayers, and families because the state of California statutes of limitations expires on August 27, 2018. The Secretary's proposed delay denies the public from citing final regulations in a petition for an injunction for relief on behalf of student loan borrowers.

## BACKGROUND

The U.S. Department of Education received notice from CED of a violation of the HEA by the state of California. The California Joint Legislative Audit Committee denied an audit request letter to certify assurance to the HEA in violation of 34 CFR 682.302(f). The Secretary's proposed delay on the Program Integrity and

(c) CED 2018| The Council for Education, ALL RIGHTS RESERVED

1

Improvements by two years prevents student loan borrowers from citing final regulations in a potential breach of contract action, which requires a notification to the Secretary prior to commencing a federal action, because the statute of limitations on the CED's California tort claim action expires on August 27, 2018.

Since 1993, the Regents have been the beneficiaries of an inadvertent false claims scheme through the manipulation of bond market exchange in the regulation of the federal student loan program.   Nevada residents attending for-profit colleges are paying significantly higher cohort default rates for the repayment of specific Federal Family Education Loan (FFEL) Program or William D. Ford Federal Direct Loan (Direct Loan) Program loans which are the result of false statements and a breach of contract with the Secretary. CED believes that Nevada state residents would be prejudiced by a two-year delay from filing a California Tort Claim in which the statute of limitations expires after August 27, 2018. *See*, attachment Exhibit "B" to view a copy of the CED's Disequilibrium Diagram.

On March 5, 2018, the National Advisory Committee on Institutional Quality and Integrity acknowledged confirmation of a notice that members of the California Joint Legislative Audit Committee had denied the CED's letter request for a state audit based on credible evidence of fraud in the administration of the student assistance programs authorized by the HEA.  In response to this denial, we intend to file a writ of mandamus with the Ninth Circuit after July 1, 2018, for an order to compel the California State Auditor to conduct an audit to guarantee assurance with Title VI (Act) by 34 CFR 682.302(f). CED believes that Nevada state residents would be prejudiced by a Secretary delay from filing a brief for an order to compel the California State Auditor to determine the amount of compensation owed to Nevada residents under 34 CFR 668.23(f)(1).

 The CED commissioned a third-party audit to study the effect on the limited number of HEA complaints, and the report concluded that the Regents owes an estimated $4.8 billion in federal student loans to the U.S. Department of Treasury in violation of 34 CFR 682.302(f) and to borrowers of federal student loan programs.  The U.S. Department of Education provides to the U.S. Department of Treasury an accounting ledger on the student loan debt. The projected 4.8 billion (USD) in supplemental revenue received by the Regents influences the economy of $100 million or more in Executive Orders 12866, 13563, and 13771.

2

(c) CED 2018| The Council for Education, ALL RIGHTS RESERVED

| Year | Percentage of UC Students Who are Non Resident | National Cohort Default Rate - by Fiscal Year | Total Volume of Student Loans Disbursements billions (USD) | Total Volume of Default Student Loans billions (USD) | UC Overcharges / NonResident Supplemental Tuition Revenue millions (USD) |
|---|---|---|---|---|---|
| 1999 | 6 | 5.60% | $32 | $2 | Data Not Available |
| 2000 | 6 | 5.90% | $33 | $2 | Data Not Available |
| 2001 | 6 | 5.40% | $36 | $2 | Data Not Available |
| 2002 | 6 | 5.20% | $41 | $2 | Data Not Available |
| 2003 | 6 | 4.50% | $47 | $2 | Data Not Available |
| 2004 | 5 | 5.10% | $53 | $3 | Data Not Available |
| 2005 | 5 | 4.60% | $56 | $3 | Data Not Available |
| 2006 | 5 | 5.20% | $60 | $3 | $227 |
| 2007 | 5 | 6.70% | $68 | $5 | $225 |
| 2008 | 5 | 7.00% | $85 | $6 | $250 |
| 2009 | 5 | 8.80% | $100 | $9 | $271 |
| 2010 | 6 | 13.40% | $105 | $14 | $302 |
| 2011 | 7 | 14.70% | $106 | $16 | $325 |
| 2012 | 9 | 13.70% | $101 | $14 | $406 |
| 2013 | 11 | 11.80% | $100 | $12 | $497 |
| 2014 | 14 | 11.30% | $96 | $11 | $620 |
| 2015 | 15 | Data not av | $94 | Data not availa | $728 |
| 2016 | 17 | Data not av | Data not availa | Data not availa | $971 |

| | | | Grand Total | | $4.822 |
|---|---|---|---|---|---|

Table 1

The amount of revenue generated by the Regents of the University of California ("Regents") in non-residential student revenue is proportional to the National Cohort Default Rate. *See*, attachment Exhibit "A" to view a copy of the CED's audit report.

(c) CED 2018| The Council for Education, ALL RIGHTS RESERVED

3

The CED's computer model extracts datasets of public records which concludes that limiting the statute of limitations to one year allows for the Regents to increase the number of non-residential students and to reduce oversight on reported violations of the HEA by student loan borrowers. There is an important role in the functioning of these final rules in the regulation of the national cohort default rates on student loan debt due to chains of transactions between national banks and the liquidity of the financial markets regulated by the Federal Reserve Banks.

The California State Report: 2015-107, Analysis Methodology supports our theory of a cause and effect between the national default cohort rates paid by student loan borrowers to non-residential student revenue. *See*, Elaine M. Howie, California State Audit Report: Its Admissions and Financial Decisions Have Disadvantaged California Resident Students, Report: 2015-107, March 29, 2016: "Despite recent increases in state funding, the university continued to enroll nonresidents. In fact, total revenue generated from nonresident enrollment grew from nearly $325 million to $728 million over the past five years." A URL link is available at https://www.auditor.ca.gov/pdfs/factsheets/2015-107.pdf

## FIRST AMENDMENT RIGHT TO PETITION

Nevada residents have a First Amendment right to present a petition before a federal court judge to show evidence of a breach of contract between the state of California and the U.S. Department of Education based on the state's failure to certify assurance (34 CFR 682) compliance to Title VI of the Civil Rights Act of 1964 (Title VI) of the Higher Education Act, as amended (HEA).

Nevada residents have the First Amendment right to petition the federal courts as members of a class for an injunction for relief, without further delays by the Secretary on final regulations. *See*, CED v. IRS, 9th Cir. R. 42-1, lead case No. 14-70825 (2014); member case No. 1456113 (Oct. 29, 2014, Dock. No. 10), Delaying this rulemaking prevents Nevada residents from petitioning the courts on the merits for restitution for overcharges received by the state of California in the administration of the federal student loan program.

## THE COUNCIL FOR EDUCATION'S OBJECTIONS TO THE SECRETARY'S DELAY

### a. Good Cause for Negligence

The CED intends to argue that attorneys for the Regents were negligent which is part of the California Tort claim, and as such would be prejudiced in a delay of the final rules. CED believes that, in 1994, attorneys for Regents were negligent in making false statements, misrepresentations, or other misconduct, including an omission of facts, regarding the six-year federal statute of limitations for the retention of academic records in violation of 18 USCA Section 1519.

(c) CED 2018| The Council for Education, ALL RIGHTS RESERVED

4

0110

CED has good reason to believe that false statements were part of an engaged scheme and conspiracy to prevent federal student loan borrowers from fully and fairly presenting violations of the HEA against the Regents in the federal district courts. As a result of these false statements, the federal courts limited a borrower's claim to a one-year statute of limitations under the California tort claims act. In <u>Taylor v. Regents of the University of California</u>, 993 F.2d 710, 712 (1993), it was established that claims brought under 42 USC Section 2000d are governed by the same state statute of limitations as claims brought under Section 1983 and that the statute of limitations for personal injury actions in CA is one-year.

### b. A Grand Scheme (18 USC §1346)
The one-year statute of limitations benefits the Regents by reducing the number of HEA complaints and increasing the amount of revenue from non-residential students through higher tuition fees, which, we believe, is part of a grand racketeering scheme (18 USC §1346) intended to defraud the U.S. Department of Treasury in the repurchasing of an unusual amount of default student loan debt. The delay in enacting the Program Integrity and Improvement rules prejudices the CED from citing final regulations in support of an injunction for relief.

### c. Financial Crisis
An independent Brookings report on a pending crisis offers an insight if excessive leverage of individual student loan debt is not regulated by the final rules to the Program Integrity and Improvement final rules on July 1, 2018. *See*, The Looming Student Loan Default Crisis is Worse Than We Thought (Jan. 10, 2018), further supports the CED's analysis concerning a disequilibrium trend in economic hardships to student loan borrowers if the Secretary continues to delay the final Program Integrity and Improvement regulations for another two years. In this report, Judith Scott-Clayton, Economic Studies at Brookings, states that "Trends for the 1996 entry cohort show that cumulative default rates continue to rise between 12 and 20 years after initial entry. Applying these trends to the 2004 entry cohort suggests that nearly 40 percent of borrowers may default on their student loans by 2023." The URL link to the report is available at  https://www.brookings.edu/wp-content/uploads/2018/01/scott-Clayton-report.pdf.  *See*, attachment Exhibit "B" to view a copy of the CED's Disequilibrium Diagram.

### d. The American Council on Education's (ACE) letter falls within the jurisdiction of the state of California
An excerpt from the American Council on Education's letter to the Secretary addresses a state and local jurisdiction issue in regard to the Program Integrity and Improvement, U.S. Department of Education, 82 FR 6253 (proposed rule 05/25/2018): "'[S]tudents who are residents of certain states may be ineligible for federal financial aid if they are studying online at institutions located outside their states. This is related to the requirement imposed by the state authorization regulations that mandates institutions disclose to students the appropriate state complaint process for their state of residence. <u>Many states, including California, do not currently have complaint processes for all out-of-state institutions.</u>"(Emphasis added). *See*, E-Mail from POTUS Donald J. Trump to Director@CforED.com (Mar.

(c) CED 2018| The Council for Education, ALL RIGHTS RESERVED

5

3, 2014, 14:49 PDT) (on file with author), "[W]e have determined that your concerns are not under the jurisdiction of the Federal Government, but instead involve [S]tate and local matters."

## CONCLUSION

In conclusion, CED objects to the delay in implementation of the final rules because there is a public interest in protecting the first amendment right of borrowers of federal student loans and these borrowers have proper legal standing for the relief of an unlawful student loan debt.

Sincerely,

Harold Huggins

Council for Education (CED)
Director, Council for Education

6

(c) CED 2018| The Council for Education, ALL RIGHTS RESERVED

# ATTACHMENT A

Private & Confidential



# Public Policy Report: UC Student Default Python Model

The Council for Education (CED)
Publication Date: October 3, 2017

The CED is registered with the Nevada Secretary of State as a Non-Profit Corporation.

**NV Business ID: NV20171702562**

1333ˉ South St., 416
Cerritos, CA 90ˉ03

t. 800ˉ30ˉ-10ˉ6 x.10]
f. 8ˉˉ-45ˉ-ˉ0ˉ

director@CforED.com
http://CforED.com

Copyright Protected 201ˉ

Student_Default_Model_janu_v2.0

In [1]: `'''This project analyzes the changes in non-resident student enrollment in
University of California campuses and its effect on outstanding student loans,
default rates and other metrics'''`

Out[1]: `'This project analyzes the changes in non-resident student enrollment in \nUniversity of California campuses and its effect on outstanding student loans, \ndefault rates and oth
er metrics'`

In [2]: `import pandas as pd`

In [3]: `import graphlab as gl`

In [23]: `f1 = 'data/Input_For_Model_Data_filled_v10.csv'`

In [24]: `df1 = g1.SFrame(f1)`

Finished parsing file /Users/janu1/anaconda/janu/My_Code/New_Prospects/HH-EDProject/data/Input_For_Model_Data_filled_v10.csv

Parsing completed. Parsed 10 lines in 0.038105 secs.

------------------------------------------------------------
Inferred types from first 100 line(s) of file as
column_type_hints=[int,int,int,int,str,float,float,str,float]
If parsing fails due to incorrect types, you can correct
the inferred type list above and pass it to read_csv in
the column_type_hints argument
------------------------------------------------------------

Finished parsing file /Users/janu1/anaconda/janu/My_Code/New_Prospects/HH-EDProject/data/Input_For_Model_Data_filled_v10.csv

Parsing completed. Parsed 10 lines in 0.012845 secs.

0115

10/2/2017                                                                 Student_Default_Model_jlew_Q20

In [25]: print(df1)

| | Xi | Year | Number of Residential UC ... | Number of Non Residential ... | Percentage of UC Students... |
|---|---|---|---|---|---|
| 0 | 1999 | 128779 | 7879 | 6 |
| 1 | 2000 | 132458 | 8479 | 6 |
| 2 | 2001 | 138735 | 8952 | 6 |
| 3 | 2002 | 145702 | 8845 | 6 |
| 4 | 2003 | 150177 | 8867 | 6 |
| 5 | 2004 | 149630 | 8422 | 5 |
| 6 | 2005 | 150777 | 7953 | 5 |
| 7 | 2006 | 154950 | 8024 | 5 |
| 8 | 2007 | 159055 | 8272 | 5 |
| 9 | 2008 | 163773 | 9000 | 5 |

| National Cohort Default R... | Total Volume of Student Lo... | Total Volume of Default St... |
|---|---|---|
| 5.60% | 31582873484.0 | 1768640915.1 |
| 5.90% | 33176168436.0 | 1957393937.72 |
| 5.40% | 36387561831.0 | 1964928338.87 |
| 5.20% | 41872392524.0 | 2177364411.25 |
| 4.50% | 47989697452.0 | 2159536385.34 |
| 5.10% | 53115726265.0 | 2708902210.88 |
| 4.60% | 56288062618.0 | 2589256080.43 |
| 5.20% | 60335198802.0 | 3137430837.7 |
| 6.70% | 68891841340.0 | 4615753369.78 |
| 7.00% | 85279308917.0 | 5969551624.19 |

| UC Overcharges / NonReside... | DRate |
|---|---|
| Data Not Available | 0.056 |
| Data Not Available | 0.059 |
| Data Not Available | 0.054 |
| Data Not Available | 0.052 |
| Data Not Available | 0.045 |
| Data Not Available | 0.051 |
| Data Not Available | 0.046 |
| $227,000,000.00 | 0.052 |
| $225,000,000.00 | 0.067 |
| $250,000,000.00 | 0.07 |

[18 rows x 10 columns]
Note: Only the head of the SFrame is printed.
You can use print_rows(num_rows=m, num_columns=n) to print more rows and columns.

In [26]: pd1 = pd.read_csv(f1)

file:///C:/Users/admin/Google%20Drive/Google%20Drive/financials/...../deliverables/batch%20i6%20%20Student_Defaul_Model_jlew_i2.0.html

0116

10/2/2017 — Student_Default_Model_Jan_v2.0

In [27]: `pd1.columns`

```
Out[27]: Index([u'Unnamed: 0', u'Year', u'Number of  Residential UC Students',
       u'Number of Non Residential UC Students',
       u'Percentage of  UC Students Who are Non Resident',
       u'National  Cohort Default Rate - by Fiscal Year',
       u'Total Volume of Student Loans Disbursements',
       u'Total Volume of Default Student Loans',
       u'UC Overcharges / NonResident Supplemental Tuition Revenue', u'DRate'],
      dtype='object')
```

In [28]: `pd1= pd1.drop('Unnamed: 0',axis=1);`

In [159]: `pd1`

Out[159]:

| | Year | Number of Residential UC Students | Number of Non Residential UC Students | Percentage of UC Students Who are Non Resident | National Cohort Default Rate - by Fiscal Year | Total Volume of Student Loans Disbursements | Total Volume of Default Student Loans | UC Overcharges / NonResident Supplemental Tuition Revenue | DRate |
|---|---|---|---|---|---|---|---|---|---|
| 0 | 1999 | 128779 | 7879 | 6 | 5.60% | 3.158287e+10 | 1.768641e+10 | Data Not Available | 0.056 |
| 1 | 2000 | 132458 | 8479 | 6 | 5.90% | 3.317617e+10 | 1.957394e+09 | Data Not Available | 0.059 |
| 2 | 2001 | 138735 | 8952 | 6 | 5.40% | 3.638756e+10 | 1.964928e+09 | Data Not Available | 0.054 |
| 3 | 2002 | 145702 | 8845 | 6 | 5.20% | 4.187239e+10 | 2.177364e+09 | Data Not Available | 0.052 |
| 4 | 2003 | 150177 | 8867 | 6 | 4.50% | 4.799870e+10 | 2.159536e+09 | Data Not Available | 0.045 |
| 5 | 2004 | 149630 | 8422 | 5 | 5.10% | 5.311573e+10 | 2.708902e+09 | Data Not Available | 0.051 |
| 6 | 2005 | 150777 | 7953 | 5 | 4.60% | 5.628808e+10 | 2.589251e+09 | Data Not Available | 0.046 |
| 7 | 2006 | 154950 | 8024 | 5 | 5.20% | 6.033520e+10 | 3.137430e+09 | $227,000,000.00 | 0.052 |
| 8 | 2007 | 159055 | 8272 | 5 | 6.70% | 6.889184e+10 | 4.615753e+09 | $225,000,000.00 | 0.067 |
| 9 | 2008 | 163773 | 9000 | 5 | 7.00% | 8.527931e+10 | 5.969552e+09 | $250,000,000.00 | 0.070 |
| 10 | 2009 | 167900 | 9552 | 5 | 8.80% | 9.982474e+10 | 8.784577e+09 | $271,000,000.00 | 0.088 |
| 11 | 2010 | 166622 | 10623 | 6 | 13.40% | 1.053435e+11 | 1.411603e+10 | $302,000,000.00 | 0.134 |
| 12 | 2011 | 167890 | 13307 | 7 | 14.70% | 1.060879e+11 | 1.559492e+10 | $325,000,000.00 | 0.147 |
| 13 | 2012 | 166269 | 16929 | 9 | 13.70% | 1.017199e+11 | 1.393562e+10 | $406,000,000.00 | 0.137 |
| 14 | 2013 | 166254 | 21754 | 11 | 11.80% | 1.001591e+11 | 1.181877e+10 | $497,000,000.00 | 0.118 |
| 15 | 2014 | 168624 | 26188 | 14 | 11.30% | 9.645762e+10 | 1.089971e+10 | $620,000,000.00 | 0.113 |
| 16 | 2015 | 168134 | 30732 | 15 | Data will be available in 2018* | 9.443679e+10 | NaN | $728,000,000.00 | 0.000 |
| 17 | 2016 | 175495 | 34673 | 17 | Data will be available in 2019* | NaN | NaN | $971,329,422.00 | 0.000 |

In [29]: `pd1.set_index(keys='Year',drop = True,inplace = True);`

10/3/2017

Student_Default_Model_janu_v2.0

```
In [31]: pd1=pd1.dropna();
         pd1
```

Out[31]:

| Year | Number of Residential UC Students | Number of Non Residential UC Students | Percentage of UC Students Who are Non Resident | National Cohort Default Rate - by Fiscal Year | Total Volume of Student Loans Disbursements | Total Volume of Default Student Loans | UC Overcharges / NonResident Supplemental Tuition Revenue | DRate |
|---|---|---|---|---|---|---|---|---|
| 1999 | 128779 | 7879 | 6 | 5.60% | 3.158287e+10 | 1.768641e+09 | Data Not Available | 0.056 |
| 2000 | 132458 | 8479 | 6 | 5.90% | 3.317617e+10 | 1.957394e+09 | Data Not Available | 0.059 |
| 2001 | 136735 | 8952 | 6 | 5.40% | 3.638756e+10 | 1.964928e+09 | Data Not Available | 0.054 |
| 2002 | 145702 | 8845 | 6 | 5.20% | 4.187239e+10 | 2.177364e+09 | Data Not Available | 0.052 |
| 2003 | 150177 | 8867 | 6 | 4.45% | 4.798970e+10 | 2.159536e+09 | Data Not Available | 0.045 |
| 2004 | 149630 | 8422 | 5 | 5.10% | 5.311573e+10 | 2.708902e+09 | Data Not Available | 0.051 |
| 2005 | 150777 | 7953 | 5 | 4.60% | 5.628806e+10 | 2.589251e+09 | Data Not Available | 0.046 |
| 2006 | 154950 | 8024 | 5 | 5.20% | 6.033520e+10 | 3.137430e+09 | $227,000,000.00 | 0.052 |
| 2007 | 159055 | 8272 | 5 | 6.70% | 6.891846e+10 | 4.615753e+09 | $225,000,000.00 | 0.067 |
| 2008 | 163773 | 9000 | 5 | 7.00% | 8.527931e+10 | 5.969552e+09 | $250,000,000.00 | 0.070 |
| 2009 | 167900 | 9552 | 5 | 8.80% | 9.982474e+10 | 8.784577e+09 | $271,000,000.00 | 0.088 |
| 2010 | 168622 | 10623 | 6 | 13.40% | 1.053435e+11 | 1.411603e+10 | $302,000,000.00 | 0.134 |
| 2011 | 167890 | 13307 | 7 | 14.70% | 1.060879e+11 | 1.559492e+10 | $325,000,000.00 | 0.147 |
| 2012 | 166269 | 16929 | 9 | 13.70% | 1.017199e+11 | 1.393562e+10 | $406,000,000.00 | 0.137 |
| 2013 | 166254 | 21754 | 11 | 11.80% | 1.001591e+11 | 1.181877e+10 | $497,000,000.00 | 0.118 |
| 2014 | 168624 | 26188 | 14 | 11.30% | 9.645762e+10 | 1.089971e+10 | $620,000,000.00 | 0.113 |

```
In [32]: %matplotlib inline
         import numpy as np
         import matplotlib.pyplot as plt
```

0118

10/3/2017

Student_Default_Model_Jan_v_Q20

In [33]:
```
fig, axes = plt.subplots(3, 2, figsize=(15,15));
pd1.plot(subplots=True, ax=axes, sharex=False, sharey=False);
```



0119

file:///C:/Users/admin/Googl%20Drive/edsci/ _deliverables/bat%20616%20v/Student_Default_Model_Jan_v_Q20.html

10/2/2017

Student_Default_Model_java_v2.0

In [164]: `from pandas import scatter_matrix;`

file:///C:/Users/admin/Google%20finance%20finance/j_____deliverables/batch%2016%20v-Student_Default_Model_java_v2.0.html

6/19

0120

Student_Default_Model_janu_v2.0

```
In [165]:  scatter_matrix(pd1, alpha=0.2, figsize=(6, 6), diagonal='kde')
```

1/26/2017

Student_Default_Model_jsnu_v2.0

```
Out[165]:  array([[<matplotlib.axes._subplots.AxesSubplot object at 0x12a608c10>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x12af24d60>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x12a95cc90>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x12a655fd0>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x12b042e10>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x12a3a8d65b>],
       [<matplotlib.axes._subplots.AxesSubplot object at 0x12b0b99b0>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x12b1eda90>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11b8911b0>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11b026110>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11b88e050>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11d07ecf90>],
       [<matplotlib.axes._subplots.AxesSubplot object at 0x11d832110>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11d4c9e10>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11dd21c90>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11dd86e090>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11df98d10>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11d670a1b0>],
       [<matplotlib.axes._subplots.AxesSubplot object at 0x11dff8b10>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11e6a7990>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11e717410>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11e79e290>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11e915290>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11ecb425b>],
       [<matplotlib.axes._subplots.AxesSubplot object at 0x11ecec290>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11ed98fd6b>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11ef4e650>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11e6f3590>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11f924f90>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11f98dc90>],
       [<matplotlib.axes._subplots.AxesSubplot object at 0x11f0fd690>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11f099c10>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11fc0a690>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11fc8c510>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11fcf1550>,
        <matplotlib.axes._subplots.AxesSubplot object at 0x11f6f3d40b>]], dtype=object)
```

Student_Default_Model_jinu_v2.0





In [166]: f12= 'Transformed_Datav2.csv'

In [167]: pd2 = pd.read_csv(f12)

In [168]: pd2 = pd2.dropna()

In [169]: pd2

Out[169]:

| | Year | Non_Residential_Count | Non_Residential_Percent | Default_Rate_Percent | Student_Loans_Disbursements | Default_Student_Loans_in_1000000_$ |
|---|---|---|---|---|---|---|
| 0 | 1999-2002 | 34155 | 6.00 | 5.53 | $143,000,000,000.00 | $7,908,950,494.00 |
| 1 | 2003-2006 | 33266 | 5.25 | 4.85 | $218,000,000,000.00 | $10,559,841,392.00 |
| 2 | 2007-2010 | 37447 | 5.25 | 8.98 | $359,000,000,000.00 | $32,268,679,001.00 |
| 3 | 2011-2014 | 78178 | 10.25 | 12.88 | $404,000,000,000.00 | $52,089,862,755.00 |

In [170]: pd2.iloc[0]['Default_Rate_Percent']

Out[170]: 5.530000000000002

10/2/2017

file:///C:/Users/admin/Google%20Drive/financials/___deliverables/back%2019%20to%2019/Student_Default_Model_jinu_v2.0.html

0123

9/19

Student_Default_Model_janu_v2.0

In [171]:
```
Class = []
for index,row in pd2.iterrows():
    if (row['Default_Rate_Percent'] < 5.0):
        Class.append('Low')
    elif(row['Default_Rate_Percent'] > 10.0):
        Class.append('High')
    else:
        Class.append ('Moderate')

print(Class)
```

['Moderate', 'Low', 'Moderate', 'High']

In [172]: pd2['Default_Class'] = Class; pd2

Out[172]:

| | Year | Non_Residential_Count | Non_Residential_Percent | Default_Rate_Percent | Student_Loans_Disbursements | Default_Student_Loans_in_1000000_$ | Default_Class |
|---|---|---|---|---|---|---|---|
| 0 | 1999-2002 | 34155 | 6.00 | 5.53 | $143,000,000,000.00 | $7,908,950,494.00 | Moderate |
| 1 | 2003-2006 | 33266 | 5.25 | 4.85 | $218,000,000,000.00 | $10,559,841,392.00 | Low |
| 2 | 2007-2010 | 37447 | 5.25 | 8.98 | $359,000,000,000.00 | $32,268,679,001.00 | Moderate |
| 3 | 2011-2014 | 78178 | 10.25 | 12.88 | $404,000,000,000.00 | $52,089,862,755.00 | High |

In [173]: df2 = g1.$frame(pd2); df2

Out[173]:

| Year | Non_Residential_Count | Non_Residential_Percent | Default_Rate_Percent | Student_Loans_Disbursements ... | Default_Student_Loans_in_1000000_$ ... | Default_Class |
|---|---|---|---|---|---|---|
| 1999-2002 | 34155 | 6.0 | 5.53 | $143,000,000,000.00 | $7,908,950,494.00 | Moderate |
| 2003-2006 | 33266 | 5.25 | 4.85 | $218,000,000,000.00 | $10,559,841,392.00 | Low |
| 2007-2010 | 37447 | 5.25 | 8.98 | $359,000,000,000.00 | $32,268,679,001.00 | Moderate |
| 2011-2014 | 78178 | 10.25 | 12.88 | $404,000,000,000.00 | $52,089,862,755.00 | High |

[4 rows x 7 columns]

Student_Default_Model_Janu_Q0

```
In [174]: model = gl.logistic_classifier.create(df2, target= 'Default_Class',
                features = ['Non_Residential_Percent', 'Non_Residential_Count'])
```

Logistic regression:
--------------------------------------------------------

Number of examples          : 4

Number of classes           : 3

Number of feature columns   : 2

Number of unpacked features : 2

Number of coefficients      : 6

Starting Newton Method
--------------------------------------------------------

+-----------+----------+--------------+-------------------+
| Iteration | Passes   | Elapsed Time | Training-accuracy |
+-----------+----------+--------------+-------------------+
| 1         | 2        | 0.050926     | 0.750000          |
| 2         | 3        | 0.051541     | 0.750000          |
| 3         | 4        | 0.052005     | 0.750000          |
+-----------+----------+--------------+-------------------+

SUCCESS: Optimal solution found.
```

Student_Default_Model_Janu_v2.0

In [175]: `model.evaluate(df2)`

Out[175]: {'accuracy': 0.75, 'auc': 0.916666666666666, 'confusion_matrix': Columns:

```
target_label    str
predicted_label str
count           int
```

Rows: 3

Data:
```
+--------------+-----------------+-------+
| target_label | predicted_label | count |
+--------------+-----------------+-------+
|   Moderate   |     Moderate    |   2   |
|     High     |       High      |   1   |
|     Low      |     Moderate    |   1   |
+--------------+-----------------+-------+
```

[3 rows x 3 columns], 'f1_score': 0.6, 'log_loss': 0.5560577881480753, 'precision': 0.8333333333333, 'recall': 0.6666666666666, 'roc_curve': Columns:

```
threshold float
fpr       float
tpr       float
p         int
n         int
class     int
```

Rows: 300003

Data:
```
+-----------+-----+-----+---+---+-------+
| threshold | fpr | tpr | p | n | class |
+-----------+-----+-----+---+---+-------+
|    0.0    | 1.0 | 1.0 | 1 | 3 |   0   |
|   1e-05   | 1.0 | 1.0 | 1 | 3 |   0   |
|   2e-05   | 1.0 | 1.0 | 1 | 3 |   0   |
|   3e-05   | 1.0 | 1.0 | 1 | 3 |   0   |
|   4e-05   | 1.0 | 1.0 | 1 | 3 |   0   |
|   5e-05   | 1.0 | 1.0 | 1 | 3 |   0   |
|   6e-05   | 1.0 | 1.0 | 1 | 3 |   0   |
|   7e-05   | 1.0 | 1.0 | 1 | 3 |   0   |
|   8e-05   | 1.0 | 1.0 | 1 | 3 |   0   |
|   9e-05   | 1.0 | 1.0 | 1 | 3 |   0   |
+-----------+-----+-----+---+---+-------+
```

[300003 rows x 6 columns]
Note: Only the head of the SFrame is printed.
You can use print_rows(num_rows=m, num_columns=n) to print more rows and columns.}

In [178]: '''The above results show that the model can predict the level of default rate accuracy': 0.75
and 'precision': 0.83 using the features = ['Non_Residential_Percent', 'Non_Residential_Count']
For this sample data set this proves the predictive power of these features '''

Out[178]: "The above results show that the model can predict the level of default rate accuracy': 0.75 \nand 'precision': 0.83 using the features = ['Non_Residential_Percent', 'Non_Reside
ntial_Count']\nFor this sample data set this proves the predictive "

0126

Student_Detail_Model_janu_2.0

In [49]: ''' The table and the graphs below show the growth of revenue from Non-resident students in UC-campuses and
campuswide from 2005-2016 '''

Out[49]: ' The table and the graphs  below show the growth of  revenue  from Non-resident  students in UC-campuses and \nCampuswide from 2005-2016 '

In [50]: f13 = 'UCOP_non_resident_Revenue_breakdown.csv'
pd3 = pd.read_csv(f12); pd3

Out[50]:

|    | Year | Session | Non-Resident Total Tuition | UC Berkeley | UC Davis | UCLA | UCIrvine | UCSanDiego | UCSantaBarbara | UCRiverside | UCMerced | UCSantaCruz | UCSFO |
|----|------|---------|----------------------------|-------------|----------|------|----------|------------|----------------|-------------|----------|-------------|-------|
| 0  | 2005 | 2004-05 | 236131 | 62528  | 24976  | 50293  | 24976  | 27803  | 22273 | 10255 | 0     | 10646 | 2381 |
| 1  | 2006 | 2005-06 | 236533 | 62909  | 22076  | 48870  | 23981  | 27745  | 21709 | 9990  | 4927  | 12007 | 2319 |
| 2  | 2007 | 2006-07 | 230830 | 61208  | 22165  | 52692  | 21776  | 29654  | 20561 | 9701  | 422   | 10407 | 2244 |
| 3  | 2008 | 2007-08 | 254241 | 65977  | 24272  | 58424  | 24440  | 33225  | 23071 | 10588 | 773   | 10600 | 2871 |
| 4  | 2009 | 2008-09 | 276891 | 72438  | 26350  | 68053  | 25681  | 35473  | 23338 | 11530 | 1400  | 10061 | 2567 |
| 5  | 2010 | 2009-10 | 305236 | 80961  | 28247  | 77067  | 25407  | 42088  | 24170 | 12093 | 1871  | 10500 | 2832 |
| 6  | 2011 | 2010-11 | 332975 | 96678  | 30459  | 84897  | 26512  | 46406  | 23849 | 11070 | 1882  | 8404  | 2718 |
| 7  | 2012 | 2011-12 | 433041 | 131451 | 36557  | 105286 | 38344  | 62125  | 28637 | 14266 | 2927  | 10395 | 3053 |
| 8  | 2013 | 2012-13 | 534540 | 145806 | 46518  | 132155 | 51274  | 81743  | 39967 | 18603 | 4476  | 11087 | 2911 |
| 9  | 2014 | 2013-14 | 656418 | 174014 | 60924  | 157077 | 69280  | 104448 | 45419 | 20454 | 6307  | 15200 | 3295 |
| 10 | 2015 | 2014-15 | 769998 | 185960 | 78779  | 176958 | 87971  | 128933 | 54559 | 23338 | 8013  | 24388 | 3099 |
| 11 | 2016 | 2015-16 | 938080 | 202918 | 106679 | 201946 | 120037 | 164644 | 68822 | 24266 | 11776 | 34004 | 2988 |

In [51]: pd3.set_index(keys='Year',drop = True,inplace = True);
pd3 = pd3.dropna()

10/02/2017

0127

Student_Default_Model_janu_v2.0

In [61]: pd3

Out[61]:

| Year | Session | Non-Resident Total Tuition | UC Berkeley | UC Davis | UCLA | UCIrvine | UCSanDiego | UCSantaBarbara | UCRiverside | UCMerced | UCSantaCruz | UCSFO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | 2004-05 | 236131 | 62528 | 24976 | 50293 | 24976 | 27803 | 22273 | 10255 | 0 | 10646 | 2381 |
| 2006 | 2005-06 | 236533 | 62909 | 22076 | 48870 | 23981 | 27745 | 21709 | 9990 | 4927 | 12007 | 2319 |
| 2007 | 2006-07 | 230830 | 61208 | 22165 | 52692 | 21776 | 29654 | 20561 | 9701 | 422 | 10407 | 2244 |
| 2008 | 2007-08 | 254241 | 65977 | 24272 | 58424 | 24440 | 33225 | 23071 | 10588 | 773 | 10600 | 2871 |
| 2009 | 2008-09 | 276891 | 72438 | 26350 | 68053 | 25681 | 35473 | 23338 | 11530 | 1400 | 10061 | 2567 |
| 2010 | 2009-10 | 305236 | 80961 | 28247 | 77067 | 25407 | 42088 | 24170 | 12093 | 1871 | 10500 | 2832 |
| 2011 | 2010-11 | 332975 | 96678 | 30459 | 84897 | 26612 | 48406 | 23849 | 11070 | 1882 | 8404 | 2718 |
| 2012 | 2011-12 | 433041 | 131451 | 36557 | 105286 | 38344 | 62125 | 28637 | 14266 | 2927 | 10395 | 3053 |
| 2013 | 2012-13 | 534540 | 145806 | 46518 | 132155 | 51274 | 81743 | 39967 | 18603 | 4476 | 11087 | 2911 |
| 2014 | 2013-14 | 656418 | 174014 | 60924 | 157077 | 69280 | 104448 | 45419 | 20454 | 6307 | 15200 | 3295 |
| 2015 | 2014-15 | 769998 | 185960 | 78779 | 176958 | 87971 | 126933 | 54559 | 23338 | 8013 | 24388 | 3099 |
| 2016 | 2015-16 | 938080 | 202918 | 106679 | 201946 | 120037 | 164644 | 68822 | 24266 | 11776 | 34004 | 2988 |

0128

Student_Default_Model_Janu_v2.0

```
In [58]: fig2, axes = plt.subplots(11, 1, figsize=(15,15));
         pd3.plot(subplots=True, ax=axes, sharex=False, sharey=False);
```



0129

10/2/2017

Student_Detail_Model_janu_v2.0

```
In [63]: pd3.columns

Out[63]: Index([u'Session', u'Non-Resident Total Tuition', u'UC Berkeley', u'UC Davis',
       u'UCLA', u'UCIrvine', u'UCSanDiego', u'UCSanBarbara', u'UCRiverside',
       u'UCMerced', u'UCSantaCruz', u'UCSFO'],
      dtype='object')
```

file:///C:/Users/admin/Google%20Drive/financiers/____deliverables/data%20info%20to%20/Student_Detail_Model_janu_v2.0.html

0130

10/2/2017

Student_Default_Model_pnu_v2.0

In [67]: plt.figure(); pd3.plot(figsize=(15,15))

10/2/2017

Student_Default_Model_janu_v2.0

Out[67]: <matplotlib.axes._subplots.AxesSubplot at 0x124e69bd8>

<matplotlib.figure.Figure at 0x126c1f710>



0132

file:///C:/Users/admin/Google%20Drive/financials/_____deliverables/autom%2018%20+/Student_Default_Model_janu_v2.0.html

Student_Default_Model_Janu_v2.0

In [ ]:

10/2/2017

file:///C:/Users/JoAnn/Google%20Drive/financial/____deliverables/tutor/%20016/%2C0+Student_Default_Model_Janu_v2.0.html

# ATTACHMENT B

Private & Confidential



Disequilibrium Price Point at Time T2. Interest on Student Loans & Bonds Increases Over Time without a Correction from the Federal Reserves

Cohort Default Rate at T2

Cohort Default Rate at T1

Price Equilibrium Point at Time T1

Non Residential Student Revenue at T1

SUPPLY

PRICE

Time

Disequilibrium Diagram



**BOISE STATE UNIVERSITY**
DIVISION OF EXTENDED STUDIES

June 7, 2018

Sophia McArdle
U.S. Department of Education
400 Maryland Avenue SW/Room 6W256
Washington, DC 20202

Re:  *Program Integrity and Improvement; Proposed Delay*
     *Docket ID ED-2018-OPE-0041/RIN 1840-AD39*

Dear Ms. McArdle:

Boise State University ([www.boisestate.edu](www.boisestate.edu)) is a public, metropolitan doctoral research university of distinction providing leadership in academics, research, and civic engagement.  We are Idaho's largest university and serve more than 22,000 students.  Accredited by the Northwest Commission on Colleges and Universities since 1941, we currently offer 11 doctoral degrees, 68 master's degrees, 24 graduate certificates, 90 undergraduate degrees, 4 associate degrees, and 37 undergraduate certificates.

## Distance Education Activities
Outside of Idaho, Boise State University operates solely as an online/distance provider of postsecondary education.  Distance Education offerings include 39 academic degrees and certificates and 535 unique academic courses delivered via web-based course management systems.  Over 40 percent of all students take at least one course online and each semester almost 3,000 students attend exclusively online.
In an effort to more efficiently and cost-effectively comply with state authorization laws nationwide, Boise State University was among the first 25 institutions in the nation to join the voluntary State Authorization Reciprocity Agreement (SARA).

## Support Proposed Delay; Vital Clarifications and Amendments Necessary
We support the proposed two-year delay and believe additional discussion during negotiated rulemaking will produce more informed, realistic, and effective regulations.  We thank the Department for listening to key stakeholders and acknowledging the complexity of state authorization, the mobility of today's students, and the maturity of distance education delivery.

Respectfully Submitted,

Mark Wheeler
Dean, Division of Extended Studies

220 E. Parkcenter Blvd.  Boise, Idaho 83706
Phone (208) 426-1709     Fax (208) 426-3467     extendedstudies.boisestate.edu

0136

# Bryant & Stratton College

### FOR EVERY & IN LIFE

June 11, 2018

Sophia McArdle, Ph.D.
U.S. Department of Education
400 Maryland Avenue, SW
Mail Stop 290-44
Washington, D.C.  20202

> Re:    Public Comment – Notice of Proposed Rulemaking
>        34 CFR Parts 600 and 668
>        Docket ID. ED-2018-OPE-0041
>        Submitted via: www.regulations.gov.

Dear Dr. McArdle:

Please accept this correspondence as public comment in response to the Notice of Proposed Rulemaking pertaining to 34 CFR Parts 600 and 668 issued by Secretary DeVos on May 22, 2018.  Bryant & Stratton College ("BSC") is a private, for-profit college with nineteen campuses located in New York, Ohio, Virginia, Wisconsin, and an Online Education division with students in most states.  BSC has been an institutional member of NC-SARA for the past two years and has kept a watchful eye on the proposed distance education regulations.

We have had the opportunity to review Secretary DeVos' recent notice proposing a delay in the effective date of the Program Integrity and Improvement regulations published on December 19, 2016, along with a number of letters submitted by our colleagues and peers in support thereof.  After working to prepare BSC to implement operations in order to ensure compliance with these regulations, we are in agreement with the various points summarized by Secretary DeVos on May 22.  We agree that the proposed delay to the effective date of the regulations will allow the Department of Education to ensure that those areas of the regulations in question will be adequately addressed so the road to compliance for all post-secondary institutions will be clear.  Accordingly, BSC respectfully submits that the effective date of the Program Integrity and Improvement regulations be delayed as proposed.

Regards,

Francis J. Felser, C.P.A., B.S., M.B.A, D.M.
President & Chief Executive Officer


# DEPARTMENT OF EDUCATION

## 34 CFR Parts 600 and 668

[Docket ID ED–2018–OPE–0041]

RIN 1840–AD39

## Program Integrity and Improvement

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Final rule; delay of effective date.

**SUMMARY:** The Secretary delays, until July 1, 2020, the effective date of selected provisions of the final regulations entitled Program Integrity and Improvement published in the **Federal Register** on December 19, 2016 (the 2016 final regulations). The Secretary is delaying the effective date of selected provisions of the 2016 final regulations based on concerns recently raised by regulated parties and to ensure that there is adequate time to conduct negotiated rulemaking to reconsider selected provisions of 2016 final regulations and, as necessary, develop revised regulations. The provisions for which the effective date is being delayed are listed in the **SUPPLEMENTARY INFORMATION** section of this document.

**DATES:** Effective June 29, 2018, the effective date for the amendments to 34 CFR 600.2, 600.9(c), 668.2, and the addition of 34 CFR 668.50, published December 19, 2016, at 81 FR 92236, is delayed until July 1, 2020.

**FOR FURTHER INFORMATION CONTACT:** Sophia McArdle, Ph.D., U.S. Department of Education, 400 Maryland Ave. SW, Mail Stop 290–44, Washington, DC 20202. Telephone: (202) 453–6318. Email: *sophia.mcardle@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** Based on concerns recently raised by regulated parties related to implementation of the 2016 final regulations, the Secretary delays, until July 1, 2020, the effective date of selected provisions of the 2016 final regulations (81 FR 92236). The Department is implementing this delay to hear from the regulated community and students about these concerns and to consider, through negotiated rulemaking, possible revisions to selected provisions of the 2016 final regulations.

Two letters in particular prompted this delay. The Department received a letter dated February 6, 2018 (February

6 letter), from the American Council on Education (*www.acenet.edu/news-room/ Documents/ACE-Letter-on-State-Authorization-Concern.pdf*), which represents nearly 1,800 college university presidents from all types of U.S. accredited, degree-granting institutions and the executives at related associations. The February 6 letter stated that, "students who are residents of certain states may be ineligible for federal financial aid if they are studying online at institutions located outside their states. This is related to the requirement imposed by the state authorization regulations that mandates institutions disclose to students the appropriate state complaint process for their state of residence. A number of states, including California, do not currently have complaint processes for all out-of-state institutions."

On February 7, 2018, the Department received a letter from the Western Interstate Commission for Higher Education (WICHE) Cooperative for Educational Technologies, the National Council for State Authorization Reciprocity, and the Distance Education Accrediting Commission, all of which represent regulated parties (February 7 letter). In the letter, these entities stated that there is widespread concern and confusion in the higher education community regarding the implementation of the 2016 final regulations, particularly with respect to State authorization of distance education and related disclosures. The authors of the February 7 letter argued that the 2016 final regulations would be costly and burdensome for most colleges and universities that offer distance education and that some States have not implemented the student complaint policies and procedures required by the regulations. The authors also expressed that institutions need additional information from the Department to better understand how to comply with the 2016 final regulations. They stated, for instance, that the definition of "residence" in the preamble of the 2016 final regulations may conflict with State laws and common practice among students for establishing residency.

The authors of the two letters also asked the Department to clarify the format in which they should make public and individualized disclosures of the State authorization status for every State, the complaint resolution processes for every State, and details on State licensure eligibility for every discipline that requires a license to enter a profession. The authors suggested that the Department should delay the effective date of the 2016 final regulations and submit the issues to

additional negotiated rulemaking or, alternatively, clarify the final regulations through guidance. We believe that these disclosure issues, particularly those regarding individualized student disclosures, also require further review and the consideration of whether more detailed requirements are necessary for proper implementation. Issues that need further consideration and clarification include the disclosures that may need to be made to a student when the student changes his or her residence, what factors would allow an institution to become aware that a student has changed his or her residence so that individualized disclosures could be made, and the length of time a student must reside at the new address to be considered a resident of that State for the purposes of State authorization disclosures. These clarifications are necessary because the handling of these situations may vary State by State and be further complicated by the fact that each State's definition of "residence" may have been originally developed for other purposes. Other issues in need of further clarification include what happens in the case of a student who enrolls in a program that meets the licensure requirements of the State in which the student was living at the time, but then relocates to a new State where the program does not fulfill the requirements for licensure as well as the obligation of the university if the program no longer meets the licensure requirements, due to the student's move, not a change in the program.

Finally, to add further complexity, students may not always notify their institution if they change addresses, or if they relocate temporarily to another State. While the preamble of the 2016 final regulations stated that an institution may rely on a student's self-determination of residency unless it has information to the contrary, there may need to be additional clarification or safeguards for institutions in the event that a student does not notify the institution of a change in residency.

The rule, as currently drafted, does not account for these complexities. Therefore, we believe that, among other things, a more precise definition of "residence"—which can be defined by States in different ways for different purposes—should be established through rulemaking to ensure institutions have the clarity needed to determine a student's residence. We believe that we will need to provide institutions with significantly more detail to properly operationalize this term and will need to work with impacted stakeholders to determine

how best to address a concern that is complex and potentially costly to institutions and students.

For both of the residency and disclosure issues, guidance is not the appropriate vehicle to provide the clarifications needed. Due to the complexity of these issues, we believe that it is important to solicit the input of stakeholders who have been engaged in meeting these requirements in developing workable solutions. Further, guidance is non-binding and, therefore, could not be used to establish any new requirements. Lastly, the necessary changes may affect the burden on some regulated parties, which would require an updated estimate of regulatory impact. The Department therefore believes that the clarifications requested are so substantive that they would require further rulemaking including negotiated rulemaking under the Higher Education Act of 1965, as amended (HEA).

We believe that delaying the effective date of selected provisions of the 2016 final regulations will benefit students.

The 2016 final regulations are currently scheduled to go into effect in July. Many institutions and students ordinarily not significantly involved in distance education provide and take online courses in the summer. We believe the delay will especially benefit those students who are planning to take coursework via online programs during the summer months, or who may be making plans to participate in internships in other States. If the selected provisions of 2016 final regulations were to go into effect on July 1, 2018, an institution may be hesitant to offer these courses outside the State in which the institution is located, because the uncertainty of how to determine students' residency, and the associated requirements, may make a State unwilling to pursue State authorization in all of the possible locations its students may reside during the summer.

If selected provisions of 2016 final regulations were to go into effect on July 1, 2018, some institutions, especially those with limited resources, could determine that the costs of obtaining State authorization, ensuring the relevant States have complaint procedures, and assessing licensure requirements, are not worth the benefit of eligibility for title IV aid if only a small number of students enroll online from a particular State, and therefore may not obtain State authorization for all applicable States. Thus, some students might not be able to continue their education during the summer if during those months they must relocate

to a State in which the institution does not have the required State authorization. Thus, if we did not delay selected provisions of the 2016 final regulations, students would potentially lose the opportunity to use title IV aid for these courses. Institutions that routinely provide distance education to large numbers of students from all 50 States may have already obtained State authorization and assessed the complaint systems and licensure requirements since the cost-benefit ratio favors such an action. As a result, the delay will not have any significant effect on students attending those institutions.

Further, the Department has provided guidance regarding student complaints and student consumer disclosures as related to distance education in a Dear Colleague letter issued on July 27, 2012 (DCL GEN–12–13),[1] ensuring that during this delay of selected provisions of the final regulations institutions will be aware of their existing obligations and that students will receive these protections. Under 34 CFR 668.43(b), an institution is required to provide to students its State approval or licensing and the contact information for filing complaints. In DCL GEN–12–13, in Questions and Answers (Q&A) 9 through 13, we provide guidance on how institutions may meet this requirement with respect to distance education. In Q&A 9, we clarify that an institution offering distance education in multiple States can satisfy the provisions of 34 CFR 668.43(b) requiring that it provide State contact information for filing complaints by providing a link to a noninstitutional website that identifies the contact information for multiple States so long as the link is accessible from the institution's website and the link is prominently displayed and accurately described. Q&A 9 also states that the institution should ensure the website link is functioning and accurate. Q&A 10 clarifies that, if an institution offering distance education in a State has only one student in that State, the institution must still provide contact information for that State. In Q&A 12, we make clear that if a student taking a program by distance education moves to another State, and the institution is aware of the move, the institution must ensure that the student has access to the State contact information or filing complaints in that State. Finally, in Q&A 13, we note that for a student who is taking distance education and is in the military, the contact information for the institution's main location is considered sufficient

---

[1] Available at: *https://ifap.ed.gov/dpcletters/ GEN1213.html.*

contact information when the student is given an assignment outside of the United States.

Based on the above considerations, the Department delays until July 1, 2020, the effective date of selected provisions of the final regulations in title 34 of the Code of Federal Regulations (CFR):

• § 600.2 Definitions (definition of "State authorization reciprocity agreement").

• § 600.9(c) (State authorization distance education regulations).

• § 668.2 (definition of "Distance education").

• § 668.50 (institutional disclosures for distance or correspondence programs regulations).

*Public Comment:* In response to our invitation in the notice of proposed rulemaking published in the **Federal Register** on May 25, 2018 (83 FR 24250) (NPRM), 39 parties submitted comments on the delay of the effective date. We do not discuss comments or recommendations that are beyond the scope of this regulatory action or that would require statutory change.

## Analysis of Comments and Changes

An analysis of the comments and of any changes since publication of the NPRM follows.

*Comment:* Many commenters supported the proposed rule to delay the effective date of the 2016 final regulations until July 1, 2020, because they believed that non-regulatory guidance from the Department is unlikely to address the current gap between institutional understanding of the final regulations and the Department's expectations for compliance. Commenters supported the Department's plan to refer the 2016 final regulations to the review and consideration afforded by the negotiated rulemaking process. Commenters also stated that the delay is prudent given the potential impact on institutions, learners, and the State authorization process, and will make it possible to resolve any confusion for students, institutions, States, and accreditors about the requirements of the 2016 final regulations. One commenter noted that some parts of the 2016 final regulations are very onerous and expensive for institutions to implement and a delay would give institutions more time to plan and budget for the changes.

*Discussion:* We appreciate the commenters' support.

*Changes:* None.

*Comment:* Many commenters opposed delaying the effective date of the 2016 final regulations because of the potential

harm to students, as well as on procedural grounds.

## Harm to Students

*Comment:* Commenters stated that delaying the effective date of the 2016 final regulations would negatively impact students because the consumer protections and disclosures that would have been available to students under the 2016 final regulations will not be available to students. A few commenters expressed concern that students' ability to file complaints against institutions would be impeded by delaying the effective date of the provisions in the 2016 final regulations related to the State complaint process.

*Discussion:* While we do not have specific data with regard to how many schools and States have come into compliance with the 2016 final regulations, based on the information we do have, we expect that many students will still receive disclosures regarding distance education programs during the period of the delay due to steps institutions have already taken. In addition, as also previously noted, DCL GEN–12–13 provides guidance regarding student complaints and student consumer disclosures as related to distance education, ensuring that during the delay institutions will be aware of their existing obligations and that students will receive the contact information needed in order to file a complaint against the institution. Under 34 CFR 668.43(b), an institution is required to provide to students its State approval or licensing and the contact information for filing complaints. DCL GEN–12–13 clarifies this requirement with respect to distance education as discussed above. We believe that these requirements will offer students protection during the delay.

With respect to other disclosures, we acknowledged in the NPRM that, as a result of the proposed delay, it is possible that students might not receive disclosures of adverse actions taken against a particular institution or program. Students also may not receive other information about an institution, such as information about refund policies or whether a program meets certain State licensure requirements. This information could help students identify programs that offer credentials that potential employers recognize and value; delaying the requirement to provide these disclosures may require students that desire this information to obtain it from another source or may lead students to choose sub-optimal programs for their preferred courses of study. We note, however, that the Department has never required ground-

based campuses to provide this information to students, including campuses that enroll large numbers of students from other States. Thus, for students who attend on-ground campuses, the program they completed may meet licensure requirements in the State in which the campus is located but not licensure requirements in other States.

*Changes:* None.

*Comment:* Commenters also noted that the 2016 final regulations require State and Federal oversight of American institutions receiving Federal financial aid but operating in foreign locations, thereby ensuring core protections for students enrolled in campuses abroad, but that the Department offers no rationale for delaying the effective date of this component of the rule. Thus, the commenters believed that the effective date of these final regulations should not be delayed.

*Discussion:* We are persuaded by the commenters and, for the reasons they specify, are not delaying § 600.9(d) (State authorization of foreign locations of domestic institution regulations).

*Changes:* We are not delaying § 600.9(d) (State authorization of foreign locations of domestic institution regulations). These regulations will go into effect July 1, 2018.

*Comment:* Commenters also noted that the 2016 final regulations strengthen States' oversight capacity by ensuring that States that sought to regulate distance education would be able to identify and regulate schools offering distance education in their State. These commenters argued that delaying the effective date of the 2016 final regulations would undermine this State oversight of distance education programs and permit schools to use Federal funds for programs that operate outside of the oversight of State regulators. Some commenters noted that State approval boards and regulatory schemes vary from State to State and that States should be able to reject institutions that do not meet a State's higher standards. Some commenters also stated that a delay of the effective date of the 2016 final regulations would impede States from ensuring that distance education students have the same State-level protections as students enrolled at brick-and-mortar institutions, and limit States' ability to bring enforcement actions against schools offering online programs in their States.

*Discussion:* We believe that concerns about undermining State regulatory and enforcement efforts may be overstated. A State already has the authority to administer legal authorization to operate

in the State as the State sees fit, whether it be to approve an institution to operate in-State, regardless of the physical location of the institution, or require an institution that is operating without approval in the State to cease such operations regardless of the physical location of the institution. There is also no requirement that a State join a reciprocity agreement, whether it is a State-to-State reciprocity agreement or a reciprocity agreement that is administered by a non-State entity. A State can also decide to leave any reciprocity agreement it had previously joined. States do not need additional Federal regulations in order to enforce their own laws if they choose to do so.

*Changes:* None.

*Comment:* Some commenters stated that the definition of "State authorization reciprocity agreement" in the 2016 final regulations is confusing, and noted particular concern about the part of the definition that says that such an agreement "does not prohibit any State in the agreement from enforcing its own statutes and regulations, whether general or specifically directed at all or a subgroup of educational institutions." They stated that some entities are interpreting this text to mean that a State authorization reciprocity agreement that is acceptable to the Department must allow a State that is a member of the agreement to enforce its own statutes and regulations even if those statutes and regulations conflict with the provisions of an agreement into which the State entered. The commenters contended that delaying the effective date of the 2016 final regulations would undermine the ability of States to protect their residents because the States would no longer be able to enforce their own statutes and regulations if doing so were prohibited by a State authorization reciprocity agreement. Other commenters indicated that it was unclear whether this part of the definition allows enforcement of State regulations that conflict with the provisions of a reciprocity agreement.

*Discussion:* We view the confusion and concern about what constitutes a State authorization reciprocity agreement under the 2016 final regulations and how that current definition is meant to be operationalized to be additional reasons to delay the effective date of selected provisions of the 2016 final regulations so that this issue can be clarified.

*Changes:* None.

## Procedural Concerns

*Comment:* Some commenters expressed concerns about procedural issues surrounding the proposed delay,

contending that the 15-day comment period does not allow enough time for meaningful comments. Commenters further stated that the Department did not provide adequate justification for delaying the effective date of the 2016 final regulations and that the Department could issue guidance, rather than delay the effective date. Some commenters also asserted that the Department must conduct negotiated rulemaking under the HEA to implement the proposed delay. They argued that the Department did not meet the criteria for an exemption from such rulemaking under the Administrative Procedure Act (APA), believing that the Department did not establish "good cause" to waive negotiated rulemaking. Commenters also opined that institutions have worked over the past 18 months to implement the 2016 final regulations, and their investments should not be wasted now by an unnecessary delay of the consumer protections and disclosures. Some commenters also stated that the proposed delay is overly broad and that since the Department justifies the delay based on only three issues, the Department should have proposed to delay only those three parts of the 2016 final regulations.

*Discussion:* The APA, 5 U.S.C. 553(c), requires an agency to provide interested parties an opportunity to comment on proposed regulations, but does not stipulate the length of the comment period. A 15-day comment period was necessary because the selected provisions of the 2016 rule are scheduled to take effect on July 1, 2018, and a final rule delaying the effective date must be published prior to that date. A longer comment period would not have allowed sufficient time for the Department to review and respond to comments, and publish a final rule.

We believe that we have adequately justified our decision to delay the effective date of selected provisions of the 2016 final regulations and that it would be inappropriate to issue guidance, rather than implement the delay. Guidance is not the appropriate vehicle to provide the clarifications needed related to the residency and disclosure issues. Guidance is non-binding and, therefore, could not be used to establish any new requirements. More importantly, due to the complexity of the issues and the substantive nature of the necessary clarifications, we believe that, in developing workable solutions, it is important to conduct negotiated rulemaking under the HEA in order to solicit the input of stakeholders who have been engaged in meeting these requirements. Additionally, the necessary changes may affect the burden on regulated parties, which would require an updated estimate of regulatory impact.

With regard to waiver of negotiated rulemaking, section 492(b)(2) of the HEA provides that the Secretary may waive negotiated rulemaking if she determines that there is good cause to do so, and publishes the basis for such determination in the **Federal Register** at the same time as the proposed regulations are first published. Negotiated rulemaking requires a number of steps that typically take the Department well over 12 months to complete. The Department could not have completed the negotiated rulemaking process between February 6, 2018 (the date the Department received the first of the two letters that were the catalyst for the delay) and the July 1, 2018, effective date . Thus, the Department has good cause to waive the negotiated rulemaking requirement with regard to this delay the effective date of the final regulations to July 1, 2020.

As stated, negotiated rulemaking requires a number of steps that typically take the Department well over 12 months to complete. First, the HEA requires the Department to hold public hearings before commencing any negotiations. Based upon the feedback the Department receives during the hearings, the Department then identifies those issues on which it will conduct negotiated rulemaking, announces those, and solicits nominations for non-Federal negotiators. Negotiations themselves are typically held over a three-month period. Following the negotiations, the Department prepares a notice of proposed rulemaking and submits the proposed rule to the Office of Management and Budget (OMB) for review. The proposed rule is then open for public comment for 30 to 60 days. Following the receipt of public comments, the Department considers those comments and prepares final regulations that are reviewed by OMB before publication. Accordingly, we would not be able to complete the negotiated rulemaking process until 2019, so regulations resulting from that process will not be effective before July 1, 2020 per section 482 of the HEA (20 U.S.C. 1089), also known as the "master calendar requirement." The master calendar requirement specifies provides that a regulatory change that has been published in final form on or before November 1 prior to the start of an award year—which begins on July 1 of any given year—may take effect only at the beginning of the next award year, or, in other words, on July 1 of the next year.

In this instance, the catalysts for the delay are the February 6 and February 7 letters. While some commenters stated that the Department was aware of the same issues raised in these letters during the 2016 rulemaking and heard about these same issues in August and October 2017, we only more recently determined that further consultation in the form of negotiated rulemaking was the appropriate vehicle by which to clarify the 2016 final regulations, and it was the cited letters that changed our understanding of the extent of stakeholder concerns. Thus, based on this further understanding, we believe that negotiated rulemaking is necessary in order to make important, substantive clarifications, and that it is in the interests of institutions, States, and students for the effective date of the selected provisions of the final regulations to be delayed and the regulations reconsidered. The Department could not have completed the 12-month negotiated rulemaking process between February 6, 2018, and the July 1, 2018, effective date. Thus, the Department has good cause to waive the negotiated rulemaking requirement with regard to its proposal to delay the effective date of selected provisions of the final regulations to July 1, 2020, in order to complete a new negotiated rulemaking proceeding to address the concerns identified by some of the regulated parties in the higher education community. It would be confusing and counterproductive for the selected provisions of the 2016 final regulations to go into effect before the conclusion of this reconsideration process.

We do not believe the proposed delay is overly broad and that because the delay discussion only addressed three issues, the Department should only delay the effective date of those three parts of the 2016 final regulations. We have agreed with the commenters that § 600.9(d) (State authorization of foreign locations of domestic institution regulations) should not be delayed. Otherwise, it is unclear what parts of the regulations will be impacted by negotiated rulemaking and how these provisions could impact other parts of the regulations.

With respect to the comments that institutions have worked over the past 18 months to implement the 2016 final regulations, and their investments should not be wasted now by an unnecessary delay of the consumer protections and disclosures, we do not believe that these investments were a waste, as the results of these efforts will be helpful to students and information

**31300**   **Federal Register** / Vol. 83, No. 128 / Tuesday, July 3, 2018 / Rules and Regulations

from institutions that made those changes can inform the upcoming negotiated rulemaking process.

*Changes:* None.

**Executive Orders 12866, 13563, and 13771**

*Regulatory Impact Analysis*

Under Executive Order 12866, it must be determined whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive order and subject to review by OMB. Section 3(f) of Executive Order 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

This regulatory action is a significant regulatory action subject to review by OMB under section 3(f)(4) of Executive Order 12866. The quantified economic effects and net budget impact associated with the delayed effective date are not expected to be economically significant. Institutions will be relieved of an expected Paperwork Reduction Act burden of approximately $364,419 in annualized cost savings or $5.2 million in present value terms for the delay period; though it is possible some institutions have already incurred these costs preparing for the current effective date.

We have also reviewed this final rule under Executive Order 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency:

(1) Propose or adopt regulations only upon a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with

obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

In choosing among alternative regulatory approaches, we selected the approach that would maximize net benefits. In particular, the Department believes avoiding the compliance costs for institutions and the potential unintended harm to students if institutions decide not to offer distance education courses to students who switch locations for a semester or do not allow students to receive title IV aid for such courses because the definition of "residency" needs clarification outweighs any negative effect of the delayed disclosures. Based on the analysis that follows, the Department believes that this delay of the effective date of selected provisions of the 2016 final regulations is consistent with the principles in Executive Order 13563.

Consistent with Executive Order 13771 (82 FR 9339, February 3, 2017), we have estimated that this final rule has a potential upper bound effect of estimated annualized cost savings of $705,737, or $10,081,963 in present value terms, using a 7 percent discount rate over a perpetual time horizon, in administrative and information disclosure costs. This is an upper bound estimate of these cost savings, since some institutions may have begun development of disclosures to meet the requirements of the 2016 final regulations. As a central estimate, the

Department estimates institutions will be relieved of an expected Paperwork Reduction Act burden of approximately $364,419 in annualized cost savings or $5.2 million in present value terms for the delay period; though it is possible some States have already incurred these costs preparing for the current effective date.

Because of these savings, this final rule is considered an Executive Order 13771 deregulatory action. In the NPRM published May 25, 2018, the Department explicitly requested comments on whether these administrative cost savings and foregone benefits calculations and discussions are accurate and fully capture the impacts of this final rule. Some commenters disagreed with the Department's estimates, especially of the costs to borrowers of not receiving certain disclosures and protections, and those comments are summarized in the *Effects of Delay* section.

*Effects of Delay*

The Regulatory Impact Analysis of the 2016 final regulations stated that the regulations would have the following primary benefits: (1) Updated and clarified requirements for State authorization of distance education and foreign additional locations, (2) a process for students to access complaint resolution in either the State in which the institution is authorized or the State in which they reside, and (3) increased transparency and access to institutional and program information. In the NPRM, we acknowledged that the delay would result in students not receiving certain disclosures about licensure and adverse actions against programs, as well as information about a process for submitting complaints in their State. The Department also estimated that institutions would benefit from the delay by having more time before incurring the costs of compliance and an opportunity to get more clarity on the details of the State authorization requirements and how they fit their programs.

Several commenters responded to the Department's analysis, both from an institutional and a borrower and consumer advocate perspective. Several commenters representing various institutions, many of which supported the delay, appreciated the Department's willingness to reopen the issue and clarify requirements that institutions find unclear. They also reiterated that the December 2016 final regulations underestimated the costs of obtaining State authorization and complying with that rule, but did not specify what additional costs there would be or what

assumptions the Department should change to more accurately capture institutional costs. Therefore, we are not changing our estimates of institutional costs in the NPRM analysis, but reiterate our acknowledgement that these are representative cost estimates and the specific costs to individual institutions will vary based on the extent of their participation in distance education, their systems and staffing, and the way they pursue State authorization.

Another set of comments focused on the potential harms to students from the delay, noting that online education is the fastest growing segment of the postsecondary market and that most of the largest providers are proprietary institutions, several with recent or ongoing investigations. Several commenters offered a variety of statistics consistent with the Department's own information that proprietary institutions are key players in the distance education market. For example, one commenter noted that proprietary schools in the top 12 providers in 2016 accounted for approximately 40 percent of distance education students. Several commenters pointed to the higher cost of distance-education-only programs at proprietary institutions, citing a cumulative average Federal student loan debt for graduates of proprietary institutions of $31,298.60 compared to $28,482.20 across all sectors and $21,525.60 for those in programs that are not entirely online. Commenters also pointed out that 770,000 of the 2.1 million students enrolled online in 2015 attended programs outside their State of residence and deserve the same protections as students at campus-based programs. Several commenters noted that proprietary institutions have a greater share of their students who are low-income, minority, or first-generation students, something the Department has recognized, so delaying the disclosures would have a detrimental impact on students with potentially less resources to seek out information from other sources.

The Department appreciates the comments and analysis submitted. We recognize that the burden of the delay does fall on students and believe that the description of the effects of the delay reflects this. However, as noted in the *Analysis of Comments* section in this preamble, many students will still receive sufficient disclosures regarding distance education programs during the period of the delay due to steps institutions have already taken to comply with the 2016 final regulations. In addition, as also previously noted, DCL GEN–12–13 provides guidance

regarding student complaints and student consumer disclosures as related to distance education, ensuring that during the delay institutions will be aware of their existing obligations and that students will receive these protections. The Department maintains its position that, in allowing reconsideration of the 2016 final regulations to provide institutions greater clarity on key issues, the benefits of the delay of the selected provisions are greater than the potential costs to students of the delayed disclosures and complaint processes that could already be accessible from other sources. The Department has modified its decision to delay the effective date of the 2018 final regulations and has decided not to delay § 600.9(d) (State authorization of foreign locations of domestic institution regulations).The analysis of the effects of the delay for the selected provisions has not changed substantially and is included below.

As a result of the delay, students might not receive disclosures of adverse actions taken against a particular institution or program. Students also may not receive other information about an institution, such as information about refund policies or whether a program meets certain State licensure requirements. Increased access to such information could help students identify programs that offer credentials that potential employers recognize and value, so delaying the effective date of the requirement to provide these disclosures may require students to obtain this information from another source or may lead students to choose sub-optimal programs for their preferred courses of study.

Additionally, the delay of the disclosures related to the complaints resolution process could make it harder for students to access available consumer protections. Some students may be aware of Federal Student Aid's Ombudsman Group, State Attorneys General offices, or other resources for potential assistance, but the disclosure would help affected students be aware of these options.

The Department also believes that, as a result of uncertainty as to the definition of "residency" and other aspects of the 2016 final regulations, institutions may refuse enrollment or title IV aid to distance education students as a safeguard against unintentional non-compliance—an unintended potential effect. For example, if a student pursues a summer internship and relocates to another State for the summer semester, institutions may choose not to allow them to take courses online because their residency

is unclear. A student who is unable to take classes during the summer months may be unable to complete his or her program on time, especially if the student is working or raising children and cannot manage a 15-credit course load during the regular academic terms. The Department believes the possibility of this outcome and the disruption it could have to students' education plans supports delaying the effective date of the 2016 final regulations to prevent institutions from taking such actions while the Department conducts negotiated rulemaking to develop clearer regulations.

Delay may, however, better allow institutions to address the costs of complying with the 2016 final regulations. In promulgating those regulations, the Department recognized that institutions could face compliance costs associated with obtaining State authorization for distance education programs or operating foreign locations. But the Department did not ascribe specific costs to the State authorization regulations and associated definitions because it presumed that institutions were already complying with applicable State authorization requirements and because the 2016 final regulations do not require institutions to have distance education programs.

Although the Department did not ascribe specific costs to the State authorization regulations, it provided examples of costs ranging from $5,000 to $16,000 depending on institution size, for a total estimated annual cost for all institutions of $19.3 million. Several commenters stated that the Department underestimated the costs of compliance with the regulations, noting that extensive research may be required for each program in each State. One institution reported that it costs $23,520 to obtain authorization for a program with an internship in all 50 States and $3,650 to obtain authorization for a new 100 percent online program in all 50 States. To renew the authorization for its existing programs, this institution estimated a cost of $75,000 annually, including fees, costs for surety bonds, and accounting services, and noted these costs have been increasing in recent years. The Department believes this institution's estimate is credible; however, we requested comment on whether this example provides a typical or accurate level of expected compliance costs across a representative population, and the extent to which institutions have already incurred these costs. As discussed previously, several commenters mentioned that the 2016 final regulations underestimated the cost for institutions but did not include

specific numbers with which to update the estimate or discuss whether the $75,000 cost provided by the earlier commenter was in line with other institutions' costs. In practice, actual costs to institutions vary based on a number of factors including an institution's size, the extent to which an institution provides distance education, and whether it participates in a State authorization reciprocity agreement or chooses to obtain authorization in specific States.

Delay may also allow institutions to postpone incurring costs associated with the disclosure requirements. As indicated in the *Paperwork Reduction Act of 1995* section of the 2016 final regulations, those costs were estimated to be 152,405 hours and $5,570,403 annually.

*Net Budget Impact*

As noted in the 2016 final regulations, in the absence of evidence that the regulations would significantly change the size and nature of the student loan borrower population, the Department estimated no significant net budget impact from the 2016 final regulations. While the updated requirements for State authorization and the option to use State authorization reciprocity agreements may expand the availability of distance education, student loan volume will not necessarily expand greatly. Additional distance education could provide convenient options for students to pursue their educations and loan funding may shift from physical to online campuses. Distance education has expanded significantly already and the 2016 final regulations are only one factor in institutions' plans within this field. The distribution of title IV, HEA program funding could continue to evolve, but the overall volume is also driven by demographic and economic conditions that are not affected by the 2016 final regulations and State authorization requirements were not expected to change loan volumes in a way that would result in a significant net budget impact. This analysis is limited to the effect of delaying the effective date of the selected provisions of the 2016 final regulations to July 1, 2020, and does not account for any potential future substantive changes in the upcoming regulations.

*Regulatory Flexibility Analysis*

This final rule would affect institutions that participate in the title IV, HEA programs, many of which are considered small entities. The U.S. Small Business Administration (SBA) Size Standards define "for-profit institutions" as "small businesses" if they are independently owned and operated and not dominant in their field of operation with total annual revenue below $7 million. The SBA Size Standards define "not-for-profit institutions" as "small organizations" if they are independently owned and operated and not dominant in their field of operation, or as "small entities" if they are institutions controlled by governmental entities with populations below 50,000. Under these definitions, approximately 4,267 of the institutions of higher education (IHEs) that would be subject to the paperwork compliance provisions of the 2016 final regulations are small entities. Accordingly, we have reviewed the estimates from the 2016 final regulations and prepared this regulatory flexibility analysis to present an estimate of the effect on small entities of the delay of the effective date of the 2016 final regulations.

In the Regulatory Flexibility Analysis for the 2016 final regulations, the Department estimated that 4,267 of the 6,890 IHEs participating in the title IV, HEA programs were considered small entities—1,878 are not-for-profit institutions, 2,099 are for-profit institutions with programs of two years or less, and 290 are for-profit institutions with four-year programs. Using the definition described above, approximately 60 percent of IHEs qualify as small entities, even if the range of revenues at the not-for-profit institutions varies greatly. Many small institutions may focus on local provision of specific programs and would not be significantly affected by the delay of the effective date of the 2016 final regulations because they do not offer distance education. As described in the analysis of the 2016 final regulations, distance education is a growing area with potentially significant effects on the postsecondary education market and the small entities that participated in it, providing an opportunity to expand and serve more students than their physical locations can accommodate but also increasing competitive pressure from online options. Overall, as of Fall 2016, approximately 15 percent of students receive their education exclusively through distance education while 68.3 percent took no distance education courses. However, at proprietary institutions almost 59.2 percent of students were exclusively distance education students and 30.4 percent had not enrolled in any distance education courses.[2] The delay of selected provisions of the effective date of the 2016 final regulations, and the resulting uncertainty regarding State authorization requirements for distance education, may slow the reshuffling of the postsecondary education market or the increased participation of small entities in distance education, but that is not necessarily the case. Distance education has expanded over recent years even in the absence of a clear State authorization regime.

In the analysis of the 2016 final regulations, we noted that the Department estimated total State Authorization Reciprocity Agreement (SARA) fees and additional State fees of approximately $7 million annually for small entities, but acknowledged that costs could vary significantly by type of institution and institutions' resources and that these considerations may influence the extent to which small entities operate distance education programs. Small entities that do participate in the distance education sector may benefit from avoiding these fees during the delay period. If 50 percent of small entities offer distance education, the average annual cost savings per small entity during the delay would be approximately $3,280, but that would increase to $6,560 if distance education was only offered by 25 percent of small entities. This estimate assumes small entities have not already taken steps to comply with the State authorization requirements in the 2016 final regulations. In the NPRM, the Department welcomed comments on the distribution of small entities offering distance education, the estimated costs to obtain State authorization for their programs, and the extent to which small entities have already incurred costs to comply with the 2016 final regulations. One comment indicated that of the 1,800 institutions that participate in SARA (and thus are likely to offer distance education programs), 45 percent (810) enroll less than 2,500 students. That enrollment figure does not correspond to the Department's definition of a "small entity," but it does indicate that many smaller institutions are participating in distance education programs, even if a significant share of students are enrolled in programs offered by large institutions.

The Department also estimated that small entities would incur 13,981 hours of burden in connection with information collection requirements with an estimated cost of $510,991

---

[2] 2017 Digest of Education Statistics Table 311.15: Number and percentage of students enrolled in degree-granting postsecondary institutions, by distance education participation, location of student, level of enrollment, and control and level of institution: Fall 2015 and Fall 2016. Available at *https://nces.ed.gov/programs/digest/d17/tables/dt17_311.15.asp?current=yes.*

annually. Small entities may be able to avoid some of the anticipated burden during the delay. To the extent small entities would need to spend funds to comply with State authorization requirements for distance education, the proposed delay would allow them to postpone incurring those costs. And although institutions may have incurred some of the $510,991 annual costs to prepare for the information collection requirements, it is possible that institutions could avoid up to that amount during the period of the delay.

*Paperwork Reduction Act of 1995*

As indicated in the Paperwork Reduction Act section published in the 2016 final regulations, the assessed estimated burden was 152,565 hours affecting institutions with an estimated cost of $5,576,251 for Sections 600.9 and 668.50. This final rule delays the effective date of selected provisions of the cited regulations.

Section 600.9(d) will go into effect on July 1, 2018, with an assessed burden of 160 hours and $5,848 in institutional costs. The maximum potential reduction in burden hours and costs from the delay are the 152,405 hours and $5,570,403 associated with sections 668.50(b) and (c).

The table below identifies the regulatory sections, OMB Control Numbers, estimated burden hours, and estimated costs of those final regulations that have not been delayed.

| Regulatory section | OMB Control No. | Burden hours | Estimated cost $36.55/hour institution |
|---|---|---|---|
| 668.50(b) ......................................................................................... | 1845–0145 | 151,715 | 5,545183 |
| 668.50(c) ......................................................................................... | 1845–0145 | 690 | 25,220 |
| Total ......................................................................................... | ........................ | 152,405 | 5,570,403 |
| Cost savings due to delayed effective date. | | | |

This final rule delays the effective date of selected provisions of the cited regulations.

*Accessible Format:* Individuals with disabilities may obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to this Document:* The official version of this document is the document published in the **Federal Register.** Free internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* At this site, you can view this document, as well as all other documents of this Department published in the **Federal Register,** in text or Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.* Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects**

*34 CFR Part 600*

Colleges and universities, Foreign relations, Grant programs—education, Loan programs—education, Reporting and recordkeeping requirements, Student aid, Vocational education.

*34 CFR Part 668*

Administrative practice and procedure, Colleges and universities, Consumer protection, Grant programs-education, Loan programs-education, Reporting and recordkeeping requirements, Selective Service System, Student aid, Vocational education.

■ Accordingly, the effective date for the amendments to 34 CFR 600.2, 600.9, 668.2, and the addition of 34 CFR 668.50, published December 19, 2016, at 81 FR 92236, is delayed until July 1, 2020.

Dated: June 28, 2018.

**Betsy DeVos,**
*Secretary of Education.*

[FR Doc. 2018–14373 Filed 6–29–18; 4:15 pm]

**BILLING CODE 4000–01–P**



American
Council on
Education®

One Dupont Circle NW
Washington, DC 20036
(202) 939-9300
acenet.edu

*100 Years of Leadership and Advocacy*

February 6, 2018

Secretary Betsy DeVos
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

Dear Secretary DeVos,

As you may be aware, the state authorization regulations finalized by the Department of
Education on December 19, 2016 are set to go into effect starting July 1, 2018. As that deadline
approaches, a number of institutions have raised concerns about possible unintended
consequence with the possibility of significant harm to students.

In brief, the regulations appear to make students who are residents of certain states ineligible
for federal financial aid if they are studying online at institutions located outside their states.
This is related to the requirement imposed by the state authorization regulations that mandates
institutions disclose to students the appropriate state complaint process for their state of
residence.

A number of states, including California, do not currently have complaint processes for all out-
of-state institutions. This would appear to effectively bar some of their residents from receiving
federal financial aid if they choose to study online at institutions located outside their states.

As colleges and universities are currently in the process of finalizing enrollments and aid
packages for the fall semester (after the effective date of the regulations), we write you in hope
that you can clarify the Department's position on the eligibility of students so situated.

Thank you for considering this request.

Sincerely,

Terry W. Hartle
Senior Vice President

  

February 7, 2018

Frank Brogan
Acting Assistant Secretary of Postsecondary Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

Dear Dr. Brogan,

Thank you for the opportunity to meet with you and your team at the U.S. Department of Education. I appreciate your interest and willingness to listen to a discussion about critical issues on accreditation and distance education. To follow up on our discussion on state authorization, my colleagues and I respectfully would like to bring to your attention concerns in the higher education distance education community regarding the USDE's rules on state authorization of distance education set to go into effect July 1, 2018 (34 CFR -- Sections 600 and 668). Those of us who represent major postsecondary distance education organizations receive many questions about implementing the rules. The institutions we represent clearly desire to comply with the rules, but are struggling with how to prepare to do so.

Compliance with the new rules will be a costly and burdensome effort for most colleges and universities that offer distance education. These institutions need a clear understanding of USDE's expectations. Specifically, the rules require institutions to provide (for each state where students are enrolled in distance education programs) public and individualized disclosures of state authorization status for every state, complaint resolution processes for every state, and details on state licensure eligibility for every discipline that requires a license to enter a profession (e.g., teaching, counseling, dietician, nursing). The rules also require institutions to comply with refund policy requirements for each state where students are enrolled, regardless of membership in the State Authorization Reciprocity Agreements. Clarification is needed on the USDE's desired format for the disclosures. Another area of concern is that issue is that the regulation defines "residence" in a way that conflicts with state laws and common practice.

The U. S. House of Representatives' draft of the PROSPER Act would remove those rules and forbid issuing future regulations on the topic. But even if the removal of state authorization is included in future HEA reauthorization legislation, reauthorization is highly unlikely to occur before July 1, 2018, when the rules go into effect. The U.S. Department of Education could (1) delay the rules and submit the issues to additional negotiated rulemaking or (2) issue clarification via a dear colleague letter on USDE's expectations for compliance. A third option would require Congress to take action to delay or suspend implementation. Otherwise, the rules will go into effect, as written, with the potential for broad misunderstandings.

Institutions that know the most about these issues are the most concerned. WCET's State Authorization Network includes 700 institutions. (WCET is an acronym for the WICHE Cooperative for Educational Technologies.) Institutional participation in the State Authorization Reciprocity Agreement (SARA) now includes about 1,750 institutions from the current 48 SARA member states (plus the District of Columbia and the U.S. Virgin Islands). DEAC (the Distance Education Accrediting Commission) accredited institutions are a part of the WCET and SARA communities. Our institutions want to comply with the regulatory environment, but many questions remain.

Thank you for your consideration. If there is any way we can provide assistance or further details, we would be pleased to do so.

Sincerely,

Russell Poulin
Director, Policy & Analysis
The WICHE Cooperative for
  Educational Technologies

Marshall Hill
Executive Director
National Council for State Authorization
  Reciprocity

Leah Matthews
Executive Director
Distance Education Accrediting Commission



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

THE ASSISTANT SECRETARY

July 27, 2012

GEN-12-13

Subject:  Guidance on Program Integrity Regulations Relating to Legal Authorization by a State

Summary: This letter provides further guidance on the program integrity final regulations published on October 29, 2010, addressing State authorization.

Dear Colleague:

On October 29, 2010, the Department published in the Federal Register final regulations on program integrity issues (75 FR 66832).  The final regulations are available at http://www.ifap.ed.gov/eannouncements/110110PubFinalRulesforTitlveIVStudentAidPrgms.html.  These final regulations make a number of changes to the regulations governing the programs authorized by the Higher Education Act of 1965, as amended (HEA).  The regulations were generally effective July 1, 2011.

The enclosure to this letter provides additional guidance on State authorization.  This guidance is provided to assist institutions with understanding the changes to the regulations in this area and does not make any changes to the regulations.  Affected parties are responsible for taking the steps necessary to comply by the effective dates established in the final regulations.

We encourage you to review the preambles to the notice of proposed rulemaking (75 FR 34812-34813, June 18, 2010) and the final regulations (75 FR 66858-66868, Oct. 29, 2010) as well as the final regulations themselves (75 FR 66946-66947, Oct. 29, 2010) with respect to the provisions concerning State authorization.  In addition, relevant technical corrections were published on April 13, 2011 (76 FR 20534-20536).

We thank you for your continued cooperation as we work to implement these regulations.  For further information, please contact Sophia McArdle by telephone at (202) 219-7078 or by e-mail at sophia.mcardle@ed.gov.

Sincerely,

David A. Bergeron
Acting Assistant Secretary
for Postsecondary Education

Enclosure

## General

**Question 1:  Is an institution required to update its Eligibility and Certification Approval Report (ECAR) by submitting updated information about its State authorization on its Application for Approval to Participate in Federal Student Financial Aid Programs (E-App)?**

Answer 1:  An institution should ensure that it is currently in compliance with the regulations but is not required to immediately update its ECAR.  An institution applying for recertification should submit an application using the Application for Approval to Participate in the Federal Student Financial Aid Programs (E-App) to include the information showing its legal authorization based on these regulations.  In addition, an institution may be asked to provide that information upon request during an audit or program review.  If an institution has any questions about documenting its State legal authorization, it should contact its School Participation Team.  Contact information for School Participation Teams is found at http://www.eligcert.ed.gov/ .

**Question 2:  If an institution's articles of incorporation establish the institution by name and identify its purpose as offering postsecondary education, is the institution considered to comply with the provisions of 34 CFR 600.9 (a)(1)(i)(A) and to be legally authorized by the State in which it is incorporated?**

Answer 2:  Yes, if the institution can demonstrate that the State played an active role in authorizing the entity to provide postsecondary education, and if the State has a student complaints process in accordance with 34 CFR 600.9(a)(1).  The institution must also show that it meets any other applicable State approval or licensure requirements under 34 CFR 600.9(a)(1)(i)(B).

**Question 3:  Can a limited liability company (LLC) be compliant with 34 CFR 600.9 (a)(1)(i)(A), or is it considered a business subject to the provisions of 34 CFR 600.9 (a)(1)(ii)?**

Answer 3:  An LLC is considered a business subject to the provisions of 34 CFR 600.9(a)(1)(ii), and the institution must have State approval or licensure.  For purposes of the student aid programs, LLCs will be reviewed on a case by case basis to determine if the State has authorized the entity to operate a postsecondary educational institution.  These reviews will be done routinely during the recertification process, but may also arise during a program review.

## Other locations and consortia

**Question 4:  Must an institution provide State authorization information for locations for which it offers less than 50 percent of any program?**

Answer 4:  No.  The Department is continuing its policy that students attending one or more locations of an institution where the students cannot complete more than 50 percent of a program are considered to be enrolled at the main campus of the institution and these locations need not be listed on its E-App or included on its ECAR.  Please note, however, that State requirements

may require an institution to obtain approval of such sites, and the Department may take that information into consideration when determining whether the institution meets applicable State requirements.

**Question 5:  How does the 50 percent standard apply to internships and externships?**

Answer 5:  The portions of programs students take in internships and externships are considered when determining whether a student can complete more than 50 percent of a program at a location not recognized by the Department as a separate additional location of the institution, provided that those activities are monitored by qualified institutional personnel.  However, if the Department is notified by a State that the institution's activities are not in compliance with State authorization or licensure requirements, the Department will take that information into consideration when determining whether the institution meets the applicable State authorization requirements.

**Question 6:  How do the regulations on State authorization apply to institutions involved in consortia agreements with institutions in other States?**

Answer 6:  For purposes of the Title IV, HEA programs, an institution offering a program is responsible for ensuring that all parts of the program it offers to its students meet all applicable State requirements.  If a student enrolled in a program from one institution takes required coursework from an institution located in another State, that coursework is deemed to be a part of the program offered by the first institution, unless the student is required to enroll separately in the out-of-State institution.  The first institution is responsible for determining what State approvals are needed and for ensuring that any needed approvals are obtained by it or by the institution providing the out-of State coursework.  In addition, the institution must provide to its students or prospective students the contact information for the relevant State official or agency that could handle a student's complaint for an issue at that location.  The institution enrolling the student must also ensure that its accreditation includes all needed approvals applicable to the program.

In addition, institutions must comply with the regulations in 34 CFR 668.5 that govern written arrangements between eligible institutions to provide all or part of an educational program.

**Decision in legal challenge to program integrity regulations**

Question 7:  How does the ruling of the U.S. Court of Appeals for the District of Columbia Circuit concerning the validity of the State authorization regulations affect what institutions must do to be in compliance with those regulations?

Answer:  The Court of Appeals upheld the requirements intended to give greater substance to the concept of State authorization by sustaining the need for an institution to be authorized by name by an appropriate State agency and affirming that this agency must have a process for reviewing and acting upon student complaints, as established in 600.9(a).  The Court vacated on procedural grounds the requirement intended to clarify existing Department policy that State authorization

extends to students receiving distance education in a State in which the institution is not physically located.

As a result, institutions must comply with the provisions found in 600.9(a).  The Department will not enforce the requirements of 600.9(c), although institutions continue to be responsible for complying with all State laws as they relate to distance education.

## Student complaints and student consumer information

**Question 8:  If a tribal college has an additional location that is not on tribal lands, does the college need to obtain State authorization for that location and identify a separate complaint process for students attending the additional location in the State?**

Answer 8:  Yes, a location of a tribal college located in a State rather than on tribal land must comply with the State approval process in that State.  In addition, the college must provide to its students or prospective students the contact information for the relevant State official or agency that could handle a student's complaint for an issue at that location.

**Question 9:  Can an institution offering distance education in multiple States satisfy the provisions of 34 CFR 668.43(b) that it provide State contact information for filing complaints by providing a link to a noninstitutional Web site that identifies the contact information for multiple States?**

Answer 9:  Yes, so long as the link is accessible from the institution's Web site and the link is prominently displayed and accurately described.  The institution is also responsible for ensuring that the link is functioning and accurate.

**Question 10:  Is an institution required to provide consumer information to all students, including students enrolled in distance education?**

Answer 10:  Yes, an institution must make sure that all of its students are provided with the applicable information that corresponds to their enrollment.  The information must be for every State in which the institution is operating, including every State where students are enrolled for distance education.

**Question 11:  If an institution offering distance education in a State has only one student in that State, must it still provide the contact information for that State?**

Answer 11:  Yes.

**Question 12:  If a student taking a program by distance education moves to another State, must the institution list the contact information for that State in its consumer information? What if the student is temporarily taking the program in another State because, for example, the student is visiting a friend?**

Page 4 of 5 - Program Integrity regulations:  State authorization questions and answers

Answer 12:  Institutions determine that students are still enrolled as a part of the normal disbursement process each payment period.  To the extent an institution is aware a student taking distance education has moved to another State, it must make sure the student has access to the State contact information for filing complaints in that State.

**Question 13:  If a student taking distance education is in the military and is given an assignment outside the United States, is the contact information for the institution's main location sufficient?**

Answer 13:  Yes.

Page 5 of 5 - Program Integrity regulations:  State authorization questions and answers

**Question 14:  Is there an updated version of the summary chart published in the preamble of the regulations that includes the relevant regulatory citations?**

Answer 14:  Yes.

| | | Meets State Authorization Requirements* | |
|---|---|---|---|
| Row | Legal entity | Entity description | Approval or licensure process |
| ROW A | Educational institution | §600.9(a)(1)(i)(A) A public, private nonprofit, or for-profit institution established by name by a State through a charter, statute, authorized by the State to offer postsecondary education in its articles of incorporation, or other action by an appropriate State agency or State entity. | §600.9(a)(1)(i)(B) The institution must comply with any applicable State approval or licensure process and be approved or licensed by name; and if there is an approval or licensure process, may be exempted from such requirement based on its accreditation, or being in operation at least 20 years, or use both criteria. |
| ROW B | Business | §600.9(a)(1)(ii) A for-profit entity established by the State on the basis of an authorization or license to conduct commerce or provide services. | §600.9(a)(1)(ii)(A) The State must have a State approval or licensure process, and the institution must comply with the State approval or licensure process and be approved or licensed by name to offer postsecondary education. §600.9(a)(1)(ii)(B) An institution in this category may not be exempted from State approval or licensure based on accreditation, years in operation, or a comparable exemption. |
| ROW C | Charitable organization | §600.9(a)(1)(ii) A nonprofit entity established by the State on the basis of an authorization or license for the public interest or common good. | §600.9(a)(1)(ii)(A) The State must have a State approval or licensure process, and the institution must comply with the State approval or licensure process and be approved or licensed by name to offer postsecondary education. §600.9(a)(1)(ii)(B) An institution in this category may not be exempted from State approval or licensure based on accreditation, years in operation, or a comparable exemption. |
| *Notes: | | | |
| | • | These requirements do not apply to Federal, tribal, and religious institutions (§600.9(a)(1)(iii) and (b)). | |
| | • | A State must have a process, applicable to all institutions except tribal and Federal institutions, to review and address complaints directly or through referrals (§600.9(a)). | |
| | • | The chart does not apply to distance education programs offered out-of-State. | |