UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| NATIONAL EDUCATION ASSOCIATION, et al., | Case No. 18-cv-05173-LB |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| BETSY DEVOS, et al., | |
| Defendants. | Re: ECF No. 20, 41 |

## INTRODUCTION

This case concerns regulations promulgated under Title IV of the Higher Education Act of 1965 ("HEA"), as amended, which authorizes the Secretary of Education and the Department of Education (collectively, "Department") to establish loan and grant programs to help students pay for post-secondary education.

In December 2016, the Department promulgated regulations ("Distance-Education Rules") intended to combat fraudulent practices relating to distance education and correspondence courses and to provide students and the public with disclosures about educational institutions that offered such programs (e.g., "online universities"). The rules originally were to go into effect in July 2018. But in July 2018, following a change in presidential administrations, the Department promulgated a regulation delaying the effective date of the Distance-Education Rules until July

United States District Court
Northern District of California

1    2020 ("Delay Rule") and raised the prospect that it would revise and reconsider the Distance-

2    Education Rules entirely.

3        In the HEA, Congress imposed a statutory requirement on the promulgation of all Title IV

4    regulations. They must be subject to "negotiated rulemaking" — a process where the Department

5    selects a committee of experienced individuals nominated by groups involved in student-financial-

6    assistance programs to negotiate proposed rules — unless the Department "determines that

7    applying such a requirement with respect to given regulations is impracticable, unnecessary, or

8    contrary to the public interest (within the meaning of section 553(b)(3)(B) of Title 5 [of the

9    Administrative Procedure Act])[.]" 20 U.S.C. § 1098a(b)(2). It is undisputed that the Department

10   did not subject the Delay Rule to negotiated rulemaking.

11       The National Education Association ("NEA"), the California Teachers Association ("CTA"),

12   and individual plaintiffs Shane Heiman, Kwynn Uyehara, and Stephanie Portilla — NEA and

13   CTA members who are enrolled or considering enrolling in online-education programs — filed

14   this case to challenge the Delay Rule. The plaintiffs argue that the Department's failure to submit

15   the Delay Rule to negotiated rulemaking violated the HEA and the Administrative Procedure Act

16   ("APA"). They argue that the Delay Rule thus should be vacated and the Distance-Education

17   Rules be allowed to go into effect as originally planned. The Department responds that it had

18   "good cause" under Section 553(b)(3)(B) of the APA to forgo negotiated rulemaking because it

19   would have been impracticable to submit a proposed delay rule to negotiated rulemaking, to

20   complete that process, and to promulgate a final delay rule, before the effective date of the

21   Distance-Education Rules. The Department also argues that any failure to engage in negotiated

22   rulemaking was harmless error that does not warrant vacating the Delay Rule. The parties filed

23   cross-motions for summary judgment.[1]

---

[1] Earlier in this case, the Department moved to dismiss on the ground that the plaintiffs lacked Article III standing to bring their claims. The court held that the plaintiffs have standing. *Nat'l Educ. Ass'n v. DeVos*, 345 F. Supp. 3d 1127 (N.D. Cal. 2018) (Order – ECF No. 31). Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

The supposed insufficient time to promulgate a rule delaying the effective date of the Distance-Education Rules is not good cause to forgo the HEA's statutorily mandated negotiated-rulemaking process. Additionally, the supposed lack of time resulted from the Department's own delay, and an agency's own delay is not good cause. Furthermore, the Department's failure to engage in negotiated rulemaking here was not harmless error. The court grants the plaintiffs' motion for summary judgment, denies the defendants' motion for cross-summary judgment, and orders the Delay Rule vacated (but stays the vacatur for 30 days from the date of this order).

## STATEMENT

### 1.   Title IV of the Higher Education Act

Title IV of the HEA "assist[s] in making available the benefits of postsecondary education to eligible students . . . in institutions of higher education" through federal grants and financial-assistance programs. 20 U.S.C. § 1070.

"Congress created the Title IV programs to foster access to higher education." *Ass'n of Private Sector Colls. and Univs. v. Duncan*, 681 F.3d 427, 435 (D.C. Cir. 2012). "Every year, Congress provides billions of dollars through loan and grant programs to help students pay tuition for their postsecondary education." *Id.* at 433. "The Department of Education ('the Department' or 'the agency') administers these programs, which were established under Title IV[.]" *Id.* "Students must repay their federal loans; the costs of unpaid loans are borne by taxpayers." *Id.*

#### 1.1   Authorization of Educational Institutions

"To participate in Title IV programs — i.e., to be able to accept federal funds — a postsecondary institution ('a school' or 'an institution') must satisfy several statutory requirements." *Ass'n of Private Sector Colls.*, 681 F.3d at 433–34. "These requirements are intended to ensure that participating schools actually prepare their students for employment, such that those students can repay their loans." *Id.* at 434. Among other things, "a school must qualify as an 'institution of higher education,' 20 U.S.C. § 1094(a) (2006) — meaning, inter alia, that the school is 'legally authorized' to provide education in the state in which it is located, *id.* § 1001(a)(2)." *Id.* "The HEA does not define 'legally authorized.'" *Id.* at 435. "This lack of a

United States District Court
Northern District of California

1  statutory definition has meant that, for virtually all of the HEA's history, each state has determined

2  for itself the method of authorizing schools within its borders." *Id.*

3      "Congress has delegated to the Secretary [of Education] the authority to promulgate

4  regulations governing the Department's administration of Title IV and other federal programs." *Id.*

5  at 436. "The grant of authority provides that '[t]he Secretary, in order to carry out functions

6  otherwise vested in the Secretary by law or by delegation of authority pursuant to law, . . . is

7  authorized to make, promulgate, issue, rescind, and amend rules and regulations governing the

8  manner of operation of, and governing the applicable programs administered by, the

9  Department.'" *Id.* (citing 20 U.S.C. §§ 1098a(a)(1), 1221e-3). This authority to promulgate

10  regulations extends to regulations defining what is "legally authorized" for purposes of the HEA.

11  *Id.* at 458–59 ("This is a federal program, federal dollars are at stake, and the most sensible

12  reading of the statute is that the Secretary has discretion to determine what is 'legal authorization'

13  in order to protect federal interests.") (quoting *Sistema Universitario Ana G. Mendez v. Riley*, 234

14  F.3d 772, 778 (1st Cir. 2000)).

15      **1.2    Negotiated Rulemaking**

16      In general, under the HEA, all regulations pertaining to Title IV are subject to "negotiated

17  rulemaking." 20 U.S.C. § 1098a(b)(2).

18      In negotiated rulemaking, the Department selects individuals nominated by "groups involved

19  in student financial assistance programs under [Title IV], such as students, legal assistance

20  organizations that represent students, institutions of higher education, State student grant agencies,

21  guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and

22  collection agencies" to participate in the negotiations process. 20 U.S.C. § 1098a(a)(1), (b)(1),

23  (b)(2). The HEA requires the Department to "select individuals with demonstrated expertise or

24  experience in the relevant subjects under negotiation, reflecting the diversity in the industry,

25  representing both large and small participants, as well as individuals serving local areas and

26  national markets." 20 U.S.C. § 1098a(b)(1), (b)(2).

27      If the negotiated-rulemaking participants reach a consensus about proposed regulations, the

28  Department must propose the consensus for promulgation, unless it reopens the negotiated-

rulemaking process or provides a written explanation why it is not proposing the consensus. 20 U.S.C. § 1098a(b)(2) ("All published proposed regulations shall conform to agreements resulting from such negotiated rulemaking unless the Secretary reopens the negotiated rulemaking process or provides a written explanation to the participants in that process why the Secretary has decided to depart from such agreements.").

The Department may bypass the negotiated-rulemaking process only if it "determines that applying such a requirement with respect to given regulations is impracticable, unnecessary, or contrary to the public interest (within the meaning of section 553(b)(3)(B) of Title 5), and publishes the basis for such determination in the Federal Register at the same time as the proposed regulations in question are first published." *Id.*

### 2.   2012–2016 and the Distance-Education Rules

The Distance-Education Rules were the product of a multi-year rulemaking process.

#### 2.1   Negotiated Rulemaking

On May 1, 2012, the Department published a notice in the Federal Register of its intent to convene a negotiated-rulemaking committee "to develop proposed regulations designed to prevent fraud and otherwise ensure proper use of Title IV, HEA program funds, especially within the context of current technologies." *Negotiated Rulemaking Committee; Public Hearings*, 77 Fed. Reg. 25,658, 25,658 (May 1, 2012).

On April 16, 2013, the Department announced that it was "considering regulatory changes related to State authorization for programs offered through distance education or correspondence education" and was adding "State authorization for programs offered through distance education or correspondence education" as a topic for consideration for action by the next negotiated-rulemaking committee. *Negotiated Rulemaking Committee; Public Hearings*, 78 Fed. Reg. 22,467, 22,468 (Apr. 16, 2013). The Department "also announce[d] three public hearings at which interested parties may comment on the new topics suggested by the Department and may suggest additional topics for consideration for action by the negotiated rulemaking committee." *Id.* at

United States District Court
Northern District of California

22,467. The Department further stated that "[f]or anyone unable to attend a public hearing, the Department will accept written comments." *Id.*

On May 13, 2013, the Department announced a fourth public hearing and extended its deadline for the submission of written comments. *Negotiated Rulemaking Committee; Public Hearings*, 78 Fed. Reg. 27,880, 27,880 (May 13, 2013).

On November 20, 2013, the Department announced that it would convene a negotiated-rulemaking committee to address a number of topics, including "State authorization for programs offered through distance education or correspondence education." *Negotiated Rulemaking Committee, Negotiator Nominations and Schedule of Committee Meetings — Title IV Federal Student Aid Programs, Program Integrity and Improvement*, 78 Fed. Reg. 69,612, 69,613 (Nov. 20, 2013). The Department requested nominations for individual negotiators representing key stakeholder constituencies, namely:

- Students.
- Legal-assistance organizations that represent students.
- Consumer-advocacy organizations.
- State higher-education executive officers.
- State attorneys general and other appropriate State officials.
- Business and industry.
- Institutions of higher education eligible to receive Federal assistance under title III, Parts A, B, and F, and title V of the HEA, which include Historically Black Colleges and Universities, Hispanic-Serving Institutions, American Indian Tribally Controlled Colleges and Universities, Alaska Native and Native Hawaiian-Serving Institutions, Predominantly Black Institutions, and other institutions with a substantial enrollment of needy students as defined in title III of the HEA.
- Two-year public institutions of higher education.
- Four-year public institutions of higher education.
- Private, non-profit institutions of higher education.
- Private, for-profit institutions of higher education.
- Regional accrediting agencies.
- National accrediting agencies.

- Specialized accrediting agencies.

- Financial-aid administrators at postsecondary institutions.

- Business officers and bursars at postsecondary institutions.

- Admissions officers at postsecondary institutions.

- Institutional third-party servicers who perform functions related to the title IV Federal Student Aid programs (including collection agencies).

- State approval agencies.

- Lenders, community banks, and credit unions.

*Id.* at 69,612, 69,614.

The Department selected a negotiated-rulemaking committee of 18 representatives (two Department representatives and 16 stakeholder-constituency representatives) and 15 alternate representatives. *See Program Integrity and Improvement*, 81 Fed. Reg. 48,598, 48,600–01 (July 25, 2016) (Distance-Education-Rules NPRM). The committee met in 2014 on February 19 to 21, March 26 to 28, April 23 to 25, and May 19 to 20 to develop proposed regulations. *Id.* at 48,601. The committee agreed to negotiate an agenda of six issues related to student financial aid, including "State authorization of distance education." *Id.*

Under the committee's protocols, the committee had to reach a consensus on all six issues, with no committee member expressing dissent, in order to reach a final consensus. *Id.* If the committee had reached a consensus, then the Department would have used the consensus-based language in its proposed regulations and would not have been able to alter the consensus-based language unless it reopened the negotiated-rulemaking process or provided a written explanation to the committee members regarding why it decided to depart from that language. *Id.*; *see* 20 U.S.C. § 1098a(b)(2). The committee did not reach a final consensus. Distance-Education-Rules NPRM, 81 Fed. Reg. at 48,601. Because the committee did not reach a consensus, the Department had discretion regarding the regulations it proposed on the issues that were subject to the committee's negotiations. *Id.*

### 2.2   Notice of Proposed Rulemaking

On July 25, 2016, the Department published a Notice of Proposed Rulemaking ("NPRM"), proposing what would become the Distance-Education Rules. Distance-Education-Rules NPRM, 81 Fed. Reg. 48,598.

The Department reported that "[t]he Office of the Inspector General (OIG), the Government Accountability Office (GAO), and others have voiced concerns over fraudulent practices, issues of noncompliance with requirements of the title IV programs, and other challenges within the distance education environment." *Id.* at 48,598. "Such practices and challenges include misuse of title IV funds, verification of student identity, and gaps in consumer protections for students." *Id.* "Documented wrong-doing has been reflected in the actions of multiple State attorneys general who have filed lawsuits against online education providers due to misleading business tactics." *Id.* at 48,599. "For example, the attorney general of Iowa settled a case against a distance education provider for misleading Iowa students because the provider stated that their educational programs would qualify a student to earn teacher licensure, which the programs did not lead to." *Id.*

The Department observed that that "[t]he HEA established what is commonly known as the program integrity 'triad' under which States, accrediting agencies, and the Department act jointly as gatekeepers for [Title IV] Federal student aid programs[.]" *Id.* at 48,598. "Because institutions that offer distance education programs usually offer the programs in multiple States, there are unique challenges with respect to oversight of these programs by States and other agencies." *Id.* "Many States and stakeholders have expressed concerns with these unique challenges, especially those related to ensuring adequate consumer protections for students as well as compliance by institutions participating in this sector." *Id.* "For example, some States have expressed concerns over their ability to identify which out of State providers are operating in their States; whether those programs prepare their students for employment, including meeting licensure or certification requirements in those States, the academic quality of programs offered by those providers, as well as the ability to receive, investigate and address student complaints about out-of-State institutions." *Id.*

United States District Court
Northern District of California

The Department announced its proposed rules to "establish[] requirements for institutional disclosures to prospective and enrolled students in programs offered through distance education or correspondence courses, which we believe will protect students by providing them with important information that will influence their attendance in distance education programs or correspondence courses as well as improve the efficacy of State-based consumer protections for students." *Id.* at 48,599. "These disclosures will provide consistent information necessary to safeguard students and taxpayer investments in the title IV, HEA programs." *Id.* "[R]equiring disclosures that reflect actions taken against a distance education program, how to lodge complaints against a program they believe has misled them, and whether the program will lead to certification or licensure[,] will provide enrolled and prospective students with important information that will protect them." *Id.* The Department extended the public 30 days (i.e., until August 24, 2016) to submit written comments on its proposed rules. *Id.* at 48,598.

The Department received 139 written comments and also had a consultative meeting with staff from the Department of Defense. *Program Integrity and Improvement*, 81 Fed. Reg. 92,232, 92,333 (Dec. 19, 2016) (Distance-Education-Rules Announcement).

### 2.3   Final Rule

On December 19, 2016, the Department promulgated the final Distance-Education Rules. Distance-Education-Rules Announcement, 81 Fed. Reg. 92,232 (amending 34 C.F.R. §§ 600.2, 600.9(c)–(d), and 668.2, and promulgating 34 C.F.R. § 668.50). The Distance-Education Rules required that (among other things) educational institutions that offered distance-education or correspondence-course programs meet certain requirements and issue certain disclosures, both publicly and individually to their enrolled and prospective students.

Among other things, the Distance-Education Rules required that educational institutions that offer distance-education or correspondence-course programs "document that there is a State process for review and appropriate action on student complaints from any of those enrolled students concerning the institution" in each state in which its enrolled students reside (either directly or through a state-authorization-reciprocity agreement). *Id.* at 92,262 (34 C.F.R.

United States District Court
Northern District of California

§ 600.9(c)(2)). In addition, the Distance-Education Rules required that such educational institutions disclose the following:

- whether the institution is authorized by each state where its enrolled distance-education or correspondence-course students reside to provide that distance-education or correspondence-course program, *id.* at 92,263 (34 C.F.R. § 668.50(b)(1));

- the process for submitting consumer complaints in the state where the institution's main campus is located and in each state where its enrolled distance-education or correspondence-course students reside, *id.* (34 C.F.R. § 668.50(b)(2), (3));

- any adverse actions that a state entity or an accrediting agency might have initiated against the institution (e.g., a state attorney general's suing the institution for defrauding students or an accrediting agency's revoking the institution's accreditation), *id.* (34 C.F.R. § 668.50(b)(4), (5), (c)(ii)(A)); and

- for programs that prepare students for certain occupations, what the educational prerequisites are in each state where the institution's enrolled distance-education or correspondence-course students reside for licensure or certification for those occupations (e.g., for a program that prepares students to become teachers, what the education prerequisites are for teaching certificates), and whether the program satisfies those requirements, *id.* (34 C.F.R. § 668.50(b)(7), (c)(i), (c)(ii)(B)).

In announcing the Distance-Education Rules, the Department addressed comments that it received on its initial NPRM. *Id.* at 92,233–52.

Several commenters noted that some states, such as California, did not have processes for reviewing complaints brought by students within the state against educational institutions located outside the state, and that the Rules thus appeared to prohibit the use of Title IV funding to pay for students in those states to enroll in distance-education or correspondence-course programs from institutions outside those states. *Id.* at 92,238. The Department confirmed that the Rules prohibited that use of Title IV funding unless those states provided a complaint process, either directly or through a state-authorization-reciprocity agreement. *Id.* Several commenters also asked for clarification about the definition of the term "reside" as used in the Rules. *Id.* at 92,249. The

Department stated that where a student "resides" under the Rules was defined by "a student's true, fixed, and permanent home of a student, usually where their domicile is located" and that "a student is considered to reside in a State if the student meets the requirements for residency under State law[.]" *Id.* at 92,250.

The Distance-Education Rules were to go into effect on July 1, 2018. *Id.* at 92,232.

### 3. 2017

On January 20, 2017, Donald Trump was inaugurated as president of the United States.

On January 24, 2017, President Trump's chief of staff issued a memorandum instructing federal agencies, including the Department, that "[w]ith respect to regulations that have been published in the [Office of the Federal Register] but have not taken effect, as permitted by applicable law, temporarily postpone their effective date for 60 days from the date of this memorandum, subject to [certain] exceptions . . ., for the purpose of reviewing questions of fact, law, and policy they raise." *Memorandum for the Heads of Executive Departments and Agencies: Regulatory Freeze Pending Review*, 82 Fed. Reg. 8346, 8346 (Jan. 24, 2017). The memorandum further stated, "[w]here appropriate and as permitted by applicable law, you should consider proposing for notice and comment a rule to delay the effective date for regulations beyond that 60-day period. In cases where the effective date has been delayed in order to review questions of fact, law, or policy, you should consider potentially proposing further notice-and-comment rulemaking." *Id.*

On January 30, 2017, the Department announced that it was delaying the effective date of regulations promulgated under the Every Student Succeeds Act. *Elementary and Secondary Education Act of 1965, as Amended by the Every Student Succeeds Act — Accountability and State Plans; Open Licensing Requirement for Competitive Grant Programs; Family Educational Rights and Privacy Act*, 82 Fed. Reg. 8669 (Jan. 30, 2017). In that announcement, the Department stated that "[t]his is the first of several regulatory actions the Department intends to take regarding regulations that have been published in the Federal Register but had not taken effect as of January 20, 2017, including the Department's regulations for . . . State Authorization (RIN 1840–AD20)

issued under title IV of the Higher Education Act of 1965, as amended" (i.e., the Distance-Education Rules). *Id.* at 8669.

On June 16, 2017, the Department announced its intention to convene two negotiated-rulemaking committees, one to revise certain "gainful employment" regulations that the Department had promulgated in 2014 and one to revise regulations on student-borrower defenses to repayment of federal loans that the Department promulgated in 2016. *Negotiated Rulemaking Committee; Public Hearings*, 82 Fed. Reg. 27,640, 27,640 (June 16, 2017).

On June 22, 2017, the Department announced that it was "seeking input on regulations that may be appropriate for repeal, replacement, or modification." *Evaluation of Existing Regulations*, 82 Fed. Reg. 28,431, 28,431 (June 22, 2017). The Department extended the public sixty days (i.e., until August 21, 2017) to submit comments. *Id.*

On August 1, 2017, the Western Interstate Commission for Higher Education ("WICHE") Cooperative for Educational Technologies ("WCET") and the WCET State Authorization Network ("SAN") submitted an eight-page written response to the Department's June 22, 2017 request for input on regulations that may be appropriate for repeal, replacement, or modification. Letter from Russ Poulin, Director, Policy and Analysis, WICHE Cooperative for Educ. Techs., and Cheryl Dowd, Director, WCET State Authorization Network, to Hilary Malawer, Assistant Gen. Counsel, Office of the Gen. Counsel, U.S. Dep't of Educ. (Aug. 1, 2017), *available at* https://www.regulations.gov/document?D=ED-2017-OS-0074-0073 (last visited Apr. 26, 2019) (2017 WCET Letter).[2] The Letter stated that "WCET represents more than 370 institutions, systems, and higher education organizations in their creation of tools and implementation of technology for distance education" and that "SAN represents more than 650 institutions interested in navigating the State and Federal regulatory nuances of compliance management for their institutions," and that representatives from WCET had served on the Department's 2014 negotiated-rulemaking committee. *Id.* at 1.

---

[2] The plaintiffs also attached the 2017 WCET Letter as Exhibit C to their complaint and Exhibit K to their summary-judgment motion. Compl. Ex. C – ECF No. 1-3; Pls. Mot. Ex. K – ECF No. 21-12. The Department did not include it as part of its administrative record. *See* Admin. Record – ECF No. 37.

United States District Court
Northern District of California

In the Letter, WCET and SAN stated that they "support[ed] the intent of these regulations to tie title IV funding to the requirement that institutions verify that they are following applicable laws in the states where the institutions are serving students" and "support[ed] the intent of the regulations to require important general disclosures as well as individualized disclosures to the students." *Id.* at 1–2. WCET and SAN stated that:

> We encourage the Department to strongly consider maintaining State authorization of distance education regulations. Requiring State compliance to participate in title IV funding will not require additional labor by the institutions, as they are legally mandated to follow the rules and laws of each state in which they enroll students. Additionally, our organizations believe that licensure-related notifications and disclosures support students' abilities to achieve their academic and career goals. Institutions should be required to dutifully notify enrolled and prospective students participating in educational programs completed solely through distance education or correspondence of all factors relevant to their pursuit of their academic and career goals. These Federal regulations will increase the level of consumer protection to ensure students are not exposed to unscrupulous actions that could impair the student's investment in higher education.

> **• Proof of State Authorization provides transparency.**

> In addition to the states' legal requirements for authorization, the ability to tie title IV funds to authorization provides transparency to students about the use of their funding and the ability to participate and complete the academic program that they choose. Students benefit from the clarity due to a federal directive for the institution to supply proof of the completion of state mandated compliance requirements in the states where students are enrolled or receiving services. The federal rule need be little more than the assurance that the Department will seek proof that the institution is following state laws. States have the obligation to oversee higher education within their borders. Put the emphasis on state oversight.

> **• Notifications and Disclosures lessens ambiguity for students.**

> Institutions are far more able than students to access information from state licensure boards about acceptable pre-requisites for programs leading to professional licensure and certification. Students encounter unfamiliar language and have difficulty understanding whether and/or how they may pursue their desired academic program in their state if the institution does not provide reasonable notice. Institutional notifications and disclosure eliminates or at least minimizes the ambiguity.

*Id.* at 6–7 (bolding in headings added).

WCET and SAN raised several issues, stating that they "wish[ed] to obtain clarification of terms important for the implementation of the regulations." *Id.* at 2. In addition to other issues, WCET and SAN raised the following.

First, WCET and SAN asked whether the Department planned to enforce the Distance-Education Rules on July 1, 2018. *Id.* at 3. They noted that the Department had recently delayed enforcement and/or compliance with gainful-employment and borrower-defenses regulations (the regulations for which the Department had announced in June 2017 that it was convening negotiated-rulemaking committees). *Id.* They stated "[i]nstitutions spend considerable time in compliance activities and wish to be clear regarding what is expected of them. Our member institutions would enjoy receiving early notification about whether the Department will enforce, further interpret/clarify, delay, or redevelop [the Distance-Education Rules] well in advance of the July 1, 2018 deadline." *Id.*

Second, WCET and SAN raised a question about the Distance-Education Rules' requirement that educational institutions make disclosures based on where enrolled students "reside." *Id.* at 3–4. They noted that the term "reside" is confusing, particularly in the context of a student who is located in and taking classes from a state other than the state of the student's "official residency," and asked the Department to provide guidance or to set out its requirements based on where students are "located," as opposed to where they "reside." *Id.* at 4.

Third, WCET and SAN raised a question about the Distance-Education Rules' requirement that educational institutions document that there is a state process for review and appropriate action on student complaints in each state where their students reside. *Id.* at 5. They noted that California in particular does not have a process for receiving complaints from students located in California about educational institutions not in California (and that California had not entered into a state-authorization-reciprocity agreement). *Id.* They asked whether the Department could work with California on a compromise. *Id.*

1    WCET and SAN "request[ed] that the Department indicate a timeline to expect to receive a

2    response to comments," stating that "compliance requirements for the federal state authorization

3    regulations will require time to implement a process to achieve compliance by July 1, 2018" and

4    that "[the Department's] response and direction will be very important." *Id.* at 7.

5    On August 25, 2017, the Department announced two public hearings where interested parties

6    could provide input "on Department regulations related to postsecondary education that may be

7    appropriate for repeal, replacement, or modification." *Regulatory Reform; Public Hearings*, 82

8    Fed. Reg. 40,518, 40,518 (Aug. 25, 2017). On October 1, 2017, WCET and SAN appeared at a

9    public hearing and reiterated their support for the Distance-Education Rules and re-raised the

10   questions they had raised in their 2017 Letter, including their questions about whether the

11   Department would enforce the Rules beginning July 1, 2018 and about how the Department was

12   defining the word "reside" as used in the Rules. U.S. Dep't of Educ., Transcript of Public Hearing

13   on Regulatory Reform 166–72 (Oct. 4, 2017), *available at* https://www2.ed.gov/policy/highered/

14   reg/reform/2017/washingtondchearingtranscript.pdf (last visited Apr. 26, 2019).[3]

15   The Department did not take any steps in 2017 to propose a rule delaying the effective date of

16   the Distance-Education Rules.

18   **4.   2018 and the Delay Rule**

19   **4.1     The 2018 ACE and WCET Letters**

20   On February 6, 2018, the American Council on Education ("ACE") sent the Department a one-

21   page letter. Letter from Terry W. Hartle, Senior Vice President, Am. Council on Educ., to Betsy

22   DeVos, Sec'y of Educ., U.S. Dep't of Educ. (Feb. 6, 2018), *available at* https://www.acenet.edu/

---

26   [3] The plaintiffs also attached excerpts of the hearing transcript as Exhibit D to their complaint and
     Exhibit L to their summary-judgment motion. Compl. Ex. D – ECF No. 1-4; Pls. Mot. Ex. L – ECF
27   No. 21-13. The Department did not include it as part of its administrative record. *See* Admin. Record –
     ECF No. 37.

United States District Court
Northern District of California

1    news-room/Documents/ACE-Letter-on-State-Authorization-Concern.pdf (last visited Apr. 26,

2    2019) (2018 ACE Letter).[4] The full text of the Letter reads:

3        As you may be aware, the state authorization regulations finalized by the
         Department of Education on December 19, 2016 are set to go into effect starting
4        July 1, 2018. As that deadline approaches, a number of institutions have raised
         concerns about possible unintended consequence with the possibility of significant
5        harm to students.

6        In brief, the regulations appear to make students who are residents of certain states
         ineligible for federal financial aid if they are studying online at institutions located
7        outside their states.

8        This is related to the requirement imposed by the state authorization regulations
         that mandates institutions disclose to students the appropriate state complaint
9        process for their state of residence.

10       A number of states, including California, do not currently have complaint processes
         for all out-of-state institutions. This would appear to effectively bar some of their
11       residents from receiving federal financial aid if they choose to study online at
         institutions located outside their states.
12

13       As colleges and universities are currently in the process of finalizing enrollments
         and aid packages for the fall semester (after the effective date of the regulations),
14       we write you in hope that you can clarify the Department's position on the
         eligibility of students so situated.
15

16       Thank you for considering this request.

17   *Id.*

18       On February 7, 2018, WCET, the National Council for State Authorization Reciprocity, and

19   the Distance Education Accrediting Commission sent the Department a one-page letter. Letter

20   from Russell Poulin, Director, Policy and Analysis, WICHE Cooperative for Educ. Techs., et al. to

21   Frank Brogan, Acting Assistant Sec'y of Postsecondary Educ., U.S. Dep't of Educ. (Feb. 7, 2018),

22   *available at* https://wcet.wiche.edu/sites/default/files/WCET-SARA-DEAC-Letter-2-7-18_0.pdf

23   (last visited Apr. 26, 2019) (2018 WCET Letter).[5] The full text of the Letter reads:

24

25   _____

     [4] The plaintiffs also attached the 2018 ACE Letter as Exhibit E to their complaint, and the Department
26   attached it as Document 4 in its administrative record. Compl. Ex. E – ECF No. 1-5; Admin. Record
     Doc. 4 – ECF No. 37 at 152 (AR 0146).

27   [5] The plaintiffs also attached the 2018 WCET Letter as Exhibit F to their complaint, and the Department
     attached it as Document 5 in its administrative record. Compl. Ex. F – ECF No. 1-6;
28   Admin. Record Doc. 5 – ECF No. 37 at 153 (AR 0147).

Thank you for the opportunity to meet with you and your team at the U.S. Department of Education. I appreciate your interest and willingness to listen to a discussion about critical issues on accreditation and distance education. To follow up on our discussion on state authorization, my colleagues and I respectfully would like to bring to your attention concerns in the higher education distance education community regarding the USDE's rules on state authorization of distance education set to go into effect July 1, 2018 (34 CFR – Sections 600 and 668). Those of us who represent major postsecondary distance education organizations receive many questions about implementing the rules. The institutions we represent clearly desire to comply with the rules, but are struggling with how to prepare to do so.

Compliance with the new rules will be a costly and burdensome effort for most colleges and universities that offer distance education. These institutions need a clear understanding of USDE's expectations. Specifically, the rules require institutions to provide (for each state where students are enrolled in distance education programs) public and individualized disclosures of state authorization status for every state, complaint resolution processes for every state, and details on state licensure eligibility for every discipline that requires a license to enter a profession (e.g., teaching, counseling, dietician, nursing). The rules also require institutions to comply with refund policy requirements for each state where students are enrolled, regardless of membership in the State Authorization Reciprocity Agreements. Clarification is needed on the USDE's desired format for the disclosures. Another area of concern is that issue is that the regulation defines "residence" in a way that conflicts with state laws and common practice.

The U. S. House of Representatives' draft of the PROSPER Act would remove those rules and forbid issuing future regulations on the topic. But even if the removal of state authorization is included in future HEA reauthorization legislation, reauthorization is highly unlikely to occur before July 1, 2018, when the rules go into effect. The U.S. Department of Education could (1) delay the rules and submit the issues to additional negotiated rulemaking or (2) issue clarification via a dear colleague letter on USDE's expectations for compliance. A third option would require Congress to take action to delay or suspend implementation. Otherwise, the rules will go into effect, as written, with the potential for broad misunderstandings.

Institutions that know the most about these issues are the most concerned. WCET's State Authorization Network includes 700 institutions. (WCET is an acronym for the WICHE Cooperative for Educational Technologies.) Institutional participation in the State Authorization Reciprocity Agreement (SARA) now includes about 1,750 institutions from the current 48 SARA member states (plus the District of Columbia and the U.S. Virgin Islands). DEAC (the Distance Education Accrediting Commission) accredited institutions are a part of the WCET and SARA communities. Our institutions want to comply with the regulatory environment, but many questions remain.

Thank you for your consideration. If there is any way we can provide assistance or further details, we would be pleased to do so.

*Id.*

### 4.2   Notice of Proposed Rulemaking

On May 25, 2018, the Department published a Notice of Proposed Rulemaking, proposing a rule to delay the effective date of the Distance-Education Rules from July 1, 2018 to July 1, 2020. *Program Integrity and Improvement*, 83 Fed. Reg. 24,250 (May 25, 2018) (Delay-Rule NPRM). The Department stated that it "propose[d] the delay based on concerns recently raised by regulated parties and to ensure that there is adequate time to conduct negotiated rulemaking to reconsider the final regulations, and as necessary, develop revised regulations." *Id.* at 24,250.

The Department stated that "[t]wo letters in particular prompted this proposed delay": the 2018 ACE Letter and the 2018 WCET Letter. *Id.* at 24,251. The Department stated that the 2018 ACE Letter

expressed concerns that, "students who are residents of certain states may be ineligible for federal financial aid if they are studying online at institutions located outside their states. This is related to the requirement imposed by the state authorization regulations that mandates institutions disclose to students the appropriate state complaint process for their state of residence. A number of states, including California, do not currently have complaint processes for all out-of-state institutions."

*Id.* (quoting 2018 ACE Letter). The Department stated that the 2018 WCET Letter

stated that there is widespread concern and confusion in the higher education community regarding the implementation of the final regulations, particularly with respect to State authorization of distance education and related disclosures. The authors of the February 7 letter argued that the new regulations will be costly and burdensome for most colleges and universities that offer distance education and that some States have not implemented the necessary policies and procedures to conform to the student complaint procedures required by the regulations. The authors also expressed that institutions need additional information from the Department to better understand how to comply with the new regulations. They stated, for instance, that the way the term "residence" is described in the preamble of the 2016 rule may conflict with State laws and common practice among students for establishing residency.

*Id.* (citing 2018 WCET Letter).

The Department stated that "[t]hese issues are more complex than we understood when we considered them in 2016." *Id.* "The Department does not believe guidance would be sufficient to address the complexities institutions have encountered, even prior to the rule's effective date." *Id.* "For both of the residency and disclosure issues, guidance is not the appropriate vehicle to provide the clarifications needed." *Id.* "Guidance is inherently non-binding and, therefore, could not be used to establish any new requirements." *Id.* "More importantly, due to the complexity of these issues, we are not confident that we could develop a workable solution through guidance and without the input of negotiators who have been engaged in meeting these requirements." *Id.* "Additionally, the necessary changes may impose a greater burden on some regulated parties, or could significantly minimize burden to institutions, which would require an updated estimate of regulatory impact." *Id.* "In sum, the Department believes that the clarifications requested are so substantive that they would require further rulemaking including negotiated rulemaking under the Higher Education Act of 1965, as amended (HEA)." *Id.*

The Department stated that "[i]t would be confusing and counterproductive for the [Distance-Education Rules] to go into effect before the conclusion of this reconsideration process." *Id.* at 24,252. It thus "propose[d] delaying the current effective date — July 1, 2018 — until July 1, 2020." *Id.*

The Department did not submit its proposed delay rule to negotiated rulemaking. Instead, it stated that "has not had sufficient time to effectuate this delay through negotiated rulemaking." *Id.* "Negotiated rulemaking requires a number of steps that typically takes the Department well over 12 months to complete." *Id.* "In this instance, the catalysts for the delay are the February 6 [2018 ACE Letter] and February 7 [2018 WCET Letter]." *Id.* "The Department could not have completed the well-over 12-month negotiated rulemaking process, described in the previous paragraph, between February 6, 2018, and the July 1, 2018, effective date." *Id.* "Thus, the Department has good cause to waive the negotiated rulemaking requirement with regard to its proposal to delay the effective date of the final regulations to July 1, 2020, in order to complete a new negotiated rulemaking proceeding to address the concerns identified by some of the regulated parties in the higher education community." *Id.* The Department also stated that it "believes it will

be in the public interest to delay the effective date of these regulations so that these issues can be resolved before the regulations go into effect." *Id.* "The approach may also benefit from input from States that are in the process of changing requirements for distance education programs." *Id.*

The Department extended the public until June 11, 2018 (i.e., 17 days) to submit comments on its proposed delay rule. *Id.* at 24,250.[6] It stated that "[w]e are doing so because the 2016 rule is scheduled to take effect on July 1, 2018, and a final rule delaying the effective date must be published prior to that date." *Id.* "A longer comment period would not allow sufficient time for the Department to review and respond to comments, and publish a final rule." *Id.* (Seven of the days in the 17-day period were either weekends or federal holidays.)

The Department received 39 comments. *Program Integrity and Improvement*, 83 Fed. Reg. 31,296, 31,297 (July 3, 2018) (Delay-Rule Announcement).[7]

### 4.3   Final Rule

On July 3, 2018, the Department promulgated the final Delay Rule. Delay-Rule Announcement, 83 Fed. Reg. 31,296.

While the Delay-Rule Announcement purports to be dated June 28, 2018, *id.* at 31,303, it was not published in the Federal Register until July 3, 2018, *id.* at 31,296, two days after the original effective date for the Distance-Education Rules.

**ANALYSIS**

The HEA provides that:

> All regulations pertaining to [Title IV] that are promulgated after October 7, 1998, shall be subject to a negotiated rulemaking (including the selection of the issues to be negotiated), unless the Secretary determines that applying such a requirement with respect to given regulations is impracticable, unnecessary, or contrary to the

---

[6] The Department stated that it was establishing a "15-day public comment period," Delay-Rule NPRM, 83 Fed. Reg. at 24,250, but a 15-day period would have lapsed on a Saturday (June 9, 2018). The Department said it would accept comments through June 11, 2018. *Id.*

[7] One of those comments was from plaintiff NEA. Letter from Donna M. Harris-Aikens, Director, Educ. Policy and Practice, Nat'l Educ. Ass'n, to Jean-Didier Gaina, Office of Postsecondary Educ., U.S. Dep't of Educ. (June 11, 2018) (attached as Compl. Ex. G – ECF No. 1-7).

United States District Court
Northern District of California

1   public interest (within the meaning of section 553(b)(3)(B) of Title 5), and
2   publishes the basis for such determination in the Federal Register at the same time
    as the proposed regulations in question are first published.

3   20 U.S.C. § 1098a(b)(2).

4   The parties agree that this negotiated-rulemaking provision applies to the Delay Rule.[8] The

5   parties also agree that under this provision, the Department could forgo negotiated rulemaking

6   only if it satisfied the standard set out in Section 553(b)(3)(B) of the APA for forgoing notice and

7   comment, namely, that "the agency for good cause finds (and incorporates the finding and a brief

8   statement of reasons therefor in the rules issued) that notice and public procedure thereon are

9   impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B).[9]

10   The Department argues that it had good cause under Section 553(b)(3)(B) to forgo negotiated

11   rulemaking with respect to the Delay Rule and that any failure to engage in negotiated rulemaking

12   was harmless error. Both arguments fail.

13

14   **1.  Good Cause**

15   **1.1    Governing Law**

16   "Good cause" under Section 553 of the APA "is determined on a 'case-by-case' basis, based

17   on the 'totality of the factors at play." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (citing

18   *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2018)). The Ninth Circuit and other

19   courts have identified several generally applicable principles regarding the good-cause standard.

20   "The good cause exception goes only as far as its name implies: It authorizes departures from

21   the APA's requirements only when compliance would interfere with the agency's ability to carry

22   out its mission.'" *Id.* (quoting *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1485 (9th Cir.

23

24   [8] Pls. Mot. – ECF No. 20 at 15; Defs. Cross-Mot. – ECF No. 41 at 11, 17–18; *accord, e.g., Pineros y Campesinos Unidos del Noroeste v. Pruitt*, 293 F. Supp. 3d 1062, 1066 (N.D. Cal. 2018) (delaying
25   rule's effective date is "substantive rulemaking" "tantamount to amending or revoking a rule," and agency "was thus required to comply with the requirements of the APA" to issue a delay) (citing *Clean
26   Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

27   [9] Pls. Mot – ECF No. 20 at 15–17; Defs. Cross-Mot. – ECF No. 41 at 11, 17–18; *accord, e.g., Bauer v. DeVos*, 325 F. Supp. 3d 74, 97 (D.D.C. 2018) (looking to case law on good cause under Section 553 of
28   the APA to analyze HEA's negotiated-rulemaking requirement).

United States District Court
Northern District of California

1992)). "Good cause is to be 'narrowly construed and only reluctantly countenanced.'" *Id.*

(quoting *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984)). "[T]he good cause exception should

be interpreted narrowly, so that the exception will not swallow the rule" and should be found

"only when 'delay would do real harm.'" *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir.

1982) (citing cases). "As such, the good cause exception is usually invoked in emergencies, and an

agency must 'overcome a high bar' to do so." *Azar*, 911 F.3d at 575 (citing *Valverde*, 628 F.3d at

1164–65).

    Good cause may be found where "'delay would do real harm' to life, property, or public

safety." *Id.* at 576 (some internal quotation marks omitted) (quoting *East Bay Sanctuary Covenant

v. Trump*, 909 F.3d 1219, 1253 (9th Cir. 2018)).[10] Good cause may be found where "the agency

cannot 'both follow section 553 and execute its statutory duties.'" *Id.* (quoting *Riverbend Farms*,

958 F.2d at 1484 n.2).

    By contrast, "an agency's desire to eliminate more quickly legal and regulatory uncertainty is

not by itself good cause," because "[i]f 'good cause' could be satisfied by an Agency's assertion

that normal procedures were not followed because of the need to provide immediate guidance and

information, then an exception to the notice requirement would be created that would swallow the

rule." *Id.* (internal brackets and ellipsis and some internal quotation marks omitted) (quoting

*Valverde*, 628 F.3d at 1167). Similarly, "[g]ood cause cannot arise as a result of the agency's own

delay, because otherwise, an agency unwilling to provide notice or an opportunity to comment

could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the

'good cause' banner and promulgate rules without following APA procedures.'" *NRDC v. Nat'l

Highway Traffic Safety Admin.*, 894 F.3d 95, 114–15 (2d Cir. 2018) (internal brackets and some

---

[10] For example, courts have found the good-cause exception satisfied where an agency promulgated a safety regulation governing helicopter flights after seven helicopter accidents involving four fatalities had occurred in the previous nine months and where an agency revoked airman certificates for pilots whom the agency determined posed "security threats" (i.e., "(1) A threat to transportation or national security; (2) A threat to air piracy or terrorism; (3) A threat to airline or passenger security; or (4) A threat to civil aviation security. 49 C.F.R. § 1540.117(c)."). *See Azar*, 911 F.3d at 576 (citing *Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d 212, 214 (9th Cir. 1995); *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)).

1   internal quotation marks omitted) (quoting *Council of the Southern Mountains, Inc. v. Donovan*,

2   653 F.2d 573, 581 (D.C. Cir. 1981)).

3       "A new administration's simple desire to have time to review, and possibly revise or repeal, its

4   predecessor's regulations falls short of this exacting [good-cause] standard." *Pineros y*

5   *Campesinos Unidos del Noroeste v. Pruitt*, 293 F. Supp. 3d 1062, 1067 (N.D. Cal. 2018) (citing

6   *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017)). Likewise, "[t]hat a regulated entity

7   might prefer different regulations that are easier or less costly to comply with does not justify

8   dispensing with notice and comment" and does not constitute good cause. *NRDC*, 894 F.3d at 115

9   (citing *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 94 (D.C. Cir. 2012)); *accord Bauer v. DeVos*, 325

10  F. Supp. 3d 74, 100 (D.D.C. 2018) (same) (citing *Mack Trucks*, 682 F.3d at 94).

11      The burden is on the agency to demonstrate that it has good cause. *NRDC*, 894 F.3d at 113–14

12  (citing *Action on Smoking and Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 801 n.6 (D.C. Cir.

13  1983)); *accord Azar*, 911 F.3d at 575 ("an agency must 'overcome a high bar' to [invoke the

14  good-cause exception]") (citing *Valverde*, 628 F.3d at 1164–65). An agency's determination that it

15  has satisfied the good-cause exception is not entitled to deference from a court. *Reno-Sparks*

16  *Indian Colony v. EPA*, 336 F.3d 899, 909 n.11 (9th Cir. 2003) ("Court[s] review[] de novo the

17  agency's decision not to follow the APA's notice and comment procedures. The agency is not

18  entitled to deference because complying with the notice and comment provisions when required

19  by the APA 'is not a matter of agency choice.'") (quoting *Sequoia Orange Co. v. Yeutter*, 973

20  F.2d 752, 757 n.4 (9th Cir. 1992)); *accord, e.g.*, *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702,

21  706 (D.C. Cir. 2014) ("[W]e cannot find that an exception applies simply because the agency says

22  we should. . . . Deference to an agency's invocation of good cause — particularly when its

23  reasoning is potentially capacious, as is the case here — would conflict with this court's deliberate

24  and careful treatment of the exception in the past.").

25      **1.2    Application**

26      To invoke the good-cause exception and forgo negotiated rulemaking, the Department must

27  "publish[] the basis for such determination in the Federal Register at the same time as the

28  proposed regulations in question are first published." 20 U.S.C. § 1098a(b)(2). In claiming that it

1   had good cause to forgo negotiated rulemaking for the Delay Rule, the Department thus is limited

2   to the explanations it provided in the Delay-Rule NPRM. *Cf. Bauer*, 325 F. Supp. 3d at 97–98, 100

3   (analyses that do not appear in the Department's NPRM "lie outside the bounds of proper

4   consideration").

5       The Delay-Rule NPRM did not identify any emergency or "real harm" that would have

6   resulted from subjecting its delay proposal to negotiated rulemaking. *Cf. Azar*, 911 F.3d at 575;

7   *Buschmann*, 676 F.2d at 357. The Delay-Rule NPRM did not identify how subjecting the

8   Department's delay proposal to negotiated rulemaking would have interfered with the

9   Department's ability to carry out its statutory duties. *Cf. Azar*, 911 F.3d at 576. Instead, the Delay-

10  Rule NPRM offered as "good cause" only that it would have been impracticable to subject a

11  proposed delay rule to negotiated rulemaking, complete that process, and issue a final delay rule in

12  time to stop the Distance-Education Rules from going into effect. Delay-Rule NPRM, 83 Fed.

13  Reg. at 24,252. But that is not the standard. The Department has not established why subjecting its

14  proposed delay rule to negotiated rulemaking — and allowing the Distance-Education Rules to go

15  into effect in the meantime — would have constituted an emergency, caused "real harm," or

16  interfered with its ability to carry out its statutory duties. The new administration's desire to

17  suspend the Distance-Education Rules while it tries to reverse or revise them is not an

18  "emergency" that justifies the Department's circumventing the statutorily required negotiated-

19  rulemaking procedures. *Cf. Pineros y Campesinos*, 293 F. Supp. 3d at 1067 ("A new

20  administration's simple desire to have time to review, and possibly revise or repeal, its

21  predecessor's regulations falls short of this exacting [good-cause] standard.") (citing *Clean Air

22  Council*, 862 F.3d at 9); *see generally Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d

23  956, 968 (9th Cir. 2015) (en banc) (while an agency may try to reverse its predecessor's

24  regulations — "[e]elections have policy consequences" — it may not violate the APA to do so).[11]

25  _____

26  [11] The Department claimed that there was "confusion" with respect to the Distance-Education Rules, specifically with respect to the definition of the term "resides" as used in the Rules and with respect to how the Rules would be applied to states like California that did not have processes in place for

27  reviewing complaints from students about out-of-state institutions. Delay Rule NPRM, 83 Fed. Reg. at 24,251. A bare claim of "confusion" is not good cause. *Cf. Bauer*, 325 F. Supp. 3d at 100; *Pineros y*

28

United States District Court
Northern District of California

### 1.2.1    Courts reject claims of "good cause" of the type the Department raises here

The District Court for the District of Columbia recently rejected a similar attempt by the Department to forgo negotiated rulemaking by promulgating a rule to delay the effective date of certain regulations promulgated by the prior administration. *Bauer*, 325 F. Supp. 3d at 74. In November 2016, the Department promulgated regulations regarding student-borrower defenses to federal-loan repayment. *Bauer*, 325 F. Supp. 3d at 81. The regulations were to go into effect on July 1, 2017. *Id.* In June 2017, the Department published a notice delaying the effective date of the regulations pending resolution of certain judicial challenges to the regulations, *id.* at 83, and in October 2017, the Department issued a NPRM proposing a rule to further delay the effective date of the regulations to July 1, 2019, *id.* at 85. The Department did not subject its delay proposal to negotiated rulemaking. *Id.* at 86. (The proposed delay rule was promulgated as a final rule in February 2018. *Id.*) Student borrowers and a coalition of states brought suit to challenge the delays. *Id.* at 78–79.

The court granted the plaintiffs summary judgment and vacated the Department's delay rule. *Id.* at 110; *Bauer v. DeVos*, 332 F. Supp. 3d 181, 186 (D.D.C. 2018). Among other things, the court held that the Department had not identified any "emergency" or "serious harm" that would have resulted from subjecting its delay proposal to negotiated rulemaking. *Bauer*, 325 F. Supp. 3d at 99 (citing *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)). The Department argued that it had been planning to change the borrower-defense regulations and that, absent a delay, the 2016

---

*Campesinos*, 293 F. Supp. 3d at 1067; *accord Azar*, 911 F.3d at 576 ("an agency's desire to eliminate more quickly legal and regulatory uncertainty is not by itself good cause," because "[i]f 'good cause' could be satisfied by an Agency's assertion that normal procedures were not followed because of the need to provide immediate guidance and information, then an exception to the notice requirement would be created that would swallow the rule") (internal brackets and ellipsis and some internal quotation marks omitted) (quoting *Valverde*, 628 F.3d at 1167). Additionally, the Department does not establish how these issues would actually cause "confusion," considering that it addressed these issues in its original announcement promulgating the Rules. Distance-Education-Rules Announcement, 81 Fed. Reg. at 92,238, 92,250. Having addressed these issues in 2016, the Department cannot reverse itself in 2018 and claim that they caused "confusion" without a reasoned explanation. The Department did not provide any reasoned explanation. *Cf. Bauer*, 325 F. Supp. 3d at 100–01 (rejecting a similar argument by the Department and holding that "it cannot [change its conclusion] without acknowledging its prior conclusion or offering any explanation for its fundamental change in course") (emphasis omitted) (citing *Fox Television*, 556 U.S. at 515).

regulations would go into effect before the Department could make its changes and regulated parties would have to comply with them, thereby subjecting those parties to additional costs and confusion. *Id.* at 100–01. The court rejected this argument, holding that "the good cause exception should be 'narrowly construed and only reluctantly countenanced,'" and that regulated parties' interest in avoiding the administrative costs of complying with the 2016 regulations did not meet the good-cause standard. *Id.* at 100 (quoting *Mack Trucks*, 682 F.3d at 94). The court held that accepting the Department's argument would lead to the good-cause exception "swallow[ing] the rule," because an agency could always use that excuse to delay the effective date of regulations. *Id.* at 101; *accord id.* at 99 ("Indeed, if [the Department's argument] was sufficient, it is difficult to imagine a circumstance in which an agency would be required to comply with the requirements of notice and comment and, where applicable, negotiated rulemaking, to delay the effective date of a regulation.").

The Second Circuit recently rejected an analogous attempt by an agency to forgo notice and comment under the APA by promulgating a rule to delay the effective date of certain regulations promulgated by the prior administration. *NRDC*, 894 F.3d 95. In December 2016, the National Highway Traffic Safety Administration ("NHTSA") promulgated penalty rates for car manufacturers that violated fuel-efficiency standards. *Id.* at 102. The rates were to go into effect starting with cars manufactured for model-year 2019. *Id.* Between January and July 2017, the NHTSA promulgated a series of rules delaying the effective date of the 2016 penalty rates. *Id.* at 102–03. The last of these rules suspended the 2016 penalty rates indefinitely on the ground that NHTSA was reconsidering the rates altogether. *Id.* at 103. The NHTSA did not subject these rules to notice and comment under the APA. *Id.* Environmental organizations and a coalition of states brought suit to challenge the delays. *Id.*

The NHTSA argued that it had good cause to forgo notice-and-comment rulemaking for the indefinite-suspension rule because the underlying 2016 penalty rates would otherwise "imminent[ly]" go into effect. *Id.* at 114. The Second Circuit rejected this argument, noting that the penalty rates were promulgated in December 2016, that the NHTSA chose to issue a series of finite delays between January and July 2017 before issuing an indefinite suspension in July 2017,

and that "[g]ood cause cannot arise as a result of the agency's own delay[.]" *Id.* at 114. The NHTSA additionally argued that it suspended the effective date of the 2016 penalty rates because it needed more time to consider the responses it anticipated receiving to its announcement that it was reconsidering the rates. *Id.* at 115. The Second Circuit rejected this argument too, holding that "[t]his is not a situation of acute health or safety risk requiring immediate administrative action" or "an emergency or other extraordinary circumstance that would justify forgoing notice and comment." *Id.* The Second Circuit vacated the NHTSA's delay rule and ordered that the 2016 penalty rates were immediately effective and in force. *Id.* at 115–16.

Another court in this district recently rejected an analogous attempt by an agency to forgo notice and comment under the APA by promulgating a rule to delay the effective date of certain regulations promulgated by the prior administration. *Pineros y Campesinos*, 293 F. Supp. 3d 1062. In early January 2017, the EPA promulgated a rule strengthening regulations surrounding the certification and use of certain pesticides. *Id.* at 1063. The rule was to go into effect on March 6, 2017. *Id.* Beginning in late January 2017, the EPA reversed course and issued four successive delays of the rule. *Id.* at 1063–64. For one delay, the EPA provided four days for interested parties to provide comments; for the other three delays, the EPA provided no opportunity to comment. *Id.* at 1063 n.1. Farmworker unions and advocacy groups brought suit to challenge the delays. *Id.* at 1064.

The EPA argued that it had good cause to forgo notice-and-comment rulemaking for its delays because more time was needed for "further review and consideration of new regulations" and confusion could result if the pesticide rule went into effect "but was subsequently substantially revised or repealed." *Id.* at 106–07 (quoting administrative record). The court rejected this argument on the ground that it did not satisfy the "extraordinarily narrow" good-cause exception, which "is reserved for situations where delay would do real harm." *Id.* at 107 (citing *Valverde*, 628 F.3d at 1164–65). The court held that "[a] new administration's simple desire to have more time to review, and possibly revise or repeal, its predecessor's regulations falls short of this exacting standard," and it vacated the EPA's delay rules on the ground that they violated the APA. *Id.* (citing *Clean Air Council*, 862 F.3d at 9).

### 1.2.2   The Department cites only one case in response, and it is inapposite

To counter *Bauer*, *NRDC*, and *Pineros y Campesinos*, the Department cites only one case to support its argument that it had good cause to forgo the HEA's statutory negotiated-rulemaking requirement: *Oregon Trollers Association v. Gutierrez*, No. Civ. 05-6165-TC, 2005 WL 2211084 (D. Or. Sept. 8, 2005) (*Or. Trollers I*), *aff'd*, 452 F.3d 1104 (9th Cir. 2006) (*Or. Trollers II*).[12] That case is inapposite.

*Oregon Trollers* involved the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson Act"), an act passed in response to overfishing and inadequate conversation measures. *Or. Trollers I*, 2005 WL 2211084, at *1. The Magnuson Act called for "fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery." *Id.* (quoting 16 U.S.C. § 1801(b)(5)). The Magnuson Act also established "Regional Fishery Management Councils" to prepare, monitor, and revise fish-management plans in conjunction with the participation and advice of interested parties and consideration of the social and economic needs of the states. *Id.* (citing 16 U.S.C. § 1801(b)(5)).[13] Ultimately, the Secretary of Commerce, acting through the National Marine Fisheries Service ("NMFS"), has responsibility for reviewing the fish-management plans and other proposed regulations for consistency with the Magnuson Act and any other applicable law. *Id.* (citing 16 U.S.C. § 1854(a)(1)(A)).

At issue in *Oregon Trollers* was the Pacific Coast Salmon Fishery Management Plan, which governed Pacific Ocean salmon fisheries in the United States's exclusive economic zone. *Id.* at *2. Since 1989, the Plan required that annual fish-management measures provide that at least 35,000 naturally spawning adult Klamath River fall chinook salmon should "escape" being harvested to be able to spawn and produce new juvenile salmon. *Id.*

---

[12] Defs. Cross-Mot. – ECF No. 41 at 17–22 (other than citations on ancillary points, citing no cases other than *Oregon Trollers*); Defs. Reply – ECF No. 46 at 5–9 (same).

[13] The Regional Councils are composed of federal and state officials, as well as private experts appointed by the National Marine Fisheries Service (the agency that bears responsibility for reviewing the fish-management plans). *Or. Trollers II*, 452 F.3d at 1108.

United States District Court
Northern District of California

In 2004, the number of salmon that returned to the Klamath River to spawn was nearly 18,000 fish under original estimates. *Id.* Only 24,300 adult salmon returned to spawn in natural areas, over 10,000 fish below the 35,000 floor. *Id.* The number of "age-4" salmon that had been harvested from the ocean (i.e., the fish that had not "escaped" to spawn), which had been estimated to be 15% of the total "age-4" stock of fish — and which was subject under the Endangered Species Act ("ESA") to a limit of 16% — turned out instead to be 52.4% of the stock of fish. *Id.*

A technical team of eight state, federal, and Native American tribal salmon specialists and the Regional Council's staff economist met to develop a report summarizing the 2004 fishing season. *Id.* at *3 & n.12. The team's first report, issued in February 2005, stated that repeating the 2004 fish-management regulations in 2005 would likely again result in an escapement rate of less than 35,000 fish and an ocean-harvest rate that exceeded the 16% limit under the ESA. *Id.* The state and tribal agencies and the Klamath Fishery Management Council ("KFMC") — an advisory committee that included members of the commercial and recreational fishing communities, Native American tribes, and state and federal agencies — discussed the report with their respective constituents. *Id.* at *3 & n.14. The Regional Council met from March 6 to March 11, 2005, to prepare regulatory options for public review. *Id.* at *3. Following that meeting, the technical team issued its second report, analyzing four fish-management options and the socioeconomic impacts of each. *Id.*

On March 28 and 29, 2005, public hearings were held to review the proposed regulatory options and to allow for public comment. *Id.* After the hearings, the Regional Council met again from April 3 to April 8, 2005. *Id.* at *4. The Council invited additional public comment. *Id.* at *3 n.16. The Council heard reports from the KFMC, the NMFS, the Native American tribes, and the states. *Id.* at *4. On April 7, 2005, the Council adopted final regulatory measures to submit to the Secretary of Commerce. *Id.* The regulations were adopted as final regulations on May 4, 2005, and went into immediate effect. *Id.* (The public was allowed until May 19, 2005, to submit additional comments on the regulations. *Id.* at *4 n.17.)

The NMFS published a statement in the Federal Register why it was forgoing notice and comment under the APA. *Id.* at *13. It stated that "[t]he annual salmon management cycle begins on May 1 and continues through April 30 of the following year." *Id.* (quoting *Fisheries Off West Coast States and in the Western Pacific; West Coast Salmon Fisheries; 2005 Management Measures*, 70 Fed. Reg. 23,054, 23,063 (May 4, 2005)). "The May 1 date was chosen because pre-May harvests constitute a relatively small portion of the annual catch," whereas harvest levels beginning in May are "much more substantial." *Id.* (quoting 70 Fed. Reg. at 23,063). "The preseason planning and public review process associated with developing Council recommendations is initiated in February as soon as forecast information becomes available." *Id.* (quoting 70 Fed. Reg. at 23,063). The NMFS noted that the process between starting in February and implementing final regulations in May — which involves "coordination of management actions of four states, numerous Indian tribes and the Federal Government, all of which have management authority over the stocks, and a meeting in April of the stakeholders on the Regional Council — was already "compressed." *Id.* (quoting 70 Fed. Reg., at 23,063). Providing notice and comment under the APA would add an additional 30 to 60 days to that process. *Id.* (quoting 70 Fed. Reg., at 23,063).

The NMFS noted that it could not add those 30 to 60 days to the front end of this process, i.e., begin the planning and review process before February, because "preseason abundance forecasts, which are derived from the previous year's observed spawning escapement, vary substantially from year to year, and are not available until January and February because spawning escapement continues through the fall." *Id.* (quoting 70 Fed. Reg., at 23,063). And if it added those 30 to 60 days to the back end, fish management would have to continue to operate under the prior year's management plan for an additional 30 to 60 days, i.e., through May and June. *See id.* ("Delaying implementation of annual fishing regulations, which are based on the current stock abundance projections, for an additional 60 days would require that fishing regulations for May and June be set in the previous year without knowledge of the current stock status.") (quoting 70 Fed. Reg. at 23,063); *see also* 70 Fed. Reg. at 23,063 ("If [the new year's] measures are not in place on May 1, the previous year's management measures will continue to apply."). The NMFS stated that

"[a]llowing the much more substantial harvest levels normally associated with the May and June seasons to be regulated [under the prior year's plan] would impair NMFS' ability to protect weak and ESA listed stocks and provide harvest opportunity where appropriate" and "could compromise the status of certain stocks" — and, conversely, could also "result in forgoing opportunity to harvest stocks whose abundance has increased relative to the previous year" — "thereby undermining the purpose of this agency action." *Id.* at *13–14 (quoting 70 Fed. Reg. at 23,063).

The district court found good cause for the NMFS's forgoing notice and comment under the APA, holding "the agency demonstrate[s] exigency which imperils its ability to fulfill its duties" and "points out specific reasons why the agency must invoke the APA exception in *this* year." *Id.* (emphasis in original). On appeal, the Ninth Circuit affirmed the district court's decision finding good cause for forgoing notice and comment. *Or. Trollers II*, 452 F.3d 1104. The Ninth Circuit first reaffirmed that generic timeliness considerations of rulemaking cannot constitute "good cause" under the APA. *Id.* at 1124 (citing *NRDC v. Evans*, 316 F.3d 904, 912 (9th Cir. 2003)). It held, however, that the NFMS had "justified its decision with specific fishery-related reasons, not generic complaints about time pressure and data collection deficiencies," and thus had shown good cause with respect to the particular 2005 regulations at issue. *Id.* at 1124–25.

The Department attempts to analogize the NMFS's decision to forgo notice and comment in *Oregon Trollers* to its decision to forgo negotiated rulemaking here. The situations are not comparable. The purpose of the Magnuson Act is to conserve and manage fishery resources, 16 U.S.C. § 1801, and in *Oregon Trollers*, the NMFS provided specific fishery-related reasons why it could not subject the 2005 fish-management regulations to notice and comment and still carry out that statutory mission. *Or. Trollers II*, 452 F.3d at 1124–25; *cf. Azar*, 911 F.3d at 576 (good cause may be found where "the agency cannot 'both follow section 553 and execute its statutory duties'") (quoting *Riverbend Farms*, 958 F.2d at 1484 n.2). Delaying the 2005 regulations would have left the looser 2004 regulations in place and would have led to continued overfishing, undermining the statutory directives in the Magnuson Act to conserve fisheries. By contrast, the Department here has not provided reasons why subjecting to negotiated rulemaking its proposal to

delay the effective date of the Distance-Education Rules would have prevented it from carrying out its statutory mission or undermined the statutory directives in Title IV of the HEA.[14]

The situation here is also not comparable to the situation in *Oregon Trollers* because in *Oregon Trollers*, the time pressures the NMFS faced were driven entirely by external forces, namely, the nature of salmon, how soon the prior year's salmon escapement rate could be fully counted (not until January and February), and how soon the next year's salmon fishing season would begin in earnest (May or June). Here, the time pressures faced by the Department were of its own making. The Department claims that it was prompted to propose delaying the effective date of the Distance-Education Rules because the 2018 ACE Letter and the 2018 WCET Letter raised issues regarding the definition of the term "resides" as used in the Rules and regarding how the Rules would apply to states like California that did not have processes in place for reviewing student complaints about out-of-state institutions. Delay-Rule NPRM, 83 Fed. Reg. at 24,251. The Department does not explain why it took no action between February 2018 (when it received those Letters) and May 2018 (when it issued the Delay-Rule NPRM) to delay the Distance-Education Rules from going into effect. Nor does the Department explain why it took no action (1) after it announced in January 2017 that it intended to take action with respect to the Distance-Education Rules, 82 Fed. Reg. at 8669, (2) after it announced in June 2017 that it was convening negotiated-rulemaking committees to reconsider other regulations, 82 Fed. Reg. at 27,640, or (3) after it received the 2017 WCET letter in August 2017, which raised the same issues regarding the

---

[14] The Department points to a statutory requirement in the HEA, the so-called "master calendar" requirement. Delay-Rule NPRM, 83 Fed. Reg. at 24,252; *see also* Defs. Reply – ECF No. 46 at 6–7. The Department claims that under the master-calendar requirement, "a regulatory change that has been published in in final form on or before November 1 prior to the start of an award year — which begins on July 1 of any given year — may take effect only at the beginning of the next award year, or in other words, on July 1 of the next year." Delay-Rule NPRM, 83 Fed. Reg. at 24,252. The Department claims that if it subjected its delay proposal to negotiated rulemaking, it might not have been able to finish the process and promulgate a final rule suspending the Distance-Education Rules until after November 1, 2019, in which case the suspension would not have gone into effect until July 1, 2020. *Id.* Even assuming the Department's interpretation of the master-calendar requirement is correct, *but see Bauer*, 325 F. Supp. 3d at 93–96 (rejecting the Department's interpretation of the master-calendar requirement), the Department has not established that leaving the Distance-Education Rules in effect until 2020 would have constituted an emergency or would have undermined the statutory directives in the HEA.

definition of the term "resides" and the applicability to California that the 2018 Letters raised and asked the Department for a timeline for when it would respond, 2017 WCET Letter at 3–5, 7. To the extent that the Department claims that it was under time pressure in May 2018 when it issued the Delay-Rule NPRM, that time pressure was due to its own delay in not taking any action before then, and "[g]ood cause cannot arise as a result of the agency's own delay[.]" *NRDC*, 894 F.3d at 114.

<p style="text-align:center">*      *      *</p>

The Department did not have good cause to forgo the negotiated-rulemaking requirements of 20 U.S.C. § 1098a(b)(2). Its desire to delay the Distance-Education Rules before the Rules went into effect did not constitute good cause. And as the Department did not meet the narrow good-cause exception in 5 U.S.C. § 553, it was required to submit its delay proposal to the negotiated-rulemaking process set out in 20 U.S.C. § 1098a(b)(2). Its failure to do so was error.

## 2. Harmless Error

### 2.1   Governing Law

Section 706 of the APA provides that in reviewing agency action, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; *accord Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090 (9th Cir. 2011) (citing *Paulsen v. Daniels*, 413 F.3d 999, 1006 (9th Cir. 2005)). The Ninth Circuit "has stressed, however, that a court 'must exercise great caution in applying the harmless error rule in the administrative rulemaking context.'" *Cal. Wilderness*, 631 3d at 1090 (quoting *Paulsen*, 413 F.3d at 1006). The Ninth Circuit explained:

> ["]The reason is apparent: Harmless error is more readily abused there than in the civil or criminal context. An agency is not required to adopt a rule that conforms in any way to the comments presented to it. So long as it explains its reasons, it may adopt a rule that all commentators think is stupid or unnecessary. Thus, if the harmless error rule were to look solely to result, an agency could always claim that it would have adopted the same rule even if it had complied with APA procedures. To avoid gutting the APA's procedural requirements, harmless error analysis in administrative rulemaking must therefore focus on the process as well as the result. We have held that the failure to provide notice and comment is harmless only

<p style="writing-mode:vertical">United States District Court<br>Northern District of California</p>

1    where the agency's mistake 'clearly had no bearing on the procedure used or the
2    substance of decision reached.' *Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760,
     764–65 (9th Cir. 1986).["]

3    *Id.* (quoting *Riverbend Farms*, 958 F.2d at 1487).

### 2.2   Application

The Department's decision to forgo negotiated rulemaking "had [a] bearing on the procedure

used" to promulgate the Delay Rule. Under negotiated rulemaking, various groups and

stakeholders would have had the opportunity to nominate individuals to participate in the

negotiations process. 20 U.S.C. § 1098a(a)(1), (b)(1), (b)(2).[15] If the committee had reached a

consensus, the Department would have been bound to propose the consensus for promulgation,

unless it reopened the negotiated-rulemaking process or provided a written explanation why it was

not proposing the consensus. 20 U.S.C. § 1098a(b)(2). Congress's decision to enact a statutory

negotiated-rulemaking requirement in Title IV reflects a congressional determination that the

process itself is important. *Cf. Cal. Wilderness*, 631 F.3d at 1092 (Congress's enactment of a

statute requiring agency to consult with states "reflects the desirability of the interactive process

itself"). In light of this, the Department's decision to circumvent this process is not harmless. *Cf.

id.*

The Department's arguments do not change this outcome. The Department first claims that

"[w]here the error is the failure to provide notice and comment, that error is considered harmless

'only where the agency's mistake clearly had no bearing on the procedure used or the substance of

decision reached,'" whereas "'[i]n other contexts, however, courts' review for harmless error is

more demanding of plaintiffs,' such that plaintiffs must identify the harm they suffered as a result

of the agency's error," quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1220 (9th Cir. 2004).[16]

The Department argues that "[a]s the alleged violation here did not involve a decision to forgo

---

[15] In the leadup to the original Distance-Education Rules, the Department requested nominations from 20 different stakeholder constituencies and convened a negotiated-rulemaking committee of 18 representatives and 15 alternate representatives. 78 Fed. Reg. at 69,612, 69,614; Distance-Education-Rules NPRM, 81 Fed. Reg. at 48,600–01.

[16] Defs. Cross-Mot. – ECF No. 41 at 22 (internal brackets omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

notice and comment, it is appropriate for the Court to apply the more rigorous standard set forth in *O'Neill*, such that Plaintiffs must 'identify the prejudice they have suffered.'"[17] The Department selectively quotes *O'Neill* and misconstrues its holding. *O'Neill* did not distinguish notice and comment qua notice and comment from other contexts — it distinguished *rulemaking* from other contexts. *O'Neill*, 386 F.3d at 1220 ("*In the rulemaking context*, we 'exercise great caution in applying the harmless error rule,' holding that 'failure to provide notice and comment is harmless only where the agency's mistake clearly had no bearing on the procedure used or the substance of decision reached.' In other contexts, however, our review for harmless error is more demanding of plaintiffs.") (emphasis added, citations omitted). Negotiated rulemaking is, of course, rulemaking, and thus the Ninth Circuit's mandate to "exercise great caution in applying the harmless error rule" applies here. *Id.*; *see also Organized Vil. of Kake*, 795 F.3d at 969 ("'If prejudice is obvious to the court, the party challenging agency action need not demonstrate anything further.'") (quoting *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010)).[18]

The Department next argues that forgoing negotiated rulemaking was harmless because in issuing its Delay-Rule NPRM, it "expressly invited comment on its proposed delay of the 2016 [Distance-Education] Rule[s]" and that "given the robust public participation — including, importantly, from the types of stakeholders whose input negotiated rulemaking is meant to solicit — in response to the 2018 NPRM, any error with the Department's decision to waive negotiated rulemaking was harmless."[19] Setting aside the question of whether the Department's call for comments over seventeen days — including seven that were on weekends or federal holidays —

---

[17] Defs. Reply – ECF No. 46 at 11; *accord* Defs. Cross-Mot. – ECF No. 41 at 22–23.

[18] *O'Neill* and *Idaho Wool Growers Association v. Vilsack*, 816 F.3d 1095 (9th Cir. 2016), another case that the Department relies on to support its harmless-error arguments, thus are inapposite, because neither case involved rulemaking.

[19] Defs. Cross-Mot. – ECF No. 41 at 24–25.

violated even the APA's notice and comment requirements,[20] this limited opportunity to provide comments is not a substitute for negotiated rulemaking.

The Ninth Circuit rejected a similar argument in *California Wilderness*, 631 F.3d 1072. The statute at issue there required the Department of Energy ("DOE") to engage in "consultation" with states regarding designating areas as "national interest electric transmission corridors." *Id.* at 1080. The DOE published draft transmission-corridor designations in the Federal Register and invited comment. *Id.* at 1081. But the DOE failed to engage in "consultation" with affected states. *Id.* at 1086–89 (holding that the DOE's interactions with states did not amount to "consultation"). The DOE argued that its failure to consult with affected states was harmless error because the states had the opportunity to provide comments on the DOE's draft proposals. *See id.* at 1086. The Ninth Circuit rejected this argument, holding that "consulting is different from commenting." *Id.* at 1094.

> Consultation requires an exchange of information and opinions *before* the agency makes a decision. This requirement is distinct from the opportunity to offer comments on the agency's decision. . . . [T]he opportunity to comment on DOE's completed Congestion Study does not compensate for the lost opportunity of consulting with DOE in the formation of that study. . . . The exclusion of the affected States from the decisionmaking process not only limited the information available to DOE, it altered the way in which DOE made its discretionary decisions. . . . [T]he impact of the lack of consultation before a decision is made as contrasted to commenting after the agency has made a decision is particularly severe here because, as DOE admits, its decisions were for the most part discretionary.

*Id.* at 1093 (emphasis in original). The Ninth Circuit held that "[t]he failure to consult was not some technical error, but resulted in a decisionmaking process that was contrary to that mandated by Congress and one that deprived DOE of timely substantive information. We conclude that

---

[20] "Although the APA mandates no minimum comment period, some window of time, usually thirty days or more, is . . . allowed for interested parties to comment." *Riverbend Farms*, 958 F.2d at 1484 (citing *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984)).

United States District Court
Northern District of California

1   DOE's failure to consult with the affected States, as directed by Congress, was not harmless

2   error." *Id.* at 1095.[21]

3       The Ninth Circuit's holding in *California Wilderness* applies here. Like "consultation,"

4   negotiated rulemaking allows stakeholders to provide input before the Department settles on a

5   proposed rule. 20 U.S.C. § 1098a(b)(2). Additionally, a negotiated-rulemaking committee, if it

6   reaches a consensus, can potentially bind the Department with respect to what rules the

7   Department can propose, in a way that mere comments cannot. *Id.* The Department's offer of a

8   seventeen-day period to comment on a proposed delay rule that the Department had already

9   formulated was not an adequate substitute for this statutory negotiated-rulemaking process, and

10  the Department's failure to offer the latter was not harmless error.[22]

---

United States District Court
Northern District of California

[21] The Ninth Circuit observed that accepting the DOE's harmless-error argument would have the practical effect of rendering the statutory requirement that the DOE engage in "consultation" with affected states unenforceable because the DOE then could always refuse to consult with states, offer instead only the opportunity to comment, and claim that the substitution of comments for consultation was harmless. *Cal. Wilderness*, 631 F.3d at 1094 n.21.

[22] The Department cites *Cal-Almond, Inc. v. U.S. Department of Agriculture*, 14 F.3d 429 (9th Cir. 1993), in support of its harmless-error arguments. That case is not analogous to the situation here. It involved a budget assessment imposed on almond handlers to pay for pro-almond marketing and public relations. *Id.* at 433. The assessment was based on a mechanical formula that took into account the California Almond Board's proposed budget and the forecast for almond harvests and reduced them to a "rate per pound of almonds." *Id.* at 441. The Board held open meetings in July every year to receive comments and testimony and to gather information relevant to estimating its budget and the resulting assessment rate. *Id.* at 442. After deciding on its recommendation, the Board directly notified each almond handler of the proposed assessment rate. *Id.* Two groups of almond handlers challenged the assessment rates, arguing that they had not been subject to notice and comment. *Id.* at 440. The Ninth Circuit agreed that the assessment rates should have been subjected to notice and comment (rejecting an argument that the assessment rates should be excused from notice and comment because they were simply "mechanical" results derived from a formula, *id.* at 441), but held that the failure to provide notice and comment was harmless given that almond handlers knew of the July open meetings and the opportunity to provide comment. *Id.* at 442. This case does not establish that the Department's failure here to engage in negotiated rulemaking for its delay proposal — a proposal that was not issued pursuant to a regular annual schedule that all stakeholders knew about and did not involve a mechanical formula-derived result — similarly was harmless.

The Department also cites *Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760 (9th Cir. 1986), a case that also is not analogous. In that case, the Department of the Interior issued a notice and invited comment on a proposal to create a conservation area in the Snake River Canyon by legislatively withdrawing the lands from mining laws but did not issue a separate notice on a proposal to administratively withdraw those same lands. *Id.* at 762, 764. The two withdrawals would have had "identical legal effect, with only one exception: whereas the congressional withdrawal would be in perpetuity (subject, of course, to Congress' inherent right to enact legislation to the contrary in the future), . . . administrative withdrawals [are limited] to a maximum of twenty years, and [are] subject to congressional review and administrative revocation." *Id.* at 762. The Ninth Circuit held

The Department argues that "by Plaintiffs' reasoning, a decision to forgo negotiated rulemaking can never constitute harmless error."[23] The court does not decide that issue in holding that the Department's decision here to forgo negotiated rulemaking for its Delay Rule was not harmless error. The court notes, however, that Congress made a point of writing the negotiated-rulemaking requirement into the statutory text of the HEA, reflecting a congressional determination that the negotiated-rulemaking process is important. *See* 20 U.S.C. § 1098a(b)(2). Nothing in the text of that statutory provision provides for a "harmless error" exception. *See id.*[24] The Department offers no explanation why it can supersede Congress's view and deem a decision to forgo negotiated rulemaking "harmless." A holding that forgoing negotiated rulemaking can never be harmless would not bar the Department from forgoing negotiated rulemaking. If the Department has good cause to forgo negotiated rulemaking, it can do so, irrespective of a harmless-error analysis. *Id.* (citing 5 U.S.C. § 553(b)(3)(B)). Such a holding would mean only that if the Department lacks good cause — as it lacks good cause here — it cannot use a claim of harmless error to circumvent the negotiated-rulemaking process that Congress enacted.

## 3.  Remedy

### 3.1  Governing Law

"'[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated[.]'" *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145

---

that the failure to issue a separate notice regarding administrative withdrawal was harmless given the notice and comment with respect to legislative withdrawal because "the impact of both actions on all concerned persons would be identical for a substantial period of time at least," and hence "the same public would have responded to a notice of administrative withdrawal as responded to the noticed congressional withdrawal[.]" *Id.* at 764. No analogous facts are present here.

[23] Defs. Reply – ECF No. 46 at 13.

[24] 20 U.S.C. § 1098a(b)(2) explicitly references 5 U.S.C. § 553(b)(3)(B) and its good-cause standard. The harmless-error exception the Department cites comes not from Section 553, but instead from 5 U.S.C. § 706. Setting aside the question of whether Section 706 and its harmless-error exception should be read into Section 1098a(b)(2)'s negotiated-rulemaking provision, nothing in Section 1098a(b)(2) explicitly provides for or refers to a harmless-error exception.

F.3d 1399, 1409 (D.C. Cir. 1998)); *accord All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) ("'[O]rdinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid.'") (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)).[25] "When equity demands, however, the regulation can be left in place while the agency reconsiders or replaces the action, or to give the agency time to follow the necessary procedures." *All. for the Wild Rockies*, 907 F.3d at 1121.

### 3.2   Application

The presumptive remedy for the Department's improper promulgation of the Delay Rule is to vacate the Rule. The equities do not favor a departure from that presumptive remedy.

The Department nonetheless argues that "the failure to conduct negotiated rulemaking is not a serious error[.]"[26] This does not change the outcome. The Department's attempt to prevent the Distance-Education Rules from going into effect without engaging in negotiated rulemaking "was not some technical error, but resulted in a decisionmaking process that was contrary to that mandated by Congress[.]" *Cf. Cal. Wilderness*, 631 F.3d at 1095; *see also California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017) (delaying the compliance date for regulations without complying with APA procedures to issue such a delay was a "serious" error, not a "minor procedural mistake[]").

The Department also argues that the court should refrain from vacating the Delay Rule because vacatur would result in "confusion" and would be "disruptive."[27] The Department has not established confusion or disruption sufficient to warrant departing from the presumptive remedy of vacatur. Regulated entities believed until May 25, 2018 (when the Department issued its Delay-Rule NPRM) that the Distance-Education Rules were going into effect and had over seventeen months to prepare for them. "[V]acating the Delay Rule would simply allow the [Distance-

---

[25] The Department agrees that "vacatur is presumptively appropriate," although "th[e] court has equitable discretion to tailor relief in response to an agency's errors." Defs. Cross-Mot. – ECF No. 41 at 26 (citations omitted).

[26] Defs. Cross-Mot. – ECF No. 41 at 27.

[27] *Id.*

United States District Court
Northern District of California

Education] Rule[s] to take effect, as the agency originally intended." *Cf. Nat'l Ventures Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 21 (D.D.C. 2017) (vacating the Department of Homeland Security's attempt to delay a regulation promulgated by the prior administration from going into effect and rejecting the argument that doing so would cause "confusion" or be "disruptive"). To further minimize the risk of any supposed "confusion" or "disruption," the court will stay vacatur for 30 days before vacating the Delay Rule and allowing the Distance-Education Rules to go into effect.[28]

## CONCLUSION

The Department did not have good cause to forgo negotiated rulemaking with respect to the Delay Rule, and its failure to engage in negotiated rulemaking was not harmless error. The court grants the plaintiffs' motion for summary judgment and denies the Department's cross-motion for summary judgment. The court orders the Delay Rule vacated but stays the vacatur for 30 days from the date of this order.

**IT IS SO ORDERED.**

Dated: April 26, 2019

_____
LAUREL BEELER
United States Magistrate Judge

---

[28] *Accord* Pls. Reply – ECF No. 45 at 19 (proposing a 30-day stay).